UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VINCENT DE GIOVANNI, MARIETTE )
BARROS, AND ALL OTHERS        )
SIMILARLY SITUATED            )
        Plaintiffs            )
                              )
v.                            )    CIVIL ACTION
                              )    NO. 07-cv-10066-RCL
JANI-KING INTERNATIONAL, INC.,)
JANI-KING, INC., AND JANI-KING)
OF BOSTON, INC.               )
        Defendants            )

MEMORANDUM AND ORDER

Young, D.J.                              September 21, 2009

## I.    INTRODUCTION

In this putative class action, named plaintiffs Vincent De
Giovanni ("De Giovanni") and Mariette Barros ("Barros")
(collectively "the plaintiffs") brought suit against Jani-King,
Inc., Jani-King International, Inc., and Jani-King of Boston,
Inc. (collectively "Jani-King").  Jani-King is one of the largest
janitorial services corporations in the world.  De Giovanni,
Barros, and the individuals in the class they seek to represent,
entered into franchise agreements with Jani-King to provide
cleaning services to Jani-King's clients in Massachusetts.

The plaintiffs assert two distinct categories of claims
against Jani-King, both of which arise out of their franchisor-
franchisee relationship.  The first, which for ease of reference
the Court will refer to as the plaintiffs' "unfair business
practices" claims, actually consists of breach of contract,

misrepresentation, Massachusetts General Laws Chapter 93A, unjust enrichment, and quantum meruit causes of action. In this set of claims, the plaintiffs allege that Jani-King systematically fails to meet its obligations under the franchise agreement it enters into with all franchisees. In the second set of allegations, which the Court will refer to as plaintiffs' "employment classification" claims, plaintiffs allege that Jani-King violates Massachusetts wage and employment laws by classifying its franchisees as independent contractors, when, in fact, the franchisees are employees.

Before the Court is the plaintiffs' motion for class certification of both their unfair business practices and employment classification claims under Federal Rule of Civil Procedure 23. For the reasons discussed below, the Court **DENIES** the motion to certify the plaintiffs' unfair business practices claims. Certification of the breach of contract, misrepresentation, unjust enrichment, and quantum meruit claims are denied with prejudice. Certification of the plaintiffs' claims arising under Chapter 93A regarding excessive fees and the inherent unfairness of section 4.3.3 of the franchise agreement , are denied without prejudice. All other Chapter 93A claims are denied with prejudice. The Court **GRANTS** the plaintiffs' motion to certify the employment classification claims.

**A.    Procedural Posture**

The initial class action complaint in this case, which was filed on January 12, 2007, named only De Giovanni as a potential class representative.  (Doc. No. 1.)  On April 16, 2007, De Giovanni filed an amended complaint, naming Barros as an additional plaintiff and adding the allegations related to Jani-King's classification of franchisees as independent contractors. (Doc. No. 13.)  On September 8, 2008, the defendants filed their answer to the plaintiffs' amended complaint.  (Doc. No. 36.)

On January 1, 2009, the plaintiffs filed the instant motion to certify this case as a class action.  (Doc. No. 45.)  The Court conducted a hearing on the motion for class certification on May 21, 2009.

**B.    Facts**

As stated above, Jani-King is one of the largest providers of janitorial services in the country.  Jani-King operates on a franchise model, whereby it grants franchisees the right to use the Jani-King name and provides franchisees with cleaning contracts to service in exchange for payments from its franchisees.

Jani-King requires that franchisees enter into a standard, adhesion contract ("Franchise Agreement") delineating the governing terms of the franchisor-franchisee relationship.  (See Franchise Agreement, Ex. 1 attach. Pls.' Mot., Doc. No. 45.)  The

agreement is quite detailed, but the primary consideration

exchanged by the parties is as follows.  A new franchisee agrees

to pay Jani-King a franchise fee.[1]  In return, Jani-King promises

to "secure commercial cleaning and maintenance contracts" and to

offer to the franchisee "the opportunity to provide service to

[accounts]" with "minimum cumulative gross monthly billings"

equal to a specified amount.  The cumulative value of the

cleaning contracts the Jani-King must offer its new franchisees

is called the "Initial Finder's Fee Business" ("Initial

Business").  Jani-King must provide a new franchisee with the

opportunity to service cleaning accounts with a cumulative, gross

monthly value equal or greater to the Initial Business within the

"Initial Offering Period," which ranges from 120 days for less

expensive franchises to more than 330 days for more expensive

franchises.  Further, Jani-King may only offer new franchisees

cleaning contracts within a geographic territory specified in

each franchisee's franchise agreement.  In sum, in exchange for a

franchise fee, Jani-King promises, before the expiration of the

Initial Offering Period, to offer new franchisees the right to

service cleaning contracts located within a limited geographic

area that have a gross monthly billing value equal or greater to

---

[1]  The franchise fee actual consists of two components, the
Initial Franchise Fee Down Payment and the Initial Finder's Fee
Down Payment.  The distinction is immaterial to the resolution of
this motion.

the Initial Business.

As a new franchisee pays Jani-King a larger franchise fee, the value of the Initial Business increases proportionally. For example, under Jani-King's "Plan A," it's least expensive franchise, a franchisee pays Jani-King an $8,600 franchise fee and Jani-King promises to provide $500 in Initial Business within a 120 day Initial Offering Period. (2005 Uniform Franchise Offering Circular ("UFOC") 3, 22, Ex. B, attach. Rubenstein Dec., Doc. No. 52.) Under Jani-King's plan E-10, the plan that named-plaintiff De Giovanni purchased, a new franchisee pays Jani-King a $32,750 franchise fee and Jani-King promises to provide $10,000 in Initial Business within 330 days. (UFOC 3, 22.)

Section 12.7 of the Franchise Agreement provides that "[i]t is agreed and understood that Franchisee will act at all times as an independent contractor and will not, at any time, directly or indirectly, hold itself out as an agent, servant or employee of Franchisor." The Franchise Agreement also includes a 22-year non-competition clause. (Franchise Agreement ¶ 5.2.3(d).) At the same time, Jani-King franchisees are free to sell their franchises, may hire their own employees, and may generally structure and operate their franchises as they see fit.

## C.    Federal Jurisdiction

This Court has diversity jurisdiction over the plaintiff's suit pursuant to 28 U.S.C. § 1332.

## II.   DISCUSSION

The plaintiffs seek to certify two separate classes: an unfair business practices class and an employment classification class.

### A.   Standard of Review

"A plaintiff who seeks to certify a class action has the burden of demonstrating that the four prerequisites enumerated in Federal Rule of Civil Procedure 23(a), plus one of the provisions of Federal Rule of Civil Procedure 23(b), are satisfied." In re TJX Cos. Retail Sec. Breach Litig., 246 F.R.D. 389, 392 (D. Mass. 2007) (citing Smilow v. Southwestern Bell Mobile Syss., Inc., 323 F.3d 32, 38 (1st Cir. 2003)). Rule 23(a) provides that class certification is only appropriate if

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Rule 23(b)(3), the only provision of Rule 23 under which the plaintiffs seek certification, mandates that a class be certified only if "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed R. Civ. P. 23(b)(3).

In their papers, Jani-King does not challenge (and therefore effectively concedes) that the plaintiffs' proposed class satisfies the numerosity, commonality, and adequacy requirements of Rules 23(a)(1), (2), and (4). Jani-King does argue, however, that the two class representatives put forward by the plaintiffs are not sufficiently typical of the class they seek to represent. Jani-King also contends that for both of plaintiffs' proposed classes, individual inquiries will overwhelm common questions, and that therefore, the plaintiffs' motion should be denied.

At the class certification stage, the Court is empowered to "probe beyond the pleadings to formulate some prediction as to how specific issues will play out in order to assess whether the proposed class meets the legal requirements for certification." In re New Motor Vehicles Can. Export Litig., 522 F.3d 6, 17 (1st Cir. 2008). Under all circumstances, the Court must "conduct a rigorous analysis of the prerequisites established by Rule 23 before certifying a class." Smilow, 323 F. 3d at 38.

**B. Predominance**

Although courts often address the 23(a) requirements before proceeding to the predominance requirement, the Court will first determine whether the plaintiffs can satisfy Rule 23(b)(3). "Rule 23(b)(3) requires, as a condition precedent to class certification, that 'questions of law or fact common to the members of the class predominate over any questions affecting

7

only individual members.' " <u>Waste Mgmt. Holdings, Inc.</u> v.

<u>Mowbray</u>, 208 F.3d 288, 295 (1st Cir. 2000). "Where 'common

questions predominate regarding liability, then courts generally

find the predominance requirement to be satisfied even if

individual damages issues remain,' for '[t]he individuation of

damages in . . . class actions is rarely determinative under Rule

23(b)(3).' " <u>In re Neurontin Mktg. and Sale Practices Litig.</u>,

244 F.R.D. 89, 106 (D. Mass. 2007) (Saris, J.) (quoting <u>Smilow</u>,

323 F.3d at 40). Further, "where common issues otherwise

predominate[], courts have usually certified 23(b)(3) classes

even though individual issues were present in one or more

affirmative defenses." <u>Smilow</u>, 323 F.3d at 39. Importantly,

Rule 23(b)(3) "requires merely that common issues <u>predominate</u>,

not that all issues be common to the class." <u>Id.</u>

It is important to look at each of the plaintiffs' claims

independently, as they present different predominance challenges

and problems.

### 1. Unfair Business Practices

The plaintiffs proposed unfair business practices class

presents intractable individualized evidentiary and legal issues

that render class certification under Rule 23(b)(3) inappropriate

for any of the proposed causes of action. For this set of

claims, the plaintiffs seek certification on behalf of a class of

all "individuals who have entered into franchise agreements with

Jani-King in Massachusetts any time since January 12, 2001."

They put forward claims of breach of contract (Count II)[2],

misrepresentation (Count IV)[3], unfair and deceptive business

practices under Massachusetts General Laws Chapter 93A (Count

I)[4], quantum meruit (Count V), and unjust enrichment (Count VI).

---

[2] The plaintiffs breach of contract claims require that they show "(1) an agreement was made between the plaintiffs and the defendants supported by valid consideration; (2) the plaintiffs have been ready, willing, and able to perform; (3) the defendant's breach has prevented them from performing; and (4) the plaintiffs have suffered damage." Singarella v. City of Boston, 342 Mass. 385, 387 (1961).

[3] To prevail on their misrepresentation claim, the plaintiffs must prove that
> 1) that the defendant made a material misrepresentation of fact with the goal of inducing the action taken by the plaintiff; (2) that the defendant knew the representation made was false, or through a minor amount of diligence could have discovered its falsity; (3) the plaintiff's justifiable reliance on the misrepresentation; and (4) that the plaintiff suffered damages as a consequence of its reliance on the misrepresentation.

Meadwestvaco Corp. v. Worcester New Bond LLC, No. 07-0921 BLS2, 2009 WL 971273, at *10 (Mass. Super. Ct. Jan. 6, 2009) (citing Powell v. Rasmussen, 355 Mass. 117, 119 (1969); Hogan v. Riemer, 35 Mass. App. Ct. 360, 365 (1993)).

[4] To establish a violation of Massachusetts' unfair and deceptive trade practices statute, Mass. Gen. Laws Ch. 93A, plaintiffs must establish that Jani-King:

> engaged in any "unfair or deceptive act or practice." Mass. Gen. Laws. c. 93A §§ 2, 11. To prove such a claim, it is neither necessary nor sufficient that a particular act or practice violate common or statutory law. [M]assachusetts courts evaluate unfair and deceptive trade practice claims based on the circumstances of each case. In so doing, Massachusetts leaves the determination of what constitutes an unfair

The Court addresses each in turn.

### a.   Breach of Contract

On its face, the elements of the breach of contract count would appear to be the easiest for the plaintiffs to satisfy with common proof.  Plaintiffs allege and Jani-King does not contest that each new franchisee entered into a materially similar Franchise Agreement with Jani-King.  Thus, plaintiffs could establish on a class-wide basis, without resorting to individualized proof, that all of the class members' relationships with Jani-King were governed by the same terms.

Demonstrating that the terms of the contracts were the same for all class members accomplishes only half of the battle.  For the class, as a whole, to recover on the breach of contract claim, plaintiffs would also have to prove that Jani-King breached its Franchise Agreement with each franchisee.  Plaintiffs have not put forward any common form of proof that

---

trade practice to the finder of fact, subject to the court's performance of a legal gate-keeping function. . . . Massachusetts courts, in considering whether a particular act or practice violates the unfairness prong of Chapter 93A: "look to (1) whether the practice ... is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."

Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir. 2009).

would permit this Court to make such a determination without engaging in lengthy, individualized inquiries regarding breach. As such, common issues will not predominate, and class certification of the breach of contract claim is inappropriate.

The plaintiffs suggest that a spreadsheet produced by Jani-King that lists the status of its franchisees can function as common proof of breach. (See Ex. A, attach. De Giovanni Aff., attach. Pls.' Mot., Doc. No. 45.) The spreadsheet, dated July 21, 2006, details the status of Jani-King's relationship with 48 franchisees. Although the columns of the spreadsheet are not labeled, according to De Giovanni, the spreadsheet lists, for each of the 48 franchisees, their Initial Business amount (Column 3), the gross monthly value of the contracts that the franchisee is servicing (Column 7), the gross monthly value of the contracts that Jani-King has offered to the franchisee (Column 8), and the gross monthly value of cleaning contracts that Jani-King must still offer the franchisee in order to satisfy the Initial Business (Column 3). Assuming the columns mean what De Giovanni represents they do, it appears that Jani-King failed to meet its Initial Business obligation within the designated time period for only a single franchisee.[5] As for the remaining 47 entries, six

_____

[5] An individual identified on the spreadsheet only as Donika had an Initial Business of $3,000 that, from the spreadsheet, appears should have been satisfied by June 9, 2006, the end of her Initial Offering Period. She also appears to have only been offered cleaning contracts worth a gross monthly

are incomplete (making it impossible to determine whether Jani-King was in breach), another 13 indicate that the Initial Offering Period had not yet passed (making it impossible for Jani-King to breach the Initial Business obligation of the Franchise Agreement), and 28 entries, including those for De Giovanni, affiant Diamantino Fernandes, and possibly three other affiants, show that Jani-King offered sufficient cleaning contracts to satisfy the Initial Business obligation. Thus, pursuant to the Court's understanding of the spreadsheet, contrary to serving as common proof of breach, the spreadsheet supports a conclusion that Jani-King almost always lived up to its end of the bargain.

If the plaintiffs seek to challenge the data on the spreadsheet to prove that Jani-King did not offer enough cleaning contracts to meet its Initial Business obligation, individual issues will inevitably predominate. De Giovanni's own breach of contract claim is illustrative. According to the spreadsheet, Jani-King offered De Giovanni cleaning services contracts with a gross monthly value of $13,916, in excess of its $10,000 Initial Business obligation, before the expiration of his Initial Offering Period. Yet in his affidavit, De Giovanni claims that

revenue of $1,543. Her Initial Offering Period had expired by the July 21, 2006. Consequently, a reasonable inference is that Jani-King was delinquent in offering sufficient cleaning contracts to satisfy Donika's Initial Business within the Initial Offering Period.

he "never received the $10,000 per month that Jani-King promised [him]." (De Giovanni Aff. ¶ 5.) In order to determine if Jani-King failed to meet its Initial Business obligation, the Court would have to conduct fact-finding regarding whether Jani-King did or did not offer De Giovanni $13,916 in cleaning contracts to service. Such mini-trials would be necessary for each franchisee who challenged the information on the spreadsheet.

The plaintiffs place great emphasis on the fact that, according to the spreadsheet, as of July 21, 2006, none of the 28 franchisees for whom Jani-King had met its Initial Business obligation were servicing (actually working on) cleaning contracts with a monthly gross revenue in excess of their Initial Business; for many, the value of the contracts they were servicing fell well short of the Initial Business value. The plaintiffs' focus on this disparity is emblematic of general confusion in their moving papers between the Initial Business -- which is merely a promise to offer the opportunity to service contracts with a specified gross monthly revenue -- and the amount of monthly revenue actually generated by a franchisee by servicing contracts. Data indicating that none of Jani-King's franchisees actually earn revenue equal or greater to their Initial Business may be quite relevant to their misrepresentation and Chapter 93A claims. It does not, however, have any bearing on the plaintiffs' breach of contract claims. The value of the

contracts that a franchisee is actually servicing is irrelevant to the determining whether Jani-King has breached its obligations to new franchisees by not offering them sufficient contracts to service.  The Franchise Agreement and the Uniform Franchise Offering Circular, as well as Jani-King's marketing materials, are extremely clear Jani-King's only obligation to new franchisees is to offer, before the expiration of the Initial Offering Period, the opportunity to service cleaning contracts with a specified gross monthly value.  Nowhere in the UFOC or Franchise Agreement does Jani-King promise new franchisees that they will ever service contracts equal to or greater than the Initial Business.

Consequently, because, in resolving the class' breach of contract claims, individualized inquiries would overwhelm common questions, the Court denies the plaintiffs' motion to certify the breach of contract claims.

### b.    Misrepresentation

The plaintiffs' misrepresentation claims face even more difficult predominance problems.  The plaintiffs' motion is extremely vague regarding what exact misrepresentations Jani-King made to any or all franchisees.  That said, the Court can identify the following possible allegations of misrepresentation in the plaintiffs' moving papers and supporting documents:

-- Jani-King, orally or otherwise, promised new franchisees
that they would <u>earn</u> monthly gross revenue equal or greater

14

to the Initial Business, rather than accurately reflecting
the obligation in the Franchise Agreement that Jani-King
_offer_ new franchisees the opportunity to service cleaning
contracts with monthly gross revenue equal or greater to the
Initial Business. (See e.g., De Giovanni Aff. ¶ 5 ("I have
never received the $10,000 per month that Jani-King promised
me."); Pls.' Mot. 13 ("[A]fter requiring individuals to pay
thousands of dollars to purchase cleaning franchises, Jani-
King systematically fails to provide the amount of cleaning
business it has promised.").)

-- Jani-King misrepresents to new franchisees that it
"guarantees" to offer the opportunity to service cleaning
contracts with a gross monthly value equal to or greater
than the Initial Business within the Initial Offering
period, (PowerPoint Presentation at JKB0002880, attach. Ex.
5 to Pls.' Reply, Doc. No. 76), when in fact there are a
number of circumstances, described in the Franchise
Agreement, that permit Jani-King to extend the Initial
Offering Period (Franchise Agreement § 6.1.2).

-- "Jani-King misrepresents to franchisees the amount of
time a cleaning account will take [to service], thus making
it impossible for the franchisees to earn any income from
the accounts." (Pls.' Mot. 13.)

The Court holds, on the record currently before it, that the

plaintiffs will not be able to establish that these alleged

statements rose to the level of an actionable misrepresentation

without individual inquiries overwhelming common questions.

   The plaintiffs have not suggested any means of common proof

for demonstrating that all the class members relied upon any

misrepresentation when they decided to become franchisees or

chose not to accept a particular cleaning contract.  As this

Court previously held, "[a] fraud class action cannot be

certified when individual reliance will be an issue."  TJX, 246

F.R.D. at 396 (quoting Castano v. Am. Tobacco Co., 84 F.3d 734,

745 (5th Cir. 1996)). Here, even assuming that the plaintiffs

could establish with common proof that all new franchisees were

exposed to Jani-King's alleged misrepresentations,[6] they would

_____

[6] On the record before the Court, the Court does not
believe that the plaintiffs could accomplish even this
prerequisite. Although the plaintiffs likely could establish
that all the class members were exposed to the UFOC and the
Franchise Agreement, the Court has carefully examined those
documents for any statements that could possibly be construed as
a misrepresentation. Both documents carefully describe Jani-
King's primary obligation accurately: as a promise to offer a new
franchisee, within the Initial Offering period, cleaning
contracts with a gross monthly value greater than or equal to the
Initial Business. (See UFOC 45 ("All accounts offered will apply
toward the Initial . . . Business . . . whether or not you accept
or decline the offered business. Our obligation is to secure and
offer to you the right to provide service to those accounts
within the specific time. However, you might choose not to
accept some of the accounts offered. That is why the Franchise
Agreement says that we will secure and 'offer' you the right to
provide service to those accounts. We can only make a good faith
effort to offer the amount of Initial . . . Business . . . and
you must choose to accept or decline the offer. We do not
guaranty that the Initial . . . Business will reach or remain at
the state level of the plan you purchase throughout the term of
the Franchise Agreement."); Franchise Agreement § 6.) Nowhere do
the UFOC or Franchise Agreement insinuate that those who purchase
franchises are purchasing any form of a guaranteed stream of
income.
    The plaintiffs have identified one place in Jani-King's
marketing materials where Jani-King potentially misstates the
nature of the Initial Offering Period. Jani-King uses a
standardized PowerPoint presentation to introduce potential
franchisees to the Jani-King business model. In that
presentation, a slide entitled "Value Comparison," where the
different Jani-King franchise plans are compared, states
"Remember, there is a guaranteed time obligation on Initial
Business . . . ." (PowerPoint Presentation at JKB0002880.)
Someone viewing the presentation could conclude that Jani-King
must, without any exceptions, meet its Initial Business
obligation within the Initial Offering Period. In fact, the
Franchise Agreement provides for a number of circumstances in
which the Initial Offering Period can be extended. (See
Franchise Agreement, § 6.1.2.) Assuming the statement in the

16

still need to prove that all class members relied upon those
misrepresentations when deciding to become a franchisee.  The
plaintiffs have not proposed how the reliance of the entire class
can be established without delving into the decisionmaking of
each individual franchisee.  Accordingly, because the plaintiffs
have not proposed any way to litigate the misrepresentation
claims without resorting to individualized reliance inquiries,
the Court denies the plaintiffs' motion to certify the
misrepresentation claims.

### c.    Chapter 93A

The plaintiffs' Chapter 93A claims form the core of their
complaint.  For the reasons discussed above, the plaintiffs will
not be able to base their Chapter 93A claims on their common law

---

presentation constitutes a material misrepresentation of fact,
the plaintiffs would still need to demonstrate that all of the
class members were exposed to the presentation and either read
the statement about the Initial Offering Period or heard a Jani-
King representative speak the statement aloud.  Attendance at a
presentation might be proved through records in Jani-King's
possession.  That the class members heard or read the statement
could, however, only be established through individual inquiries.
     Finally, whether Jani-King ever misrepresented the length of
time a particular cleaning contract would take to service is
inherently an individualized question.  Not even all of the
plaintiffs or affiants declare that Jani-King ever stated to them
that a job would take less time than it actually did.  To
determine whether any statements about the amount of time
necessary to service a contract were in fact false, the Court
would need to determine (1) the amount of time that Jani-King
told a franchisee a job would take and (2) the amount of time
that the particular job should take to service.  That process
would invariably result in individualized questions overwhelming
common issues.

breach of contract or misrepresentation causes of action.  See

Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics,

Inc., 552 F.3d 47, 69 (1st Cir. 2009) (explaining that a Chapter

93A claim can be founded on a practice that falls within "the

penumbra of some common-law . . . concept of unfairness").  It is

not, however, "necessary . . . that a particular act or practice

violate common or statutory law" in order to establish a

violation of Chapter 93A.  Id.  To demonstrate that a business

act or practice is "unfair or deceptive," Mass. Gen. Laws ch. 93A

§§ 2, 11, a plaintiff must merely show that an act or practice

(1) falls "[w]ithin at least the penumbra of some . . .

established concept of unfairness; (2) . . . is immoral,

unethical, oppressive, or unscrupulous; [or] (3) . . . causes

substantial injury to consumers (or competitors or other

businessmen)."  See Massachusetts Eye and Ear, 552 F.3d at 69.

The plaintiffs appear to present at least three distinct

Chapter 93A claims.  First, they allege that Jani-King offers new

franchisees cleaning contracts that Jani-King knows they will

reject or refuse to service.  Through this allegedly unfair and

deceptive conduct, the plaintiffs contend that Jani-King can

offer the same cleaning contract to multiple franchisees,

technically satisfying its Initial Business obligations for those

franchisees while simultaneously providing those franchisees with

the least possible amount of actual clients from which to

generate revenue.  Second, the plaintiffs assert that two provisions of the Franchise Agreement governing Jani-King's obligation to offer cleaning contracts to franchisees are inherently unfair in violation of Chapter 93A.  Third, the plaintiffs allege that the fees that Jani-King charges its franchisees are excessive and unconscionable.  The Court addresses each in turn.

### (1)  Offering Contracts that Jani-King Knew Franchisees Would or Could Not Accept

The plaintiffs allege that in order to meet its Initial Business obligations by offering contracts with a gross monthly value equal to or greater than the Initial Business, Jani-King actively seeks to offer franchisees contracts that Jani-King knows they will not be able to service.  If the franchisee rejects the contract, Jani-King is able to count the value of the contract toward its satisfaction of the Initial Business.  Jani-King can then also offer the contract to another franchisee.  In this way, Jani-King can count a single cleaning contract toward its fulfillment of the Initial Business obligations for two or more franchisees.  Meanwhile, the franchisees have paid considerable sums for a franchise, only to generate revenue far below both their Initial Business and their expectations.

To facilitate this scheme, the plaintiffs allege, <u>inter alia</u>, that Jani-King:

-- targeted non-English speaking immigrants as

potential franchise buyers because they cannot
understand the business opportunities offered by Jani-
King;

-- misrepresented the hours necessary to service
offered accounts;

-- underbid cleaning contracts, making it difficult or
impossible for franchisees to make a profit servicing a
contract;

-- offered cleaning accounts geographically too far and
too inconvenient, preventing franchisees from accepting
or performing the offered accounts;

-- offered contracts to franchisees, but refused to
provide franchisees with an opportunity to inspect the
premises they would be cleaning before they must accept
or decline the contract; and,

-- provided franchisees with unreasonably short periods
of time to accept or decline an offered contract.

The plaintiffs also allege that Jani-King "churns" cleaning

contracts, meaning that it takes away, without justification, a

contract that a franchisee is already servicing, and offers that

same contract to another franchisee. By so acting, Jani-King can

satisfy multiple Initial Business obligations with the same

contract.

To certify such claims for class treatment, however, the

plaintiffs would still need to come forward with some evidentiary

proffer that would allow these claims to be adjudicated on a

class-wide basis. With the spreadsheet, discussed above, the

plaintiffs do have at least one piece of common proof that

indicates something may be amiss with the way that Jani-King

treats many[7] of its franchisees.  As is discussed above, the
spreadsheet shows that as of July 21, 2006, Jani-King had met its
Initial Business obligation with respect to all but one
franchisee on the list; however, none of the franchisees on the
list were servicing contracts with a gross monthly value equal to
or greater than their Initial Business.  The vast majority, in
fact, were servicing contracts with a gross monthly value far
below their Initial Business value.[8]  Of the 28 franchisees with
complete information, only 9 were servicing contracts with a
gross monthly value of even 50 percent of their Initial Business.
If, as plaintiffs allege, Jani-King (1) does not have enough
cleaning contracts to satisfy all of its obligations to its
franchisees, and (2) offers cleaning contracts to franchisees
that it knows they will be unable to accept, the state of affairs

_____

[7]  The plaintiffs have not presented the Court with any
information about whether the spreadsheet includes data for all
of the potential members of their unfair business practices
class.  The spreadsheet only lists 48 names in total.  Other
documents submitted by the plaintiffs, including an alphabetical
list of current franchisees, with well more than 100 names, and
the UFOC, which explains that as of that there were more than 100
franchises in the Boston area, indicate that Jani-King had far
more than 48 franchises in Massachusetts.  In order for the
spreadsheet to function as a useful piece of class-wide evidence,
the plaintiffs would need to provide the Court with additional
information about how Jani-King decided which franchisees to
include on the list.

[8]  For example, affiant Diamantino Fernandes had an initial
business of $15,000, had been offered (according to the
spreadsheet) cleaning contracts with a gross monthly value of
$16,860, but was servicing as of July 21, 2006, cleaning
contracts with a gross monthly value of only $1,095.

reflected by the spreadsheet represents one possible outcome.

Again, however, the plaintiffs encounter an insurmountable problem satisfying the predominance requirement. Chapter 93A claims require proof of the "causal nexus" between a defendant's unfair business practice and the injury suffered by a plaintiff. Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 409 (1991). Here, the plaintiffs would have to show that Jani-King's allegedly unfair conduct -- intentionally offering franchisees cleaning contracts Jani-King knew that they could or would not accept -- caused the class members injuries -- a decrease in the revenue they otherwise would have receive from their franchise or a decrease in the value of their franchise. To meet this burden, the plaintiffs ask the Court to presume that for each franchisee on the spreadsheet, the difference between their Initial Business and their actual gross monthly revenue is entirely due to Jani-King's misconduct. To make that presumption, the Court would also need to presume that franchisees only rejected an offered cleaning contract because Jani-King engaged in the above-alleged unfair and deceptive business practices.

The plaintiffs have not introduced any evidence to support either presumption.[9] A multitude of reasonable explanations

---

[9] The six affidavits submitted in support of the plaintiffs' motion for class certification are plainly insufficient for this purpose. The Court cannot extrapolate from the experience of these six individuals, who very well may have been treated unfairly by Jani-King, to conclude that Jani-King

could justify the disparities between the Initial Business and monthly revenue, foremost among them, that the franchisees simply rejected cleaning contracts that Jani-King offered in good faith. On the record before the Court, the only way to determine if the rejected cleaning contracts were offered in violation of Chapter 93A would be to conduct fact-finding on each and every cleaning contract offered by Jani-King to a class member. This would be so even if the Court were to presume that some, but not all, of the disparity was attributable to actionable conduct by Jani-King. In that circumstance, the Court would still need to distinguish between injuries caused by Jani-King and "self-inflicted" wounds that franchisees brought upon themselves by rejecting cleaning contracts offered by Jani-King in good faith. Accordingly, the Court holds that common legal or factual issues will not predominate with respect to these claims.

### (2) Inherently Unfair Provisions in the Franchise Agreement

The plaintiffs also allege that at least two provisions in the Franchise Agreement, sections 4.3.3 and 6.1.2, are inherently unfair in violation of Chapter 93A.

---

acted in the same manner with all class members. In fact, the spreadsheet, upon which the plaintiffs rely so heavily, indicates that different franchisees had very different experiences. While affiant Fernandes' gross monthly revenue fell $13,990 short of his Initial Business, according to the spreadsheet, at least seven franchisees were servicing cleaning contracts with a gross monthly value in excess of 90 percent of their initial business.

## (a)  Section 4.3.3

Section 4.3.3 provides that where Jani-King is unable to satisfy its Initial Business obligation within the Initial Offering Period, Jani-King can satisfy its entire Initial Business obligation simply by paying the franchisee "an amount equal to the lesser of (i) three (3) times the amount of the Initial . . Business not offered to the Franchisee or (ii) the total [franchise fee] paid by the Franchisee . . . " (Franchise Agreement, § 4.3.3), minus any money still owed to Jani-King by the franchisee.

One can conceive how this provision might be considered unfair.  As is discussed above, under Jani-King's Plan A, a franchisee pays an $8,600 down payment in exchange for a promise from Jani-King to provide $500 in Initial Business within 120 days.  Under section 4.3.3, if Jani-King offers the new franchisee no cleaning contracts within 120 days, Jani-King can satisfy all of its obligations to the franchisee simply by "refunding" to the franchisee $1,500, three times the franchisee's Initial Business, minus any outstanding debts the franchisee owed to Jani-King.  Even if the franchisee owed Jani-King no additional money for various startup fees or equipment, the franchisee would lose $7,100.  Under all but the very most expensive of Jani-King's plans, the franchise fee far exceeds

three times the value of the corresponding Initial Business.[10]
Thus, Jani-King stands to profit, in some cases quite handsomely,
by failing to satisfy its Initial Business obligation to its
franchisees.

The plaintiffs' allegations asserting that section 4.3.3
violates Chapter 93A are amenable to treatment on a class-wide
basis because common issues would predominate. A fact-finder
could determine, for all class members, whether section 4.3.3
does, in fact, violate Chapter 93A. And proof of causation,
which was the primary obstacle to certifying plaintiffs' other
Chapter 93A claims, could be easily demonstrated with respect to
any injury suffered as a result of section 4.3.3; if section
4.3.3 violates Chapter 93A, any payouts made in accordance with
section 4.3.3 would similarly violate Chapter 93A. Discovering
whether and to whom those payouts had been made, presumably
through introduction of Jani-King's business records, would not

_____

[10] A few examples:

-- Plan D: Initial Business = $3,000; Franchise fee =
$13,500; 3X Initial Business (-) Franchise fee = -$4,500.

-- Plan E-6: Initial Business = 6,000; Franchise fee=
$21,750; 3X Initial Business (-) Franchise fee = -$3,750.

-- Plan E-10 (De Giovanni's plan): Initial Business $10,000;
Franchise fee = $32,750; 3X Initial Business (-) Franchise
fee = $2,750.

-- Plan E-17: Initial Business = $17,000; Franchise fee =
$52,000; 3X Initial Business (-) Franchise fee = -$1,000.

cause individualized questions to predominate over common issues.
In addition, a class action would be "superior to other available
methods for fairly and efficiently adjudicating this claim,"
because the amounts in dispute are not sufficient to support
individual lawsuits.  Fed R. Civ. P. 23(b)(3).  Accordingly, the
plaintiffs' claim that section 4.3.3 violates Chapter 93A
satisfies the predominance requirement.

### (b)  Section 6.1.2

The plaintiffs also suggest that section 6.1.2 of the
Franchise Agreement,[11] which describes circumstances under which

---

[11]  In its entirety, section 6.1.2 reads:

The actual time to secure and offer . . . the Initial
Finder's Fee Business to the Franchisee may, at
Franchisor's sole discretion, be automatically extended
under the following conditions: (1) if Franchisee
requests a delay in the offering of the Initial
Finder's Fee Business; (2) if the Franchisee is in
default under the terms and conditions of the Franchise
Agreement or any other agreement between Franchisee and
Franchisor; or (3) if any of the Initial Finder's Fee
Business previously provided to Franchisee rrequests a
transfer to another Franchisee or requests to be
cabcelled due to non-performance in which case
Franchisee is required to repeat and complete to
Franchisor's satisfaction all training classes required
by Franchisor.  In the event of the occurrence of any
of the above conditions, Franchisor will have the
remainder of the Initial Offering Period or a minimum
of 120 days, which ever is longer, from the date (1)
Franchisee notifies Franchisor that they are ready to
accept the right to service other business and has
provided any documentation required under the Policies
and Procedures; (2) Franchisee has cured any default;
or (3) the acknowledgment of retraining is signed , to
offer the balance of Initial Finder's Fee Business to
Franchisee.  Franchisor does not guaranty that the

Jani-King can extend the Initial Offering Period, is "inherently"
unfair in violation of Chapter 93A.  This claim is nothing more
than a repackaging of the plaintiffs' misrepresentation
allegation regarding the duration of the Initial Offering Period.
Nowhere in their complaint or moving papers do the plaintiffs
state that section 6.1.2, standing on its own, violates Chapter
93A.  Rather, they allege that section 6.1.2 serves as evidence
that the statement made by Jani-King in its marketing materials
"guaranteeing" the duration of the Initial Offering Period was a
misrepresentation.  Thus, unlike the plaintiffs' claims related
to section 4.3.3 of the Franchise Agreement, the violation
alleged by the plaintiffs with respect to section 6.1.2 is not
"inherent" in Franchise Agreement.  The Court discussed above why
this misrepresentation claims cannot be certified as a class
action.  That same reasoning applies with full force here.

### (3)  Excessive Fees

The plaintiffs also allege that pursuant to the Franchise
Agreement, Jani-King charges its franchisees inherently excessive
fees in violation of Chapter 93A.  Those fees include:

-- Charges for equipment (Franchise Agreement § 4.4);

-- 10% royalty fee (id. § 4.5.1);

---

Initial Finder's Fee Business will reach or remain at
the level state on the Franchise Summary throughout the
term of the Franchise Agreement.

(Franchise Agreement § 6.1.2.)

-- 1% advertising fee (<u>id.</u> § 4.5.2);

-- 3% Accounting Fee, (<u>id.</u> § 4.7);

-- $25 Non-Reported Business Fee "for each day Franchisee fails to report all Gross Revenue" (<u>id.</u> § 4.5.1);

-- $50/hour Service Fee "on each occasion Franchisor dispatches its staff to an account in order to correct a deficiency in performance" (<u>id.</u> § 4.17.4);

-- $50 Complaint Fee "to any Franchisee who does not respond to or who has not serviced a customer complaint within the time frames allotted for initial response and corrective action and which require Franchisor's representatives to respond to the complaint" (<u>id.</u> § 4.23);

-- Finder's Fees for additional business (<u>id.</u> § 4.6);

-- "Chargebacks on past due invoices" (<u>id.</u> § 4.7.1); and

-- Fees for insurance (<u>id.</u> § 4.12).

As with the plaintiffs' claims regarding section 4.3.3 of the Franchise Agreement, the plaintiffs allegations with respect to the fees Jani-King charges its franchisees can be adjudicated on a class-wide basis. A fact-finder can determine for all class members whether the amount or types of fees charged by Jani-King are inherently unfair under Chapter 93A. Causation, injury, and damages could be proved through Jani-King's own business records. Further, the Court holds that adjudicating this claim as a class action would be superior to individual lawsuits; the potential amounts lost by the franchisees as a result of allegedly excessive fees would not be sufficient to support individual

actions.  As a result, plaintiffs' claims that the fees charged by Jani-King violate Chapter 93A satisfy Rule 23(b)(3)'s predominance requirement.

### d.    Unjust Enrichment and Quantum Meruit

Under the doctrine of unjust enrichment, "a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." Smith v. Jenkins, 626 F. Supp. 2d 155, 170 (D. Mass. 2009) (Stearns, J.).  Quantum meruit is "derived from the principles of equity and fairness and is allowed where there is substantial performance but not full completion of [a] contract." J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 793 (1986).  Both unjust enrichment and quantum meruit are simply "[t]heor[ies] of recovery, not . . . cause[s] of action . . . ." Id.; Smith,626 F. Supp. 2d at 170.  Further, for the same reasons that the breach of contract claim is not appropriate for certification, both of these claims cannot be certified.  No common source of proof exists to support the plaintiffs' prosecution of these claims; the extent of uncompensated performance and unjust retention of a benefit could only be ascertained through complex and disputed individual inquiries.  Thus, the Court denies the plaintiffs' motion to certify these claims as a class action.

### 2.    Employment Classification

The plaintiffs seek certification of a second proposed class

consisting of "all individuals who have performed cleaning work for Jani-King in Massachusetts any time since January 12, 2004." (Pls.' Mot. 2.) On behalf of this class, the plaintiffs claim that Jani-King improperly classifies its franchisees as independent contractors when they are in fact employees. The plaintiffs allege that, because of the improper classification, Jani-King violates of a variety of Massachusetts laws that afford protections to employees, including minimum wage, overtime pay, and timely payments of all wages owed without improper deductions from pay. Independent contractors are not covered by the same statutory provisions.

Pursuant to Massachusetts General Laws ch. 151A, § 2, an individual is an employee unless the services "at issue are performed (a) free from control or direction of the employing enterprise; (b) outside of the usual course of business, or outside of all the places of business, of the enterprise; and (c) as part of an independently established trade, occupation, profession, or business of the worker." Athol Daily News v. Board of Review of the Div. of Employment & Training, 439 Mass. 171, 175 (2003). "The conditions are conjunctive. Therefore, if an employer fails to establish any one of the three prongs, the services in question will constitute 'employment,' " as opposed to an independent contractor relationship. Coverall N.A., Inc. v. Com'r of Div. of Unemployment Assistance, 447 Mass. 852, 857

(2006).

Common questions will predominate for the plaintiffs
employment classification class under all three prongs of the
Massachusetts' test.  With respect to prong two, the defendants
do not assert that any individualized issues would complicate the
identification of (1) the types of businesses operated by the
purported class or (2) the type of business operated by Jani-
King.  Thus, common issues will predominate to determine whether
the services performed by the class fall outside of Jani-King's
usual course of business.  Similarly, because common issues will
predominate in determining whether the plaintiffs are "capable of
performing the service to anyone wishing to avail themselves of
the services or, conversely, whether the nature of the business
compels the[m] to depend on a single employer for the
continuation of the services," Athol, 439 Mass. at 858, prong
three can be adjudicated on a class-wide basis.  See Coverall,
447 Mass. at 858-59 (holding, in a suit brought by a single
franchisee of a janitorial services franchisor, that the
franchisor did not meet its burden under prong three).[12]

---

[12]  In its moving papers, Jani-King repeatedly refers to
footnote two in Coverall, claiming that although the
Massachusetts Supreme Judicial Court held that the janitorial
services franchisee was an employee, that court also held
explicitly that it refused to "extend [its] holding to other
Coverall franchisees governed by [the] same written contract
provisions." (Jani-King's Opp'n. 19, Doc. No. 51.)  Footnote two
says absolutely nothing of the sort, and nowhere else in Coverall
does the SJC intimate that, if presented with a similar claim as

31

Prong one presents a closer issue, but one the Court still resolves in the plaintiffs' favor. To satisfy its burden on this prong, Jani-King must establish that the services performed by its franchisees are "free from its control or direction." Com'r of Div. of Unemployment Assistance v. Town Taxi of Cape Cod, 68 Mass. App. Ct. 426, 434 (2007). This inquiry, however, is "not so narrow as to require that a worker be entirely free from direction and control of outside forces." Athol, 439 Mass. at 178. In analyzing a prong one claim, even "[w]here a written contract exists between the parties, 'a reviewing court [is required] to look beyond the four corners of the agreement to the actual working relationship' to determine whether an employer has satisfied its burden." Driscoll v. Worcester Telegram & Gazette, 72 Mass. App. Ct. 709, 713 (2008) (citing Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56 Mass. App. Ct. 473, 484 (2002)).

Jani-King asserts that the different ways in which franchisees run their franchises, including whether they choose to incorporate their franchises, to hire employees, or to sell their franchises, renders certification on prong one inappropriate. Affidavits and discovery conducted to this point in the litigation indicates that there is a great degree of diversity between franchises. Still, the Court holds that common

a class action, it would reach a contrary conclusion.

issues predominate over these differences. What is critical to the prong one analysis is the balance between the areas in which franchisees have total, uninhibited control over their franchises, and the areas where Jani-King pervasively controls the franchisees conduct. Although the balance may ultimately favor Jani-King, i.e., Jani-King may be able to establish that it does not control its franchisees, the Court is convinced that the question can be answered with reference to common facts. For this reason, in resolving prong one, common issues will predominate over individualized questions.

Jani-King argues, in a motion submitting additional authority in opposition to the plaintiffs' motion for class certification, that conflicts between the class members regarding whether they would benefit from being classified as employees precludes this Court from granting class certification. (See Doc. No. 73 at 3-4.) Jani-King cannot raise this argument through such an oblique mechanism as a submission of additional authority, and thus, the Court will not consider it.

Finally, a class action is a superior method for adjudicating the plaintiffs' employment classification claims. Both the United States Supreme Court and the Massachusetts Supreme Judicial Court have expressed a strong preference for rendering decisions on the classification of employees on class wide basis. See Athol, 439 Mass. at 181 ("[C]riteria based on

the factual circumstances of each individual worker, rather than on the nature of the services performed, would have the anomalous result of inconsistent status determinations with respect to workers performing identical services for the same company."); Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 327 (1992) (determination of employment status "generally turns on factual variables within an employer's knowledge, thus permitting categorical judgments about the 'employee' status of claimants with similar job descriptions"). This Court agrees that a class action in which all of the class members, whose relationships with Jani-King were all governed by the same Franchise Agreement, have their employment classification decided collectively and consistently is superior to individual determinations. Accordingly, the Court holds that the plaintiffs' employment classification claims satisfy the predominance requirement.

### C. **Typicality**

Having held that the plaintiffs' employment classification claims and Chapter 93A claims with respect to section 4.3.3 of and excessive fees under the Franchise Agreement satisfy Rule 23(b)(3), the Court must determine if the plaintiffs' proposed class representatives are typical for those claims. "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the

same legal theory." In re Neurontin Mktg. and Sale Practices Litig., 244 F.R.D. 89, 106 (D. Mass. 2007) (Saris, J.). The goal underlying the typicality analysis is to ensure that "the interests of the class and the class representatives [are such] that the latter will work to benefit the entire class through the pursuit of their own goals." Id. at 105-106.

### 1. De Giovanni

De Giovanni is not typical for the Chapter 93A claims. The plaintiffs have not introduced any evidence that Jani-King exercised its right under section 4.3.3 of the Franchise Agreement or ever charged him any of the fees that the plaintiffs claim are excessive. As a result, De Giovanni could not possibly pursue the Chapter 93A claims for the benefit of the entire class.

De Giovanni is typical for the employment classification claims. Jani-King claims that because De Giovanni (1) transferred, with Jani-King's consent, his franchise to a corporation that he founded and wholly owned, and (2) hired his own employees to perform cleaning services on behalf of the corporation, that De Giovanni cannot represent the employment classification class. Neither of these objections render De Giovanni atypical. Even though the corporation controlled De Giovanni's franchise, he still meets the broad class definition for the employment classification claims -- all "individuals who

have performed cleaning work for Jani-King in Massachusetts any time since January 12, 2004." Jani-King does not assert that De Giovanni controlled his franchise in an exceptional manner that differed from the way other franchisees could or have treated other franchises.

Jani-King also asserts that De Giovanni is not typical because he executed a general release in Jani-King's favor as partial consideration for transferring his franchise to CDD. Although courts should consider unique defenses, such as a release from liability, when determining whether a plaintiff is typical of a class, unless the defense "will consume the merits of the case," the defense should not defeat a plaintiff's typicality. Abt v. Mazda Am. Credit, No. 98-C-2931, 1999 WL 350738, at *3 (N.D. Ill. May 19, 1999); see Waste Mgmt. Holdings, Inc. v. Mowbray, 208 F.3d 288, 296 (1st Cir. 2000) (rejecting any "per se rule that treats the presence of such issues as an automatic disqualifier"); McAdams v. Massachusetts Mut. Life Ins. Co., No. Cv. A..99-30284, 2002 WL 1067449, at *5 (D. Mass. May 15, 2002) (Freedman, S.J.) (citing cases). Jani-King has not argued and the record does not indicate that disputes regarding the validity or applicability of De Giovanni's release would likely "usurp a significant portion of [the] plaintiff's time and energy, distracting him from representing the interests of other class members." Abt, 1999 WL 350738, at *3. Accordingly, De

Giovanni's execution of a release of liability does not render him atypical of the employment classification class.

### 2. Barros

Barros is also not typical of the Chapter 93A claims. No evidence in the record indicates that Jani-King elected to exercise its rights under section 4.3.3 of the Franchise Agreement to avoid satisfying its obligations to Barros[13] or that Jani-King charged Barros any allegedly excessive fees. Therefore, she cannot be typical of the Chapter 93A claims.

Barros can represent the employment classification class. Jani-King's only objection to Barros' representation of the employment classification class is that she was not sufficiently under Jani-King's control or supervision such that she could be classified as a Jani-King employee. This contention speaks only to the merits of Barros' employment classification claim, as opposed to her typicality for those claims, and thus does not

---

[13] In fact, the record indicates that Barros purchased her franchise in 2003 from Lukanmi Olatubosun ("Olatubosun"), who originally purchased his Jani-King franchise in 1997. In order to take control of the franchise, Barros had to execute a transfer agreement with Jani-King. The transfer agreement states explicitly in paragraph 3.5 that Jani-King had an obligation to offer cleaning contracts to Olatubosun with a certain cumulative gross monthly billing equal to the Initial Business. (See Transfer Agrmt. ¶ 3.5, attach. as Ex. 59 to Barros Dep., Ex. D, Doc. No. 52.) That same paragraph explains that the remaining balance on Olatubosun's Initial Business was $0. Thus, Jani-King had satisfied its obligation to Olatubosun, and upon transfer, had no obligation to Barros. Because Jani-King was not required to offer Barros any cleaning service contracts, Jani-King would not have needed to exercise its rights under section 4.3.3.

present grounds for rejecting her as a class representative.
Consequently, the Court holds that Barros is typical of
employment classification class, but is not typical of the unfair
business practices class.

### 3. Other potential class representatives

Because the Court holds that neither De Giovanni nor Barros
are typical of the Chapter 93A claims, the Court cannot certify
those claims as a class action unless the plaintiffs can identify
a typical class representative. In their reply brief, the
plaintiffs sought to add two additional class representatives:
Diamantino Fernandes and Maria Pinto. The Court need
not consider these proposed class representatives because
plaintiffs cannot seek to add new class representatives through
such an improper procedural mechanism. Even so, neither
Fernandes nor Pinto could rescue the plaintiffs Chapter 93A
claims. There is no evidence, for either newly proposed class
representative, that Jani-King exercised its rights under section
4.3.3 or charged them allegedly excessive fees. Accordingly,
they cannot be typical of the Chapter 93A claims.

Without any class representative who are typical of the
Chapter 93A claims, the Court must deny certification of those
claims. The Court will, however, exercise its discretion and
deny class certification of the Chapter 93A claims without
prejudice. The plaintiffs may amend their complaint and renew

their motion for class certification of these two Chapter 93A claims, provided they include some evidence that an existing or newly proposed class representative was injured when Jani-King exercised its rights under section 4.3.3 of the Franchise Agreement and was charged allegedly excessive fees.

## III. CONCLUSION

For the preceding reasons, the Court **DENIES** the plaintiffs' motion for class certification of the unfair business practices claims. The breach of contract, misrepresentation, unjust enrichment, and quantum meruit claims are denied with prejudice. The Chapter 93A claims regarding the inherent unfairness of section 4.3.3 of the Franchise Agreement and the excessive fees in the Franchise Agreement, are denied without prejudice. The Court provides the plaintiffs with leave to amend their complaint and renew their motion for class certification if they can identify typical class representatives for these claims. All other Chapter 93A claims are denied with prejudice. The Court **GRANTS** the plaintiffs' motion for class certification of the employment classification claims and, as to those claims, certifies a class of all individuals who have performed cleaning work for Jani-King in Massachusetts any time since January 12, 2004.

SO ORDERED.

    /s/ William G. Young
WILLIAM G. YOUNG
DISTRICT JUDGE