

# FRANCHISE OFFERING CIRCULAR

## JANI-KING OF BOSTON, INC.

a Texas corporation
6 Lincoln Knoll Lane
Suite 104
Burlington, Massachusetts 01803
(781) 229-5655

The franchise will provide comprehensive, commercial cleaning and maintenance services.

The initial franchise fee and the initial finder's fee down payment ranges from $8,600 to $16,250* (*Plus $2,750.00 for each additional level of Plan E). You will also be required to purchase certain supplies and equipment prior to engaging in any business in the amount of $1,800 to $3,300. The estimated initial investment ranges from $11,300 to $34,050 (*Plus $2,750.00 for each additional level of Plan E).

Risk Factors:

1. THE FRANCHISE AGREEMENT PERMITS YOU TO SUE US ONLY IN TEXAS. OUT OF STATE LITIGATION MAY FORCE YOU TO ACCEPT A LESS FAVORABLE SETTLEMENT FOR DISPUTES. IT MAY ALSO COST YOU MORE TO SUE US IN TEXAS THAN IN YOUR HOME STATE.

2. THE FRANCHISE AGREEMENT STATES THAT TEXAS LAW GOVERNS THE AGREEMENT, AND THIS LAW MAY NOT PROVIDE THE SAME PROTECTIONS AND BENEFITS AS LOCAL LAW. YOU MAY WANT TO COMPARE THESE LAWS.

3. THERE MAY BE OTHER RISKS CONCERNING THIS FRANCHISE.

Information about comparisons of franchisors is available. Call your public library for sources of information.

Registration of this franchise with the state does not mean that the state recommends it or has verified the information in this offering circular. If you learn that anything in the offering circular is untrue, contact the Federal Trade Commission, Washington D.C. 20580.

Effective Date: April 30, 2005

# ITEM 1

## THE FRANCHISOR, ITS PREDECESSORS AND AFFILIATES

JANI-KING OF BOSTON, INC. is the franchisor for this offering circular, and to simplify matters will be referred to as "we", "us" or "our". "You" means a person who buys a franchise from us. If you are a corporation, partnership or other entity, our Franchise Agreement also will apply to your owners, officers and directors. If you are married and your spouse is not a partner in the franchise business, certain provisions of our Franchise Agreement will also apply to that spouse.

We are a Texas Corporation incorporated in Texas on April 23, 1990. Our principal business address is 16885 Dallas Parkway, Addison, Texas 75001. We conduct business under our corporate name and under the trade and service mark "JANI-KING" and associated logos and designs (collectively called "Marks"). Our agent for service of process in the state of Massachusetts it is the CT Corporation System, located at 101 Federal Street, Boston, Massachusetts 02110. Our agent for service of process in the state of New Hampshire it is the CT Corporation System, located at 9 Capitol Street, Concord, New Hampshire 03301. We do not have any predecessors.

## Our Affiliates.

We are a wholly owned subsidiary of our affiliate, JANI-KING, INC., who will be referred to in this offering circular as "JKI". JKI was incorporated in Texas on March 11, 1983, and is a wholly owned subsidiary of our affiliate, JANI-KING INTERNATIONAL, INC., who will be referred to as "JK INT'L". JK INT'L is a Texas corporation, incorporated on October 1, 1985. JK INT'L and all of our other affiliates have their principal business address at 16885 Dallas Parkway, Addison, Texas 75001. All of our affiliates are Texas corporations, except Jani-King of Toronto, Inc. which is incorporated in Ontario, Canada.

JK INT'L does not directly engage in the business of providing commercial cleaning services, and it does not offer any franchises substantially similar to our business. It does provide significant support and management services to the various operating affiliates who do offer similar franchises. JK INT'L has not offered franchises in other lines of business.

JKI also does not directly offer any franchise or engage directly in the business of providing commercial cleaning services similar to our business. It provides administrative and management services to operating affiliates. JKI has not offered franchises in other lines of business.

The following list of affiliates are wholly owned subsidiaries of JKI that offer franchises in other territories similar to the type being offered by us. Each of the affiliates listed conducts a business of the type to be operated by you, but not in the same territory as you. The chart below shows how long each affiliate has conducted that business and how long they have offered JANI-KING franchises. None of these affiliates have offered franchises in other lines of business.

| AFFILIATE | DATE INCORPORATED | DATE BEGAN CONDUCTING BUSINESS | SELLING FRANCHISES SINCE |
|---|---|---|---|
| Jani-King of Boston, Inc. | 04/23/90 | 07/01/90 | 07/01/90 |
| Jani-King of Buffalo, Inc. | 11/02/92 | 08/12/96 | 08/12/96 |
| Jani-King of California, Inc. | 06/08/82 | 08/01/82 | 08/01/82 |
| Jani-King of Colorado, Inc. | 02/05/90 | 03/07/90 | 03/07/90 |
| Jani-King of Hartford, Inc. | 11/02/92 | 01/01/93 | 01/01/93 |
| Jani-King of Las Vegas, Inc. | 05/06/94 | 07/01/94 | 07/01/94 |
| Jani-King of Miami, Inc. | 06/14/88 | 08/01/88 | 08/01/88 |
| Jani-King of Michigan, Inc. | 03/05/87 | 04/08/87 | 04/08/87 |
| Jani-King of Minnesota, Inc. | 11/09/87 | 12/01/87 | 12/01/87 |
| Jani-King of Nashville, Inc. | 12/16/91 | 03/01/93 | 03/01/93 |
| Jani-King of New Jersey, Inc. | 10/24/90 | 07/01/91 | 07/01/91 |
| Jani-King of New York, Inc. | 05/29/86 | 02/01/88 | 02/11/88 |

| AFFILIATE | DATE INCORPORATED | DATE BEGAN CONDUCTING BUSINESS | SELLING FRANCHISES SINCE |
|---|---|---|---|
| Jani-King of Oklahoma, Inc. | 05/31/79 | 06/01/79 | 06/01/79 |
| Jani-King of Philadelphia, Inc. | 06/15/90 | 07/01/90 | 07/01/90 |
| Jani-King of St. Louis, Inc. | 09/07/88 | 09/26/88 | 09/26/88 |
| Jani-King of Toronto, Inc. | 12/08/95 | 12/08/95 | 12/08/95 |
| Jani-King of Washington, D.C., Inc. | 04/28/89 | 06/01/89 | 06/01/89 |

Our affiliate, Jani-King Franchising, Inc. ("JKF"), is a wholly owned subsidiary of JK INT'L and was incorporated on October 1, 1985. JKF develops territories under a Regional Franchise program called "Master Franchises". Also, JKF directly offers franchises similar to our franchise program, under the "Associate Franchise" program, in territories where no regional support office has been established. An Associate Franchise will not be offered in the same territory where we offer our franchise program. JKF offers Master Franchisees the right to conduct a business of the same type you will operate, and to offer franchises similar to yours.

Our affiliate, Jani-King Leasing Corporation ("LEASING") is a Texas corporation incorporated on December 21, 1981 and is under common control with us. LEASING leases commercial cleaning equipment to franchisees operating JANI-KING franchises. It does not engage in any other business activities and does not offer or operate franchises.

## Our Franchise Program.

We grant franchises for the performance of complete cleaning and/or maintenance related services, including commercial, industrial, institutional and residential cleaning and/or maintenance services and the distribution of related supplies and equipment under the name JANI- KING. The type of services you will offered to provide include carpet cleaning, hard floor care, trash disposal, window washing, wall cleaning, and other specialty cleaning services on a daily, weekly, or monthly schedule. The territory granted to you under the franchise agreement by us is not exclusive to you, and we have the right to open franchises in your territory. In the event you already own one of our franchises and you purchase additional franchises, you will be required to sign the then current franchise agreement and the conditions existing at the time of the purchase will control the franchise relationship.

You will use the methods, procedures and products developed under the JANI-KING marks, and we will provide support services for you in the territory described commonly as the Boston Standard Metropolitan Statistical Area. We will offer you within a certain number of days the right to provide service to commercial cleaning contracts owned by us with varying amounts of gross monthly billings. We call the amount of cumulative gross monthly billings and the contracts which we will offer to you to service the "Initial Finder's Fee Business," but we may also refer to it as "Initial Business." We call the number of days during which we are required to offer you the Initial Finder's Fee Business the "Initial Offering Period." We provide a limited guarantee for the Initial Finder's Fee Business for a maximum of 12 months if you service the accounts properly. See Item 11 for more information about the Initial Finder's Fee Business offered to you, and the circumstances when an account might be replaced by us. The schedule below is a sample of plans through Plan E-10. Other plans with more Initial Finder's Fee Business are available.

THIS SPACE INTENTIONALLY LEFT BLANK

| PLAN | INITIAL FINDER'S FEE BUSINESS ($) | INITIAL OFFERING PERIOD (Days) |
|------|-----------------------------------|--------------------------------|
| E-10* | 10,000* | 330** |
| E-9 | 9,000 | 300 |
| E-8 | 8,000 | 270 |
| E-7 | 7,000 | 240 |
| E-6 | 6,000 | 210 |
| E-5 | 5,000 | 180 |
| E-4 | 4,000 | 150 |
| D | 3,000 | 120 |
| C | 2,000 | 120 |
| B | 1,000 | 120 |
| A | 500 | 120 |

*An Additional $1,000 for each higher level of the "E" Plan.

**Plus An Additional 30 Days for each higher level of the "E" Plan.

     The Initial Franchise Fee and the Initial Finder's Fees charged for our franchise will vary and are determined by the plan purchased.  The Initial Franchise Fee is the Initial Franchise Fee Down Payment and the Initial Franchise Fee Monthly Payments.  The Initial Finder's Fee is the Initial Finder's Fee Down Payment plus the projected amount of the Initial Finder's Fee Monthly Payments.  The projected amount of the Initial Franchise Fee Monthly Payments and the Initial Finder's Fee Monthly Payments shown for each plan was calculated with the assumption that your franchise produces revenue equal to or greater than the projected monthly payments after the first payment is made.  The first payment will not be due until your franchise's Gross Revenue reaches $500 (for Plan A) or $1,000 (for Plan B and up).  The Initial Finder's Fee Monthly Payments are monthly payments that are calculated as a percentage of the Initial Finder's Fee Business. The percentage decreases as the plans get larger.  The Initial Franchise Fee Monthly Payments and the Initial Finder's Fee Monthly Payments are deducted from the revenue produced by the operation of your franchise and are contingent upon services being performed by you or your franchise.  We offer a 5% discount on all franchise plans where all Initial Franchise Fees and Initial Finder's Fees are paid in cash at the time the franchise is purchased.  We also offer an additional 5% discount and a reduction in the Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment to qualified United States military veterans.  These franchise plans are listed in the table in Item 5.

     We will offer you the right to perform services under the terms of commercial cleaning contracts with a cumulative total amount of Initial Finder's Fee Business identified in the Plan you select, within the period of time shown as the Initial Offering Period.  The contracts under which you will be providing service will always be owned by us, and you will not have any rights under the contract unless we assign rights to you.  The Initial Offering Period will begin when you successfully complete the initial training program, obtain all the required supplies and equipment, and provide proof of the required insurance.  We do not guaranty the amount of Initial Finder's Fee Business of the plan you purchase will reach that amount or remain at that amount for the entire term of the Franchise Agreement.  We are under no obligation to maintain the amount of Initial Finder's Fee Business throughout the term of the Franchise Agreement.  You should also be aware that the cumulative total billing for any specific month may not equal the total sum of the Initial Finder's Fee Business because: (1) the Initial Finder's Fee Business may be offered to you in stages during the Initial Offering Period; (2) you may not accept all of the accounts offered; (3) accounts may cancel the contract or request a change of franchisees due to your poor performance; or (4) the account may move or go out of business before the end of the contract period.  To effectively service these accounts, you must adhere to the quality standards associated with the JANI-KING marks, maintain good customer relations, and maintain industry standard commercial cleaning production rates.

## Our Business.

     We are in the business of operating and franchising comprehensive cleaning and maintenance businesses like the type we are offering to you.  We have been offering JANI-KING franchises since July 1, 1990.  Our operations are distinguished from other affiliated JANI-KING companies offering franchises by the fact that our operations will only be

offered within the described region, and no other affiliated company will offer franchises within that territory.  We have not offered franchises in other lines of business.

## The Market.

Your products and services will be offered to the general public for both commercial and residential properties.  You will be competing with national and local businesses offering janitorial and maintenance services.  We may also conduct the type of business operated by you.  The market for commercial cleaning services is developed in some areas and developing in others, depending on the existing businesses and economic conditions in the particular area.

## Regulations.

There are no regulations specific to the operation of a JANI-KING franchise, other than those affecting businesses generally.

# ITEM 2

# BUSINESS EXPERIENCE

### Chairman, Vice President and Secretary: Jim Cavanaugh

Mr. Cavanaugh founded JANI-KING as a janitorial service company in Oklahoma City, Oklahoma, in 1969, and developed the JANI-KING cleaning methods during the period from 1969 to 1974.  Mr. Cavanaugh has been Chairman and Chief Executive Officer of JK INT'L from October 1985 through the date of this offering circular.  He has held various officer positions in JK INT'L since October 1985.  He is also Chairman, Vice President and Secretary JKI; Chairman, Vice President and Secretary JKF; Chairman, President and Secretary, LEASING; Chairman, President and Secretary, Jani-King of California, Inc.; and Chairman and Secretary of each of the other affiliated JANI-KING subsidiaries

### Director and President:  Jerry Crawford

Mr. Crawford has served as President of JKF since October 1988; as President of JKI (December, 1993 through January, 1997); and in various officerships of the affiliated franchising subsidiaries of JKI since December 1993.  In September 1995, he was elected director of JK INT'L, JKF, JKI and the other affiliated franchising subsidiaries.  In January, 1997, Mr. Crawford was elected President of JK INT'L.

### Vice President (JK INT'L):  Garry R. Clark

Mr. Clark joined JANI-KING as a Regional Director for Jani-King of Illinois, Inc. in July 1989.  In January 1994, he was elected Vice President of Jani-King of Illinois, Inc.  In January 1996, Mr. Clark was elected Vice President of JKI, and was promoted to President of JKI and Vice President of all other operating subsidiaries in January 1997. He became Vice President of Jani-King International, Inc. in January 1999.

### Vice President, Internal Operations (JK INT'L):  Jill Bean

Ms. Bean joined JANI-KING as an Accounting Assistant in November 1990.  In February 1991, she was promoted to Director of Franchisee Accounting and was promoted to her current position in April, 1994.

### Vice President (JK INT'L):  Charles (Chuck) Gibson

Mr. Gibson joined Jani-King of Illinois, Inc., located in Chicago, Illinois, in May 1986, as Operations Manager.  He was promoted to National Operations Director with JK INT'L in December 1988, and was made International Operations Director of JK INT'L in October 1991.  He was promoted to Vice President-Operations of JKF in February 1993.  He became Vice President of Jani-King Franchising, Inc. in January 1994 and Vice President of JK INT'L in January 1999.

Corporate Liaison:  Brent Rohde

Mr. Rohde joined JANI-KING in January 2005.  From July 1999 to January 2005, Mr. Rohde was the Director of Franchise Sales and Development for Cendant.

Corporate and Master Development: Jeff Hawkins

Mr. Hawkins joined JANI-KING in April 2005.  From January 2005 to March 2005, he was a Vice President for U.S. Metro Group.  Mr. Hawkins was a Corporate Liaison from August 2002 to January 2005 for Jani-King International, Inc. He was an Account Executive for Red Bull Energy Drink from May 2000 to July 2002.   From December 1997 to May 2000, he was an Account Executive for Coca-Cola Bottling Co.

Corporate Operations Director:  Nathan Zimring

Mr. Zimring joined JANI-KING in June 2000 as an Executive Director of Regional Development. He was promoted to his current position in October 2003.   From December 1992 to April 2000, he was the Custodial and Security Manager for Richardson Independent School District.

Executive Director of Regional Development:  Chadd Clements

Mr. Clements joined JANI-KING in March 2005.  He was a District Sales Manager for AT & T Wireless from May 1999 to April 2000.  From June 2000 to March 2002, he was an Advisory Sales Specialist for IBM Corporation.  Mr. Clements worked for Sprint as a Business Account Manager from September 2002 to March 2004.  From March 2004 to July 2004, he was a Business Account Manager for Verizon Wireless.

Executive Director of Regional Development:  Paul McCarthy

Mr. McCarthy joined JANI-KING in February 2005.  He was a self-employed as a consultant from February 2003 to February 2005.  From December 1999 to February 2003, he was a Vice President and Group Manager for Primedia.

Executive Director of Regional Development:  Blake Seylhouwer

Mr. Seylhouwer joined JANI-KING in August 2002.  From December 2001 to August 2002, he was the Director of Sales for Supreme Janitorial Services, Inc.  He was an Account Executive and Sales Manager for EPICUS, Inc. from December 2000 to December 2001.  He was a student at Colorado State University from August 1996 to December 2000.

Executive Director of Regional Development:  Dean Taylor

Mr. Taylor joined JANI-KING in June 2004.  From February 2002 to May 2003, he was an Operations Director for Magnolia Tree Management.  He was a restaurant owner of Sandwich Construction Company from March 2000 to December 2001.  Mr. Taylor was a Franchise Business Consultant from February 1997 to March 2000 for Pizza Inn Corporate.

Regional Director:  Michael Salmon

Mr. Salmon joined JANI-KING in June 1991.

Director of Franchise Sales:  Joan Starr

Ms. Starr joined JANI-KING in January 2005.  From June 2004 to November 2004, she was a Sales Representative for Supreme Industrial Products.  She worked as an Operations Manager and a Sales Associate for JANI-KING from June 2003 to June 2004.  From October 1998 to June 2003, Ms. Starr was a Manager for Blockbuster, Inc.

# ITEM 3

# LITIGATION

**Pending Litigation.**

Jani-King Franchising, Inc. v. Pemoba, LLC, James Moriarity, Hans Peterson, (Case No. 04-06398, in the 134th Judicial District Court, Dallas County, Texas). On July 9, 2004, Plaintiff, the franchisor of the regional (master) franchise rights for the greater Madison, Wisconsin area filed a complaint against Defendants, the regional franchisee and the guarantors of the regional franchise for numerous and repeated violations of the franchise agreement between Plaintiff and Pemoba. Jani-King has previously terminated the franchise rights of Pemoba after Pemoba failed to cure numerous breaches of the franchise agreement. Jani-King is seeking declaratory judgment that the franchise agreement has been terminated, that Jani-King no longer has any duties to Pemoba, that defendants have no further rights under the franchise agreement, permanent injunction preventing Defendants from using any Jani-King materials, ordering Defendants to return all material relating to the franchise, and for Defendants to immediately pay all monies due Jani-King. Pre-trial activity is underway. On January 6, 2005, Jani-King entered into a settlement agreement with Hans Peterson whereby Peterson paid Jani-King the sum of $60,000.00 in exchange for dismissal of the lawsuit against Peterson and mutual releases. Jani-King specifically reserved all actions against Moriarity and Pemoba.

Austin L. Okocha v. Jani-King, Inc. and Jani-King of Seattle, (Case No. C01-1688Z, in the United States District Court For The Western District Of Washington). On October 19, 2001, Plaintiff, a franchisee of a former regional (master) franchisee of an affiliated corporation of Jani-King, Inc., filed a complaint against Jani-King, Inc. and Jani-King of Seattle alleging breach of franchise agreement/contract, breach of implied covenant of good faith and of (sic) fair dealing, intentional interference with business relationship, deceit, fraud, and misrepresentation, disparate treatment, retaliation, and intentional infliction of emotional distress and anguish resulting from actions which allegedly occurred during Plaintiff's operation of his franchise under the terms of a franchise agreement between Robert H. Vennell Co., Inc., the former Jani-King master franchisee and Plaintiff. On January 29, 2002, Plaintiff amended his complaint and added Jani-King International, Inc., Jani-King Franchising, Inc., Performance Franchising, Inc., and Bob Vennell Co., Inc. and removed Jani-King of Seattle, Inc. On February 19, 2002, the Court removed Jani-King of Seattle, Inc. Plaintiff's motion for default judgment, previously filed, against Jani-King of Seattle, Inc. were rendered moot and stricken and Jani-King, Inc. was dismissed from the action due to insufficiency of service of process. All Jani-King defendants strongly denied any wrongdoing. On December 18, 2002, the Court granted the Jani-King parties' motion for summary judgment and dismissed all claims against the defendants. The defendants are seeking attorneys fees and costs from the Plaintiff. On April 1, 2003, the Court granted summary judgment in its entirety for the defendants and awarded the Jani-King defendants $192,274.36 in attorneys' fees and $3,502.50 in attorneys' fees relating to Jani-King's motion for contempt. Defendant's collections procedures are now underway.

Jani-King of Michigan, Inc. v. Barbara Mallinger and Nofar Brothers, Inc. d/b/a Metro Lodge, (Case No. 01-108023, Circuit Court for the County of Wayne, State of Michigan). On March 8, 2001, Jani-King filed a complaint against the defendants for breach of contract, injunctive relief, and quantum meruit/implied contract alleging Mallinger, a Jani-King franchisee, breached her franchise agreement by failing to report revenues generated by her franchise, failing to pay the fees associated with the unreported revenue, diverting business from Jani-King, owning, maintaining, operating, and engaging in a competing business, and failing to return Jani-King property and further alleging Metro Lodge breached the terms of cleaning contracts by employing Mallinger directly and for failing to pay for services performed by Jani-King under the terms of the contracts. Jani-King is seeking damages in excess of $25,000 and injunctive relief restraining Mallinger from future breaches of her franchise agreement and restraining defendant Nofar Brothers, Inc. from employing Mallinger or any of her employees, costs, interest, attorney fees, and other costs. On July 12, 2001, counsel for Nofar Brothers, Inc. withdrew. On July 14, 2001, Jani-King obtained a default judgment against Mallinger. In March, 2002, Jani-King and Nofar Brothers, Inc. entered into a settlement agreement whereby Norfar Brothers, Inc. paid Jani-King $16,000, Jani-King and NoFar dismissed all claims and executed mutual releases, and entered into an order for reinstatement and consent judgment which will be entered only if Nofar Brothers, Inc. fails to abide by the agreement. As part of the settlement with Nofar, Nofar Brothers, Inc. agreed to cooperate with Jani-King in their claims against Mallinger and agreed not to employ Mallinger or any agents of Mallinger during the term of Mallinger's Jani-King franchise. Jani-King will seek enforcement of all actions against Mallinger.

Michael Covington and Brian K. Napier v. Jani-King of Cincinnati, Inc., (Case No. A9905193, Hamilton County Court of Common Pleas in Hamilton County, Ohio). On September 3, 1999, Plaintiffs filed a complaint against Jani-King of Cincinnati, Inc. alleging Jani-King fraudulently induced them into entering into the franchise agreement, under which terms the complaint is made, that Jani-King engaged in unspecified deceptive accounting and business practices, failed to provide equipment and training, failed to follow written policies and procedures, and failed to provide Plaintiffs unspecified pertinent information. Plaintiffs are seeking damages in excess of $25,000 and unspecified punitive damages. Jani-King has filed a motion to dismiss the complaint for lack of jurisdiction and venue. On November 3, 2000, the Plaintiffs voluntarily dismissed all claims against Jani-King. On November 5, 2001, the Plaintiffs re-filed their complaint alleging the same issues that were contained in their previous complaint. In November, 2002, the Court granted Jani-King's motion for summary judgment and dismissed all claims against the defendants. The defendants are seeking attorneys fees and costs from the Plaintiff.

**Past Litigation.**

Nancy Evans and Sally Brown v. Jani-King of Colorado, Inc., et al (Case No. 93-CV-5325, District Court for the City and County of Denver, Colorado) On October 1, 1993, a complaint was filed against Jani-King and Rod Mesplay by Ms. Evans and Ms. Brown, former Jani-King franchisees. Rod Mesplay was a former employee Jani-King regional director for the Denver region in 1991. The complaint was amended to join Frank Squillace, the Jani-King's Denver operations manager at the time. Plaintiffs alleged that the Defendants made false representations in early 1991 about the profitability of the franchise, the pricing of Jani-King's janitorial contracts, the proximity of the offered accounts and the support that Jani-King would provide. Plaintiffs also claimed that Jani-King failed to inform them that the monthly payments on the promissory note signed by Plaintiffs for a portion of the purchase price of the franchise would be offset against Plaintiffs' monthly revenues and that some of the accounts offered to them as Initial Business under the franchise agreement were not reasonably profitable as Plaintiffs claimed Jani-King had promised. The allegations included claims of fraud, negligent and intentional infliction of emotional distress, conspiracy, and violation of the Colorado Consumer Protection Act. Plaintiffs sought damages in excess of $500,000.

Before trial, the Court granted Jani-King's motion to dismiss Plaintiff's conspiracy claim, and the trial commenced on January 23, 1995. At the close of Plaintiffs' case in chief, the judge dismissed Plaintiffs' claim for intentional infliction of emotional distress. Upon completion of the trial, the Court dismissed Plaintiffs' claim for negligent infliction of emotional distress, and all Plaintiffs' claims against Mesplay and Squillace. In its Decision dated February 7, 1995, the Court found for the Plaintiffs on their claims of fraud and violation of the Consumer Protection Act. The Court found that in 1991 former employees of Jani-King made misrepresentations to the Plaintiffs about general profitability of the business, the proximity of the accounts offered, and the amount of support that Jani-King would provide Plaintiffs.

The Court ruled that the Plaintiffs failed to prove they suffered any lost profits; but entered judgment against Jani-King for $12,000; the amount Plaintiffs paid for their franchise, which was trebled under the mandatory trebling provision of the Colorado Consumer Protection Act. The Court also awarded Plaintiffs interest, costs and a portion of their attorney's fees. Following entry of judgment, the parties settled the dispute on May 23, 1995. The settlement included a payment by Jani-King to the Plaintiffs of $55,000. Jani-King received from Plaintiffs a satisfaction of judgment and the parties exchanged mutual releases. The Decision of February 7, 1995 against Jani-King was thereafter vacated by the Court by order of June 1, 1995.

Michael and Debra Olmstead, Ahmed and Shannon Attieh, Robert Baltimore, Robert Santhavi, Perry and Marian Sangston, Chieu Dang and William Wise v. Jani-King International, Inc., Jani-King, Inc., Jani-King of San Antonio, Inc. and Jani-King Leasing Corporation (Cause No. 94CI-00362, 160th Judicial District Court in Bexar County, Texas). On January 10, 1994 a petition was filed by the plaintiffs who are a mixed group of both current and former franchisees of Jani-King of San Antonio, Inc. The plaintiffs claim that the Jani-King related companies engaged in deceptive trade practices by misrepresenting: (1) that its goods and services had characteristics, uses, benefits and/or quantities which they did not have; (2) facts concerning the existence of certain services; (3) that the franchise agreements conferred or involved rights or remedies or obligations which they did not have; and (4) information concerning the services by withholding facts which were known at the time of the transaction and thereby intentionally induced plaintiffs into the franchise agreements. No facts have been presented by the plaintiffs, either in the mediation of the disputes before they filed suit or in the petition, that identifies any wrongdoing by Jani-King. The plaintiffs have only asserted overly broad allegations that are totally contradictory to the documents associated with the claims. Plaintiffs seek an unspecified amount of actual and punitive

damages and rescission for fraud, breach of contract, tortuous interference, breach of fiduciary relationship, breach of duty of good faith and fair dealing, and conversion. Jani-King denies any wrongdoing and will vigorously defend the suit. On January 9, 1995, the attorneys for the Plaintiffs were granted authority by the court to withdraw as counsel. On March 26, 1996, the court dismissed the case for want of prosecution.

Alfred R. Soricelli and Robert A. Fava v. Jani-King of Miami, Inc.and David Villandry (95-37CA17, 19th Judicial Circuit Court, St. Lucie County, Florida). On January 12, 1995, a complaint was filed by Soricelli and Fava, franchisees of Jani-King of Miami, Inc., claiming Villandry, a former manager of the Jani-King regional office in Miami, made misrepresentations that Jani-King would provide a certain level of gross monthly billings, only 3 labor-hours were needed to complete the work for every $1,000 in gross billings, 60% of new contracts would be designated for service by existing franchisees, and Jani-King would provide the Plaintiffs with growth opportunities for profitable new business. Plaintiffs claim fraud and a violation of the Florida Unfair and Deceptive Trade Act, and seek damages, special damages, attorneys' fees and costs in an amount not less than $15,000. On November 7, 1995, the parties reached a settlement of the lawsuit without either party admitting any liability. Pursuant to the settlement, the Plaintiffs voluntarily dismissed the lawsuit with prejudice and voluntarily entered a noncompetition agreement. Jani-King agreed to pay the plaintiffs $62,500 in four payments and the Plaintiff's franchise agreement was terminated.

Daniel J. Missar v. Jani-King International, Inc. (Case No. MC-95- 6583-RB, County Court, Palm Beach County 15th Judicial Circuit, Florida) On April 26, 1995, Daniel J. Missar, a franchisee of Jani- King of Miami, Inc., filed a suit for $12,000 plus interest and cost of suit based on breach of contract and unjust enrichment. In August 1995, the parties reached a settlement of this lawsuit, without either party admitting any liability. Pursuant to the settlement, Jani-King agreed to pay the plaintiff $5,000 in two payments. In return, the plaintiff returned his franchise to Jani-King and voluntarily dismissed his lawsuit with prejudice. Jani-King has made the required payments and the lawsuit has now been dismissed.

Michael R., Patricia A. Scarborough, Robin Momon, Geraldine C. James, Original Plaintiffs, and Jeanette Yates and Shirley Dunn, Intervenors, v. Jani-King of Memphis, Inc., Jani-King, Inc. and Jani-King International, Inc. (Case No. 95G159, 239th Judicial District Court of Brazoria County, Texas). On July 19, 1995, a petition was filed by plaintiffs who are mix of current and former franchisees of Jani-King of Memphis, Inc. The plaintiffs claim that the separate Jani-King companies acted as agents of each other and engaged in fraud, misrepresentation, breach of contract and violated the Texas Deceptive Trade Practices - Consumer Protection Act by representing that its goods were of a particular standard, quality or grade that they did not have and that it represented its goods had sponsorship, approval, characteristics, ingredients, uses, benefits or qualities which they do not have. Plaintiff's are seeking monetary damages of $139,000 plus interest, lost profits in the future, mental anguish damages, undisclosed punitive damages, treble damages under the Texas Deceptive Trade Practices - Consumer Protection Act, attorneys fees and expenses. While denying all liability and wrongdoing, the parties reached a settlement in principal in December, 2002 whereby all causes of actions were dismissed and the parties issued mutual releases and Jani-King agreed to a payment of $750,000 which would be distributed to all plaintiffs.

In the Matter of the Marriage of Margaret Arleen Cavanaugh and James A. Cavanaugh, Jr. And Jani-King International, Inc. (Third Party), (Case No. 199-51814-95, 199 Judicial District Court, Collin County, Texas). On August 1, 1995, Margaret Arleen Cavanaugh, the wife of our President, James A. Cavanaugh, Jr., filed a Petition for Divorce and Request for Temporary Restraining Order, seeking to terminate her marriage to Mr. Cavanaugh, a division of their marital estate, and damages. Ms. Cavanaugh has alleged, among other claims, that Mr. Cavanaugh committed fraud and breached his fiduciary duty in connection with his management of their marital property. Ms. Cavanaugh has also alleged that Jani-King International, Inc. and Mr. Cavanaugh are in substance one and the same, and to continue to recognize Jani-King International, Inc. as a corporation would result in fraud and/or injustice against Ms. Cavanaugh. Based upon this allegation, Ms. Cavanaugh has requested a division of unspecified corporate assets. Mr. Cavanaugh and Jani-King International, Inc. strongly denied all allegations, particularly as they related to Jani-King International, Inc. Jani-King International, Inc. and Mr. Cavanaugh filed Joint Motions for Partial Summary Judgment on all claims and allegations filed against Jani-King International, Inc. , which Motions for Partial Summary Judgment were granted by the court on February 2, 1996, denying all relief requested by Ms. Cavanaugh. On February 11, 1996 the parties reached a mediated settlement, resolving all disputes between the parties. Pursuant to the settlement, Ms. Cavanaugh resigned from all offices, directorships and positions of employment with Jani-King International, Inc. and all of its subsidiaries and affiliates. She and Jani-King International, Inc. also agreed to the entry of an order of a final judgment holding that Ms. Cavanaugh take nothing by way of her claims against Jani-King International, Inc. Jani-King International, Inc. agreed to seek the release of Ms. Cavanaugh from all personal guarantees made on behalf of Jani-King International, Inc. or any of its subsidiaries, and to indemnify her in connection with

such guarantees and to indemnify and hold her harmless from liability and defense costs in connection with the case of Joseph Schreiber v. Jani-King International, Inc., Jani-King of San Antonio, Inc. and Arleen Cavanaugh.

Lawland Shamoun v. Jani-King of California, Inc. and Does 1 through 20, (Case No. C 22295, Municipal Court of the State of California County of Orange, North Judicial District).  On August 24, 1995, plaintiff filed a breach of written contract action against defendants alleging defendant did not supply the plaintiff with the required training and information needed by plaintiff to perform under the contract, that defendant did not fulfill a promise of offering certain types of contracts, and that defendant failed to offer the volume of contracts required to be offered by defendant.  Plaintiff is demanding compensatory damages of $24,500, interest of $15,300, attorney's fees, and the cost of the suit.  This lawsuit, originally filed on October 9, 1992 and dismissed per Delay Reduction Rules by the Court, is being vigorously defended by defendant who denies all claims.  The lawsuit was tried on February 27, 1997.  The Court denied all of Plaintiff's claims, awarded Jani-King of California, Inc. the remaining balance on Plaintiff's promissory note ($2,769.03).  Jani-King of California, Inc. was also awarded attorney's fees in the amount of $30,636.50.

Barbara J. Wheeler v. Kenneth Simmons and Jani-King of Memphis, Inc.  (Case No. 75011 T.D.-2, Circuit Court of Tennessee for the 30th Judicial District at Memphis).  On December 28, 1995, the plaintiff filed a complaint claiming breach of contract against defendant Simmons and procurement of breach of contract against defendant Jani-King of Memphis, Inc. alleging Simons materially breached a partnership agreement with plaintiff by maliciously informing defendant Jani-King that plaintiff refused to participate in the partnership franchise thereby having her name removed from the franchise and further alleging that Jani-King caused procurement of the breach of contract by failing to notify plaintiff of the partnership dissolution.  Plaintiff demanded the franchise's profits plus interest from the date of the dissolution, treble damages under T.C.A. 47-50-109, and attorney's fees.  Jani-King denied all allegations; and on May 7, 2001, without admitting any wrongdoing or liability, the parties reached a settlement whereby Plaintiff's franchise was repurchased for the sum of $15,000.00 and Plaintiff dismissed the complaint with prejudice.

Gary Pang and Mohammed Sadiq v. Jani-King of California, Inc., Jeff Freeman, Vito Stabile, and Does 2-100, (Case No. 396258, Superior Court of the State of California, City and County of San Mateo).  On January 10, 1996, a complaint was filed by the plaintiffs, current franchisees of Jani-King of California, Inc. , in the Superior Court of the State of California, City and County of San Francisco, alleging breach of written contract, fraud and deceit, fraud by omission, negligent misrepresentation, breach of California's Franchise Investment Law and unfair business practices.  On April 22, 1996, the case was transferred to the Superior Court of the State of California, City and County of San Mateo.  Plaintiffs allege Jani-King failed to provide them with the amount of janitorial contracts stated in their contracts within the stated time period, offered plaintiffs contracts which were underbid, failed to make pertinent information available to them, failed to provide assistance and guidance, induced plaintiff Pang to waive the mandatory 10 day cooling off period, misrepresenting the amount of money needed to purchase materials to commence business, the amount of insurance coverage provided by the insurance program offered to plaintiffs and the territory granted under the plaintiffs' franchise agreements. Both plaintiffs sought recession of their franchise agreements, the return of initial franchise fees, attorney's fees,  undetermined compensatory ($3,000 for plaintiff Sadiq and $12,550 for plaintiff Pang), punitive and exemplary damages, future lost profits, injunctive relief, an offer of rescission of contract to all franchisees in California and cost of the suit. Defendants denied all allegations; and on January 4, 2000, the parties reached an agreement to settle this complaint and the Summan complaint listed in this Item 3 whereby Jani-King paid a sum of $110,000 plus $550,000 in attorneys fees and costs, and all Plaintiffs in both cases agreed to dismissed all claims against Jani-King and the other Defendants, with prejudice, and all Plaintiff's franchise agreements were terminated.

Zachar Pripilitsky v. Jani-King of Minnesota, Inc. (Case No. 960321087, Conciliation Court for the State of Minnesota, County of Hennepin).  On March 22, 1996, plaintiff filed a complaint claiming breach of contract against defendant alleging that Jani-King had breached the terms of the franchise agreement by not disclosing how defendant bid accounts which were offered to plaintiff.  Plaintiff sought damages in the amount of $3,000.00 plus filing fees,  Jani-King filed a counter suit for the remainder balance of the financed portion of the initial franchise fee.  On June 14, 1996, the court awarded Jani-King $6,530.07 and the defendant nothing.  Plaintiff appealed the decision to the Hennepin County District Court, which was denied due to plaintiff's failure to file an Affidavit of Service.  Plaintiff subsequently filed a motion to extend the time to appeal which was granted on January 13, 1997.  Plaintiff filed an appeal for a de novo trial with the Hennepin County District Court which is currently pending service of process.  In September 4, 1997, the parties, without admitting any wrongdoing or liability, reached a settlement of all claims whereby Plaintiff agreed to pay Jani-King of Minnesota, Inc. $3,500, to execute a confession of judgment, to abide by the terms of the post termination non-compete provisions of his franchise agreement; and both parties dismissed all claims against each other.

Shelley Wheeler Podrosky; Ray Sauceda; Boota Singh; SLK Enterprises and Mike Taing v. Jani-King International, Inc.; Jani-King Franchising, Inc.; Jani-King, Inc.; James A. Cavanaugh; Robert H. Vennell Company; Vennell Enterprises and Robert H. Vennell, (Case No. 96-2-14809-1SEA, Superior Court for the State of Washington in and for King County). On June 4, 1996, the plaintiffs, current and former franchisees of Robert H. Vennell Company, filed a class action complaint alleging violations of: 1989 Revised Code of Washington (RCW), Title 19, Section 19.100.170, which makes unlawful the sale or offer to sale by means of any written or oral communications which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements not misleading; RCW 19.100.180(d) which makes unlawful the sale, rent or offer to sell to a franchisee any product or service for more than a fair and reasonable price, alleging fees charged by defendants are neither fair nor reasonable; RCW 19.100.180(c) which make it unlawful to discriminate between franchisees in the charges offered or made for royalties, by offering select contracts and not charging the same fees to Vennell Enterprises; RCW 19.86; and that defendants committed unfair and deceptive acts in  marketing franchises by misrepresenting defendant's litigation history and the success rate of other franchisees.  Plaintiffs seek unspecified restitutionary and treble damages; injunctive relief; all costs and expenses of litigation and  pre judgment interest. On January 28, 1997, the court denied the class certification motion of the Plaintiffs.  On September 12, 1997, the court dismissed all claims for violation of RCW 19.100(c) and (d), dismissed all claims against Vennell Enterprises, and dismissed all claims brought by Plaintiff Singh.  On September 14, 1997, the court dismissed Jani-King, Inc. and James A. Cavanaugh, with prejudice, from the lawsuit.  On October 6, 1997, without admitting any wrongdoing or liability, the parties reached a settlement on all claims whereby the Plaintiffs dismissed all claims against all Defendants in exchange for one payment of $8,300.  Also included in the settlement was the termination of each of the Plaintiffs' franchise agreements with the post termination non compete agreements remaining in effect.

Margaret Arleen Cavanaugh v. Jani-King Franchising, Inc. and Jani-King, Inc. (Cause No. 9606851-F, 116th Judicial District Court in Dallas County, Texas). On July 8, 1996, the plaintiff filed a petition, claiming that: (1) the Jani-King defendants employed her in October, 1985, and (2) the Jani-King defendants promised to compensate her by giving her 50% ownership  of each defendant and their subsidiaries. The plaintiff claims to have provided valuable services in reliance upon these promises; and further claims that, following her divorce from Jim Cavanaugh, she learned for the first time that she had not received the ownership interest in the defendant companies, all of which the defendants vigorously deny.  Based upon these alleged facts, she has asserted claims of fraud, breach of contract, and quantum meruit and seeks specific performance of the alleged verbal contract or, in the alternative, actual damages equal to the greater of the value of the 50% ownership interest in the defendants and their subsidiaries, or her services, as well as other unspecified and alleged actual damages purportedly caused by the Jani-King defendant's alleged conduct.  She also sought exemplary damages, attorney's fees, costs of court, and pre and post-judgment interest.  The Jani-King defendants deny all of the Plaintiff's claims and have filed a motion for summary judgment seeking dismissal of all claims.  On June 26, 2001, the trial court entered an agreed order abating the lawsuit.  On October 26, 2001 the parties reached a settlement of all matters pending whereby, without admitting any liability, Jani-King agreed to pay Plaintiff at least $25,500 a month in exchange for Plaintiff dismissal of the about claims with prejudice, mutual releases, a nondisparagement provision, and the return of certain Jani-King documents.

Igor Balk v. Jani-King of Illinois, Inc., Joseph Boemer, and Robert Limbach (Case number 96 M1 142099, Circuit Court of Cook County, Illinois).  On August 14, 1996, plaintiff filed a complaint alleging the defendants violated Illinois Statute 815 ILCS 705/6 by making untrue statements of material fact regarding their performance as franchisor and failed to supply the plaintiff with workable jobs and in so doing did materially mislead the plaintiff.  The plaintiff further alleged that the defendants provided him with industrial/manufacturing cleaning contracts despite statements made to plaintiff to the contrary; and that the defendants supplied him with a temporary cleaning job insufficient to support the statements made to induce him to purchase the franchise.  On March 27, 1997, the parties reached a settlement of this lawsuit, without either party admitting any liability.  Pursuant to the settlement, Jani-King agreed to pay the plaintiff $2,850.  In return, the plaintiff returned his franchise to Jani-King and voluntarily dismissed his lawsuit with prejudice.

Ronald Prosch v. Jani-King of Minnesota, Inc. and George B.Selman, (Court File No. CT 97-00872, Minnesota Civil District Court of the Fourth Judicial District for the County of Hennepin).  On January 14, 1997, the plaintiff delivered a complaint alleging violations of the Minnesota Franchise Act, fraud/misrepresentation, material breach of contract, and estoppel.  The plaintiff purchased an existing franchise owned by a third party.  The plaintiff claims that defendant Selman made false and misleading representations to him to induce plaintiff to purchase the franchise in violation of Minnesota Statute §80C.13, subd. 2 and §80C.18 which plaintiff relied upon to his detriment.  Plaintiff further alleges that defendant Jani-King failed to provide plaintiff with the mandatory initial training.  Plaintiff seeks damages in excess of $50,000 for each count, rescission of the franchise agreement, all amounts paid to on behalf of defendant Jani-King, and all costs and

attorneys' fees. On November 13, 1997, the parties, without admitting any wrongdoing or liability, entered into a Settlement Agreement and Mutual Release whereby Jani-King agreed to assist in the sale of Plaintiff's franchise, agree to provide contract business to the Plaintiff's franchise upon the sale, to guaranty a minimum sales price of the franchise, and to exchange certain janitorial equipment. As part of the settlement, all parties agreed to dismiss all claims against each other with prejudice.

Jani-King International, Inc., Jani-King, Inc., and Jani-King Franchising, Inc. v. Margaret Arleen Cavanaugh, Bonus Building Care, Inc., Rueben Amesquita, Julie Flores, Jimmy Wren Lacy, Melissa Sampson, and Kevin H. Spurrier v. Jani-King International, Inc., Jani-King, Inc., Jani-King Franchising, Inc., Jani-King of Memphis, Inc., and James A. Cavanaugh, Jr. (Third-party), (Case No. 199-00424-97, 199 Judicial District Court, Collin County, Texas). On March 13, 1997, Jani-King filed an original petition for violation by defendant Margaret Arleen Cavanaugh of a Protective Order issued by this court which prohibited the use of confidential information other than in the proceedings of the divorce action filed by defendant Margaret Arleen Cavanaugh and for breach of contract by Rueben Amesquita, Julie Flores, Jimmy Wren Lacy, Melissa Sampson, and Kevin H. Spurrier for violation of their post employment covenants not to compete. These actions stem from defendant Margaret Arleen Cavanaugh's use of confidential information in the establishment and operation of a competing janitorial franchise business (Bonus Building Care, Inc.) and the other defendants' employment with Bonus Building Care, Inc. Plaintiffs sought actual, punitive, and exemplary damages to be determined by the court; attorney's fees; temporary and permanent injunctions. Defendants Margaret Arleen Cavanaugh, Bonus Building Care, Inc. and Jimmy Wren Lacy have filed counterclaims alleging malicious prosecution/tortuous interference by the use of litigation to interfere with defendants' business. Defendant Lacy has also alleged fraud based on material misrepresentations that induced him to accept employment with defendant, and violation of the Texas Free Enterprise and Anti-Trust Act by the enforcement of the non-compete covenants; and further sought indemnification for any violations of 16 C.F.R. Part 436 by Lacy. Counterclaimants sought unspecified damages. On November 3, 1997, the Jani-King plaintiffs dismissed all claims against defendant Kevin Spurrier. On November 5, 1997, Defendants Margaret Arleen Cavanaugh and Bonus Building Care, Inc. dismissed all claims against Jani-King International, Inc., Jani-King Franchising, Inc., Jani-King, Inc. and Third Party Defendants Jani-King Leasing Corporation, James A. Cavanaugh, Jr. and Jani-King of Memphis, Inc. On November 14, 1997, Defendant Jimmy Wren Lacy, Sr. dismissed all claims against Jani-King International, Inc., Jani-King Franchising, Inc., Jani-King, Inc. and Third Party Defendants Jani-King Leasing Corporation, James A. Cavanaugh, Jr. and Jani-King of Memphis, Inc. On January 20, 1998, the Jani-King plaintiffs dismissed their claims against Jimmy Wren Lacy, Sr. On February 27, 1998, the Jani-King plaintiffs dismissed their claims against Melissa Sampson. On October 26, 2001, the remaining parties reached a settlement of all matters pending whereby Jani-King agreed to dismiss the above complaints with prejudice and to enter into mutual releases and a nondisparagement provision. This settlement was part of a global settlement of litigation between various parties and no money was specifically designated for the settlement of these claims.

In the Matter of the Marriage of Margaret Arleen Cavanaugh and James A. Cavanaugh, Jr. (Case No. 199-51814-95, 199th Judicial District Court, Collin County, Texas) and Margaret Arleen Cavanaugh v. Jani-King International, Inc. (Case No. 199-465-96, 199th Judicial District Court, Collin County, Texas). Both lawsuits were originally one case (In the Matter of the Marriage of Margaret Arleen Cavanaugh and James A. Cavanaugh, Jr. and Jani-King International, Inc., Case No. 199-51814-95, 199th Judicial District Court, Collin County, Texas) prior to their severance into two suits in 1996. On January 23, 1997, plaintiffs, James A. Cavanaugh, Jr. and Jani-King International, Inc. filed a Motion to Enforce Property Settlement and Protective Order seeking, among other things, to enforce the terms of the Protective Order entered in the pre-severed case and incorporated into and extended in effect until August 16, 2002 by the final judgments in each of the post-severance cases. The request to enforce the Protective Order's terms included the request that the Court order Margaret Arleen Cavanaugh (now known as Margaret Arleen Masterson) to cease and desist the use of "Confidential information," as defined in the Protective Order, including Masterson's use of Jani-King trade secrets in her competing business, now known as Bonus Building Care. The Motion was amended five times and was last filed on September 21, 1998 as two separate motions: James A. Cavanaugh, Jr.'s Fifth Amended Motion to Enforce (in Case No. 199-51814-95) and Jani-King International, Inc.'s Fifth Amended Motion to Enforce (in Case No. 199-465-96). These two motions were heard together by the 199th Judicial District Court from October 5, 1998 through October 30, 1998. In the interest of judicial efficiency and to avoid awarding a double recovery, the Court rendered one Final Order on both enforcement motions on the 16th day of August, 1999. In the Final Order, the Court found that Masterson had used and disclosed Confidential Information in violation of the Protective Order. The Court ordered Masterson to immediately discontinue disclosure and use, through whatever means, of Confidential Information in violation of the Protective Order and to strictly comply with the Protective Order from the 16th day of August, 1999 forward. The Court found that the materials listed on Exhibits B and C to the Final Order constitute Confidential Information under the Protective Order. The Court ordered Masterson to deliver to Jani-King and Mr. Cavanaugh by August 31, 1999 all Confidential Information listed on Exhibits B and C to the Final Order and to retrieve and destroy any documents derived

from the Confidential Information. The Court awarded Jani-King and Mr. Cavanaugh a total of $829,000 in attorneys' fees; an additional $40,000 in attorneys' fees if the proceedings are appealed to the Court of Appeals; and an additional $10,000 in attorneys' fees if the proceedings are appealed to the Texas Supreme Court. The Court also taxed and adjudged against Masterson all court costs incurred by Mr. Cavanaugh and Jani-King during the enforcement proceedings. The Court awarded Mr. Cavanaugh and International on all recoveries granted in the Final Order post-judgment interest of 10% compounded annually from the date of the Order. On September 15, 1999, Masterson filed a notice of appeal. On October 1, 1999, the Court ordered that the amount of supersedeas bond required to be posted by Masterson in order to supersede the monetary portion of the Final Order is $1,020,500. The Court further ordered that the amount of supersedeas bond required to be posted by Masterson in order to supersede the non-monetary portion of the Final Order is $5,000,000; or alternatively, Masterson may supersede the non-monetary portion of the Final Order by (1) delivering to the Master in Chancery all documents required under the Final Order to be delivered to Mr. Cavanaugh and Jani-King; (2) delivering to the Master in Chancery and to Mr. Cavanaugh and Jani-King a log of all documents delivered to the Master in Chancery; and (3) posting a $1,000.00 supersedeas bond. Also on October 1, 1999, the Court further ordered Masterson to immediately comply with the Final Order and to turn over certain property to the Collin County Sheriff. Masterson has appealed the matter to the Court of Appeals, Fifth District of Texas in Dallas, Texas. Briefing was submitted to the Dallas Court of Appeals in Masterson's appeals, and the court heard oral argument on March 14, 2001. On October 26, 2001, the parties reached a settlement of all matters pending whereby Jani-King agreed to dismiss the above complaints with prejudice, to have the trial court's orders vacated, and to enter into mutual releases and a nondisparagement provision. This settlement was part of a global settlement of litigation between the parties and no money was specifically designated for the settlement of these claims.

   William and Sylvia Velazquez v. Jani-King Franchising, Inc. and Jani-King of Illinois, Inc, (Cause No. 45D05 9707CP 1251, Superior Court of Lake County, Indiana, Civil Division). On July 8, 1997, Plaintiffs filed a complaint against Defendants alleging breach of contract, breach of fiduciary duty, violation of the Indiana Franchise Act, fraud, and violations of the Indiana Deceptive Franchise Practice Law. Plaintiffs sought unspecified actual, exemplary, and punitive damages, interest, and attorney's fees. On November 21, 1997, without admitting any wrongdoing or liability, the parties reached a settlement whereby Plaintiffs dismissed all claims against Defendants in exchange for payment in the amount of $25,000. Also included in the settlement was the termination of each of the Plaintiffs' franchise agreements with the post termination non compete agreements remaining in effect and the return of certain equipment by Plaintiffs to Defendants.

   John Waszak and Barbara Waszak v. Jani-King of New York, Inc., Jani-King International, Inc., and Jani-King, Inc., (Index No. 97/020104, Supreme Court of the State of New York, Nassau County, New York). On July 10, 1997, Plaintiffs filed a verified complaint against the Jani-King defendants alleging breach of contract seeking unspecified damages, punitive damages of $5,000,000, rescission of the franchise agreement and $14,000 in franchise fees, and unspecified attorney's fees. The Jani-King defendants have denied all allegations and is vigorously defending the lawsuit. On April 1, 1998 without admitting any wrongdoing or liability, the parties reached a settlement whereby Plaintiffs dismissed all claims, with prejudice, against Defendants in exchange for payment in the amount of $20,000.00. Also included in the settlement was the termination of each of the Plaintiffs' franchise agreements.

   Daniel Ross, Henryetta Ross, Ross & Ross, Inc. , Earnest Sherrod, Cassandra Sherrod, and The Sherrod Group, Inc. v. Synergy Corporation, d/b/a Jani-King of Raleigh Durham, Doug Johns, Allen Lee, Sam McFall, Michael Nardelli, Jani-King Franchising, Inc. and Jani-King International, Inc., (Cause No. 97CVD01237 in the General Court of Justice, Superior Court Division of Durham County, North Carolina). On April 7, 1997, plaintiffs filed a complaint alleging that Synergy and the individuals named have charged and collected multiple finder's fees on accounts which Synergy Corporation has not newly acquired but had transferred from other franchise owners, have oversold the franchises in the area, conflict of interest resulting from employees of Synergy owning Synergy franchises, failure to provide clear and complete financial statements, failure to provide the level of business as stated in the franchise agreement, incorrect deductions from the franchises, and breach of contractual duties for failure to provide training, assistance, and guidance. Plaintiffs are seeking a refund of their franchise fees, cancellation of promissory notes executed by them, unspecified damages, treble damages for unfair and deceptive trade practices, attorney's fees and costs. Through a motion with the court, the individual defendants were dismissed from the lawsuit. On September 18, 1997, the court dismissed all claims against Jani-King International, Inc. and Jani-King Franchising, Inc. for failure of Plaintiffs to state a claim upon which relief could be granted. On November 18, 1997, plaintiff's complaints against Jani-King International, Inc. and Jani-King Franchising, Inc. were dismissed for failure to state a claim upon which relief could be granted. On November 16, 1998, plaintiffs and the remaining defendants dismissed all claims against one another.

Sarkis Khoshaba v. Jani-King of Illinois, Inc., (Case Number 96M1171146, Circuit Court of Cook County, Illinois). Romeo Sarhan v. Jani-King of Illinois, Inc., (Case Number 96M1171147, Circuit Court of Cook County, Illinois). On January 13, 1997, the two above named plaintiffs filed claims against the defendant claiming they were not offered the Initial Business within the Initial Offering Period as stated in the franchise agreement. Khoshaba is seeking $12,000 in damages and Sarhan is seeking $8,000 plus court fees. Romeo Sarhan dismissed all claims against the defendant after a settlement whereby defendant would pursue certain collections matters relating to the operation of Sarhan's franchise. On February 17, 1998, an order to dismiss all claims against defendant by Khoshaba was entered. Plaintiff Khoshaba filed a motion to vacate the dismissal. On October 22, 1998, an order was entered whereby defendant Khoshaba would offer plaintiff $4,000 in monthly business and on January 8, 1999 the court struck plaintiff Khoshaba's motion to vacate the dismissal.

Jani-King Franchising, Inc. v. Kimberlite, Inc., (Cause No. 97-02318-C, 160th Judicial District Court in Dallas County, Texas). Kimberlite, Inc. v. Jani-King Franchising, Inc., Jani-King, Inc., and Jani-King International, Inc., (Cause No. 97-02324-I, 162nd Judicial District Court in Dallas County, Texas). On March 13, 1997, Jani-King Franchising, Inc. filed a petition seeking a declaratory judgment to terminate the regional franchise agreement between Jani-King Franchising, Inc. and the defendant in response to defendant's breach of the agreement resulting from defendant's actions in wrongfully providing Jani-King's confidential and trade secret information to unauthorized third parties to start and build a competing business. Jani-King Franchising, Inc. is seeking undetermined damages, a declaration that the regional franchise agreement is terminated and that Jani-King has no liability to Kimberlite, Inc., reasonable attorney's fees, courts costs, and pre-judgment and post-judgment interest. On the same day Jani-King Franchising, Inc. filed the above captioned lawsuit, Kimberlite, Inc. filed a petition in the 162nd Judicial District Court alleging breach of contract, breach of duty of good faith and fair dealing and fraud resulting from the Jani-King entities' alleged breach of oral and written agreements between the parties and alleging that the Jani-King entities failed to disclose material facts about the business opportunity being offered to Kimberlite, Inc. Kimberlite, Inc. also has sought indemnification from the Jani-King entities for any liability incurred by Kimberlite, Inc. as a result of alleged unlawful provision of insurance to Kimberlite, Inc. and their franchisees. The Jani-King entities have denied all allegation and are aggressively defending the lawsuit and pursuing their claims against Kimberlite, Inc. The cases have been consolidated in the 160th Judicial District court and discovery and injunctive hearings are proceeding. On February 11, 1999, the court granted summary judgment in favor of Jani-King denying each and all of Kimberlite's claims and a take nothing judgment is entered on all of Kimberlite's claims and granting judgment for Jani-King on its claim seeking specific enforcement of the contract of sale for the repurchase of the regional franchise. Kimberlite appealed the decision of the Court; and, on October 31, 2001 the parties reached a settlement of all matters pending whereby, without admitting any liability, Jani-King agreed to pay Plaintiff at least $8,000 a month and the parties agreement to dismiss all of the above claims with prejudice, mutual releases, a nondisparagement provision, and the return of certain Jani-King documents. Jani-King Franchising, Inc agreed to repurchase the regional franchise rights from Kimberlite for $300,000.00

Larry R. Lass v. Jani-King of Memphis, Inc., Jani-King International, Inc., James A. Cavanaugh, Jr., Jerry Crawford, Gene Nunn, (Civil Action No. 3-97CV1293-P in the United States District Court for the Northern District of Texas). On May 21, 1997, plaintiff, a franchise of Jani-King of Memphis, Inc., filed a complaint in the 160th Judicial District Court in Dallas County, Texas, seeking declaratory relief that the covenant not to compete contained in his franchise agreement is unenforceable as an unreasonable restraint of trade in violation of Texas law, alleging fraud against the defendant for failure to disclose material facts about the insurance provided through defendant's business protection plan and misrepresentation, and allegations of violations of 18 U.S.C. §1341, the Racketeer Influenced and Corrupt Organizations Act, resulting from alleged mail and wire fraud, tax evasion, and money laundering, and a temporary restraining order and preliminary injunction seeking to prevent defendant from interfering with his employment with a competitor of defendant, Bonus Building Care, Inc. The defendants, on May 30, 1997, removed the case to federal court. Defendants filed a counter claim alleging that Plaintiff had breached his covenant not to compete contained in his franchise agreement by his employment with Bonus Building Care, Inc. On March 24, 1998, the complaint was amended to add additional defendants, and the Defendants filed a counterclaim alleging Plaintiff's DTPA claims were groundless and brought in bad faith. In response to a Rule 11 letter which put Lass on notice that a motion for Rule 11 sanctions would be filed if he did not withdraw the frivolous RICO claim, Plaintiff dismissed all claims relating to violations of 18 U.S.C. §1341, the Racketeer Influenced and Corrupt Organizations Act and all claims alleging antitrust violations. Defendants denied each and every claim. On March 19, 1999, the court heard summary judgment arguments and ruled in favor of all defendants, dismissing all of Plaintiff's claims against Defendants. All Defendants except Gene Nunn and Jerry Crawford filed motions seeking attorneys fees in the amount of $480,000 plus $28,345.10 in costs. Gene Nunn sought an award of $88,102.92 in attorneys fees and Jerry Crawford requested an award of $95,275 in attorneys fees. The Defendants' motions for attorneys' fees were pending when the parties announced the settlement of this case to the Court. Under the terms of the Settlement Agreement, Plaintiff agreed to an entry of judgment against himself in the total amount of attorneys fees and costs petitioned by the

Defendants, to waive any rights of appeal, and to return all documents delivered by Defendants. Plaintiff's attorneys agreed not to share any information obtained in the litigation with any attorneys or litigants and to identify anyone to whom she had produced such information and sign an affidavit avowing and affirming that she has complied. Plaintiff and his counsel agreed to waive all attorney/client and attorney work product privileges and to participate in interview sessions with Defendants and disclose information and truthfully answer questions on numerous matters raised by Defendants. Plaintiff also agreed that if Plaintiff or his counsel materially breached the settlement agreement, Defendants would proceed with execution and other post-judgment collection remedies on the judgment. The parties provided mutual releases.

Paramjit Summan and Mohammed Haq v. Jani-King of California, Inc., Jani-King, Inc., Jani-King International, Inc., John "Jeff" Freeman, Vito Stabile, and Does 2-100, (Case No. 400501, Superior Court of the State of California, City and County of San Mateo). On April 25, 1997, a complaint was filed by the plaintiffs, current franchisees of Jani-King of California, Inc., alleging the Defendants engaged in unfair business practices in violation of Section 17200 of the California Business and Professions Code by making untrue earnings claims, providing false information to Plaintiffs, and seeking rescission and reformation of Plaintiffs' franchise agreements and promissory notes, breach of California's Franchise Investment Law, fraud and deceit, fraud by omission, negligent misrepresentation, breach of written contract and implied covenant of good faith and fair dealing. Plaintiffs also are seeking the return of their initial investment ($12,550 for Summan and $2,850 for Haq), other unspecified punitive and exemplary damages, and attorney's fees and costs. Defendants denied all allegations; and on January 4, 2000, the parties reached an agreement to settle this complaint and the Pang complaint listed in this Item 3 whereby Jani-King paid a sum of $110,000 plus $550,000 in attorneys fees and costs, and all Plaintiffs in both cases agreed to dismissed all claims against Jani-King and the other Defendants, with prejudice, and all Plaintiff's franchise agreements were terminated.

Anthony Belfiore and Christopher Sitler d/b/a Belfiore-Sitler Services v. Jani-King of New York, Inc. (Case No. 4472/95, Supreme Court of the State of New York, Nassau County, New York). On February 3, 1995, Anthony Belfiore and Christopher Sitler, franchisees of Jani-King of New York, Inc., filed a suit for rescission of the franchise agreement based on breach of contract and fraud. Plaintiff's are seeking monetary damages of $127,371.50 plus interest, unspecified additional damages, punitive damages of $5,000,000 and the discharge of any unpaid franchise fees. Jani-King has denied all allegations and is vigorously defending the lawsuit. On March 17, 1999, the parties, without admitting any wrongdoing or liability, the parties reached a settlement whereby Plaintiffs dismissed all claims, with prejudice, against Defendants in exchange for payment in the amount of $100,000.00. Also included in the settlement was the termination of each of the Plaintiffs' franchise agreements.

Fernando Melendez v. Angel Garcia and Jani-King, Inc., (Docket Number ATL-L-39046, Superior Court of New Jersey Chancery Division Atlantic County). On August 19, 1997, Plaintiff amended his original complaint against Garcia and added Jani-King, Inc., alleging Jani-King breached its contract with Plaintiff by sending financial and reporting information to his partner, the co-defendant in this lawsuit, which caused Plaintiff's partnership to monopolize and control the franchise. Jani-King was never served with the amended complaint, and Plaintiff never caused a summons for service to be issued by the Court which has notified Jani-King that the case is now marked closed in all respects.

Brenda Wynacht and William Snow v. Jani-King International, Inc. and Concept Management Ltd., (No. 9701-14780, In The Court Of Queen's Bench Of Alberta Judicial District of Calgary). On October 17, 1997, Plaintiffs filed a Statement of Claim against Jani-King International, Inc. ("Jani-King") and Concept Management Ltd., a Regional Sub-Master Franchisee of a Regional Franchisee under Jani-King Franchising, Inc. alleging that the defendants provided the Plaintiffs false and misleading information prior to Plaintiff's purchase of the franchise. Plaintiffs also allege that their franchise was terminated by Concept with the consent of Jani-King. Plaintiffs are seeking damages in the amount of $16,900 for loss of franchise fees, for monies improperly withheld, $23,000 for monies resulting from the loss of the sale of their franchise, and cost on a solicitor and own client basis. Jani-King has denied all allegations, has denied any contractual relationships with the Plaintiffs, and has filed an application for summary dismissal of all claims against it. The case has remained dormant and no action of any kind has been undertaken on this matter for over 4 years.

Kerry Lewis v. Jani-King of Illinois, Inc., (Case No. 98L2323, In the Circuit Court of Cook County, Illinois County Department, Law Division). Jani-King of Illinois, Inc. v. Kerry Lewis (Case No. 98 CH 7035, In the Circuit Court of Cook County, Illinois County Department, Law Division). On February 25, 1998, plaintiff, a franchisee of defendant, filed a complaint alleging breach of the franchise agreement between plaintiff and defendant based on allegations that defendant allowed individuals other than plaintiff to provide janitorial services to accounts being serviced by plaintiff's franchise and by allowing the termination of certain other accounts being serviced by plaintiff's franchise, and for conversion of funds

being held by defendant for the benefit of plaintiff. Plaintiff is seeking $41,545.80 for compensatory damages, punitive damages of at least $100,000 and attorney's fees and costs. On June 5, 1998, the court dismissed plaintiff's conversion claims with prejudice. Jani-King of Illinois, Inc. filed a complaint against Kerry Lewis for breach of contact, injunctive relief, misrepresentation, and for failure to pay monies due Jani-King of Illinois, Inc. On July 10, 2000, without admitting any wrongdoing or liability, the parties reached a settlement whereby Lewis would pay Jani-King $2,500.00, the parties will dismiss all claims, with prejudice, against each other, the franchise agreement will be terminated, and Plaintiff will return all Jani-King materials to Jani-King.

Dewayne Mitchell vs. Jani-King of Minnesota, Inc., (Case No. CT-98-009468, In the District Court, Forth Judicial District, State of Minnesota, Hennepin County). On June 1, 1998, plaintiff, a franchisee of defendant, filed a complaint alleging breach of contract and unjust enrichment based on allegations that defendant failed to properly account for money owed to plaintiff, failure to provide support services, and wrongfully taking a client from plaintiff without replacing the business. Plaintiff is seeking return of his $12,000 franchise payment, compensatory damages in an amount exceeding $18,580, and other unspecified relief. Defendant denied all allegations; and on August 24, 1999, the parties reached an agreement whereby Jani-King will repurchase Defendants franchise for a sum of $18,000, and Defendant will dismiss all claims against Jani-King with prejudice.

Michael Judie v. Jani-King, Inc., Jim Cavanaugh, Garry Clark, Michael Kearns, Rich Hausman, Vic Arminio, Jeffery Gainer, Kim Phouc Jeweler's, Nancy Phu, Harley Silva, Eddie Reynolds, Garden Fresh Corporation, and Souplantation Restaurant; Nancy Phu (Cross-Complainant) v. Jani-King, Inc., (Case No. BC193099, In the Superior Court of the State of California, for the County of Los Angeles). On June 23, 1998, plaintiff, a franchisee of an entity not named in the complaint, filed a complaint alleging breach of contract, fraud and deceit, intentional misrepresentation, conspiracy to interfere with an economical relationship, intentional infliction of emotional distress, temporary restraining order, preliminary and permanent injunction and declaratory relief based on allegations that one or more of the defendants prevented plaintiff from performing plaintiff's obligations under the franchise agreement by employing plaintiff's employees, failing to make cash advances to plaintiff, failure to pursue collections on behalf of plaintiff, and failing to notify plaintiff of special financing options available to veterans. On September 9, 1998, Jani-King of California, Inc. filed a demurrer to the complaint. Plaintiff, in response, amended his complaint and dropped his cause of action for discrimination. In December, 1998, a demurrer to the intentional infliction of emotional distress claim was sustained without leave to amend. Plaintiff is seeking damages in excess of $25,000, unspecified exemplary, punitive, general, special and treble damages. On January 20, 1999, plaintiff agreed to dismiss defendants Garry Clark and Jim Cavanaugh. Defendants denied all allegations; and on March 7, 2000, the parties reached an agreement whereby Jani-King paid Defendant $50,000, and Defendant dismissed all claims against Jani-King with prejudice and Plaintiff's franchise agreement was terminated.

Prince A. Suleman v. Jani-King of New York, Inc., (Case No. 033935 CVN 1998, In the Civil Court of the City of New York, County of New York). On October 23, 1998, plaintiff filed a endorsed complaint alleging breach of contract, resulting from an unspecified claim that the franchise contract was never replaced. Jani-King denied all allegations and, following a trial on the issues on August 3, 1999, the Court rendered a judgment in favor of Jani-King, denying all of Plaintiff's allegations.

James Edward Gatlin and Brenda Carol Gatlin vs. Jani-King of Michigan, Inc., (Case No. 98-010634-CK, State of Michigan, Oakland County Circuit Court). On November 18, 1998, plaintiffs, franchisees of defendant, filed a complaint alleging breach of contract and interference with contractual relationship. Plaintiffs allege that defendant has failed to pay plaintiff for services rendered in violation of the franchise agreement and interfered with contract to which plaintiff's franchise was providing janitorial services by terminating the subject contracts and failing to pursue the clients for breach of contract. Plaintiffs are seeking $30,579 in damages, interest, costs, and attorneys fees. Jani-King denied the allegations; and on September 9, 1999, without admitting any wrongdoing or liability, the parties reached a settlement whereby Plaintiffs dismissed all claims, with prejudice, against Defendants in exchange for payment in the amount of $3,500.00. Also included in the settlement was the termination of each of the Plaintiffs' franchise agreements.

Donald R. Andrews vs. Jani-King of Illinois, Inc., (Case No. 98LM560, In the Circuit Court for the 19th Judicial Circuit, McHenry County, Illinois). On December 16, 1998, plaintiff, a franchisee of Jani-King of Illinois, Inc. filed a complaint alleging breach of contract and failure to comply with the Illinois Franchise Disclosure laws and alleging that defendant failed to offer the amount of business to plaintiff under the terms of the franchise agreement within the allotted period of time and failure to provide a disclosure statement to plaintiff prior to the sale of the franchise in violation of Section 705/5 of the Illinois Franchise Disclosure Act. Plaintiff is seeking damages in an amount not to exceed $50,000, attorneys

fees, and costs.  On February 24, 1999, Jani-King filed a motion to dismiss the complaint based on lack of standing and the fact that Plaintiff had previously released Jani-King on which Plaintiff based his complaint.  On April 16, 1999, the Court granted Jani-King's motion to dismiss.  On April 30, 1999, Plaintiff amended his complaint to add Complete Enterprises, Inc. as an additional plaintiff.  On June 4, 1999, Jani-King filed a second motion to dismiss the amended complaint.  Plaintiff did not file a response to the Motion to Dismiss and voluntarily agreed to dismiss the action with prejudice, which the Court did on July 14, 1999.  On August 21, 1999, Jani-King filed a complaint against Plaintiff and Complete Enterprises, Inc. seeking attorneys fees plus costs, court expenses and other damages resulting from Jani-King's defense of the lawsuit.  On September 7, 2000, the Court entered a default judgment against the Plaintiff and Complete Enterprises, Inc. in the amount of $32,098.49.  While Jani-King was seeking enforcement of their judgment, Plaintiff filed for bankruptcy protection which was granted by the bankruptcy court.

Marvin Riley vs. Jani-King of Miami, Inc., (Case No. 99 01096, In the Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida).  On January 21, 1999, plaintiff, franchisees of Jani-King of Miami, Inc., filed a complaint against Jani-King of Florida, Inc. for breach of contract, rescission, fraud, and deceptive and unfair trade practices based on allegations that the defendants made misrepresentations to the plaintiff during the sales process and failure to fulfill the Initial Business within the Initial Offering Period. After Jani-King of Florida, Inc. filed a motion to dismiss, Plaintiff filed an amended complaint that named Jani-King of Miami, Inc. as the sole Defendant, dropped the claim of breach of contract, and added a claim of violation of the Florida Franchise Act.  On September 9, 1999, the Court dismissed Plaintiffs claims of rescission and fraud and struck Plaintiff's claim for punitive damages.  Plaintiff sought unspecified damages, interest, costs and attorney's fees.  Jani-King of Miami, Inc. denied all allegations of wrongdoing.  On September 7, 2000, the parties reached a settlement as to all claims whereby Jani-King agreed to repurchase Plaintiff's franchise for $10,000 and Plaintiff agreed to dismiss all claims against Jani-King, with prejudice.

Raul Mercado and Carlos Navarette v. Jani-King of California, Inc. and Jani-King Leasing Corporation and Does 1-20, (Case No. 814448-9, In the Superior Court of the State of California in and for the County of Alemeda).  On August 23, 1999, Plaintiffs filed a complaint against the Jani-King defendants alleging that Plaintiffs were fraudulently induced into entering into their franchise agreement, violations of the California Corporations Code §§31101, 31119, and 31201, fraud based on allegations that defendants failed to provide to Plaintiffs material required by law and allegations that Jani-King agents made material misrepresentations and omissions which were intended to induce reliance by Plaintiffs to enter the franchise agreements, breach of the covenant of good faith and fair dealing, rescission and restitution for violation of California Business and Professions Code Section 17200.  Plaintiff Mercado sought $23,550 in damages, $3,000 in expenses, unspecified general damages, exemplary damages, and attorneys fees.  Plaintiff Navarette sought $250 in damages, $1,000 in expenses, unspecified general damages, exemplary damages, and attorneys fees.  Both Plaintiffs sought contract damages in the amount of $8,000 per month from June, 1997 to date.  Jani-King denied all allegations; and on October 2, 1999, without admitting any wrongdoing or liability, the parties reached a settlement whereby Plaintiff's franchise was repurchased for the sum of $27,750.  Plaintiffs agreed to return all equipment leased by them and to dismiss all claims, with prejudice, against Defendants.

Michael Covington and Brian K. Napier v. Jani-King of Cincinnati, Inc., (Case No. A9905193, Hamilton County Court of Common Pleas in Hamilton County, Ohio).  On September 3, 1999, Plaintiffs filed a complaint against Jani-King of Cincinnati, Inc. alleging Jani-King fraudulently induced them into entering into the franchise agreement, under which terms the complaint is made, that Jani-King engaged in unspecified deceptive accounting and business practices, failed to provide equipment and training, failed to follow written policies and procedures, and failed to provide Plaintiffs unspecified pertinent information.  Plaintiffs are seeking damages in excess of $25,000 and unspecified punitive damages.  Jani-King has filed a motion to dismiss the complaint for lack of jurisdiction and venue.  On November 3, 2000, the Plaintiffs voluntarily dismissed all claims against Jani-King.

Shelby J. Sibley v. Jani-King of Cincinnati, Inc., (Case No. A9906998, Hamilton County Court of Common Pleas in Hamilton County, Ohio).  On November 17, 1999, Plaintiffs filed a complaint against Jani-King of Cincinnati, Inc. alleging Jani-King fraudulently induced them into entering into the franchise agreement, under which terms the complaint is made, that Jani-King engaged in unspecified deceptive accounting and business practices, failed to provide equipment and training, failed to follow written policies and procedures, and failed to provide Plaintiffs unspecified pertinent information.  Plaintiffs are seeking damages in excess of $25,000 and unspecified punitive damages.  Jani-King has filed a motion to dismiss the complaint for lack of jurisdiction and venue.  On September 19, 2000, the Plaintiffs voluntarily dismissed all claims against Jani-King.

Jose Carlos Roza, Luis Aponte, Jose Amado Aponte, Ruben Echevarria, Nerril Campbell and Sydney Campbell, Luz Silva, Andres Bedoya, Wayne Smith, Luis A. Livelli, and Carlos Vernay v. Jani-King of Miami, Inc., (Case No. 00013875, In the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida). On August 23, 2000, Plaintiffs filed a complaint against Jani-King of Miami, Inc. alleging breach of contract, fraud in the inducement and accounting allegedly resulting from Jani-King not providing required training, making earnings claims, wrongfully transferring accounts from Plaintiffs, not fulfilling Plaintiffs' business obligation, overselling franchises in Plaintiffs' area of operation, and underbidding accounts. Plaintiffs sought unspecified damages in excess of $15,000, costs, attorney fees, and interest. On January 11, 2001, the Court granted Jani-King's motion to dismiss all complaints for lack of jurisdiction and venue. On June 1, 2001, Plaintiffs filed an amended complaint making no substantive changes from their original complaint. In response, on July 18, 2001, Jani-King filed a motion to dismiss Plaintiffs' amended complaint under the same grounds as the original motion to dismiss. On November 8, 2001, the Court dismissed the Plaintiffs' claims with prejudice based on the forum selection clause in the franchise agreement and ruling that any action must be brought in Dallas County, Texas.

Cappling Enterprise, Inc. v. Jani-King of Detroit, Inc., Jani-King of Michigan, Inc., and Jani-King International, Inc. (Case No. Honorable Susan D. Borman, In the Circuit Court for the County of Wayne, Michigan.). On December 3, 2000, Plaintiff, a franchisee of Jani-King of Michigan, Inc., filed a complaint alleging tortuous interference with Plaintiff's business expectancy, breach of a duty to act in a business-like and legal manner, breach of fiduciary duty, business defamation, misappropriation of trade secrets, tortuous interference with an advantageous business expectancy, and violation of the Michigan Consumer Protection Act which Plaintiff alleges occurred as a result of Jani-King misusing Plaintiff's Certificate of Affiliate Membership in the Michigan Minority Business Develop Council. Plaintiff seeks unspecified damages in excess of $1,000,000 plus costs and attorneys fees. Jani-King denied all allegations; and on August 2, 2001 without admitting any wrongdoing or liability, the parties reached a settlement whereby Jani-King paid the Plaintiff the sum of $22,500, Plaintiff will pay Jani-King all monies due and owing Jani-King which is expected to be equal or exceed the sum paid to Plaintiff, the lawsuits will dismissed with prejudice, and Jani-King will retain all rights to all royalties and fees due Jani-King by Plaintiff.

Bernice E. Rains and Anita Hyche Rains v. Jani-King of Nashville, Inc. (Case No. 301-CV1778-H in the United States District Court for the Northern District of Texas). On September 10, 2001, Plaintiffs, franchisee of Jani-King of Nashville, Inc., filed a complaint alleging breach of contract and violation of the Texas Unfair and Deceptive Trade Practices Act, and seeking declaratory action from actions Plaintiffs alleged occurred as a result of Jani-King's failure to provide replacement accounts for accounts lost by Plaintiffs and Jani-King's interference with accounts serviced by Plaintiffs and seeking relief from the non-compete provisions of Plaintiff's franchise agreement. Plaintiffs were seeking unspecified damages in excess of $75,000 and attorneys fees and court costs. Jani-King denied all allegations and counter sued Plaintiffs for violation of their franchise agreement resulting from Plaintiffs engaging in competition with Jani-King. On April 17, 2002, without admitting any wrongdoing or liability, the parties reached a settlement whereby Jani-King paid the Plaintiff the sum of $95,750 in return for the repurchase of Plaintiffs' franchise, the return of janitorial equipment and supplies and all Jani-King materials, an agreement to cease all janitorial services and not to engage in the janitorial business for a period of two years, and for dismissal of the lawsuit with prejudice.

Jani-King of Hartford, Inc. v. Larry Simonoff, Diversified Resources, Inc., Harold A. Taylor and Elizabeth A. Taylor, (Docket No. CV-02-0817720-S, in the Superior Court, Judicial District of Hartford). On June 27, 2002, Plaintiff Jani-King of Hartford, Inc. file verified complaint seeking entry of a permanent injunction prohibiting defendants from violating the noncompetition covenants of defendant Simonoff and defendant Ms. Taylor's franchise agreements and seeking damages for breach of contract for violations of the non-competition clauses of the franchise agreements and for failure to pay royalties due Jani-King. Jani-King is seeking damages in excess of $338,000 and attorneys' fees and costs in excess of $112,000. Both the damages and fees and costs continue to increase throughout the course of discovery. The defendants filed a counterclaim alleging breach of contract relating to Ms. Taylor's and Mr. Simonoff's franchise agreements and Jani-King's refusal to pay monies allegedly owed and for violations of the Connecticut Unfair Trade Practices Act. Defendants seek unspecified monetary damages, attorneys fees, punitive damages, interests and costs in excess of $15,000.00. On July 22, 2002, the parties entered into a permanent injunction against Elizabeth Taylor and a temporary injunction against Harry Taylor, Simonoff, and Diversified preventing the defendants from engaging in acts which violate the terms of Taylor and Diversified's franchise agreements. On February 26, 2003, the Taylors filed for a chapter 7 no asset bankruptcy. On June 14, 2003, the parties entered into a settlement agreement whereby the defendants agreed to a permanent injunction prohibiting them from engaging in competition with Jani-King of Hartford, Inc. or otherwise violating the noncompetition provisions of their franchise agreements, the Taylors agreed to pay Jani-King the sum of $90,000, Simonoff and Diversified agreed to pay Jani-King the sum of $60,000, the Defendants agreed to transfer all accounts being serviced outside the Jani-King system to Jani-King, and in the future to report all revenue generated by their franchises or derived from the provision

of cleaning services and to pay the applicable royalties and fees associated with such revenue. The Taylors further agreed to reaffirm the settlement agreement and its obligations in their bankruptcy proceeding., After negotiations with the Chapter 7 trustee, the amount payable by the Taylors to Jani-King was reduced to $86,000 with the remaining $4,000.00 payable to the Chapter 7 trustee instead.

Jaroslaw Chojnowski v. Jani-King of New York, Inc., (Case No. 033784/2002, Supreme Court of the State of New York, Kings County, New York). On or about September 10, 2002, Plaintiff, a franchisee of Jani-King of New York, Inc., filed a complaint against defendant Jani-King alleging breach of contract, unjust enrichment, breach of duty of good faith, negligence, harassment, fraud, detrimental reliance, conversion, and interference with business relations resulting from Jani-King's alleged failure to provide sufficient account numbers, failure to provide adequate time to cure defaults with clients, failure to properly collect client receivables, failure to pay monies owed to Plaintiff, wrongfully removing client from accounts, and wrongfully collecting finder's fees from Plaintiff. Plaintiff is seeking unspecified damages in excess of $3,000,000. Jani-King denies all allegations and has filed a motion to dismiss the complaint for lack of jurisdiction. On May 15, 2003, the court granted Jani-King's motion and dismissed plaintiff's complaint for lack of jurisdiction.

Jani-King International, Inc. v. Alfatir Q. Crawford and Jani-Queen International, Inc., (Case No. 303CV2071P, in the United States District Court for the Northern District of Texas, Dallas Division). On September 11, 2003, Jani-King filed a complaint for federal trademark infringement, false designation of origin and false representation, false advertising, and cyberpiracy against defendants seeking injunctive relief, cancellation of the domain name www.janiqueen.com, compensatory and enhanced damages, defendants' profits, and an award of reasonable attorneys' fees and court cost by reason of defendant's use of the word and logo "Jani-Queen" and the slogan "Queen of Clean" in connection with its commercial cleaning and commercial cleaning franchise services. On March 10, 2004, the matter was settled by defendants entering into an agreed final judgment on the matter in which defendants are permanently enjoined from using either the designation JANI-QUEEN, its JANI-Queen logo, or the slogan THE QUEEN OF CLEAN, or any derivative thereof; or any term, symbol, logo, slogan, phrase, designation or mark containing the term JANI; in conjunction with the sale, distribution, commercialization, offering for sale or advertising or promotion in the United States, or elsewhere, of any product or service, including but not limited to commercial, residential, apartment or hotel cleaning services, or the franchising of such cleaning services, using any term, symbol, phrase, slogan, logo or designation which is likely to cause confusion with the Jani-King marks and logos, attempting to register any of these marks, and from using the domain name www.janiqueen.com or any name using "jani." Defendants also agreed to abandon with prejudice their trademark/servicemark applications and the domain name www.janiqueen.com.

Jani-King Franchising, Inc. v. 803168 Ontario, Ltd and Larry G. Gaylord, (Case No. 0209308-H, in the 160th Judicial District of Dallas County, Texas). On September 30, 2002, Jani-King filed a complaint against Gaylord and 803168 Ontario, a former regional (master) franchise owner of Jani-King, seeking the payment of outstanding royalty fees, late charges, and payment of the balance of a promissory note executed by Gaylord as guarantor and principal of 803168, pre and post judgment interest, court cost, attorneys fees, and accounting expenses. The complaint also seeks an accounting of 803168's business records in accordance with the terms of the regional franchise agreement between 803168 and Jani-King which expired on March 31, 2002. Jani-King also seeks declaratory judgment that as of the expiration of the regional franchise agreement, Ontario forfeited its rights as regional franchisee to Jani-King Franchising, and all rights granted to 803168 under the regional franchise agreement and under any agreements entered into by 803168 pursuant to the authority granted to it by the regional franchise agreement, including but not limited to, the right to collect on the promissory notes provided by unit franchise holders reverted to, were assigned to, and became the property of, Jani-King Franchising. Gaylord failed to answer the complaint and on March 7, 2003, the court entered a judgment nihil dicit wherein the court made a declaration that all rights granted to 803168 under the regional franchise agreement and under any agreements entered into by 803168 pursuant to the authority granted to it by the regional franchise agreement, including but not limited to, the right to collect on the promissory notes provided by unit franchise holders reverted to, were assigned to, and became the property of, Jani-King Franchising.

Glenn Andre Davis v. Jani-King of Washington, D.C., Inc., (Case No. 03-30295, Fairfax County General District Court, County of Fairfax, Commonwealth of Virginia). On October 6, 2003, Plaintiff, a franchisee of Jani-King of Washington, D.C., Inc. filed a warrant in debt against the defendant alleging that Jani-King had not met its obligations under the franchise agreement. On December 22, 2003, without admitting any wrongdoing or liability, the parties reached a settlement whereby Jani-King paid the Plaintiff the sum of $7,725.50 in return for the repurchase of Plaintiffs' franchise.

Daniel Long and Gerald Long v. Jani-King of Kansas City, Inc., (Cause No. 02-9561, in the H-160[th] Judicial District of Dallas County, Texas). On October 8, 2002, Plaintiffs, franchise owners of Jani-King, filed a complaints alleging violations of the Texas Business Opportunities Act, the Texas Deceptive Trade Practices Act, breach of contract, fraud, negligent misrepresentation, and seeking rescission of the franchise agreement resulting from Jani-King's alleged failure to provide adequate training, failure to provide sufficient initial business, underbidding accounts, and improper billing. The Plaintiffs sought damages in the amount of $69,389.11 , rescission of the franchise agreement, and attorneys fees. On January 15, 2003, without admitting any wrongdoing or liability, the parties reached a settlement whereby Plaintiffs dismissed all claims against Defendants in exchange for payment in the amount of $13,000. Also included in the settlement was the termination of the Plaintiff's franchise agreements with certain post-termination non-compete agreements remaining in effect and the return of certain equipment by Plaintiffs to Defendants.

Oneyka Anthony Osakwe v. Jani-King of Minnesota, Inc., George Selman, Tom Schellinger, and Steve Schmidt, (Court File Number 03-00325, in the Fourth Judicial District in the County of Hennepin, Minnesota). On or about December 30, 2002, Osakwe, an officer of a corporation who is a Jani-King franchisee, filed a complaint alleging violations of the Minnesota Franchise Act, fraud and misrepresentation, material breach of contract, estoppel, and unjust enrichment from Jani-King's alleged misrepresentations made when Plaintiff purchased a Jani-King franchise from a third party, and failure to provide cleaning contracts. Plaintiff sought to rescind the franchise agreement and to have all monies paid returned, $18,500 plus interest, compensatory damages in excess of $20,000 and other unspecified damages. Jani-King denied all allegations. On February 7, 2003, without admitting any wrongdoing or liability, the parties reached a settlement whereby Plaintiffs dismissed all claims against Defendants in exchange for payment in the amount of $10,000. Also included in the settlement was the termination of the Plaintiff's franchise agreements with the post termination non compete agreements remaining in effect and the return of certain equipment by Plaintiffs to Defendants.

Glenn Sullivan  and Lex-G Inc. v. Mike Gomez, Corporate Cleaning Services, Pro Health Corp, Pro Health Ambulatory Surgery Center, Inc., David Cooper, Cynthia Kubala, Bob Russo, and Jani-King of New York, Inc., (Case No. 13886-02, Supreme Court of the State of New York, Nassau County, New York). On August 21, 2002, Plaintiff, a franchisee of Jani-King of New York, Inc., filed a complaint against the defendants alleging that defendant Pro Health breached their contract with Plaintiff, defendant Gomez negligently, intentionally, and tortously interfered with contracts between Plaintiff and defendants by inducing the defendants to beach their contracts with Plaintiff, that defendant Jani-King wrongfully breached the franchise agreement with Plaintiff, that all defendants except Jani-King agreed, conspired, and arranged to restrain Plaintiffs competition and induced Jani-King to breach the Plaintiff's franchise agreement and failed to pay Plaintiff for services rendered. Plaintiff is seeking $10,000,000.00 for each cause of action except for the second cause for which Plaintiff seeks $5,000,000.00. Jani-King denies all allegations and has been granted an extension of time to file an answer to the allegations. On June 2, 2003, Jani-King filed a complaint against Sullivan, Jani-King of New York, Inc. v. Glenn Sullivan (Case Number 03-05543-D, 95th Judicial District Court for Dallas County, Texas), alleging that Sullivan violated the terms of Sullivan's Jani-King franchise by soliciting business outside the terms of the franchise agreement. On May 1, 2004, without admitting any wrongdoing or liability, the parties reached a settlement whereby Jani-King agreed to offer Sullivan's franchise the right to provide service to additional Jani-King clients in exchange for Sullivan's agreement to immediately cease any competing business and to assign any service to which Sullivan was performing outside the Jani-King system to Jani-King.

**Administrative Orders and Decrees.**

California v. Jani-King of California, Inc. (Case No. 691-473, Superior Court, Los Angeles County, California). A consent decree was issued on July 19, 1988, based on an inquiry conducted by the California Department of Corporations ("the Department"). On April 25, 1988, an order was issued by the Department which denied and revoked Jani-King of California, Inc.'s registration due to the alleged failure by Jani-King of California, Inc. to comply with Sections 31123 and 31200 of the California Franchise Investment Law. The Department alleged that Jani-King of California, Inc. failed to notify it of the issuance of an order dated January 20, 1988 described in the offering circular within the material disclosing the counterclaims in the Hastings, Coston and Nicholas lawsuits. The Department also alleged that Jani-King of California, Inc. made certain misrepresentations in its franchise offering circular regarding the length and adequacy of franchisee training, the billing and collection practices of Jani-King of California, Inc., the types of clients a franchisee would service, the cost and availability of products offered by Jani-King of California, Inc., and general information about Jani-King Leasing Corporation and its relationship with Jani-King of California, Inc. The allegations made by the Department of Corporations are substantially similar to some of the allegations made in the California lawsuits described in this Item, particularly the allegations regarding the operation of the franchise. In an attempt to resolve the matter without delay, an agreement was reached with the Department to reinstate Jani-King of California, Inc.'s registration upon satisfaction of certain conditions,

including the amendment of the franchise offering circular, and the entry of a permanent injunction the terms of which required a temporary suspension of sales activity for forty-five (45) days, retention of competent franchise counsel, completion of certain educational and reporting requirements and the payments of a fine and costs incurred by the Department, and future compliance with the provisions of the California Franchise Investment Law. Jani-King of California, Inc. agreed to the entry of the permanent injunction solely for the purpose of settling the matter and does not admit that the allegations made by the California Department of Corporations are true or that it violated the California Franchise Investment Law. A permanent injunction was entered by the court on July 19, 1988.

On September 18, 1998, the California Department of Corporations issued a Cease and Desist Order against Jani-King of California, Inc., and certain affiliates, ordering them to stop offering and selling franchises in the state of California. On February 16, 1999, the Department of Corporations and Jani-King of California, Inc. entered into a Stipulation and Proposed Order and on February 17, 1999, both parties jointly moved to modify the permanent injunction entered by the court on July 19, 1988, to provide for, among other things, 1) the appointment of an independent monitor and the imposition of procedures to verify and confirm future compliance with the California Franchise Investment Law, and; 2) certain training requirements for salespersons of Jani-King of California, Inc. The Cease and Desist Order was rescinded according to the terms of the Stipulation and Proposed Order. The court entered an order modifying the permanent injunction on February 19, 1999. In August, 2002, the independent monitor determined that no significant violation of the California Franchise Investment law or decree had occurred during the last testing period and the monitoring was discontinued.

<u>United States of America v. Jani-King International, Inc.</u>, (Civ. No. 395-CV1492-G), United States District Court for the Northern District of Texas, Dallas Division. On July 24, 1995, without admitting any liability, we agreed to a Stipulated Final Judgment and Order for Permanent Injunction ("the Final Judgment") with the Federal Trade Commission ("FTC"). The FTC alleged that we did not comply with the Commission's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" (the "Franchise Rule") by not properly disclosing our litigation history concerning violations of law during the previous seven fiscal years, by not providing all of the information required concerning existing franchisees, and by making earnings claims without a reasonable basis and without the disclosures required by the Franchise Rule. Under the Final Judgment, we are required to comply with the Franchise Rule, and we agreed to pay $100,000 to the FTC as a civil penalty. No guilt or innocence was determined, and we admitted no liability for any of the matters alleged in the FTC's complaint.

On October 7, 1992, the Franchise Administrator's staff for the Michigan Attorney General's office notified Jani-King of Michigan, Inc. of two issues regarding acts or practices that they considered not to be in compliance with the Michigan Franchise Investment Law ("Law"). The format utilized by the Attorney General of Michigan to review this matter is an informal administrative proceeding which allows a franchisor to confer with the Attorney General on these issues. It is conducted within the Attorney General's own office and intends to obtain a mutually agreeable resolution to the Michigan Attorney General's objections. The state asserted that the use of the address and telephone number of Jani-King's Regional Office, which is utilized by the franchisees for business purposes, rather than the residential address and telephone number of the franchisees did not provide prospective franchisees with the information necessary to comply with Section 8 (2) ® of the Law. Jani-King of Michigan, Inc. does not agree that there was any error in the method of disclosing the names and addresses of the current franchisees, and asserts that Jani-King was in compliance with Item 20 E. of the Uniform Franchise Offering Circular guidelines, which is the controlling text concerning this issue. However, before being contacted by the Michigan Attorney General and independent of any Michigan disclosure requirements, Jani-King had made the decision to modify the disclosure format concerning that franchisee information. The Attorney General also asserted that this format of disclosure for franchisee business addresses violated a provision of the Law which makes unenforceable and void any contract term in documents under a franchise agreement that prohibits a franchisee from joining an association of franchisees. Jani-King's position is that the complaint was irrelevant since at no time has any provision which places a prohibition on the right of franchisees to join an association of franchisees been a part of the Jani-King of Michigan, Inc.'s franchise related documents, nor has Jani-King of Michigan, Inc. sought to enforce any provision to that effect.

In order to demonstrate its commitment to maintaining the highest standards regarding disclosure and marketing practices, but without admitting any violation of the Michigan Act, Jani-King entered into an Assurance of Compliance with the State of Michigan, whereby Jani-King committed to the state that it will comply with the Michigan Franchise Investment Law in the marketing and sale of franchises, and will provide to any prospective franchisee a disclosure statement that includes the specific addresses and telephone numbers of each franchisee under a franchise agreement. Jani-King will also offer rescission to certain qualifying franchisees, if there are any, who are able to document in writing that within four years from the date of the Assurance, and before the purchase of their franchise, that an attempt was made to obtain a list of names

and residential addresses of the franchisees in the State of Michigan and that the franchisee was unable to obtain this information before signing their franchise agreement. The franchisee has the burden of proof to provide the documentation that they tried and were unsuccessful in obtaining the requisite information. The Assurance does not include any admission of wrongdoing, but serves as documentation of Jani-King's willingness to maintain a good relationship with its franchisees and the state franchise administrators.

Other than these 55 actions, no litigation must be disclosed in this offering circular.

## ITEM 4

## BANKRUPTCY

No person previously identified in Items 1 or 2 of this offering circular has been involved as a debtor in proceedings under the U.S. Bankruptcy Code required to be disclosed in this Item.

## ITEM 5

## INITIAL FRANCHISE FEE
## AND
## INITIAL FINDER'S FEE

The Initial Franchise Fee (Initial Franchise Fee Down Payment plus the projected payout amount of the Initial Franchise Fee Monthly Payments) and the Initial Finder's Fee (Initial Finder's Fee Down Payment plus the projected payout amount of the Initial Finder's Fee Monthly Payments) for the franchise offered vary depending on the Plan purchased and whether the Initial Franchise Fee and an Initial Finder's Fee are paid in full at the time you purchase your franchise. You are required to pay an Initial Franchise Fee Down Payment and an Initial Finder's Fee Down Payment at the time of the purchase of your franchise. If you do not pay all Initial Franchise Fee and an Initial Finder's Fee in full at the time you purchase your franchise, some of the Initial Franchise Fee and the Initial Finder's Fees can be paid after you purchase the franchise, using revenue produced by the franchise. These contingent payment arrangements vary according to the particular Plan chosen and the number of payments that are made.

The total amount of the Initial Franchise Fee Down Payment, the Initial Finder's Fee Down Payment, the projected amount of the Initial Franchise Fee Monthly Payments, and the projected amount of the Initial Finder's Fees Monthly Payments are outlined in the following schedule for the plans through Plan E-25, other plans with more Initial Finder's Fee Business may be available:

THIS SPACE INTENTIONALLY LEFT BLANK

| PLAN | INITIAL FINDER'S FEE BUSINESS | INITIAL FRAN. FEE$^x$ D.P.$^{xx}$, INITIAL F.F.$^{xxx}$ D.P., PROJECTED PAYOUT OF INITIAL FRAN. FEE MONTHLY PAYMENT and PROJECTED PAYOUT OF INITIAL F.F. MONTHLY PAYMENT | INITIAL FRAN. FEE D.P., INITIAL F.F. D.P., PROJECTED PAYOUT OF INITIAL FRAN. FEE MONTHLY PAYMENT and PROJECTED PAYOUT OF INITIAL F.F. MONTHLY PAYMENT (5% CASH DISCOUNT) | INITIAL FRAN. FEE D.P. and INITIAL F.F. D.P. | PROJECTED PAYOUT OF INITIAL FRAN. FEE MONTHLY PAYMENT AND INITIAL F.F. MONTHLY PAYMENT | PROJECTED TIME FOR FULL PAYOUT OF INITIAL F.F. MONTHLY PAYMENTS (Yrs) | PROJECTED AMOUNT OF INITIAL FRAN. FEE AND INITIAL F.F. MONTHLY PAYMENT |
|---|---|---|---|---|---|---|---|
| E-25* | 25,000* | 74,000** | 70,300.00 | 70,300 | 3,700 | 2 | 154.17 |
| E-24 | 24,000 | 71,250 | 67,687.50 | 67,550 | 3,700 | 2 | 154.17 |
| E-23 | 23,000 | 68,500 | 65,075.00 | 64,800 | 3,700 | 2 | 154.17 |
| E-22 | 22,000 | 65,750 | 62,462.50 | 62,050 | 3,700 | 2 | 154.17 |
| E-21 | 21,000 | 63,000 | 59,850.00 | 59,300 | 3,700 | 2 | 154.17 |
| E-20 | 20,000 | 60,250 | 57,237.50 | 56,500 | 3,700 | 2 | 154.17 |
| E-19 | 19,000 | 57,500 | 54,625.00 | 53,800 | 3,700 | 2 | 154.17 |
| E-18 | 18,000 | 54,750 | 52,012.50 | 51,050 | 3,700 | 2 | 154.17 |
| E-17 | 17,000 | 52,000 | 49,400.00 | 48,300 | 3,700 | 2 | 154.17 |
| E-16 | 16,000 | 49,250 | 46,787.50 | 45,550 | 3,700 | 2 | 154.17 |
| E-15 | 15,000 | 46,500 | 44,175.00 | 42,800 | 3,700 | 2 | 154.17 |
| E-14 | 14,000 | 43,750 | 41,562.50 | 40,050 | 3,700 | 2 | 154.17 |
| E-13 | 13,000 | 41,000 | 38,950.00 | 37,300 | 3,700 | 2 | 154.17 |
| E-12 | 12,000 | 38,250 | 36,337.50 | 34,550 | 3,700 | 2 | 154.17 |
| E-11 | 11,000 | 35,500 | 33,725.00 | 31,800 | 3,700 | 2 | 154.17 |
| E-10 | 10,000 | 32,750 | 31,112.50 | 29,050 | 3,700 | 2 | 154.17 |
| E-9 | 9,000 | 30,000 | 28,500.00 | 26,300 | 3,700 | 2 | 154.17 |
| E-8 | 8,000 | 27,250 | 25,887.50 | 23,550 | 3,700 | 2 | 154.17 |
| E-7 | 7,000 | 24,500 | 23,275.00 | 20,800 | 3,700 | 2 | 154.17 |
| E-6 | 6,000 | 21,750 | 20,662.50 | 18,050 | 3,700 | 2 | 154.17 |
| E-5 | 5,000 | 19,000 | 18,050.00 | 15,300 | 3,700 | 2 | 154.17 |
| E-4 | 4,000 | 16,250 | 15,437.50 | 12,550 | 3,700 | 2 | 154.17 |
| D | 3,000 | 13,500 | 12,825.00 | 9,800 | 3,700 | 2 | 154.17 |
| C | 2,000 | 12,000 | 11,400.00 | 6,000 | 6,000 | 3 | 166.67 |
| B | 1,000 | 10,000 | 9,500.00 | 3,000 | 7,000 | 4 | 145.83 |
| A | 500 | 8,600 | 8,170.00 | 2,000 | 6,600 | 4 | 137.50 |

$^x$ – Fran. Fee is an abbreviation for Franchise Fee
$^{xx}$ – D.P. is an abbreviation for Down Payment
$^{xxx}$ – F.F. is an abbreviation for Finder's Fees

INITIAL FRANCHISE FEE
+    PROJECTED PAYOUT OF INITIAL FRANCHISE FEE MONTHLY PAYMENT
+    INITIAL FINDER'S FEE DOWN PAYMENT
+    PROJECTED PAYOUT OF INITIAL FINDER'S FEE MONTHLY PAYMENT
= TOTAL PAYMENT TO US FOR THE PURCHASE OF THE FRANCHISE (excluding royalty and other fees described in Item 6)

*An additional $1000 of Initial Finder's Fee Business will be offered for each higher level of the "E" Plan.

**The Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment is increased by an additional $2,750 for each higher level of the "E" Plan and is due upon the sale of the franchise. The amount of the projected payout amount of the Initial Franchise Fee Monthly Payments and the Initial Finder's Fees Monthly Payments remains the same for these additional plans.

The Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment due for each plan, except for any applicable sales tax, is the total amount you must pay to us when you purchase of your franchise. Sales tax is computed in accordance with state and local laws.

We offer a 5% discount off of the Initial Franchise Fee and the Initial Finder's Fee on all franchise plans where such fees are paid in full at the time the franchise is purchased.

Although we do not provide any financing for the purchase of our franchises, you have two options when purchasing a franchise: (1) you may pay the Initial Franchise Fee (Initial Franchise Fee Down Payment plus the projected payout amount of the Initial Franchise Fee Monthly Payments) and the Initial Finder's Fees (Initial Finder's Fee Down Payment plus the projected amount of the Initial Finder's Fee Monthly Payments) in cash at the time of purchase and receive a 5% discount off of the Initial Franchise Fee and the Initial Finder's Fees or (2) you may pay the Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment in cash at the time of purchase and authorize us to deduct the Initial Franchise Fee Monthly Payments and the Initial Finder's Fee Monthly Payments from your franchise's revenue. The Initial Franchise Fee Monthly Payments and the Initial Finder's Fee Monthly Payment are not accrued and do not include any interest.

JANI-KING VET•FRAN PROGRAM:

In order to provide additional support to the veterans of the United States military, Jani-King is now offering to qualifying veterans:

1.  An additional 5% discount off the Initial Franchise Fee (Initial Franchise Fee Down Payment plus the projected payout amount of the Initial Franchise Fee Monthly Payments) and the Initial Finder's Fee (Initial Finder's Fee Down Payment plus the projected payout amount of the Initial Finder's Fee Monthly Payments).

2.  The opportunity to lower the Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment to 50% of the Initial Franchise Fee (Initial Franchise Fee Down Payment plus the projected payout amount of the Initial Franchise Fee Monthly Payments) and the Initial Finder's Fee (Initial Finder's Fee Down Payment plus the projected payout amount of the Initial Finder's Fee Monthly Payments) for all Plans D and higher.

3.  An additional 5% discount (10% total) on all cash franchise purchases.

Under Jani-King's VET•FRAN program, the remainder of the Initial Franchise Fee Down Payment, the Initial Finder's Fee Down Payment, the projected amount of the Initial Franchise Fee Monthly Payments, and the projected amount of the Initial Finder's Fees Monthly Payments will be paid out using revenue produced by the franchise. The program is available for those veterans who have received a discharge (other than dishonorable) as well as any active duty personnel. If the franchise will be operated as a partnership, corporation, or limited liability company, the veteran participant must maintain at least a 51% ownership interest. A copy of the form DD-214, evidencing the status of a participating veteran, must be submitted with the franchise agreement. The following schedule shows the terms of the program through Plan E-25, but larger plans may be available.

SCHEDULE OF TERMS

JANI-KING VET•FRAN PROGRAM
SCHEDULE OF TERMS

| PLAN | INITIAL FINDER'S FEE BUSINESS | INITIAL FRAN. FEE$^x$ D.P.$^{xx}$, INITIAL F. F.$^{xxx}$ D.P., PROJECTED PAYOUT OF INITIAL FRAN. FEE MONTHLY PAYMENT and PROJECTED PAYOUT OF INITIAL F.F. MONTHLY PAYMENT | INITIAL FRAN. FEE D.P., INITIAL F. F. D.P., PROJECTED PAYOUT OF INITIAL FRAN. FEE MONTHLY PAYMENT and PROJECTED PAYOUT OF INITIAL F.F. MONTHLY PAYMENT (5% CASH DISCOUNT) | INITIAL FRAN. FEE D.P. and INITIAL F. F. D.P. | PROJECTED PAYOUT OF INITIAL FRAN. FEE MONTHLY PAYMENT AND INITIAL F.F. MONTHLY PAYMENT | PROJECTED TIME FOR FULL PAYOUT OF INITIAL F.F. MONTHLY PAYMENTS (Yrs) | PROJECTED AMOUNT OF INITIAL FRAN. FEE AND INITIAL F.F. MONTHLY PAYMENT |
|---|---|---|---|---|---|---|---|
| E-25* | 25,000* | 70,300.00** | 66,785.00 | 35,150.00 | 35,150.00 | 4 | 732.29 |
| E-24 | 24,000 | 67,687.50 | 64,303.12 | 33,843.75 | 33,843.75 | 4 | 705.08 |
| E-23 | 23,000 | 65,075.00 | 61,821.25 | 32,537.50 | 32,537.50 | 4 | 677.86 |
| E-22 | 22,000 | 62,462.50 | 59,339.37 | 31,231.25 | 31,231.25 | 4 | 650.65 |
| E-21 | 21,000 | 59,850.00 | 56,857.50 | 29,925.00 | 29,925.00 | 4 | 623.44 |
| E-20 | 20,000 | 57,237.50 | 54,375.62 | 28,618.75 | 28,618.75 | 4 | 596.22 |
| E-19 | 19,000 | 54,625.00 | 51,893.75 | 27,312.50 | 27,312.50 | 4 | 569.01 |
| E-18 | 18,000 | 52,012.50 | 49,411.87 | 26,006.25 | 26,006.25 | 4 | 541.80 |
| E-17 | 17,000 | 49,400.00 | 46,930.00 | 24,700.00 | 24,700.00 | 4 | 514.58 |
| E-16 | 16,000 | 46,787.50 | 44,448.12 | 23,393.75 | 23,393.75 | 4 | 487.37 |
| E-15 | 15,000 | 44,175.00 | 41,966.25 | 22,087.50 | 22,087.50 | 4 | 460.16 |
| E-14 | 14,000 | 41,562.50 | 39,484.37 | 20,781.25 | 20,781.25 | 4 | 432.94 |
| E-13 | 13,000 | 38,950.00 | 37,002.50 | 19,475.00 | 19,475.00 | 4 | 405.73 |
| E-12 | 12,000 | 36,337.50 | 34,520.62 | 18,168.75 | 18,168.75 | 4 | 378.52 |
| E-11 | 11,000 | 33,725.00 | 32,038.75 | 16,862.50 | 16,862.50 | 4 | 351.30 |
| E-10 | 10,000 | 31,112.50 | 29,556.87 | 15,556.25 | 15,556.25 | 4 | 324.09 |
| E-9 | 9,000 | 28,500.00 | 27,075.00 | 14,250.00 | 14,250.00 | 4 | 296.88 |
| E-8 | 8,000 | 25,887.50 | 24,593.12 | 12,943.75 | 12,943.75 | 4 | 269.66 |
| E-7 | 7,000 | 23,275.00 | 22,111.25 | 11,637.50 | 11,637.50 | 4 | 242.45 |
| E-6 | 6,000 | 20,662.50 | 19,629.37 | 10,331.25 | 10,331.25 | 4 | 215.23 |
| E-5 | 5,000 | 18,050.00 | 17,147.50 | 9,025.00 | 9,025.00 | 4 | 188.02 |
| E-4 | 4,000 | 15,437.50 | 14,665.63 | 7,718.75 | 7,718.75 | 4 | 160.81 |
| D | 3,000 | 12,825.00 | 12,183.75 | 6,412.50 | 6,412.50 | 4 | 133.59 |
| C | 2,000 | 11,400.00 | 10,830.00 | 6,000.00 | 5,400.00 | 3 | 150.00 |
| B | 1,000 | 9,500.00 | 9,025.00 | 3,000.00 | 6,500.00 | 4 | 135.42 |
| A | 500 | 8,170.00 | 7,761.50 | 2,000.00 | 6,170.00 | 4 | 128.54 |

$^x$ – Fran. Fee is an abbreviation for Franchise Fee
$^{xx}$ – D.P. is an abbreviation for Down Payment
$^{xxx}$ – F.F. is an abbreviation for Finder's Fees

Except as described below, the Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment are not refundable and are fully earned by us when paid. If we fail to offer you the right to provide service under contracts with cumulative total initial gross monthly billings equal to the value of the Initial Finder's Fee Business for your Plan within the Initial Offering Period described in Item 11, we will refund an amount equal to 3 times the amount of Initial Finder's Fee Business not offered to you, less any amount you owe us or our affiliates. A refund will first be applied to any current, unpaid fees or charges you owe that would result in a negative due on your Franchisee Report, and then to any other outstanding balance you owe to us or our affiliates, including any lease obligations owed to our affiliates. We will pay the remaining sum, if any, to you. A refund under this provision fulfills our obligation to offer you any remaining portion of the Initial Finder's Fee Business used to calculate the refund.

EXAMPLE:

Plan D purchased; $2,500 of initial gross monthly billings offered.

Refund: $3,000 Amount of Initial Finder's Fee Business to be offered by Us for You to service
-2,500 Amount of Initial Finder's Fee Business actually offered
$ 500 Amount of Initial Finder's Fee Business not offered
X  3 =
$1,500 Total Credit (this credit may be applied to money you owe to us or if no money is owed to us, it may be refunded to you)

The Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment vary according to the Plan purchased.

**Payments to Affiliates.**

You must acquire all the required commercial cleaning equipment and supplies before you will be authorized to service any accounts as a JANI-KING franchisee. The Supply and Equipment Package may be purchased from or through us, subject to shipping restrictions, or from any other source that sells commercial grade cleaning products and equipment. You are not required to purchase the Supply and Equipment Package from us or our affiliates. However, if you choose to purchase the Supply and Equipment Package from us, the cost, based on price rates in use as of February 2, 2004, is approximately $600 and is payable in cash.

The Additional Electric Equipment required, except for the Compact Portable Vacuum Cleaner, may also be leased from LEASING. The approximate cost of the Compact Portable Vacuum Cleaner when purchased through LEASING is $126. If the remaining equipment is leased from LEASING the total approximate cost, depending on which equipment package is chosen, ranges from $1,250 to $1,380 based on the rates in use as of February 2, 2004. Total lease payments include a down payment with an approximate range from $201 to $222 and twelve monthly payments with an approximate range from $101 to $111, depending on which equipment package is chosen. At the end of the lease period, you may purchase the equipment at its fair market value, which historically has been approximately 20% of the equipment price when the lease began.

# ITEM 6

# OTHER FEES

The following table shows recurring or isolated fees or payments you must pay to us or our affiliates. None of them are refundable.

| Fee Name(14) | Amount | Due Date | Remarks |
|---|---|---|---|
| Royalty (2) | 10% of monthly Gross Revenue (1) | Deducted on 5th day of each month | Subject to $50 minimum for first 12 months, and then $100 minimum, adjusted for increased in the Consumer Price Index |

| Fee Name(14) | Amount | Due Date | Remarks |
|---|---|---|---|
| Accounting (3) | 3% of monthly Gross Revenue ( 1) | Deducted on 5th day of each month | We will account for all revenue and expense transactions on a monthly basis. We disburse revenues to you for previous month's service less appropriate deductions. (3) |
| Initial Franchise Fee Monthly Payment (4) | Varies, depending on the revenue of franchise | Deducted on 5th day of each month that franchise produces sufficient revenue. | See the detailed notes below. (4) |
| Initial Finder's Fee Monthly Payment (5) | Varies, depending on the revenue of franchise | Deducted on 5th day of each month that franchise produces sufficient revenue. | See the detailed notes below. (5) |
| Finder's Fee (6) (Optional) | % formula for each category of account type scheduled, times amount of additional business we offer you (6) | As scheduled after you accept the new or additional business | See the detailed notes below. (6) |
| Business Protection Plan (7)  (Optional) | 4-7% of monthly Gross Revenue plus cost of Employee Administration Fee of $7-14/month | Deducted on 5th day of each month for the prior months service | This is an optional plan which we may allow you to participate in. This plan provides the minimum insurance requirements as set forth in Item 7 |
| Lease Payments to LEASING (8) (Optional) | Varies, depends on equipment leased, if any | Deducted on 5th day of each month | LEASING determines all terms and conditions for any equipment leased |
| Charge Back | Varies, depends on outstanding receivables (3) | Deducted on 5th day of each month | Receivables more than 60 days past date of original invoice are debited against your current revenue account |
| Operations Assistance/ Complaint (9) | $50 | Payable in the month the fees are incurred | Applies if we respond to a customer complaint |
| Service (9) | Currently $15 per labor hour plus expenses; may charge up to $50 per hour | Payable in the month the fees are incurred | In addition to the Complaint Fee, we charge for Operations Department time spent rectifying any deficient performance and satisfying the unhappy customer |
| Advertising (10) | 1% of monthly Gross Revenues (1) | Deducted on 5th day of each month for the prior month | See the detailed notes below. (10) |
| Additional Training (11) | $50/hour plus expenses | Payable in the month the fees are incurred | No additional training fee is currently charged. The initial training is provided for in the Initial Franchise Fee. Additional training is provided if you request it or if required by us due to performance problems by you. You are responsible for your travel and lodging costs |

| Fee Name(14) | Amount | Due Date | Remarks |
|---|---|---|---|
| Transfer (12) | The greater of $2,000 or 10% of the sales price or exchanged value | At time of transfer | Not charged for transfer among current owners, to controlled corporation or immediate family |
| Administrative | $250 (11) | Payable as incurred | For preparation of documents to change owners when no transfer fee is charged |
| Liquidated Damages | $1,000/day | As incurred | Payable if you terminate or do not renew the Franchise Agreement and you do not surrender to us all property belonging to us, including the keys and contracts |
| Costs and Attorneys' Fees | Will vary under circumstances | As incurred | Payable if you fail to comply with the Franchise Agreement and we have to enforce it |
| Non-Reported Business Fee | $25 per day | Immediately, when incurred | Payable when you have failed to report all Gross Revenue derived from your franchise |
| Indemnification | Will vary under circumstances | As incurred | You are solely responsible for and must indemnify and hold us harmless for all loss, damage, claims or demands arising from your Jani-King franchise |
| Audit | All costs and expenses, i.e., reasonable accounting and attorney fees | Immediately, when incurred | Payable only if audit shows an understatement of at least 5% of Gross Revenue for any month |
| Replacement of Manual (13) | $10 per copy | As incurred | Cost of replacement copy |

NOTES:

(1) <u>Gross Revenue:</u>

Gross Revenue is defined as all revenue invoiced by anyone for any contract services, one time cleans, extra work, sales of supplies, equipment or goods and any other revenue related to or derived from the provision of any cleaning and maintenance services including, but not limited to, commercial, industrial, institutional and residential, as well as the sale, leasing or distribution of related supplies and equipment in connection with the conduct and operation of Franchisee's business or otherwise directly or indirectly, in whole or in part, performed or sold by, or for the benefit of, you, your principals, guarantors, spouse(s), officers, directors, shareholders, agents, or employees, regardless of the entity or business name used.

(2) <u>Royalty Fee:</u>

You must pay us a non-refundable monthly royalty fee equal to 10% of your Gross Revenues monthly. This royalty will be paid by the fifth (5th) day of each month and is subject to a minimum royalty payment of $50 per month for the first 12 months of operation and $100 per month after the first year. The minimum royalty fee is subject to annual adjustment for increases in the Consumer Price Index.

(3) <u>Accounting Fee:</u>

You will pay us 3% of the your Gross Revenues monthly, as an Accounting Fee, to cover our operational costs for this service. We have the exclusive right to perform all billing and accounting functions for the services provided by your

franchise, unless we notify you otherwise in writing. Depending on your monthly Gross Revenue, you may be eligible for a rebate on the accounting fees paid by you. This rebate will be a percentage reduction of the accounting fee for the month(s) in which you are eligible and will be calculated each month using the following table. Your eligibility for the rebate will be determined solely by us, and the calculation of the rebate will be performed solely by us. Any rebate we determine you are eligible for will be issued to you twice per year at a time that will be determined solely by us.

| Monthly Gross Revenue ($) | Accounting Rebate (%) |
|---|---|
| 0-25,000 | 0 |
| 25,001-45,000 | 0.5 |
| 45.001-65,000 | 1.0 |
| 65,001-85,000 | 1.5 |
| 85,001-Over | 2.0 |

We will invoice each month all the clients serviced by you for the cost of the services you render or supplies you provide. We will receive the monies charged on those client invoices and pay them to you on a monthly basis, after we deduct all the appropriate fees and charges due to us, our affiliates, and to third parties with special credit arrangements for your benefit.

On the 5th day of each month, we will issue you a report summarizing your franchise's business during the previous month. We call this report the "Franchisee Report." On the 5th day of each month, we will disburse to you the amount of money reported in the "Due Franchisee" column of your Franchisee Report for the preceding month, less any monies not collected from accounts serviced by your franchise for prior months ("Charge Back"). If the 5th day of the month falls on a Saturday, Sunday or recognized holiday, then all amounts due to you will be disbursed before the end of the next business day.

(4)  Initial Franchise Fee Monthly Payment:

You are required to pay us Initial Franchise Fee Monthly Payments. The payment of these fees are for the remainder of the Initial Franchise Fee charged by us in connection with your purchase of the franchise. The Initial Franchise Fee Monthly Payments are contingent upon services being performed by you or your franchise and will be deducted each month from the revenue produced from the operation of the franchise. The payment of the Initial Franchise Fee Monthly Payments will only be deducted in months your franchise produces revenue in an amount at least equal to the amount of the monthly Initial Franchise Fee Monthly Payments.

(5) Initial Finder's Fee Monthly Payment:

You are required to pay us Initial Finder's Fee Monthly Payments. The payment of these fees are for the remainder of the Initial Finder's Fee charged by us in connection with the Initial Finder's Fee Business. The Initial Finder's Fees are different than and in addition to the Finder's Fees described in (6) below. The Initial Finder's Fee Monthly Payments are contingent upon services being performed by you or your franchise and will be deducted each month from the revenue produced from the operation of the franchise. The payment of the Initial Finder's Fee Monthly Payments will only be deducted in months your franchise produces revenue in an amount at least equal to the amount of the monthly Initial Finder's Fee Monthly Payments.

(6)  Finder's Fee:

In addition to the Initial Franchise Fee, the Initial Finder's Fee Down Payment, the Initial Finder's Fee Monthly Payments, and royalty fees, you must pay us a Finder's Fee on any additional business or contracts above the Initial Finder's Fee Business that you choose to accept the designation of as authorized franchisee to service the business. A Finder's Fee is charged whether or not that additional business or contract resulted from an increase in the contract price for existing business, an expansion of service for existing business at the same or other locations, or completely new business. Finder's Fees are in addition to royalties and other payments set out in the franchise agreement, and are calculated on the gross monthly billing for an account according to the formulas listed below. We are not obligated to designate you to service additional business or contracts beyond the Initial Finder's Fee Business determined by the plan purchased. If we decide to offer any additional business or contracts to be serviced by your franchise, you may either reject or accept the designation at the time it is made.

Upon acceptance of and designation to service any additional business or contract, you will pay us an amount as a Finder's Fee according to the guidelines we establish. We will establish these guidelines, policies and procedures as necessary to calculate the applicable Finder's Fee, taking into consideration industry standards and increases in costs and expenses of soliciting new accounts. We reserve the right to increase or decrease the Finder's Fee in all categories. Currently, the following guidelines apply, but we may change any guideline or policy about the calculation or payment of a Finder's Fee for any type of account before an account is offered to you.

Upon acceptance of any additional business, you will sign an Account Acceptance/Finder's Fee Agreement that will include the Finder's Fee calculations, and the terms for the unpaid portion of any Finder's Fee, if any, according to the provisions set out in the Finder's Fee Schedules below.

For each of the Finder's Fee Schedules set out below, the following terms apply to calculate the Finder's Fee for the additional business:

"OVER" / "UP TO": The proper formula for a Finder's Fee payment structure is selected from the Monthly Billing categories listed by ranges, where the monthly billing for the cleaning contract will exceed the amount listed as "OVER", but less than the amount listed as "UP TO". If the monthly billing may fluctuate, the proper range of Monthly Billing will be determined by the maximum gross monthly billing allowed by the contract.

"DOWN PAYMENT": The initial payment due as established under these guidelines, is calculated by multiplying the percentage stated in the appropriate category and range of Monthly Billing under Down Payment, times the appropriate gross monthly billing. All Down Payments will be calculated using the gross billing for the First Full Month of Service. "First Full Month of Service", for purposes of calculating the Down Payment, is defined as the first month in which the service is performed on or before the 15th day of the month. If the "First Full Month of Service" is a partial month, the gross monthly billing, for purposes of calculating the Down Payment, is determined as though the account had been serviced for the entire month. If the account begins service after the 15th, the following month will be used for purposes of computing the Down Payment, and no payment is due for the initial period. The Down Payment described above is due and is payable as a deduction from the monthly Franchisee Report.

"MONTHLY PAYMENT": The payment made each month for the designated number of months, calculated by multiplying the percentage stated in the appropriate schedule under Monthly Payment, times the gross monthly billing for the current accounting month. However, the total of the amounts paid as Monthly Payments (exclusive of the Down Payment) shall not exceed a sum greater than 300% of: (a) for Multi-Tenant Accounts, the maximum gross monthly billing that would be generated in a month in which the building was at a 100% occupancy factor, exclusive of any down payment; or (b) for Public Event or Seasonal Accounts, the average gross monthly billing for the first 12 months service is performed under the account contract, exclusive of any down payment. Monthly Payments will begin the month following any scheduled Down Payment.

"MONTHS": The number of months a Monthly Payment must be made under the terms of the Account Acceptance/Finder's Fee Agreement, subject to the maximum sum described in the definition of Monthly Payment.

Accounts will be categorized according to the following definitions and the Finder's Fee will be calculated using the formula set out in the appropriate Finder's Fee Schedule for the type of account:

1) FIXED RATE ACCOUNT: An account that has a constant monthly billing established by the account contract, and has a term of 1 year or longer. You may pay the Finder's Fee in full at the time you accept the account, in which event, you will pay 3 times the amount of the maximum gross monthly billing allowed under the contract, or the fee will be structured as scheduled.

THIS SPACE INTENTIONALLY LEFT BLANK

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING | | DOWN | MONTHLY | |
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 1,500 | 60% | 20% | 13 |
| 1,500 | 3,000 | 40% | 15% | 20 |
| 3,000 | 6,000 | 30% | 10% | 30 |
| 6,000 | 10,000 | 15% | 10% | 32 |
| 10,000 | unlimited | 5% | 5% | 65 |

2)  VARIABLE RATE ACCOUNT:  An account with a monthly billing that may fluctuate, depending on the occupancy of the property, where the billing is based on a set price per square foot of service area, and has a term of one year or longer.  Any city, State or Federal account or Public School will be bid as a Multi-Tenant account.  You may pay the Finder's Fee in full at the time you accept the account, in which event, you will pay 3 times the amount of the maximum gross monthly billing that would be generated in a month in which the building was at a 100% occupancy factor, or the fee will be structured as Scheduled.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING | | DOWN | MONTHLY | |
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 3,000 | 30% | 5% | 72 |
| 3,000 | 6,000 | 15% | 5% | 72 |
| 6,000 | unlimited | 5% | 5% | 72 |

3)  SEASONAL ACCOUNT:  An account that will be serviced for a limited period of time but may recur on a seasonal basis.  This account may have a constant or fluctuating monthly billing amount.  You must pay a Down Payment only for the initial season.  You must pay Monthly Payments each month until the total you have paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service performed under the account contract, which may occur over several seasons.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING | | DOWN | MONTHLY | |
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| | Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing
for the first 12 months service is performed.

4)  PUBLIC EVENT FACILITIES:  An account involving a public facility that houses special events for a limited duration, but similar events recur on a regularly scheduled basis.  The monthly billing will fluctuate, depending on the type of event or use of the facility, where the billing is based on the labor-hours required to service the property, and has a term of 1 year or longer.  You must pay Monthly Payments each month until the total you have paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first 12 months service performed under the account contract.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING | | DOWN | MONTHLY | |
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| | Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly
Billing for the first 12 months.

5)  APARTMENT TURNAROUND:  An account where one or more apartments or other facilities are serviced on a recurring basis as a make ready between occupancies or other uses.  The monthly billing will fluctuate depending on the number of units serviced, but the account contract has a term of 1 year or more.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| | Any Amount | 20% | 10% | All* |

*Each month service is performed.

6)  OTHER NON-STANDARD ACCOUNTS:  We will establish the Finder's Fee on any other account that does not fall within one of the other categories, before the account is offered to you for designation of service.  The Finder's Fee on nonrecurring contracts, initial cleaning, or 1 time cleaning contracts will vary but do not currently exceed 25% of the total invoiced amount.

Policies and Procedures will be established by us which regulate the calculation and amount, terms of payment, credits on termination or transfers of accounts, and other issues concerning Finder's Fees.  The following is a summary of some of the policies and procedures currently in effect:

• We will deduct all payments of Finder's Fees, whether Down Payment, Monthly Payment, or a one time fee on nonrecurring contracts, on the monthly Franchisee Report that includes the billing for which the Finder's Fee is based.

• Additional or different locations of an account, and increases in the monthly billing rate of current accounts, which we secure are considered additional business and Finder's Fees will be assessed.  If you are substantially involved in the marketing efforts to secure the additional location or increase, the Finder's Fee will be reduced by an amount up to 50% of the full Finder's Fee.

• We will attempt to contract with new business for a minimum of 1 year, and you will be notified at the time an account is offered if the term is less than 1 year.  Increases from existing customers will, in most cases, continue for the balance of the term in the existing customer contract.

• If a customer contract is terminated for improper performance or improper conduct by you or anyone acting under your supervision or control, all outstanding Finder's Fees for that contract will be paid by us as scheduled, or will become due and payable immediately at our option.  For accounts that have a Finder's Fee with fluctuating monthly payments that cannot otherwise be determined precisely at the time of termination, the outstanding balance of the Finder's Fee will be the average of all monthly Finder's Fees paid to date, excluding down payments, multiplied by the number of months remaining to be paid.

• If we can successfully transfer, to another franchisee, an account which is canceling due to your non-performance, and that customer account does not cancel within 60 days after the transfer, then you will not be liable for any Finder's Fee still owing.  If the transfer is successful, you will not be entitled to any credits or rebates of Finder's Fees, royalties or other fees paid, but any remaining balance due on the Finder's Fee you owe will be canceled.

• Finder's Fee payments may be discontinued if the account cancels the service contract for reasons which you did not contribute any factor.  Finder's Fee payments will continue if the account canceled due to a contributing factor by you.  You have the responsibility to prove that your actions were not a contributing factor to the cancellation of the account.  If a Finder's Fee credit is due to you, we will apply the proper amount of credit to Finder's Fees on new business, but no cash refunds will be issued to you.  No credit on Finder's Fees will be issued on any account if:

(1)  the account requests a change in franchisees or the account cancels due to non-performance;

(2)  you have serviced the contract longer than 180 days;

(3) you are in violation of the Franchise Agreement;

(4) you are not in compliance with all current Policies and Procedures in the manual, policy directives or memos, with complete revisions;

(5) the credit for Finder's Fees was not requested in writing within 30 days of the contract cancellation.

• If cancellation occurs within the first 6 months of service for an account where a credit on Finder's Fees is applicable, the previous Finder's Fees paid will be applied to any future account accepted by you based on the following schedule, counted from the date that service began:

| | |
|---|---|
| 1 - 30 days: | 100% credit |
| 31 - 120 days: | 50% credit |
| 121 - 180 days: | 30% credit |

• Regardless of the payment arrangements, if the total Finder's Fee to be paid is $150 or less, then you must pay that amount in full upon acceptance of the additional business.

• Except where authorized in the Policies and Procedures Manual, no credit on Finder's Fees will be issued for any account you return to us unless the job is being used as an account exchange for larger accounts which has been approved by us.

• We will assist you in the development of your own marketing and sales efforts. Preparation of proposals (bids) or assistance in determining price and development of cleaning schedules, as long as such services are performed without traveling, are not considered part of the negotiations, so no Finder's Fees are charged for that assistance.

The royalty fees and Finder's Fees are not refundable.

(7) Insurance Requirements:

Before you will be authorized to begin operating your franchise, you must either purchase the insurance with the policy limits described below or join our Business Protection Plan. The cost of this insurance will vary, depending on factors that include the charges established by the insurer, terms of payment, prior loss history and the geographic location of the franchise operations. If you choose to purchase the insurance from another source, you must name us, JK INT'L, and their officers and directors as Additional Insureds in the following minimum amounts.

| TYPE | LIMITS |
|---|---|
| Comprehensive General Liability | $ 2,000,000 (Aggregate) |
| Comprehensive General Liability | $1,000,000 (per Occurrence) |
| Hired and Non-Owned Automobile Insurance | $1,000,000 (per Occurrence) |
| Excess or Umbrella Insurance | $20,000,000 (Aggregate) |
| Workers' Compensation | Statutory Limits |

These limits may be increased or have new types of coverage added, as circumstances dictate, from time to time.

As an alternative to the requirement of purchasing the above insurance, we currently offer you the opportunity to participate in our Business Protection Plan ("BPP"). Participation in the BPP is voluntary, and you are not obligated or required to participate. If you choose not to participate in the BPP, you must provide us with a certificate of insurance showing that you have obtained the equivalent amount of insurance coverage with limits as shown above or as established in the Jani-King Policies and Procedures Manual.

Participation in the BPP includes an initial membership in the Guardian Risk Purchasing Group ("GRPG"), a Texas non-profit corporation organized for the purpose of purchasing liability insurance on a group basis for persons or entities engaged in the janitorial industry.  Members in the GRPG participate in GRPG's group insurance policies.  GRPG's group insurance policies are not individual insurance policies and the policy limits are shared between all GRPG members.  If you participate in the BPP, you are not required to purchase the required liability insurance listed above.  Insurance provided by GRPG does not include coverage of your personal or business use automobile(s) or your equipment, supplies, or building if your building is different from ours.  You are required to purchase this insurance and supply proof of insurance to us before you will be authorized to begin operations of your franchise.  You are also required to keep accurate payroll records.  In the event you do not purchase this insurance, we reserve the right to purchase the insurance for you and charge you for the cost of the insurance.

You must be a engaged in the janitorial industry in order to be a member of the GRPG. Your membership in GRPG can be terminated if you: (1) fail to pay any amount owed for your participation in the BPP or  (2) if you fail to report all revenue generated by your participation in the janitorial industry or (3) if you file a fraudulent insurance claim under any of the insurance coverage you obtain from GRPG or (4) if you do not participate in the janitorial industry for 12 consecutive months.

The BPP also includes risk management, claims management assistance, periodic safety training, and regulatory compliance assistance.  For these services, you will be required to pay an administration fee which may include a profit to us. We will be solely responsible for administering the BPP.

The cost of the BPP varies, depending upon the cost of insurance purchased by the GRPG and the amount of insurance premium deductible you pay for insurance claims, if any.  The current BPP fee for this region is 6.25% of your franchise's Gross Revenue per month.  In addition, you will be responsible for payment of the administration fee which is $7 a month for monthly Gross Revenue less than or equal to $5,000 and $14 a month for monthly Gross Revenue above $5,000. The cost of the BPP may change occasionally.   We reserve the right to discontinue offering the BPP to you upon reasonable notice.

(8)  Equipment Lease through Affiliate:

The Additional Electric Equipment required, except for the Compact Portable Vacuum Cleaner, may be leased from our affiliate, LEASING, for a total approximate cost, depending on which equipment package is chosen, ranging from $1,250 to $1,380 based on the rates in use as of February 2, 2004.  The approximate cost of the Compact Portable Vacuum Cleaner when purchased through LEASING is $126.  Total lease payments include a down payment with an approximate range of $201 to $222 and twelve monthly payments with an approximate range of $101 to $111, depending on which equipment package is chosen.   At the end of the lease, you have the right to purchase the equipment at its fair market value, which historically has been approximately 20% of the equipment price at the time it is leased.  The terms and conditions of a lease for any electrical equipment offered by LEASING are determined solely by LEASING, and they may be modified or changed without our consent.

(9)  Operations Assistance or Complaint Fee/Service Fee:

In order to promote full compliance with all Jani-King performance standards and policies, we will charge you a $50 Complaint Fee if you do not comply with the time frames allotted for initial response or corrective action to a customer complaint or other performance deficiency, and our staff must respond to the client.   "Serviced" or "respond to" the complaint in this case means communicating with the client to determine the nature of the complaint and what needs to be done to resolve the situation, and to provide the customer relations necessary to try to protect the account.  It does not mean providing commercial cleaning services to the client to solve the problem.  An additional "Service Fee" will be assessed, plus expenses (i.e., labor, materials, supplies, equipment, etc.), for our personnel's time spent on cleaning or maintenance services required to rectify the complaint or satisfy the unhappy client.

The procedure for charging the Complaint Fee and the Service Fee, plus expenses is as follows:

If at any time, whether through a complaint or inspection, we discover a deficiency in performance at an account you clean, we have 4 hours to make contact with you (attempting to contact you a minimum of once each hour) and report the complaint to you.

The Complaint Fee and the Service Fee, plus expenses, will be charged under either of the following conditions:

(a)  We cannot locate you during the 4 hour contact period and our Operations Department must respond to the complaint; or

(b)  We notify you of the complaint, and 2 hours after the opening of the client's business the next morning, you have not corrected the deficiency in performance to the satisfaction of the client and us, requiring our Operations Department to respond to the complaint.

One of our representatives will inspect your accounts occasionally in order to insure that the service of all accounts is being performed according to the Cleaning Schedule and to the JANI-KING performance standards.  If we discover a deficiency in performance, whether through complaint or inspection, we may send our own staff to the account and correct all deficiencies in performance.  We have sole discretion to determine the urgency and the time frame of when to send our staff to an account.

You must cooperate fully with our staff, and pay a reasonable hourly rate ("Service Fee"), plus expenses and travel time, on each occasion we dispatch our staff to an account in order to correct a deficiency in performance.  The Service Fee will be established exclusively by us, but it will not exceed the rate of $50 per "labor hour".  The current rate for the Service Fee is $15 per labor hour, but may be changed when we determine it to be appropriate.

If the deficiency in performance requires immediate action to meet the client's demand for a visit or performance of services at their premises in less than 4 hours, and we are not able to contact you or you are not available for an immediate visit or to perform services, you will be assessed the Service Fee, plus expenses, for the operations representative's time and effort to satisfy the needs of the customer.

We will charge the Complaint Fee and Service Fee even if the account is transferred to save it.  If the account cancels for non-performance, the Service Fee, plus expenses may also be charged.  The fees will be payable in the month they are incurred.

<u>(10)  Advertising Fees:</u>

You will pay to us an advertising fee of 1% of your monthly Gross Revenues.  This advertising fee would be in addition to any monthly royalty fee charged.  We have the right to allocate parts of the Fee for certain of our administrative expenses for marketing activities. (See Item 11).

<u>(11)  Additional Training Fee:</u>

We will provide a mandatory local, initial training program for no additional fee, which includes classroom instruction and hands-on demonstration of cleaning methods, the Jani-King operating systems and programs using established procedures and forms.  We will also offer additional training classes and assistance to you by our staff and other industry experts.  In most cases, the additional training is not mandatory; however, you must participate in additional training if you fail to maintain Jani-King performance standards or production rates and we notify you of the required training.  At the present time, we do not charge for any additional training, nor have we done so in the past.  However, the rate currently established by Jani-King policies and procedures for additional training or other assistance is $50 per hour, plus expenses.  We reserve the right to charge this fee and to adjust the rates in the future.

<u>(12)  Transfer Fee:</u>

You may be required to pay a transfer fee in the amount of $2,000 or 10% of the sales price or exchanged value, whichever is greater, if you sell, assign, transfer, convey or encumber ("Transfer") your franchise.  The addition of any party to the franchise and the later deletion of an original party to the franchise will be treated as a constructive transfer, and the Transfer Fee will apply.  The Transfer Fee is non-refundable and must be paid on the date of transfer.  If you do not receive any monetary compensation or other exchange of value, no Transfer Fee will be charged for a transfer to: (1) any party currently holding an interest in the franchise at the time of the transfer, subject to the above restrictions; (2) a controlled corporation in which the current owners of the franchise retain 90% or greater of the outstanding shares of stock; or (3) if the

transfer is to one of the immediate members of your family (for the purposes of this section, family members include Franchisee's mother, father, brother, sister, and children only), whether it is a transfer during your lifetime or upon your death. An administrative fee will be charged to cover necessary and reasonable costs and preparation of the documents associated with the transfer if no Transfer Fee is assessed. The current administrative fee is $250, but we may increase this fee in the future.

(13) Revision of Fees:

   We reserve the right to change the amount of this fee.

(14) Except as otherwise indicated in the chart above, all fees and expenses described in this Item 6 are non-refundable and we impose all the fees and expenses listed, and they are payable to us. Except as specifically stated above, the amounts given may be subject to increases based on changes in market conditions, our cost of providing services and future policy changes. At the present time, we have no plans to increase payments over which we have control.

# ITEM 7

# INITIAL INVESTMENT

| NATURE OF INVESTMENT | ESTIMATED LOW/HIGH RANGE | WHEN PAYABLE | METHOD OF PAYMENT | TO WHOM PAID | WHETHER REFUNDABLE |
|---|---|---|---|---|---|
| | | | | | |
| Initial Franchise Fee and Initial Finder's Fee | $8,600/$16,250* | On signing Agreement/ When Franchise Produces Sufficient Revenue** | Immediate Negotiable Funds/Monthly Deduction from Franchise Revenue** | Us | (Note 1) |
| | | | | | |
| Real Estate | $ -0- to $5,000 | (Note 2) | (Note 2) | (Note 2) | (Note 2) |
| | | | | | |
| Supplies (Note 3) | $ 500 to $800 | Before Opening | Lump Sum/Installment | Vendors, Us | No |
| | | | | | |
| Equipment (Note 4) | $ 1,300 to $2,500 | Before Opening | Lump Sum/Installment | Vendors, Us, Affiliate | No |
| | | | | | |
| Security deposits, etc. (Note 5) | $ 100 to $1,000 | Before Opening | Lump Sum | Vendors, Suppliers, Utilities | (Note 5) |
| | | | | | |
| Additional Funds (120 days) (Note 6) | $ 800 to $8,500 | As Incurred | As Incurred | Us, Vendors, Employees | No |
| | | | | | |
| TOTAL | $11,300 to *$34,050 (Notes 7 and 8) | | | | |

*Upper range is open-ended under Plan E. See Item 5.
** Only Initial Franchise Fee Monthly Payment and Initial Finder's Fee Monthly Payment can be made by deduction from franchise revenue. Initial Franchise Fee Down Payment and Initial Finder's Fee Down Payment are due at the time of purchase.

NOTES:

(1) See Item 5 for the Initial Franchise Fee Down Payment and Initial Finder's Fee Down Payment charged for each plan.   We also offer a 5% discount off of the Initial Franchise Fee and the Initial Finder's Fee on all franchise plans where all Initial Franchise Fees and Initial Finder's Fees are paid in cash at the time the franchise is purchased.

(2) There is no requirement that you purchase or lease any real estate. Some Jani-King Franchisees have offices in their homes and conduct business from there, or they use the office facilities and support services we offer.  If you open an office, you must maintain it and all fixtures, furnishings, signs and equipment in good order and condition, and in conformity with the JANI-KING system image as we may establish.  The size of the office space obtained would be solely dependent on the size of your business operation.  The total cost for deposits, build-out and monthly rent will depend on factors such as the size, condition and location of the leased premises.

(3) The Initial Franchise Fee under each of the Plans includes the cost of an Office Supply and Advertising Package.  You must obtain those items listed in the Supply and Equipment Package listed in Exhibit IV before you will be eligible to service any accounts.  This Supply and Equipment Package may be purchased from or through us (subject to shipping restrictions), or from any other source that sells commercial grade cleaning products and equipment.

(4) You must purchase, lease, or provide proof of ownership of a commercial vacuum cleaner, a commercial floor polisher, a commercial wet/dry vacuum.  Also, depending on which of the equipment packages listed in the Additional Electric Equipment in Exhibit IV you chose to obtain, you may also be required to obtain either a Compact Portable Vacuum Cleaner (Canister Type) W/Shoulder Strap and Cloth Bag or a backpack vacuum cleaner including tool package.  We estimate the cost of this equipment may range from approximately $1,300 to $2,500, depending upon which equipment package is chosen and whether the equipment is new or used.  All of Additional Electric Equipment may also be leased from LEASING except the Compact Portable Vacuum Cleaner which is not available for leasing.  The approximate cost of this piece of equipment when purchased through LEASING is $126.  The total cost for the Additional Electric Equipment if obtained from LEASING ranges from approximately $1,250 to $1,380 depending on which equipment package is chosen.  These cost estimates are based on rates in use as of February 2, 2004.  If the equipment is leased, the initial (first and last month) payment of the leased equipment will have an approximate range from $201 to $222.

We do not require you to purchase or lease any special vehicle for transportation of the equipment to the job site.  If you currently own or lease an automobile, that vehicle may be appropriate for the transportation involved in serving your accounts.  In many cases, the equipment is left at the job site and no special transportation is required.  However, the Business Protection Plan provided by us does not provide coverage to your personal automobile or your equipment or supplies.  If a vehicle is needed, the cost for a lease or purchase will depend upon the type of vehicle acquired, the financing or lease arrangements available, whether the vehicle is new or used, etc.  The monthly cost of leasing or financing a vehicle could range from $200 and up.

(5) You must obtain all proper business licenses and permits from various state and local agencies before engaging in business.  These filing and application fees may range up to $500 each.  If you operate out of your home or lease any office space, costs for a business telephone and office equipment could range from $100 to $1,000.  If you have your own business telephone, you must also arrange for a security deposit with us to protect the JANI-KING name in the event you are not able to pay for the continuation of telephone service through the remainder of the telephone directory publication period.  A security deposit may also be required by your landlord for the lease of real property.  Also, utility companies may require deposits.  Security deposits and utility deposits are normally refundable.

(6) This item covers your other initial start-up for expenses, including all other fees you pay to us, payroll, insurance premiums and miscellaneous costs and expenses, such as legal and accounting expenses, for the initial phase of the business.  The cost of adequate insurance coverage may vary between $600 and $6,000 during the initial phase.  The initial phase is considered to be 120 days from when the Initial Offering Period begins.

(7) These figures are estimates, and we cannot guarantee that you will not have additional expenses starting the business. Your costs will depend on factors such as: how much you follow our methods and procedures; your management skill; experience and business capability; local economic conditions; the local market for our services; the prevailing wage rate; competition; and the sales level reached during the initial phase.

(8) We relied on our experience in the commercial cleaning business to compile these estimates. You should review these figures carefully with a business advisor before making any decision to purchase the franchise.

# ITEM 8

## RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES

You must purchase certain professional products and equipment listed on Exhibit IV as the "SUPPLY AND EQUIPMENT PACKAGE" and the "ADDITIONAL ELECTRIC EQUIPMENT", under specifications in the Franchise Agreement and operating manuals. These specifications are established to provide standards for performance, durability, design and appearance. We will notify you of the establishment or revision of standards, specifications, or the designation of approved suppliers through the Operations Manual, Policies and Procedures Manual, and policy memorandums. You have no obligation to purchase or lease these items from any designated supplier, but you may purchase them from us, subject to shipping restrictions.

We negotiate purchase arrangements, including price terms and a limited, guaranteed credit line, with designated and approved suppliers on behalf of the franchisees in our region. We also provide an automated payment service for your supply and equipment purchases from these designated suppliers. Our criteria for supplier approval is based on quality controls, the capacity to supply your needs promptly, reliably, price management, and product knowledge and support. If a supplier fails to maintain the criteria required for designated status, we will notify you prior to the reporting period in which the designation will be revoked.

We receive rebates ranging from 5% to 10% of the amount of purchases of equipment and supplies sold to our franchisees by unaffiliated approved suppliers. We also receive discounts ranging from 5% to 10% on purchases from these suppliers which may not be available to you.

Our affiliate, LEASING, is an approved supplier of the Additional Electrical Equipment for franchisees. LEASING pays us 7 ½% of all leases. In the year ending December 31, 2004, LEASING's revenues from the sale or lease of equipment to franchisees was $1,543,175, representing 100% of its total revenues. This financial information is taken from the books and records of LEASING.

Before you will be authorized to begin operating your franchise, you must either purchase the insurance with the policy limits described below or join our Business Protection Plan. If you choose to purchase the insurance, you must name us, JK INT'L, and their officers and directors as Additional Insureds in the following minimum amounts. We may increase these limits or have new types of coverage added. This insurance coverage must be maintained during the term of the Franchise Agreement and must be obtained from an insurer carrying an A.M. Bests' rating of "A" or better. (see Note (5), Item 6).

| TYPE | LIMITS |
| --- | --- |
| Comprehensive General Liability | $ 2,000,000 (Aggregate) |
| Comprehensive General Liability | $1,000,000 (per Occurrence) |
| Hired and Non-Owned Automobile Insurance | $1,000,000 (per Occurrence) |
| Excess or Umbrella Insurance | $20,000,000 (Aggregate) |
| Workers' Compensation | Statutory Limits |

You must obtain our approval before you use any advertising and promotional materials, signs, forms and stationery unless we have prepared or approved them during the 12 months before their proposed use.  You may purchase advertising and promotional materials, brochures, fliers, forms, business cards and letterhead from us.

If you choose to operate from a separate business office, we have the right of prior approval of office location, layout, and decor.  You must maintain your office and all fixtures, furnishings, signs and equipment in good order and condition, and in conformity with the JANI- KING system image, as we may establish.

During our last fiscal year ending December 31, 2004, we had revenues of $163,435,813 (on a consolidated basis with all the JKI affiliates).  Approximately 8% ($13,216,508) of this amount consisted of revenues from the sale or lease of equipment and supplies, from the administration of the Business Protection Plan, rebates from designated suppliers, and the sale of promotional and advertising materials.  Also, we have the exclusive right to perform all billing and accounting functions for the services provided and sales of products by your franchise.  This service is fully described in Item 6.  We charge you 3% of your Gross Revenue as an Accounting Fee for these services.  Approximately 2.3% ($3,718,080) of our consolidated revenue described above consisted of revenues from these services.

We estimate that the purchase and lease of all goods and services you must make in accordance with our specifications, or that you purchase or lease from us, our affiliates, or from unaffiliated suppliers from whom we receive rebates, represents approximately 85% to 95% of your total purchases in connection with the establishment of your franchise business, and approximately 85% to 95% of your overall purchases in connection with the operation of the business.

## ITEM 9

## FRANCHISEE'S OBLIGATIONS

THIS TABLE LISTS YOUR PRINCIPAL OBLIGATIONS UNDER THE FRANCHISE AND OTHER AGREEMENTS. IT WILL HELP YOU FIND MORE DETAILED INFORMATION ABOUT YOUR OBLIGATIONS IN THESE AGREEMENTS AND IN OTHER ITEMS OF THIS OFFERING CIRCULAR.

| Obligation | Section in Franchise Agreement | Item in Offering Circular |
|---|---|---|
| (a) Site selection and acquisition/lease | Section 4.11.1 | Items 7 and 8 |
| (b) Pre-opening purchase/leases | Section 4.4 | Items 5, 6, 7, 8, 10, 11 and 16 |
| (c) Site development and other pre-opening | None | Items 5, 6, 7, 11 |
| (d) Initial and ongoing training | Sections 6.1.1, 6.3,6.4, 6.6 | Item 11 |
| (e) Opening | Section 6.1.1 | Item 11 |
| (f) Fees | Sections 4.23, 4.3, 4.3.2, 4.5.1, 4.5.2, 4.6, 4.7,4.7.1, 4.13, 4.17.4,4.17.5, 4.17.8, 4.19.1, 4.23, 4.23.1, 5.4,  6.6, 10.2, 11.6 | Items 5, 6 and 7 |
| (g) Compliance with standards and Policies/Operating Manual | Sections 4.1, 4.2.2, 4.6, 4.11, 4.11.1, 4.17.2, 4.17.3, 4.17.4, 4.17.6, 4.19.2, 4.23, 4.24, 8.1(b)(f)(g)(ii) | Item 11 |

| Obligation | Section in Franchise Agreement | Item in Offering Circular |
|---|---|---|
| (h) Trademarks and proprietary information | Sections 4.1, 4.11.1, 4.16, 4.20, 4.25, 5.1(a), 6.7, 8.1(a)(g)(v) | Items 13 and 14 |
| (i) Restrictions on products/services offered | Sections 4.17, 4.19.2, 4.24, 4.25, | Items 8, 12 and 16 |
| (j) Warranty and customer service requirements | Sections 4.17, 4.23 | Item 11 |
| (k) Territorial development and sales quotas | None | Item 12 |
| (l) On-going product/service purchases | None | Item 8 |
| (m) Maintenance, appearance and remodeling requirements | Section 4.11.1 | Items 11 and 17 |
| (n) Insurance | Section 4.12 | Items 6, 7 and 8 |
| (o) Advertising | Sections 4.1, 4.5.2, 6.2 | Items 6, 7 and 11 |
| (p) Indemnification | Sections 4.10, 4.12.1, | Item 6 4.12.3, 4.13 |
| (q) Owner's participation/management/staffing | Section 4.2.1 | Items 11 and 15 |
| (r) Records and reports | Sections 4.7, 4.9 | Item 11 |
| (s) Inspections and audits | Sections 4.9, 4.17 | Items 6 and 11 |
| (t) Transfer | Section 10 | Items 6 and 17 |
| (u) Renewal | Section 9 | Items 6 and 17 |
| (v) Post-termination obligations | Sections 4.14, 4.20, 4.21, 4.22, 5 | Item 17 |
| (w) Non-competition covenants | Section 4.14, 5 | Item 17 |
| (x) Other | None | |

# ITEM 10

# FINANCING

We do not offer financing for the Initial Franchise Fee or the Initial Finder's Fee. (See Item 5 for purchasing options)

<u>Equipment Lease through Affiliate.</u>

       Our affiliate, LEASING, provides lease arrangements for most of the equipment you will use in your franchise. LEASING determines all the terms and conditions of the leases offered by them, and they may be modified or changed without our consent. The lease arrangements vary depending on the particular piece of equipment. A description of the types of equipment along with the Manufacturer's List Price, Cash Price, Down Payment, Monthly Lease Payment, Term of months, and Total Payments for each piece of equipment available through LEASING is listed in Exhibit III.

       We guarantee your payment of the lease to LEASING, and LEASING pays us 7 ½% of all lease payments. If you are a corporation, or other limited liability entity, the lease must be guaranteed individually by all shareholders, officers and directors. If you are married and your spouse is not a partner in the franchise business, your spouse must personally guarantee the lease.

<u>Our Guarantee of Your Supply and Equipment Purchases.</u>

       We negotiate purchase arrangements with designated and approved suppliers on behalf of the franchisees in our region. For these designated suppliers, we guarantee on your behalf up to $300 on account for ongoing supply purchases. We also provide an automated payment service for your supply and equipment purchases from these designated suppliers. There is no charge to you for this guarantee, but we receive a rebate from the designated suppliers that range from 5% to 10% of the amounts you purchase.

<u>Automatic Credit Line.</u>

       We will invoice all of our clients which are serviced by you for the services rendered and supplies sold. On the 5th day of the following month, we will calculate the amounts due to you on the Monthly Franchise Report without consideration as to whether those accounts receivable have been collected for that billing period. This provides you with an automatic, 30 day credit line. If monies have not been collected from a prior billing period's invoices that are over 30 days old, we will deduct that amount ("Charge Back") from the amount listed in the "Due Franchisee" column on the Monthly Franchise Report and distribute the difference in the money to you. You will pay us 3% of your Gross Revenues from the current billing period report, as the "Accounting Fee." (Franchise Agreement, Section 4.7.1)

<u>Payment of Finder's Fees for Additional Business.</u>

       If you accept any additional business we offer to you in excess of the Initial Finder's Fee Business, you must pay us a Finder's Fee according to the guidelines we establish. This Finder's Fee is different than the Initial Finder's Fee Payments described in Item 6. You must sign an Account Acceptance/Finder's Fee Agreement that will include the Finder's Fee calculations, and the payment terms for the unpaid portion of any Finder's Fee, if any. See Item 6, Note 4 for a detailed description of the Finder's Fee program.

       We reserve the right to assign or factor any promissory notes or leases. Except as disclosed in the information above about our arrangements with designated suppliers, we do not receive direct or indirect payments for the placement of financing. Except as disclosed in the information above about the limited guaranty we provide to designated suppliers and to our affiliate, LEASING, we do not guarantee your obligations to third parties.

# ITEM 11

## FRANCHISOR'S OBLIGATIONS

       Except as listed below, we need not provide any assistance to you.

<u>Pre-Opening Obligations.</u>

       Before you open your business we will:

1.  Grant you the right to operate a JANI-KING franchise and a license to use the JANI-KING marks in a non-exclusive, specific geographical territory.  (Franchise Agreement: 3.2, 6.7).

2.  Provide you with the Office Supply and Advertising Package listed in Exhibit IV. (Franchise Agreement:  6.2).

3.  Loan you our confidential manuals and training aids. (Franchise Agreement:  6.3).

4.  Within 45 days of when you sign the Franchise Agreement, provide an initial local training program to include the cleaning processes, methods, materials, equipment, forms and promotional plans developed by JANI-KING.  This training is described in detail later in this Item. (Franchise Agreement:  6.4).

5.  Certify you as an authorized JANI-KING franchisee after you complete the training, acquire the necessary equipment and supplies, and provide proof of required insurance. (Franchise Agreement:  6.1).

6.  Provide you the lists of approved products. We also provide some of these items directly to you.  See Item 8 for details of the supplier arrangements we establish and the specifications for the supplies and equipment.

7.  Approve or disapprove your site if you choose to operate from an office outside your home and the facilities we provide for you. We will make sure the appearance complies with the JANI-KING standards, but we do not offer assistance in site selection. (Franchise Agreement:  4.11.1).  We recommend that you not lease or purchase an office location to open your franchise business.  The majority of JANI-KING Franchisees are able to conduct their business from their homes.

Post-Opening Obligations.

After you open your business we will:

1.  Offer you the right to provide service under commercial cleaning and/or maintenance contracts that in total would provide a minimum in gross monthly billings in an amount defined as the "INITIAL FINDER'S FEE BUSINESS" in the Franchise Summary of the Franchise Agreement.  All contracts will be the property of Jani-King.  The Initial Finder's Fee Business is not stated as a specific amount of revenue, but instead, is the total of the monthly billing rates for all the cleaning contracts offered to you to service as Initial Finder's Fee Business. (Franchise Agreement: 6.1.1).

| PLAN | INITIAL FINDER'S FEE BUSINESS ($) | INITIAL OFFERING PERIOD (Days) |
|---|---|---|
| E-10* | 10,000* | 330** |
| E-9 | 9,000 | 300 |
| E-8 | 8,000 | 270 |
| E-7 | 7,000 | 240 |
| E-6 | 6,000 | 210 |
| E-5 | 5,000 | 180 |
| E-4 | 4,000 | 150 |
| D | 3,000 | 120 |
| C | 2,000 | 120 |
| B | 1,000 | 120 |
| A | 500 | 120 |
|  | *An Additional $1,000 for each higher level of the "E" Plan | **Plus An Additional 30 Days for each level higher of the "E" Plan |

**Note 1-1.**  Time to Offer the Initial Finder's Fee Business.

The right to provide service to these contracts will be offered during the "INITIAL OFFERING PERIOD", which time period begins on the date you complete the initial training program to our satisfaction, obtain all required equipment and supplies, and provide proof of required insurance.

Under Plans A, B, C and D, the Initial Offering Period is 120 days.  Under each level of Plan E, the Initial Offering Period is calculated as the total of:  120 days, plus an additional 30 days for each higher level of the "E" Plan, beginning with level E-4.

Example:  E-4  [120 + 30 (1st level)]  = 150 days
          E-5  [120 + 60 (2nd level)]  = 180 days
          E-6  [120 + 90 (3rd level)]  = 210 days, etc.

We will make a good faith effort to secure accounts and offer you the right to perform the services as soon as possible, but we will have the total period to offer the Initial Finder's Fee Business under each plan, and we are not obligated to offer any portion of the Initial Finder's Fee Business before the end of that time.  We calculate the Initial Offering Period from the date you sign the Acknowledgment of Completion of Training,  you obtain all required equipment and supplies, and you have provided proof of required insurance.

**Note 1-2.**  We may automatically extend the actual time to secure and offer the Initial Finder's Fee Business to you, at our sole discretion, under the following conditions:

(1)  If you make a written request for a delay in the offering of all or part of the Initial Finder's Fee Business, and we agree to the postponement.  Before we resume offering any other business to you, you must provide us notification, in writing, as to when you are ready to accept other business.  We may require you to provide documentation that you are performing services satisfactorily at your existing accounts.

(2)  If you are in default under the terms of the Franchise Agreement or any other agreement between you and us.

(3)  If you fail to comply with any policies or procedures within 72 hours after we notify you of non-compliance.

(4)  If any of the Initial Finder's Fee Business previously provided to you requests a transfer to another franchisee or requests to be canceled due to non-performance.

**Note 1-3.**  If the Initial Offering Period is extended based on a transfer or cancellation of an account, we will not offer any other accounts toward fulfillment of the Initial Finder's Fee Business obligation, nor will we offer any "additional business" until you successfully complete the additional training as required by our Regional Office.

**Note 1-4.**  If the Initial Offering Period is extended, the time allowed for us to offer the balance of the Initial Finder's Fee Business to you will be the remaining portion of the Initial Offering Period or a minimum of 120 days, whichever is most, from the date you:

(1)  notify us you are ready for other business (and provide any required documentation),

(2)  cure any default of the Franchise Agreement or violation of policies and procedures, or

(3)  complete the required additional training.

**Note 1-5.**  All accounts offered will apply toward the Initial Finder's Fee Business as specified in the Franchise Agreement, whether or not you accept or decline the offered business.  Our obligation is to secure and offer to you the right to provide service to those accounts within the specified time.  However, you might choose not to accept some of the accounts offered. That is why the Franchise Agreement says that we will secure and "offer" you the right to provide service to those accounts.  We can only make a good faith effort to offer the amount of Initial Finder's Fee Business for the Plan specified, and you must choose to accept or decline the offer."  We do not guaranty that the Initial Finder's Fee Business will reach or remain at the stated level of the plan you purchase throughout the term of the Franchise Agreement.

We intend for the accounts offered under the Initial Finder's Fee Business to continue for at least 1 year.  However, an account might not continue in business beyond the Initial Offering Period at no fault of yours.  Under this circumstance, we have met our obligation to "offer" the business within the required time.

Under either of the situations where you decline an offer to service an account or an account cancels at no fault of yours, we are relieved of our time obligation regarding the Initial Offering Period for that amount of gross monthly billings, however, we will at some point in the future, offer you the right to perform services on that amount of contract billings without Finder's Fees. Those accounts which are transferred or canceled due to your failure to perform according to JANI-KING standards will not be replaced.

**Note 1-6.** Partial Refund if Initial Finder's Fee Business not offered within Initial Offering Period.

If we are unable to secure and offer you the full amount of Initial Finder's Fee Business within the time frame allocated for the Initial Offering Period, an amount equal to 3 times the amount of Initial Finder's Fee Business not offered to you will be refunded. Any refund will be first applied to any outstanding balance or other obligation you owe us or LEASING, with the remaining sum, if any, paid to you. A refund under this provision will fulfill our obligation to offer any remaining portion of the Initial Finder's Fee Business.

**Note 1-7.** Transfers or Cancellation of Initial Finder's Fee Business.

The following procedures apply if any account you are servicing as part of the Initial Finder's Fee Business requests a transfer to another franchisee or cancels the cleaning contract:

(1) If an account cancels or is transferred to a new franchisee due to non-performance, theft, your failure to service the account properly, customer relations problems caused by you, or your failure to comply with the Policies and Procedures, we will not replace the account.

(2) If an account cancels at no fault of yours before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account, at no additional cost to you. This provision applies until you have serviced that replacement account for the remainder of the initial 12 month period. If any replacement account has a greater value than the original account, the excess will be applied to the obligation of other Initial Finder's Fee Business, or if the Initial Finder's Fee Business obligation has been fulfilled, Finder's Fees will be charged.

EXAMPLE: An account with a monthly gross billing of $1,000 per month cancels after 7 months through no fault of yours. We will replace the account with one or more accounts having cumulative gross monthly billing of at least $1,000 per month. If any of the replacement accounts also happen to cancel at no fault of yours at any time during the next 5 months you service the account(s), we will replace the replacement account(s) with other account(s). If the cumulative gross monthly billings of the replacement accounts exceed $1,000, the monthly billing in excess of $1,000 would apply against other Initial Finder's Fee Business obligation, or Finder's Fees would be charged.

No other obligations exist for us to replace the contracts if the contracts are canceled before the full term.

2. Handle all billing and accounting functions for the services and supplies you provide to your customers, unless we notify you in writing otherwise. We will disburse to you on the 5th day of each month, all monies due you as reported on the Franchisee Report after we deduct all the appropriate fees, charges and any other amounts due to us, our affiliates, and to third parties with special credit arrangements for your benefit. (Franchise Agreement: 4.7.1).

Other than monthly invoicing, we are not required to engage attorneys, commence litigation, or perform any other acts in order to secure payment from businesses you service.

3. Provide you with an automatic, 30 day credit line for the uncollected receivables on the accounts you service. (Franchise Agreement: 4.7.1).

4. Provide you with marketing and technical assistance, and consultation and advice on operating procedures. We will continue to provide appropriate assistance and guidance until you have been offered the right to service business with the gross monthly billing as required by the plan purchased. This guidance will, at our discretion, be furnished in our operating manuals, bulletins or other written materials and/or during telephone consultations, electronic mail, training programs, meetings, conferences and/or personal consultations at our office or at a mutually convenient place. (Franchise Agreement: 6.5).

5.  Provide you additional training and support at reasonable rates we establish by policies and procedures, currently at a rate of $50 per hour, plus expenses. (Franchise Agreement:  6.6).

6.  Loan you one copy of the Manuals, consisting of such materials (which may include audio tapes, videotapes, magnetic media, computer software and written materials) that we generally furnish to franchisees for use in operating JANI-KING Businesses.  The Manuals contain mandatory and suggested specifications, standards, operating procedures and rules ("System Standards") that we prescribe from time to time.  The Manuals may be modified periodically to reflect changes in System Standards. (Franchise Agreement:  4.25, 6.3).

7.  Permit you the right to profit from your efforts, commensurate with your status as a business or business owner, and, correspondingly, to permit you to bear the risk of loss or failure that is characteristic of this status.

8.  Have available for you all appropriate facets of the JANI-KING system as well as pertinent new developments in the cleaning service industry, including procedures for improved efficiency.

9.  Have available for you at a reasonable cost, promotional materials, sales and service manuals, and other materials as they are developed that are relevant to the operation of your franchise. (Franchise Agreement:  6.10).

10.  Offer you the option to participate in the contributory Business Protection Plan, which includes your minimum insurance required for the franchise. (Franchise Agreement:  4.12.4).

11.  Perform periodic quality control visits to each location under your care.  During these visits we will inspect and evaluate the quality of the cleaning services you are providing for the client.  We will make recommendations on how to correct deficiencies, improve techniques, and enhance the efficiency of those services.  We will have an operations representative available to answer routine questions or to assist you with problems during normal business hours. (Franchise Agreement:  4.17.3).

12.  Provide consultation and service at your customer locations or at our office for a charge to be established by policies and procedures at a rate not to exceed $50 per hour, plus reasonable expenses.  This rate is subject to review and may be changed at our sole discretion. (Franchise Agreement:  4.17.4).

13.  Issue, modify and supplement system standards for your franchise.  We may periodically modify system standards and procedures, which may accommodate regional or local variations as we determine, and these modifications may require you to invest additional capital in your franchise business and/or incur higher operating costs.  However, these modifications will not alter your fundamental status and rights under the Franchise Agreement. (Franchise Agreement:  4.24, 4.25).

14.  Establish, amend or revise company policies and/or procedures pertaining to the operation of your franchised business and distribute them through the Policies and Procedures Manual, policy directives, or memos. (Franchise Agreement:  4.24).

15.  We may offer additional or new business upon your request and proven ability to expand your level of productivity.  All additional or new business we offer you is contingent upon you paying us a Finder's Fee based on the monthly billing amount of the account. (Franchise Agreement:  4.6).

16.  Throughout the term of the Franchise Agreement, we will offer you sales, marketing and technical assistance, and consultation and advice on operating procedures. (Franchise Agreement:  6.5).

We will not provide any other supervision, assistance or service during the operation of the franchise business.

Advertising.

We charge an advertising fee ("Fee" as defined in Item 6) for the purpose of advertising on a regional or national basis.  You must pay us 1% of the your monthly Gross Revenue. (Franchise Agreement:  4.5.2).  This fee is charged to all of our franchisees at a uniform rate.

The Fee will be used by us or our designee as follows:

1.    We will direct all advertising programs and will have sole discretion to approve or disapprove the creative concepts, materials and media used in the programs.  The Fee is intended to be used to maximize general public recognition and acceptance of the registered trademarks and enhance the collective success of all franchises operating under the Jani-King system.  None of the Fee is specifically or principally used for advertising that is principally a solicitation for the sale of franchises.  In using the Fee, we and our designees are not required to make expenditures for you which are equivalent or proportionate to your payment or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising.  We or our designees are also not required to advertise in the area where you are located.

2.    The Fee may be used to satisfy any and all costs of maintaining, administering, directing and preparing advertising (including, without limitation, the cost of preparing and conducting television, radio, magazine and newspaper advertising campaigns; direct mail and outdoor billboard advertising; public relations activities; employing advertising agencies to assist therein; and costs of our personnel and other departmental costs for advertising that is internally administered or prepared by us).  Sums paid by you relating to the Fee will also be used to defray any of our administrative costs incurred in activities reasonably related to advertising programs.  This Fee is a payment to us for advertising and related costs and we do not have any duty to you related to the use of the Fee.

We currently advertise or may advertise Jani-King services in various forms of media, including:  radio, magazine, newspaper, and stockcar racing advertising campaigns; and direct mail and outdoor billboard advertising.  Our print advertising may also include general business magazines, direct mail, vehicle signage, and yellow page directory listings.  Our advertising also includes telemarketing, video and audio tapes, and various point-of-sale items.  The majority of our advertising is developed by members of our staff and outside advertising agencies.  We use national, regional and local advertising agencies to assist us in the development and placement of advertising on an as needed basis.

During the year 2004, we spent 3% of the consolidated Fee collected from franchisees in all related franchising entities on production, 36% on media placement, 58% on trade shows and related marketing campaigns, and 3% on general and administrative expenses.

You must obtain our approval before you use any advertising and promotional materials, signs, forms and stationery.  You may purchase advertising and promotional materials, brochures, fliers, forms, business cards and letterhead from us.

Computer Systems.

We do not require use of a computer system or an electronic cash register.

We are making reasonable efforts to address the potential impact of the Year 2000 ("Y2K") issue.  Those efforts are described in the following paragraphs, which also serve as our Year 2000 statement and readiness disclosure under the Year 2000 Information Readiness Disclosure Act.

Y2K relates to potential problems with computer systems, or any equipment employing technology that uses dates, where the date has been stored as just 2 digits (e.g., "98" for 1998).  On January 1, 2000, any date recording mechanism, including date sensitive computer systems and software, which uses only 2 digits to represent the year may recognize a date using "00" as the year 1900 rather than the year 2000.  If this occurs, it could cause system failures or miscalculations, resulting in disruption of operations.

We are aware of the potential impact of Y2K and have developed a plan to minimize the impact of the Y2K problem on our operations and material relationships with our franchisees and other third parties. Under our plan, we are engaged in the process of identifying programs or hardware used by our computer systems, and third party systems, products or services upon which our operations depend, that may malfunction as a result of the Y2K problem.

We have initiated programs to rectify such problems, including upgrading existing software packages, implementing new Y2K compliant systems, repairing existing software and thoroughly testing all material systems.  Among other things, we are converting and testing our franchisee accounting system, which we support and maintain.  This system is used to provide

accounting of the business being serviced by each franchise owner. Application remediation efforts for this system were completed in April, 1999. We expect to complete implementation of this system June, 1999.

We are also in the process of communicating with our significant suppliers to determine the extent to which our operations are vulnerable if those third parties fail to solve their own Y2K issues.

You are responsible for analyzing and remediating any systems outside those which we support and maintain. Examples of such systems include your corporate office computers or networks, telephone systems, security systems, and environmental systems. You may also face potential Y2K problems in dealing with suppliers, landlords, financial institutions and others. It is your responsibility to timely ensure you have taken the necessary action to conduct your own Y2K assessments and compliance efforts, including contingency planning.

We believe that the necessary revisions or replacements of material computer systems and the necessary due diligence with third party vendors will be accomplished in a timely manner, thus insuring minimal disruption in the operations of our business. However, there can be no assurance that we will not experience disruptions in operations that could materially and adversely affect our business, results of operations, and financial condition, any of which may impact you, as a franchisee.

Office Location

The factors which we consider when approving non-residence locations include general location and neighborhood, whether any other businesses operate out of the same premises, and whether the location will result in damage to our image and reputation.

Time to Opening.

"Operational" or "open" means that you have been granted a franchise, successfully completed the initial training, acquired the necessary equipment, and provided proof of required insurance, and are authorized by us to begin servicing accounts. The typical length of time between the signing of the Franchise Agreement, or the first payment of any consideration for the franchise, and the opening of the business is 30 days. However, the length of time may range from 10 days to 6 months or more, depending on when you are available to begin the training program, complete the training, and obtain all the required equipment and supplies. The exact time when your business will commence depends on the specific fact situation of each individual franchise. See Item 19 for information about our experience with offering the Initial Finder's Fee Business.

Training.

We will provide initial training on the operation of your franchise business to you, and you must attend and complete, to our satisfaction, our initial training program within 6 months after the signing of the Franchise Agreement. Successful completion of the training program is mandatory for all your owners, directors or officers who will actively participate in the operations of your franchise business.

We will conduct this training at our local regional office and 1 or more local customer locations we designate. Initial training programs are offered at various times, and we plan to be flexible in scheduling training to accommodate you and our personnel. Typically, there is at least 1 training class offered each month, depending on how many new franchisees enter the system.

The training program we offer generally will consist of at least 8 training sessions, held usually in the evenings and on weekends over a 2 week period, and includes approximately 40 hours of instruction and self study. The program provides training in JANI-KING methods and practices of professional cleaning services, management, sales and promotional techniques. The training program includes information about production procedures and rates, marketing, and management matters presented through classroom lectures and discussions, actual demonstrations, printed manuals, video presentations, formal instructions, and practical hands-on training. The home study materials include video training tapes on cleaning techniques that you may later use for your personnel.

Our initial training will be conducted by persons who are active operations and administration managers and staff from our regional office that will be supporting you. The person(s) conducting the initial training will have at least six

months experience in the commercial cleaning industry.   We also expect to draw on the substantial experience of our management, personnel of the designated suppliers in our region, and occasionally from other experienced franchisees.

There are no additional fees for this initial training, but you are responsible for any travel and living expenses which you and your principals incur in connection with the training.  However, normally, no travel or living expenses will be necessary as training will be conducted at our regional office or on the premises of businesses that are being serviced by another franchisee, all within commuting distance of your residence.

We will provide additional training, seminars and refresher courses to you at your option, but except in the case where you had an account transfer or cancel due to improper operation of your franchise, attendance is not required.  There currently is no charge for the additional training or refresher courses, and although we do not charge for any special assistance or additional training of any franchisee, we may charge up to $50 per hour, plus expenses for other assistance which we provide you.

The subjects covered, the type of instructional material, and the hours of classroom and on the job training in the initial training program are described below:

| SUBJECT | INSTRUCTIONAL MATERIAL | HOURS | |
|---|---|---|---|
| | | CLASSROOM | ON THE JOB |
| Policies & Procedures | Manuals | 3.0 | 0.0 |
| | | | |
| Restrooms | Manuals & Video | 1.25 | 0.5 |
| | | | |
| Offices | Manuals & Video | 1.25 | 1.0 |
| | | | |
| Hard Surface Floor Care | Manuals & Video | 5.5 | 5.0 |
| | | | |
| Carpet Care | Manuals & Video1.5 | 1.5 | 1.0 |
| | | | |
| Supplies & Equipment | Manuals | 2.0 | 0.5 |
| | | | |
| Sales & Marketing | Manuals | 2.0 | 0.0 |
| | | | |
| Communications | Manuals | 2.0 | 0.0 |
| | | | |
| Personnel | Manuals | 2.0 | 0.0 |
| | | | |
| Administration & Reporting | Manuals | 2.0 | 0.0 |

| | | | Total |
|---|---|---|---|
| Training Hours | 22.5 | 8 | 30.5 |
| Self Study | | | 10.0 |
| | | | 40.5 |

Manuals.

The Tables of Contents of our 4 operating manuals are included in Exhibit V.

# ITEM 12

# TERRITORY

You will not receive an exclusive territory. We will license you and offer you the right to provide services under your Agreement in a specific, non-exclusive, geographical territory that will be designated in the Franchise Agreement as 1 or more counties in the States of Massachusetts and New Hampshire. We have established, or may establish, one or many franchisees that also will be permitted to use our trade name or trademark in the same territory. We have also established, or may establish, a company owned outlet, or "in house" operation, using our trade name or trademark in the same territory that may compete with your franchise. No franchisee will be granted an exclusive area or territory.

You and the other franchisees must not knowingly interfere, solicit, or otherwise contact in any manner a current client or prospect of another JANI-KING franchisee or of our regional office, unless we request you to do so in writing. If a franchisee solicits a potential client and discovers that the client will be receiving, or has already received a JANI-KING proposal delivered by another franchisee or our Regional Office staff member, the franchisee may not pursue any further solicitation of that account, and must withdraw any proposal until a decision has been made on the original proposal currently under consideration, or for a maximum of 60 days from the date on that proposal.

We may monitor the performance reports on all accounts and also perform periodic quality control visits to each location under your care. During these visits we may inspect and evaluate the quality of the cleaning services you are providing for the client and discuss your performance and customer service with the client. If at any time, whether through complaint or inspection, we discover a deficiency in performance concerning an account you service, and you do not cure the deficiency within the time stated in our policies and procedures or the notice provided to you, we have the right to suspend or terminate your authority to service that account, or all of your accounts. We may then transfer the account to another franchisee or service the account through our "in house" operation.

We may also solicit additional business from customers where you are providing service. If the additional services contracted for are for a facility where you are currently providing service and if you are providing acceptable service and customer service, we may offer you the right to provide service for the payment of applicable Finder's Fees. If we offer you and you do not choose to accept the offer, we may designate another franchisee to provide the additional service. If the additional business is located away from the facility you are servicing for that customer, we will determine which franchisee will be designated to service the business, and we are not obligated to offer it to you.

Our staff must approve all proposals and contracts for services. We will not allow you to solicit or accept accounts outside of your designated territory. All services provided by you must be made under an approved JANI-KING Maintenance Agreement where we are a party to the agreement, and we must prepare all proposals for solicitation of accounts by you in order to maintain consistency in accuracy and quality of appearance.

You may purchase more than 1 franchise unit within the territory, either from us or from an existing franchisee; and we will recognize your interest in multiple units. However, all transactions between you and us about any operation of your franchise business will be controlled by the most recent franchise agreement. If you choose not to formally merge the multiple interests into 1 franchise, you may later transfer a franchise unit without affecting your other interest.

The Franchise Agreement does not give you a right to relocate your franchise to another territory.

There is no minimum sales quota or market penetration contingency affecting your franchise.

We do not intend to establish any other franchise with similar services or products under a different trademark, but we do propose to establish a system of retail supply stores that may operate under a different trade name or trademark.

THIS SPACE INTENTIONALLY LEFT BLANK

# ITEM 13

# TRADEMARKS

We grant you the right to use certain trademarks, service marks and other commercial symbols in operating your franchise.  Our primary service marks are the word mark, "JANI-KING", and the JANI-KING logo with the dot on the letter "I" in "JANI" formed by a cut-line of a crown as shown in the upper left corner of the cover sheet to this offering circular.  JK INT'L owns the JANI-KING marks and we are licensed to use them as an affiliated subsidiary.

JK INT'L registered the marks on the Principal Register of the United States Patent and Trademark Office and has filed all required affidavits:

| Mark | Federal Registration Number | Registration Date |
|------|-----------------------------|-------------------|
| JANI-KING (logo) | 1,399,797 | July 1, 1986 |
| JANI-KING (word) | 1,472,588 | Jan. 12, 1988 |

You must follow our rules when you use these marks.  You may not use the marks as part of your corporate or other legal name, and you must comply with our instructions in filing and maintaining trade name or fictitious name registrations.  You must use the marks only for the operation of your franchise as specified in the Franchise Agreement, and you cannot use any of the marks for the performance or sale of any unauthorized services or products or in any other manner we do not authorize in writing.

There are no currently effective material determinations by the Patent and Trademark Office, the Trademark Trial and Appeal Board, the trademark administrator of any state, or of any court, nor are there any pending infringement, opposition or cancellation proceedings or any pending material litigation involving our principal marks, which are relevant to their use in this state or in any other state in which the franchise business is to be located.

We know of no superior prior rights or infringing uses that could materially affect your use of these marks in any state where your franchise business will be located.  No agreements limit our rights to use or license the use of the marks listed above in a manner material to the franchise.

We are not obligated to protect your rights to use these marks or to protect you against claims of infringement or unfair competition that result from your use of the marks within the terms of the Franchise Agreement, although we intend to do so when that action is in the best interest of the JANI-KING system.

We may change the system and may require you, among other things, to adopt and use new or modified trademarks.  You must promptly accept, implement, use and display these additions, modifications and changes in the operation of the franchise business at your sole cost and expense.

# ITEM 14

# PATENTS, COPYRIGHTS AND PROPRIETARY INFORMATION

Patents and Copyrights.

No patents are material to the franchise.

We and JK INT'L claim copyrights in the manuals; advertising, training and marketing materials; and the business methods and processes used in the operation of the franchise.  These copyrights have not been registered with the United States Registrar of Copyrights.

There currently are no effective determinations of the Copyright Office (Library of Congress) or any court regarding any of the copyrighted materials.  No agreements are currently in effect which significantly limit our right to use or authorize our franchisees to use the copyrighted materials.  Neither we nor JK INT'L know of any infringing uses which could materially affect your use of the copyrighted materials in any state.  We and JK INT'L are not required by any agreement to protect or defend copyrights, patents, or confidential information, although we intend to do so when that action is in the best interest of the JANI-KING system.

Confidential Manuals.

You must operate the franchise according to the standards, policies and procedures specified in the operating manuals.  We will loan 1 copy of the manuals to you for the term of the Franchise Agreement.  You must treat the manuals and any other materials we create or approve for use in the operation of your franchise, and the information in them, as confidential.

We may revise the contents of the manuals and you must comply with each new or changed standard.  You must also ensure that the manuals are kept current at all times.  If there is a dispute as to the contents of the manuals, the terms of the master copy maintained at our corporate office will be controlling.

Confidential Information.

We claim property rights in all the information about the operational, sales, promotional methods and techniques, and marketing methods and techniques of the JANI-KING system.  We claim proprietary trade secret rights in information like lists and files, and other compilations of information pertaining to the JANI-KING system of doing business, which information includes (a) Jani-King manuals and forms, the information contained and compiled in the manuals and forms, and the updates and memoranda relating to the manuals and forms; (b) names of Jani-King's agents, suppliers, and customers, and their requirements, specifications, and preferences; (c) the contractual arrangements between Jani-King and its agents, suppliers, and customers; (d) the financial details (including but not limited to credit and discount terms) of Jani-King's relationship with its agents, suppliers, or customers; (e) the names of prospective Jani-King customers and their requirements, specifications, and preferences; (f) information concerning the remuneration paid by Jani-King to its employees; (g) Jani-King's accounting software and forms; (h) information concerning and presented at Jani-King meetings; (i) security and access information; (j) information provided through initial and ongoing specialized training; (k) Jani-King's business plans and strategies; and (l) similar information.  All such lists, files, other compilations of information, and the information contained in such materials (whether or not denoted, labeled, or marked as confidential) is considered confidential and will be and remain our exclusive property, even if compiled or developed by you (including your officers and directors, if you are a corporation, and your employees) in connection with your business under the Franchise Agreement.  You must provide us, upon our request, with a list of all customers you are servicing and copies of their respective contracts.

You and your principals must not use or communicate, either during or after the term of the Franchise Agreement, the contents of any confidential manuals or forms, or any other trade secrets or confidential information about the operation of the franchise or of the JANI-KING system, except as provided for in the Franchise Agreement.  You must also use all reasonable efforts to maintain this information as secret and confidential, and you must not duplicate, copy, record or otherwise reproduce these materials, in whole or in part, or make them available to any unauthorized person without our written permission.

If you (including your officers and directors, if you are a corporation), your principals, or any of your employees develop any new materials, concept, process, or improvement in the operation or promotion of the business, you must give us notice and all necessary information related to such development(s). These developments are and will remain our property, without compensation, and we will have the right to use or disclose them to other franchisees if we believe it is appropriate.

THIS SPACE INTENTIONALLY LEFT BLANK

# ITEM 15

## OBLIGATION TO PARTICIPATE IN THE
## ACTUAL OPERATION OF THE FRANCHISE BUSINESS

You must participate personally in the direct operation of the franchise business. If you are a corporation, the direct, on-site supervision must be done by a person who owns at least 1/3 of the corporate equity. You will be solely responsible for the services performed at the customer locations where you provide service, and you must provide all labor, materials, tools and supplies necessary to service those premises. You must perform all of those services in a good and workmanlike manner, to the satisfaction of the customer and in accordance with our performance standards. You must also maintain an acceptable relationship with the customer contact person. You and your employees may also be required to undergo background checks as a condition to being offered the right to provide service to some of our customer's locations.

We believe that only a person with an ownership interest can adequately insure that the standards of quality established by us are being provided to the customer. You must be directly involved in the day-to-day operations. While you may hire additional assistance for the labor intensive portions of the business, we have built our reputation on the "owner-management" concept and believe it is mandatory for continued success.

The typical JANI-KING service contract is for a one-year term, and may be renewed by the client for additional periods of one year. The quality of your work and your relationship with the customer contacts are the primary factors in retaining the service contract. It is our belief that consistent, quality service provided at a competitive production rate and good customer relations, achieved by your direct involvement in the operation of the franchise business, is an important factor in the continuation of the service contract.

If you are a corporation your owners, directors and officers and the spouses of your owners, directors, and officers must sign an agreement to personally and unconditionally guarantee your obligations under the Franchise Agreement and agree to be personally bound by, and personally liable for, the breach of every provision of the Franchise Agreement. The owners must agree to maintain confidentiality of the proprietary information described in Item 14 and to conform with the covenants not to compete described in Item 17. The same applies to your partners if you are a partnership, their spouses, and to your spouse if you are married and your spouse is not a partner in the franchise business. The form of that "Guaranty" agreement is attached to this Offering Circular in Exhibit II.

If you employ any individual in a managerial position, you must also obtain the execution of covenants not to compete similar to the provisions in the Franchise Agreement. You must also require an agreement to maintain the confidentiality of information they receive or have access to base on their relationship with you.

# ITEM 16

## RESTRICTIONS ON WHAT THE FRANCHISEE MAY SELL

You must offer for sale all types of products, and perform all services, that we require for JANI-KING businesses. You may not offer for sale any types of products or perform any services that we have not authorized. You are limited in the operation of the franchise business to the offering of cleaning services and supplies to the public. Our system standards may regulate required or authorized products, product categories and supplies. We have the right to change the types of required and/or authorized goods and services without limitation.

We also designate some goods and services as optional for qualified franchisees. We may require special training and certification before we will allow you to offer these goods and services.

All proposals for services made by you to either current or prospective clients must be reviewed and approved by our staff. Any solicitation for services made by you must be approved by us. All contracts and agreements for services must be in our name only and signed by one of our employees. You are not allowed to enter into contracts for services. You must not solicit business outside of your designated territory.

You must not knowingly interfere, solicit, or otherwise contact in any manner a current client or prospect of another JANI-KING franchisee or of our regional office, unless we request you to do so in writing. If you solicit a potential client and discover that the client will be receiving, or has already received a JANI-KING proposal delivered by another franchisee or our regional office staff member, we will not allow you to pursue any further solicitation of that account, and you must withdraw any proposal until a decision has been made on the initial proposal currently under consideration, or for a maximum of 60 days from the date on that proposal.

## ITEM 17

## RENEWAL, TERMINATION, TRANSFER
## AND DISPUTE RESOLUTION

This table lists certain important provisions of the franchise and related agreements. You should read these provisions in the agreements attached to this offering circular.

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | |
| Length of the term of the franchise | Section 9.1 | 20 years. |
| | | |
| Renewal or extension of the term | Section 9.2 | If you are in good standing, you can renew or extend the term of your franchise on our then current terms for 4 additional 20-year periods. |
| | | |
| Requirements for you to renew or extend | Sections 9.2, 9.3, 9.4 | You must give us written notice of your desire to renew 8 to 12 months before the end of the term. You must sign a new agreement and a general release. |
| | | |
| Termination by you | None | No early termination by you. |
| | | |
| Termination by us without cause | None | |
| | | |
| Termination by us with cause | Section 4.8, 4.16, 8.1 | We can terminate only if you commit a default. |

THIS SPACE INTENTIONALLY LEFT BLANK

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | |
| "Cause" defined - defaults which can be cured | Section 4.16, 8.1 (g) | The following defaults, if not cured within 30 days after we have given you written notice, may result in termination: failure to comply with any provisions of the Franchise Agreement or other agreement between us and you; failure to pay any monies due us, our subsidiaries or affiliates, or others when due; failure to submit required financial information or make false statements about it; failure to maintain the standards that we require in the Franchise Agreement, or Manuals; engaging in conduct that reflects unfavorably on the operation and reputation of the JANI-KING system; failure to obtain any required approvals; misuse of JANI- KING marks; insolvency or bankruptcy. |
| "Cause" defined - defaults which cannot be cured | Section 8.1 (a)-(f) | Non-curable defaults include being convicted of, pleading guilty or no contest to, or receiving deferred adjudication for a felony, crime of moral turpitude, or certain other crimes; disclosure of confidential information; abandonment; unauthorized transfer; material misrepresentations when you purchase the franchise; repeated failure to comply with Franchise Agreement or Manual requirements, even if corrected. |
| Your obligations on termination/nonrenewal | Section 4.20, 4.21, 4.22 | You must immediately cease use of all JANI-KING marks, trade secrets, and all aspects of the JANI-KING system; You must immediately return to us all advertising matter, products or writing that contain JANI-KING's trade name, logo, or copyright, and any information of a proprietary nature; you must also return to us all keys to buildings, security passes and/or codes, all our client contracts and all our equipment.  You must pay us all sums due.   If you claim to have terminated or failed to renew and refuse to return the items described above, you must pay us $1,000 per day as liquidated damages.    (Also see Non-competition below.) |
| Assignment of contract by us | Section 10.5 | The Franchise Agreement is fully assignable by us. |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | |
| "Transfer" by you defined | Section 10.1 | Includes transfer of Franchise Agreement or assets or ownership change. |
| | | |
| Our approval of transfer by you | Section 10.1 | We have the right to approve all transfers. |
| | | |
| Conditions for our approval of transfer | Section 10.2 - 10.4 | New franchisee qualifies; you are in full compliance with your Franchise Agreement; you pay us all amounts due; transferee and its managers have satisfactorily completed our training program, transferee executes our then-current form of Franchise Agreement; transfer fee paid; we approve written agreements regarding transfer; you supply us with any additional information we require; you provide, as a personal covenant to the transferee, in addition to your covenants to us, an agreement not to compete in the janitorial services industry for a period of 2 years after transfer, nor to seek to divert business from us and our franchisees; and you sign a general release and other documents we require. (Also see Non-competition below.) |
| | | |
| Our right of first refusal to acquire your business | Section 11 | We have a right to acquire your business under the same terms you are offering to a third party. |
| | | |
| Our option to purchase your business [1] | Section11 | You must notify us if you plan to transfer your business to a third party.  After we have been notified, we will notify you whether or not we will purchase your business under the same terms you are offering to a third party. |
| | | |
| Your death or disability | Section 10.2 | Subject to transfer rules; however an administrative fee, not a transfer fee, is charged if the transfer is to a family member. |
| | | |
| Non-competition covenants during the term of the franchise | Section 4.14, 5.1 - 5.6 | You may not have an ownership interest in, financial interest in, or perform services for, related businesses anywhere. You also must not divert or attempt to divert any business or customer from us or our franchisees; influence your previous clients or our other franchisees; injure our goodwill; or employ or solicit our employees. |

| Provision | Section in Franchise Agreement | Summary |
|---|---|---|
| | | |
| Non-competition covenants after the franchise is terminated or expires | Section 4.14, 5.1 - 5.6 | For 2 years, you must not: divert or attempt to divert any business or customer from us or our franchisees or injure our goodwill; employ or solicit our employees; influence or attempt to influence your previous clients or other franchisees; or own or engage in any competing business in the territory (or for 1 year, in any other JANI-KING territory).  You must not use the name "JANI-" permanently (same restrictions after transfer). |
| | | |
| Modification of the agreement | Section 4.2.2, 12.2.2 | No modifications generally except by written  Agreement, but we may change the Manuals and system standards at any time.  You may be required to implement these changes at your own cost. |
| | | |
| Integration/merger clause | Section 12.3 | Only the terms of the Franchise Agreement (including  the Manuals) are binding (subject to state law). Any other promises may not be enforceable. |
| | | |
| Dispute resolution by arbitration or mediation | None | |
| | | |
| Choice of forum | Section 12.10 | Litigation must be in Dallas County, Texas. |
| | | |
| Choice of law | Section 12.10 | Texas law applies without reference to choice of law principles. |

Notes   (1) We have an option to transfer any of the accounts serviced by your franchise if you fail to comply with the Franchise Agreement or our policies and procedures within 72 hours after we give you notice of non-compliance, you fail to perform the cleaning services as required for a cumulative number of 5 days within a 90 day period, a customer asks for a transfer or cancellation, or you service any customer other than as a bona fide JANI-KING franchise (See Sections 4.17.2, 4.17.6 and 4.17.7.)

# ITEM 18

# PUBLIC FIGURES

We have an agreement with Highline Performance Group, Inc. that will allow us to use the names and images of Terry Bradshaw and race car drivers of Highline Performance Group, Inc. in the sale of our services and the overall promotion of our name and image.  We will pay Highline $900,000 for race car sponsorship rights and the right to produce and use advertising, promotional and marketing materials containing the names and images of Terry Bradshaw and Highline's professional drivers through 2005.  Neither Highline nor Bradshaw manage, control, or own an interest in us.

# ITEM 19

# EARNINGS CLAIMS

We do not furnish or authorize our salespersons or any employees to furnish any oral or written information concerning the actual or potential sales, costs, income or profits of a JANI-KING franchise. Actual results vary from unit to unit and we cannot estimate the results of any particular franchise. We have specifically instructed sales personnel, agents, employees and officers that they are not permitted to make claims or statements as to earnings, sales, profits, or prospects or chances of success, nor are they authorized to represent or estimate dollar figures for those items as to any particular JANI-KING franchise. You should not rely on any unauthorized representations.

## ANALYSIS OF ACTUAL INITIAL FINDER'S FEE BUSINESS OFFERING EXPERIENCE

This analysis sets forth information about our performance of the obligation to provide Initial Finder's Fee Business for certain Jani-King franchises. The analysis and underlying data is based on information provided by JANI-KING INTERNATIONAL, INC., through its direct and indirect subsidiaries, including any Regional Franchisees of an affiliated subsidiary, for the specified franchises operating within all JANI-KING regions in the United States. The Territory for each franchise is identified more specifically in each franchise agreement.

The analysis is based on data as of December 31, 2004, reported for 2,148 franchisees that either purchased their franchise between January 1, 2004 and December 31, 2004 or they purchased their franchise prior to 2004 and their offering period ended in 2004.

Under the terms of the Franchise Agreement, we agree to secure and offer you the opportunity to service signed commercial cleaning and/or maintenance contracts that in total would provide a minimum in gross monthly billings in an amount defined as the "INITIAL FINDER'S FEE BUSINESS". These contracts will be secured and offered within the number of days identified in the Franchise Summary of the Franchise Agreement as the "INITIAL OFFERING PERIOD", such time period beginning on the date all required equipment and supplies listed in the "Supply and Equipment Package" and "Additional Electric Equipment" have been obtained and the Acknowledgment of Completion of Training is signed, or a later date as discussed later in this item. The schedule below is a sample of plans through Plan E-10, other plans with more Initial Finder's Fee Business are available:

| PLAN | INITIAL FINDER'S FEE BUSINESS ($) | INITIAL OFFERING PERIOD (Days) |
|---|---|---|
| E-10* | 10,000* | 330** |
| E-9 | 9,000 | 300 |
| E-8 | 8,000 | 270 |
| E-7 | 7,000 | 240 |
| E-6 | 6,000 | 210 |
| E-5 | 5,000 | 180 |
| E-4 | 4,000 | 150 |
| D | 3,000 | 120 |
| C | 2,000 | 120 |
| B | 1,000 | 120 |
| A | 500 | 120 |
| | *An additional $1,000 for each higher level of the "E" Plan | **Plus An Additional 30 Days for each higher level of the "E" Plan |

Under Plans A, B, C and D, the Initial Offering Period is 120 days. Under the various levels of Plan E, the Initial Offering Period is calculated as the total of: 120 days, plus an additional 30 days for each higher level of the "E" Plan, beginning with level E-4.

Example: E-4 $[120 + 30\ (1^{st}\ level)] = 150$ days
E-5 $[120 + 60\ (2^{nd}\ level)] = 180$ days
E-6 $[120 + 90\ (3^{rd}\ level)] = 210$ days, etc.

The franchises reported in this analysis are listed by ranges of Initial Finder's Fee Business obligated to be offered in order to provide a more meaningful presentation of the relevant information about the offering of accounts for Initial Finder's Fee Business by JANI-KING. The time period in which the Initial Finder's Fee Business is contractually required to be offered is the Initial Offering Period stated in the Franchise Agreement, while the average time period within which the Initial Finder's Fee Business was offered represents the actual number of days within which JANI-KING had secured and offered cleaning contracts with gross monthly billings that equal or exceed the total obligation required under each Franchise Agreement for the specified range.

You should particularly note the following:

THE INFORMATION CONCERNING FRANCHISEE INITIAL CONTRACT BUSINESS SHOULD NOT BE CONSIDERED AS THE ACTUAL OR POTENTIAL SALES, COSTS, INCOME OR PROFITS THAT YOU WILL REALIZE. YOUR SUCCESS WILL DEPEND LARGELY UPON YOUR OWN ABILITY, AND THE INDIVIDUAL FINANCIAL RESULTS ACHIEVED BY YOU MAY DIFFER FROM THE FRANCHISEE INFORMATION STATED IN THIS OFFERING CIRCULAR. THEREFORE WE DO NOT REPRESENT THAT ALL FRANCHISEES CAN EXPECT TO ACHIEVE THESE GROSS BILLINGS, OR ANY PARTICULAR LEVEL OF SALES, COSTS, INCOME OR PROFITS, OR ANY INCOME THAT EXCEEDS THE INITIAL PAYMENT FOR, OR INVESTMENT IN, THE FRANCHISED BUSINESS. SUBSTANTIATION OF THE DATA USED IN PREPARING THIS ANALYSIS WILL BE MADE AVAILABLE UPON REASONABLE REQUEST.

THE TOTAL REVENUE, AND THE TOTAL GROSS BILLING FOR ANY SPECIFIC MONTH, REALIZED BY YOU MAY NOT BE DIRECTLY RELATED TO OUR PERFORMANCE OF OUR OBLIGATION TO OFFER THE INITIAL FINDER'S FEE BUSINESS REQUIRED BY THE FRANCHISE AGREEMENT. THE AMOUNT OF REVENUE IS AFFECTED BY MANY FACTORS, SUCH AS (1) THE INITIAL FINDER'S FEE BUSINESS MAY BE OFFERED IN STAGES DURING THE INITIAL OFFERING PERIOD; (2) YOU MAY NOT ACCEPT ALL OF THE ACCOUNTS OFFERED; (3) ACCOUNTS MAY CANCEL THE CONTRACT OR REQUEST A CHANGE OF FRANCHISEES DUE TO POOR PERFORMANCE BY YOU; OR (4) THE ACCOUNT MAY GO OUT OF BUSINESS BEFORE THE END OF THE CONTRACT PERIOD.

Other factors that affect the amount of revenue you realize include the quality of management and service, the rate of cleaning production you achieve; the extent to which you finance the acquisition and/or operation of the franchise, your legal, accounting and other professional fees; federal state and local income, gross profits or other taxes; discretionary expenditures; and accounting methods used.

We will make a good faith effort to secure and offer accounts to you as soon as possible, but we will have the total period to offer the Initial Finder's Fee Business under each plan, and we are not obligated to offer any portion of the Initial Finder's Fee Business before the end of that time. We calculate the Initial Offering Period from the date you sign the Acknowledgment of Completion of Training and you obtain all required equipment and supplies.

The actual time to secure and offer the Initial Finder's Fee Business to you may, at our sole discretion, be automatically extended under certain conditions. Item 11 of this offering circular has a detailed explanation of those conditions, but they are summarized as follows:

- Upon your written request

- You are in default of the Franchise Agreement

- Upon a transfer or cancellation due to non-performance of an account accepted by you as Initial Finder's Fee Business.

- You fail to comply with policies or procedures

All accounts offered will apply toward the minimum amount of business as specified in your Franchise Agreement, whether or not the offered business is accepted or declined by you. Our obligation is to secure and offer those accounts to you within the specified time. However, you might choose not to accept some of the accounts offered. That is why the Franchise Agreement says that we will secure and "offer" those accounts to you. We can only make a good faith effort to offer the amount of business for the plan specified, and you must choose to accept or decline the "offer". Under a situation where you either decline an offer of an account or an account cancels at no fault of you, we are relieved of our obligation regarding the Initial Offering Period for that amount of gross monthly billings, however, we will at some point in the future, offer that amount of contract billings to you without Finder's Fees.

If an account cancels or is transferred from you due to non-performance, theft, your failure to service the account properly, customer relations problems caused by you, or your failure to comply with Jani-King Policies and Procedures, the account will not be replaced. If an account cancels at no fault of you before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account until a cumulative total of 12 full months of billing between both the original account and any replacement account occur (See Item 11: Transfers Or Cancellation Of Initial Finder's Fee Business). There is no other obligation for us to replace the contracts if the contracts are canceled before the full term.

If we are unable to secure and offer you the full amount of Initial Finder's Fee Business within the time frame allocated for the Initial Offering Period in the plan you purchase, an amount equal to 3 times the amount of Initial Finder's Fee Business not offered to you will be refunded. Any refund will be first applied to any outstanding balance owe us or LEASING, with the remaining sum, if any, paid to you. A refund under this provision will fulfill our obligation to offer any remaining portion of the Initial Finder's Fee Business.

### INFORMATION CONCERNING FRANCHISEE INITIAL FINDER'S FEE BUSINESS
### FOR JANI-KING OF BOSTON, INC.'S FRANCHISEES – 2004

| Range of Monthly Initial Finder's Fee Business Purchased ($) | 500 | 1,000 | 2,000 | 3,000 | 4,000 to 8,000 | 9,000 to 15,000 | TOTAL |
|---|---|---|---|---|---|---|---|
| Time Period (days) in which Initial Finder's Fee Business contractually required to be offered[1] | 120 | 120 | 120 | 120 | 150 to 270 | 300 to 480 | N/A |
| Average time period (days) in which Initial Finder's Fee Business was actually offered[1] | 88 | 90 | 101 | 94 | 111 | 1 | N/A |
| Number of franchisees purchasing within range during 2004 | 1 | 6 | 10 | 9 | 7 | 1 | 34 |
| Number of franchisees purchased prior to 2004 and their offering period ended in 2004 | 1 | 6 | 9 | 8 | 6 | 1 | 31 |
| Percentage[3] of franchisees in which Initial Finder's Fee Business was offered[1] within required period | 100 | 100 | 100 | 100 | 100 | 100 | 100 |

| Range of Monthly Initial Finder's Fee Business Purchased ($) | 500 | 1,000 | 2,000 | 3,000 | 4,000 to 8,000 | 9,000 to 15,000 | TOTAL |
|---|---|---|---|---|---|---|---|
| Number of franchises whose initial offering period expired in 2004 and Initial Finder's Fee Business was offered[1] within required period | 1 | 7 | 13 | 10 | 11 | 1 | 43 |
| Number of franchises who purchased prior to 2004 and whose offering period has expired in 2004 | 1 | 7 | 13 | 10 | 11 | 1 | 43 |
| Number of franchises in which time period for Initial Finder's Fee Business was extended[2] pursuant to franchise agreement | 0 | 0 | 1 | 0 | 0 | 0 | 1 |

[1]  Offered means the accounts totally fulfilling the Initial Finder's Fee Business were offered to the franchisee.  Initial Finder's Fee Business Packages not shown indicates that no plans were sold in those ranges for which the Initial Offering Period expired in 2004.

[2]  Extended is the latest date, if any, that the Initial Offering Period was extended pursuant to the Franchise Agreement or Policies and Procedures.

[3]  Percentage calculated as number of franchises whose Initial Offering Period had expired in 2004 and whose total Initial Finder's Fee Business was offered within required time period, divided by the total number of franchises sold during 2004 or prior to 2004 and whose Initial Offering Period had expired in 2004.

**Percentage[3] of Franchisees For All U.S. Regions In Which Initial Finder's Fee Business Was Offered[1] Within Required Period**

| REGION | % | REGION | % |
|---|---|---|---|
| Alexandria | 0 | Denver | 100 |
| Atlanta | 100 | Detroit | 95 |
| Austin | 97 | Ft. Worth | 100 |
| Baltimore | 100 | Greater Rhode Island | 100 |
| Baton Rouge | 100 | Greensboro | 100 |
| Birmingham | 100 | Greenville/Spartanburg | 100 |
| Boston | 100 | Hampton Roads | 100 |
| Buffalo | 100 | Hartford | 100 |
| Charleston | 100 | Hawaii | 100 |
| Charlotte | 100 | Houston | 67 |
| Chattanooga | N/A | Huntsville | 91 |
| Chicago | 100 | Indianapolis | 100 |
| Cincinnati | 100 | Jackson | 100 |
| Cleveland | 100 | Jacksonville | 100 |
| Columbia | 100 | Kansas City | 100 |
| Columbus | 100 | Knoxville | 100 |
| Dallas | 100 | Lafayette/Lake Charles | N/A |
| Dayton | 100 | Las Vegas | 100 |

| REGION | % | REGION | % |
|--------|---|--------|---|
| Little Rock | N/A | Philadelphia | 100 |
| Los Angeles | 98 | Phoenix | 100 |
| Louisville | 100 | Pittsburgh | 100 |
| Madison | N/A | Portland | 57 |
| Memphis | 100 | Raleigh/Durham | 100 |
| Miami | 100 | Reno | N/A |
| Milwaukee | 100 | Richmond | 100 |
| Minneapolis | 100 | St. Louis | 94 |
| Mobile | 100 | Sacramento | 100 |
| Montgomery | 100 | Salt Lake City | 100 |
| Nashville | 100 | San Antonio | 100 |
| New Jersey | 100 | San Diego | 100 |
| New Mexico | 100 | San Francisco | 100 |
| New Orleans | 100 | Seattle | 100 |
| New York | 76 | South East Mississippi | 90 |
| Oklahoma City | 100 | Tampa Bay | 96 |
| Orlando | 100 | Tucson | 100 |
| Pensacola | 100 | Tulsa | 100 |
|  |  | Washington D.C. | 100 |

# ITEM 20

# LIST OF OUTLETS

As of the close of business on December 31, 2004, JK INT'L, through its direct and indirect subsidiaries, including any Master Franchisees of our affiliate, JKF, had in existence a total of 10,715 unit franchises substantially similar to the franchise we offer, in the United States, Argentina, Australia, Belgium, Brazil, Canada, France, Great Britain, Hong Kong, Malaysia, Mexico, New Zealand, Singapore, South Korea, Russia, Taiwan, Turkey and United Arab Emirates and that have not expired or otherwise been terminated.

Of the total franchises granted, as of December 31, 2004, approximately 10,600 were operational, meaning that they have been granted franchises, completed the initial training, obtained the necessary equipment to begin servicing accounts, are authorized to service accounts or have previously been designated as the authorized JANI-KING franchisee to service one or more specific accounts, and are currently licensed to provide commercial cleaning services pursuant to their franchise agreement.

The basic nature of our business allows for a portion of our franchisees to service commercial cleaning accounts on a sporadic basis because they choose to operate their franchises on a part-time basis and/or only as a source of supplemental income. Therefore, the calculation of operational franchises does not necessarily consider the status or volume of revenues of these franchises at the time they are classified for this disclosure, since any franchise which was not then currently generating revenues may later resume services and actively compete with a franchise who elects to join the JANI-KING system.

In addition to these unit franchises, JKF has existing 71 Master Franchises operating regional support centers in the United States and in 18 other countries. These regions are indicated in the chart below by an asterisk ([1]). Of those regions listed, for the 3 year period before December 31, 2004, one was canceled or terminated by us for failure to comply with quality control standards or other reasons; none have been reacquired by us through a purchase, although we are not required to do so; one was non-renewed by us; and none have been otherwise reacquired by us.

The number, location and status of those unit franchises under affiliation with JK INT'L are identified in the charts on the following 5 pages.

NOTES FOR CHARTS:

[A] All numbers are as of December 31 for each year.

[B] The numbers in the "Total" column may exceed the number of franchises affected because several events may have affected the same franchise. For example, the same franchise may have had multiple owners.

[C] We provide commercial cleaning services to accounts through regional office personnel, but we do not own any separate franchise units.

[1] Master Franchisee

[2] Region combined with the Los Angeles region on February 1, 2003.

[3] Region combined with the San Francisco region on February 1, 2003.

[4] Region partitioned out of New Orleans region on January 1, 1995.

[5] Opened for operations less than 3 years

[6] Opened means a franchise was granted and the franchisee has completed the initial training, obtained the necessary equipment, and is authorized to service accounts.

## FRANCHISED BUSINESS STATUS SUMMARY
## FOR YEARS [A] 2004/2003/2002

| State (By Regional Office) | Transfers | | | Cancelled or Terminated | | | Not Renewed | | | Reacquired by Franchisor | | | Ceased to do Business | | | Total From Left Columns[B] | | | Total Franchises Year End | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **DOMESTIC:** | | | | | | | | | | | | | | | | | | | | | |
| **Alabama** | | | | | | | | | | | | | | | | | | | | | |
| Birmingham[1] | 1 | 3 | | | | | | | | | | | 34 | | 30 | 35 | 3 | 30 | 173 | 168 | 125 |
| Huntsville[1] | 1 | | | | | 2 | | | | | | | 3 | 1 | | 4 | 1 | 2 | 49 | 38 | 27 |
| Mobile[1] | 1 | 1 | 1 | | | | | | | | | | 1 | 4 | 2 | 2 | 5 | 3 | 29 | 27 | 27 |
| Montgomery[1] | | | | | | | | | | | | | | 1 | | | 1 | | 7 | 3 | |
| Associate | | | | | | | | | | | | | | 1 | | | 1 | | | | |
| **Alaska** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Arizona** | | | | | | | | | | | | | | | | | | | | | |
| Phoenix[1] | 4 | 3 | 5 | | | | | | | 3 | 7 | 6 | 12 | 13 | 8 | 19 | 23 | 19 | 152 | 135 | 139 |
| Tucson[1] | 2 | | 1 | | | | | | | 1 | 2 | 1 | 1 | 7 | 4 | 4 | 9 | 6 | 83 | 66 | 58 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Arkansas** | | | | | | | | | | | | | | | | | | | | | |
| Little Rock[1,5] | | | | | | | | | | | | | | | | | | | | | |
| Memphis[1] | | | | | | | | | | | | | | | 2 | | | 2 | 2 | 1 | 1 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **California** | | | | | | | | | | | | | | | | | | | | | |
| Colton[2] | | | | | | 2 | | | | | | | | | 10 | | | 12 | | | 62 |
| Los Angeles | 6 | 5 | 6 | | | | | | | | | 1 | 42 | 42 | 37 | 48 | 47 | 44 | 324 | 307 | 251 |
| Oakland[3] | | | | | | 5 | | | | | | | | | 16 | | | 21 | | | 98 |
| Sacramento | 2 | 2 | 1 | | | | | | | | | | 9 | 9 | 2 | 11 | 11 | 3 | 60 | 53 | 50 |
| San Diego | 6 | 5 | 6 | | | | | | | | | | 20 | 17 | 14 | 26 | 22 | 20 | 163 | 156 | 146 |
| San Francisco | 7 | 7 | 1 | | | | | | | | | 1 | 14 | 21 | 18 | 21 | 29 | 19 | 212 | 196 | 86 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Colorado** | | | | | | | | | | | | | | | | | | | | | |
| Denver | 8 | 5 | 5 | | | | | | | | | | 12 | 8 | 20 | 20 | 13 | 25 | 157 | 139 | 117 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Connecticut** | | | | | | | | | | | | | | | | | | | | | |
| Hartford | 1 | | | 1 | | | | | | | | | 15 | 13 | 12 | 17 | 13 | 12 | 84 | 83 | 78 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Delaware** | | | | | | | | | | | | | | | | | | | | | |
| Philadelphia | | | | | | | | | | | | | 2 | | 1 | 2 | | 1 | 10 | 7 | 7 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **District of Columbia** | | | | | | | | | | | | | | | | | | | | | |
| Washington D.C. | | | | | | | | | | | | | 2 | 5 | 4 | 2 | 5 | 4 | 17 | 13 | 16 |
| Associate | | | | | | | | | | | | | | | | | | | | | |

| State (By Regional Office) | Transfers | | | Cancelled or Terminated | | | Not Renewed | | | Reacquired by Franchisor | | | Ceased to do Business | | | Total From Left Columns[B] | | | Total Franchises Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Florida** | | | | | | | | | | | | | | | | | | | | | |
| Jacksonville[1] | 2 | 1 | 1 | | | | | | | | | 1 | 6 | 12 | 20 | 8 | 13 | 22 | 119 | 112 | 108 |
| Miami | 2 | 6 | 4 | | | | | | | | | | 14 | 20 | 24 | 16 | 26 | 28 | 139 | 130 | 129 |
| Orlando[1] | 3 | 3 | | | | | | | | | | | 36 | 14 | 4 | 39 | 17 | 4 | 121 | 137 | 110 |
| Pensacola[1] | | | | | | | | | | | | | 1 | 2 | 1 | 1 | 2 | 1 | 13 | 9 | 6 |
| Tampa Bay[1] | 4 | 2 | 2 | | | | | | | | | 2 | 30 | 22 | 6 | 34 | 24 | 10 | 294 | 280 | 253 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Georgia** | | | | | | | | | | | | | | | | | | | | | |
| Atlanta[1] | | 1 | | 6 | | | 23 | 10 | 1 | 41 | | | 2 | 40 | 26 | 72 | 51 | 27 | 231 | 217 | 225 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Hawaii** | | | | | | | | | | | | | | | | | | | | | |
| Honolulu[1] | | 4 | 9 | | | 7 | | | | | | | 8 | 2 | 6 | 8 | 6 | 22 | 142 | 143 | 121 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Idaho** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Illinois** | | | | | | | | | | | | | | | | | | | | | |
| Chicago[1] | 12 | 14 | 10 | | | | | | | | | 2 | 41 | 66 | 47 | 53 | 80 | 59 | 482 | 452 | 447 |
| St. Louis | 1 | | | | | | | | | | | | 3 | 4 | 2 | 4 | 4 | 2 | 25 | 23 | 22 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Indiana** | | | | | | | | | | | | | | | | | | | | | |
| Cincinnati[1] | | | | | | | | | | | | | | | | | | | | | |
| Indianapolis[1] | 1 | | 1 | | | | | | | | | | 5 | | 11 | 6 | | 12 | 121 | 108 | 101 |
| Louisville[1] | | | | | | | | | | | | | 1 | | 1 | 1 | | 1 | 5 | 5 | 5 |
| Associate | | | | | | | | | | 1 | | | | | | 1 | | | | | |
| **Iowa** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Kansas** | | | | | | | | | | | | | | | | | | | | | |
| Kansas City[1] | | | | | | 1 | | | | | | 1 | 3 | 3 | 3 | 3 | 5 | 3 | 36 | 38 | 39 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Kentucky** | | | | | | | | | | | | | | | | | | | | | |
| Cincinnati[1] | | 1 | | | | | | | | | | | | | 1 | | 1 | 1 | 12 | 10 | 10 |
| Louisville[1] | 2 | | 2 | | | | | | | | | | 2 | 3 | 2 | 4 | 3 | 4 | 61 | 50 | 40 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Louisiana** | | | | | | | | | | | | | | | | | | | | | |
| Alexandria[1,5] | | | | | | | | | | | | | | | | | | | 1 | | |
| Baton Rouge[1,4] | 3 | 1 | 2 | | | | | | | | | 1 | 5 | 3 | 3 | 8 | 5 | 5 | 116 | 121 | 107 |
| Lafayette/Lake Charles[1] | 1 | | | | | | | | | | | | | 1 | | 1 | 1 | | 16 | 6 | 7 |
| New Orleans[1] | 3 | 4 | 1 | | | | | | | | | | 6 | 6 | 4 | 9 | 10 | 5 | 184 | 179 | 164 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Maine** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Maryland** | | | | | | | | | | | | | | | | | | | | | |
| Baltimore[1] | | 1 | 1 | 1 | | | | | | | | | | 15 | | | 17 | 1 | 207 | 174 | 162 |
| Washington D.C. | 1 | 1 | | | | | | | | | | | 10 | 9 | 11 | 11 | 10 | 11 | 50 | 58 | 66 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Massachusetts** | | | | | | | | | | | | | | | | | | | | | |
| Boston | 6 | 11 | 9 | | | | | | | | | | 28 | 30 | 25 | 34 | 41 | 34 | 198 | 189 | 174 |
| Greater Rhode Island[1] | | | | | | | | | | | | 1 | | | 2 | | | 3 | 6 | 4 | 2 |
| Hartford | | | | | | | | | | | | | 5 | 8 | 5 | 5 | 8 | 5 | 30 | 28 | 27 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Michigan** | | | | | | | | | | | | | | | | | | | | | |
| Detroit | 6 | 2 | | | | | | | | | | 1 | 49 | 39 | 32 | 55 | 42 | 32 | 258 | 249 | 244 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Minnesota** | | | | | | | | | | | | | | | | | | | | | |
| Minneapolis | 8 | 12 | 6 | | | | | | | | | 4 | 28 | 30 | 16 | 36 | 46 | 22 | 224 | 212 | 208 |
| Associate | | | | | | | | | | | | | | | | | | | | | |

| State (By Regional Office) | Transfers | | | Cancelled or Terminated | | | Not Renewed | | | Reacquired by Franchisor | | | Ceased to do Business | | | Total From Left Columns[B] | | | Total Franchises Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Mississippi** | | | | | | | | | | | | | | | | | | | | | |
| Jackson[1] | 1 | | | | | | | | | | | | 2 | 6 | 1 | 3 | 6 | 1 | 36 | 26 | 27 |
| Memphis[1] | | | | | | | | | | | | | 2 | 2 | 2 | 2 | 2 | 2 | 11 | 11 | 10 |
| South East Mississippi[1] | 3 | | | | | | | | | | | | 1 | 6 | 1 | 4 | 6 | 1 | 33 | 31 | 25 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Missouri** | | | | | | | | | | | | | | | | | | | | | |
| Kansas City[1] | | | | | | | | | | | | | 1 | 4 | 7 | 1 | 4 | 7 | 33 | 24 | 24 |
| St. Louis | | 2 | 3 | | | | | | | | | | 27 | 30 | 32 | 27 | 32 | 35 | 132 | 146 | 159 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Montana** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Nebraska** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Nevada** | | | | | | | | | | | | | | | | | | | | | |
| Las Vegas | 1 | 3 | 3 | | | | | | | | | | 18 | 15 | 9 | 19 | 18 | 12 | 102 | 102 | 94 |
| Reno[1,5] | | | | | | | | | | | | | | | | | | | 1 | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **New Hampshire** | | | | | | | | | | | | | | | | | | | | | |
| Boston | 2 | 1 | | | | | | | | | | | 1 | 1 | 1 | 3 | 2 | 1 | 14 | 16 | 13 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **New Jersey** | | | | | | | | | | | | | | | | | | | | | |
| New Jersey | 1 | 2 | 2 | | | | | | | | | | 8 | 9 | 4 | 9 | 11 | 6 | 60 | 57 | 57 |
| Philadelphia | | | | | | | | | | | | | 4 | 1 | 2 | 4 | 1 | 2 | 29 | 26 | 26 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **New Mexico** | | | | | | | | | | | | | | | | | | | | | |
| Albuquerque[1] | | | 1 | | | | | | | 2 | | 1 | 1 | 1 | 2 | 3 | 1 | 4 | 29 | 24 | 17 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **New York** | | | | | | | | | | | | | | | | | | | | | |
| Buffalo | | 3 | | | | | | | | | | | 6 | 4 | 3 | 6 | 7 | 3 | 56 | 43 | 33 |
| New York | 8 | 4 | 2 | 1 | | | | | | 1 | | | 21 | 23 | 17 | 31 | 27 | 19 | 139 | 145 | 144 |
| Associate | | | | | | | | | | | | | | | | | | | 1 | 1 | 1 |
| **North Carolina** | | | | | | | | | | | | | | | | | | | | | |
| Charlotte[1] | | 2 | 1 | | | | | | | | | | 7 | 43 | | 7 | 45 | 1 | 154 | 119 | 123 |
| Greensboro[1] | | | | | | | | | | | | | 2 | 5 | | 2 | 5 | | 62 | 56 | 52 |
| Raleigh/Durham[1] | 3 | 2 | 1 | | | | | | | 4 | 2 | 1 | 6 | 4 | 4 | 13 | 8 | 6 | 220 | 203 | 172 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **North Dakota** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Ohio** | | | | | | | | | | | | | | | | | | | | | |
| Cincinnati[1] | 1 | | 4 | | | | | | | | | | 8 | 10 | 4 | 9 | 10 | 8 | 69 | 65 | 63 |
| Cleveland[1] | 3 | 6 | 3 | | | | | | | | | | 3 | 15 | 14 | 6 | 21 | 17 | 178 | 167 | 160 |
| Columbus[1] | 1 | 2 | 1 | | | | 4 | 1 | | 2 | | 1 | 17 | 23 | 6 | 21 | 25 | 12 | 143 | 136 | 131 |
| Dayton[1] | | 2 | 1 | | | | | | | | | | 6 | 1 | 1 | 6 | 3 | 2 | 37 | 37 | 35 |
| Detroit | | | | | | | | | | | | | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 3 | 4 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Oklahoma** | | | | | | | | | | | | | | | | | | | | | |
| Oklahoma City | 4 | 3 | 1 | | | | | | | | | | 31 | 30 | 21 | 35 | 33 | 22 | 135 | 136 | 136 |
| Tulsa[1] | | 1 | | | | | | | | | | | 3 | 10 | 5 | 3 | 11 | 5 | 72 | 71 | 82 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Oregon** | | | | | | | | | | | | | | | | | | | | | |
| Portland[1] | 6 | 3 | 4 | 7 | | | | | | 5 | 9 | 6 | 4 | 4 | 19 | 22 | 16 | 29 | 123 | 123 | 103 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Pennsylvania** | | | | | | | | | | | | | | | | | | | | | |
| Philadelphia | 2 | 2 | 2 | | | | | | | | | | 13 | 13 | 16 | 15 | 15 | 18 | 133 | 113 | 100 |
| Pittsburgh[1] | | | | | | | | | | | | | 4 | 10 | 26 | 4 | 10 | 26 | 43 | 30 | 26 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Rhode Island** | | | | | | | | | | | | | | | | | | | | | |
| Greater Rhode Island[1] | 2 | 5 | 5 | | | | | | | 1 | 1 | 1 | 1 | | 1 | 4 | 6 | 7 | 67 | 50 | 37 |
| Associate | | | | | | | | | | | | | | | | | | | | | |

| State (By Regional Office) | Transfers | | | Cancelled or Terminated | | | Not Renewed | | | Reacquired by Franchisor | | | Ceased to do Business | | | Total From Left Columns[B] | | | Total Franchises Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **South Carolina** | | | | | | | | | | | | | | | | | | | | | |
| Charleston[1] | 4 | 2 | 2 | | | | | | | 3 | 1 | | 9 | 1 | | 16 | 4 | 2 | 62 | 61 | 45 |
| Charlotte[1] | | | | | | | | | | | | | 1 | 4 | | 1 | 4 | | 10 | 9 | 11 |
| Columbia[1] | 1 | 1 | 1 | | | | | | | | | | 5 | 4 | 3 | 6 | 5 | 4 | 81 | 69 | 65 |
| Greenville/Spartanburg[1] | | 1 | | | | | | | | | | | | | | | 1 | | 47 | 39 | 36 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **South Dakota** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | 1 | | | 1 | | | | 1 | 1 |
| **Tennessee** | | | | | | | | | | | | | | | | | | | | | |
| Chattanooga[1,5] | | | | | | | | | | | | | | | | | | | 2 | | |
| Knoxville[1] | 1 | 2 | 2 | | | | | | | | | | 1 | 10 | 9 | 2 | 12 | 11 | 78 | 71 | 70 |
| Memphis[1] | | | | 2 | | | | | | | | | 15 | 19 | 15 | 17 | 19 | 15 | 63 | 71 | 74 |
| Nashville[1] | 1 | 1 | 2 | | | | | | | | | 1 | 8 | 12 | 13 | 9 | 13 | 16 | 58 | 58 | 61 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Texas** | | | | | | | | | | | | | | | | | | | | | |
| Austin[1] | 4 | 6 | 2 | | | | | | | | 2 | | 4 | 3 | 7 | 8 | 11 | 9 | 212 | 205 | 180 |
| Dallas[1] | | | | | | | | | | | | | 27 | 21 | 16 | 27 | 21 | 16 | 202 | 206 | 200 |
| Ft. Worth[1] | | | | | | | | | | | | | 3 | 3 | 4 | 3 | 3 | 4 | 53 | 41 | 37 |
| Houston[1] | 2 | 4 | 3 | 58 | 65 | 46 | 13 | | | | | | 31 | 25 | 37 | 104 | 94 | 86 | 394 | 388 | 355 |
| San Antonio[1] | 3 | 1 | 3 | | | | | | | | 1 | | | 8 | 6 | 3 | 10 | 9 | 97 | 85 | 78 |
| Associate | | | | | | | | | | | | | 1 | | | 1 | | | | | |
| **Utah** | | | | | | | | | | | | | | | | | | | | | |
| Salt Lake City[1] | 1 | 1 | | | | | | | 1 | | | | 5 | 5 | 1 | 6 | 6 | 2 | 63 | 60 | 59 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Vermont** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Virginia** | | | | | | | | | | | | | | | | | | | | | |
| Hampton Roads[1] | 2 | 1 | 1 | | | | | | | | 1 | | 18 | 16 | 10 | 20 | 18 | 11 | 229 | 216 | 176 |
| Richmond[1] | 1 | | 4 | | | | | | | | | 1 | 12 | 27 | | 13 | 27 | 5 | 77 | 70 | 78 |
| Washington D.C.[1] | 3 | 3 | 2 | | | | | | | | 1 | | 9 | 4 | 5 | 12 | 8 | 7 | 87 | 75 | 65 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Washington** | | | | | | | | | | | | | | | | | | | | | |
| Portland[1] | 3 | | 1 | | | | | | | 2 | 2 | 1 | 2 | | 7 | 7 | 2 | 9 | 19 | 20 | 16 |
| Seattle[1] | 1 | | | | | | | | | | | | 8 | 5 | | 9 | 5 | | 79 | 71 | 56 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **West Virginia** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Wisconsin** | | | | | | | | | | | | | | | | | | | | | |
| Madison[1] | | | | | | | | | | | | | 7 | 1 | | 7 | 1 | | 31 | 25 | 27 |
| Milwaukee[1] | 1 | | 1 | | | | | | | 2 | | | 10 | 20 | 16 | 13 | 20 | 17 | 107 | 99 | 102 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **Wyoming** | | | | | | | | | | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **INTERNATIONAL:** | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | |
| Argentina[1] | | | | 4 | | | | | | | | | 7 | 1 | | 11 | 1 | | 14 | 14 | 19 |
| Australia[1] | 43 | 28 | 23 | | | | | | | 9 | 7 | 16 | 9 | 27 | 32 | 61 | 62 | 70 | 719 | 655 | 603 |
| Belgium[1,5] | | | | | | | | | | | | | | | | | | | 4 | | |
| Brazil[1] | | 1 | | | | | | | | | | | 11 | 2 | 10 | 11 | 3 | 10 | 119 | 129 | 131 |
| Canada[1] | 38 | 29 | 27 | 1 | | 4 | 15 | 20 | 9 | 3 | 8 | | 17 | 24 | 24 | 74 | 81 | 64 | 437 | 417 | 386 |
| France[1] | | 3 | | 23 | 1 | 3 | | | | | | | 1 | 5 | 1 | 24 | 9 | 4 | 65 | 63 | 57 |
| Great Britain[1] | | 4 | 2 | 5 | | | | | | | | | 21 | 49 | 23 | 26 | 53 | 25 | 199 | 197 | 229 |
| Hong Kong[1] | | | | | | | 1 | 1 | | | | | 2 | | | 2 | 1 | | 12 | 12 | 9 |
| Malaysia[1] | | | | | | | | | | | | | | | | | | | 10 | 10 | 10 |
| Mexico[1] | | | | | | | | | | | | | | | | | | | 42 | 42 | 42 |
| New Zealand[1] | 17 | 6 | 4 | | | | | | | 1 | | | | 1 | 1 | 18 | 7 | 5 | 106 | 80 | 63 |

| State (By Regional Office) | Transfers | | | Cancelled or Terminated | | | Not Renewed | | | Reacquired by Franchisor | | | Ceased to do Business | | | Total From Left Columns[B] | | | Total Franchises Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Russia[1,5] | | | | | | | | | | | | | | | | | | | | | |
| Singapore[1] | | | | | | | | | | | | | | | | | | | 11 | 11 | 11 |
| Spain[1] | | | | | | | | | | | | | | | 14 | | | 14 | | | |
| South Korea[1] | | | | | | | | | | | | | | | | | | | 49 | 49 | 48 |
| Taiwan[1] | | | | | | | | | | | | | | | 8 | | | 8 | 30 | 30 | 30 |
| Toronto | 4 | 3 | 6 | | | | | | | | | | 5 | 5 | 5 | 9 | 8 | 11 | 87 | 79 | 69 |
| Turkey[1] | | | | 5 | 2 | | | | | | | | 2 | 1 | | 7 | 3 | | 13 | 11 | 7 |
| United Arab Emirates[1,5] | | | | | | | | | | | | | | | | | | | | | |
| Windsor | 2 | 1 | | | | | | | 1 | | | | 1 | 3 | 1 | 3 | 4 | 2 | 20 | 20 | 17 |
| Associate | | | | | | | | | | | | | | | | | | | | | |
| **SYSTEM TOTAL:** | 264 | 236 | 201 | 109 | 75 | 68 | 52 | 30 | 11 | 80 | 52 | 44 | 886 | 1,058 | 910 | 1,391 | 1,451 | 1,233 | 10,715 | 10,046 | 9,442 |

## STATUS OF FRANCHISED BUSINESS
### FOR YEARS[A] 2004/2003/2002

| State (By Regional Office) | Franchises Sold During Year | | | Franchises Closed During Year | | | Franchises Opened During Year[6] | | | Total Franchises Existing at Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DOMESTIC:** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Alabama** | | | | | | | | | | | | |
| Birmingham[1] | 39 | 43 | 37 | | | | 39 | 41 | 37 | 173 | 168 | 125 |
| Huntsville[1] | 12 | 12 | 20 | | | 2 | 11 | 12 | 18 | 49 | 38 | 27 |
| Mobile[1] | 2 | 5 | 6 | | | | 2 | 5 | 6 | 29 | 27 | 27 |
| Montgomery[1] | 4 | 3 | | | | | 3 | 3 | | 7 | 3 | |
| Associate | | | | | | | | | | | | |
| **Alaska** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| **Arizona** | | | | | | | | | | | | |
| Phoenix[1] | 32 | 17 | 24 | 3 | 7 | 6 | 29 | 16 | 24 | 152 | 135 | 139 |
| Tucson[1] | 17 | 15 | 11 | 1 | 2 | 1 | 17 | 15 | 11 | 83 | 66 | 58 |
| Associate | | | | | | | | | | | | |
| **Arkansas** | | | | | | | | | | | | |
| Little Rock[1,5] | | | | | | | | | | | | |
| Memphis[1] | | | | | | | | | | 2 | 1 | 1 |
| Associate | | | | | | | | | | | | |
| **California** | | | | | | | | | | | | |
| Colton[2] | | | 5 | | | | | | 5 | | | 62 |
| Los Angeles | 55 | 33 | 37 | | | 1 | 54 | 29 | 36 | 324 | 307 | 251 |
| Oakland[3] | | | 15 | | | | | | 13 | | | 98 |
| Sacramento | 16 | 11 | 9 | | | | 15 | 11 | 9 | 60 | 53 | 50 |
| San Diego | 26 | 25 | 22 | | | | 22 | 24 | 21 | 163 | 156 | 146 |
| San Francisco | 27 | 32 | 9 | | 1 | | 23 | 31 | 9 | 212 | 196 | 86 |
| Associate | | | | | | | | | | | | |
| **Colorado** | | | | | | | | | | | | |
| Denver | 27 | 28 | 24 | | | | 27 | 28 | 23 | 157 | 139 | 117 |
| Associate | | | | | | | | | | | | |
| **Connecticut** | | | | | | | | | | | | |
| Hartford | 16 | 18 | 18 | 1 | | | 14 | 17 | 16 | 84 | 83 | 78 |
| Associate | | | | | | | | | | | | |

| State (By Regional Office) | Franchises Sold During Year | | | Franchises Closed During Year | | | Franchises Opened During Year[6] | | | Total Franchises Existing at Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Delaware** | | | | | | | | | | | | |
| Philadelphia | 5 | | 4 | | | | 4 | | 4 | 10 | 7 | 7 |
| Associate | | | | | | | | | | | | |
| **District of Columbia** | | | | | | | | | | | | |
| Washington D.C. | 5 | 2 | 4 | | | | 4 | 2 | 3 | 17 | 13 | 16 |
| Associate | | | | | | | | | | | | |
| **Florida** | | | | | | | | | | | | |
| Jacksonville[1] | 13 | 17 | 17 | | | 1 | 12 | 17 | 16 | 119 | 112 | 108 |
| Miami | 22 | 21 | 27 | | | | 21 | 16 | 26 | 139 | 130 | 129 |
| Orlando[1] | 20 | 41 | 53 | | | | 18 | 29 | 53 | 121 | 137 | 110 |
| Pensacola[1] | 5 | 4 | 1 | | | | 5 | 4 | 1 | 13 | 9 | 6 |
| Tampa Bay[1] | 44 | 49 | 44 | | | 2 | 43 | 49 | 44 | 294 | 280 | 253 |
| Associate | | | | | | | | | | | | |
| **Georgia** | | | | | | | | | | | | |
| Atlanta[1] | 26 | 31 | 37 | 70 | 10 | 1 | 25 | 28 | 37 | 231 | 217 | 225 |
| Associate | | | | | | | | | | | | |
| **Hawaii** | | | | | | | | | | | | |
| Honolulu[1] | 8 | 24 | 8 | | | 7 | 8 | 23 | 8 | 142 | 143 | 121 |
| Associate | | | | | | | | | | | | |
| **Idaho** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| **Illinois** | | | | | | | | | | | | |
| Chicago[1] | 67 | 72 | 91 | | | 2 | 59 | 66 | 84 | 482 | 452 | 447 |
| St. Louis | 4 | 4 | 4 | | | | 4 | 4 | 4 | 25 | 23 | 22 |
| Associate | | | | | | | | | | | | |
| **Indiana** | | | | | | | | | | | | |
| Cincinnati[1] | | | | | | | | | | | | |
| Indianapolis[1] | 18 | 7 | 17 | | | | 18 | 7 | 15 | 121 | 108 | 101 |
| Louisville[1] | 1 | | 1 | | | | 1 | | 1 | 5 | 5 | 5 |
| Associate | | | | | | 1 | | | | | | |
| **Iowa** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| **Kansas** | | | | | | | | | | | | |
| Kansas City[1] | 1 | 4 | 5 | | 2 | | 1 | 3 | 5 | 36 | 38 | 39 |
| Associate | | | | | | | | | | | | |
| **Kentucky** | | | | | | | | | | | | |
| Cincinnati[1] | 2 | 1 | 1 | | | | 2 | 1 | 1 | 12 | 10 | 10 |
| Louisville[1] | 13 | 13 | 10 | | | | 11 | 12 | 6 | 61 | 50 | 40 |
| Associate | | | | | | | | | | | | |
| **Louisiana** | | | | | | | | | | | | |
| Alexandria[1,5] | 1 | | | | | | 1 | | | 1 | | |
| Baton Rouge[1,4] | 7 | 17 | 10 | | 1 | | 7 | 13 | 10 | 116 | 121 | 107 |
| Lafayette/Lake Charles[1] | 2 | | 1 | | | | 2 | | 1 | 16 | 6 | 7 |
| New Orleans[1] | 12 | 19 | 21 | | | | 11 | 18 | 21 | 184 | 179 | 164 |
| Associate | | | | | | | | | | | | |
| **Maine** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| **Maryland** | | | | | | | | | | | | |
| Baltimore[1] | 32 | 25 | 30 | | | 1 | 32 | 25 | 30 | 207 | 174 | 162 |
| Washington D.C. | | | 11 | | | | | | 11 | 50 | 58 | 66 |
| Associate | | | | | | | | | | | | |

| State (By Regional Office) | Franchises Sold During Year | | | Franchises Closed During Year | | | Franchises Opened During Year[6] | | | Total Franchises Existing at Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Massachusetts** | | | | | | | | | | | | |
| Boston | 34 | 44 | 37 | | | | 25 | 39 | 31 | 198 | 189 | 174 |
| Greater Rhode Island[1] | 2 | 2 | 1 | | | 1 | 1 | 2 | 1 | 6 | 4 | 2 |
| Hartford | 7 | 9 | 6 | | | | 6 | 9 | 6 | 30 | 28 | 27 |
| Associate | | | | | | | | | | | | |
| **Michigan** | | | | | | | | | | | | |
| Detroit | 55 | 45 | 67 | | 1 | | 55 | 45 | 67 | 258 | 249 | 244 |
| Associate | | | | | | | | | | | | |
| **Minnesota** | | | | | | | | | | | | |
| Minneapolis | 38 | 35 | 61 | | 4 | | 35 | 31 | 57 | 224 | 212 | 208 |
| Associate | | | | | | | | | | | | |
| **Mississippi** | | | | | | | | | | | | |
| Jackson[1] | 10 | 3 | 10 | | | | 10 | 3 | 9 | 36 | 26 | 27 |
| Memphis[1] | 3 | 3 | 2 | | | | 3 | 3 | 2 | 11 | 11 | 10 |
| South East Mississippi[1] | 3 | 12 | 10 | | | | 3 | 11 | 10 | 33 | 31 | 25 |
| Associate | | | | | | | | | | | | |
| **Missouri** | | | | | | | | | | | | |
| Kansas City[1] | 9 | 2 | | | | | 9 | 2 | | 33 | 24 | 24 |
| St. Louis | 12 | 16 | 27 | | | | 12 | 15 | 26 | 132 | 146 | 159 |
| Associate | | | | | | | | | | | | |
| **Montana** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| **Nebraska** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| **Nevada** | | | | | | | | | | | | |
| Las Vegas | 18 | 21 | 24 | | | | 17 | 19 | 22 | 102 | 102 | 94 |
| Reno[1,5] | 1 | | | | | | | | | 1 | | |
| Associate | | | | | | | | | | | | |
| **New Hampshire** | | | | | | | | | | | | |
| Boston | | 4 | 6 | | | | | 4 | 5 | 14 | 16 | 13 |
| Associate | | | | | | | | | | | | |
| **New Jersey** | | | | | | | | | | | | |
| New Jersey | 10 | 9 | 7 | | | | 10 | 8 | 6 | 60 | 57 | 57 |
| Philadelphia | 6 | 2 | 5 | | | | 5 | 1 | 4 | 29 | 26 | 26 |
| Associate | | | | | | | | | | | | |
| **New Mexico** | | | | | | | | | | | | |
| Albuquerque[1] | 8 | 8 | 8 | 2 | | 1 | 8 | 8 | 8 | 29 | 24 | 17 |
| Associate | | | | | | | | | | | | |
| **New York** | | | | | | | | | | | | |
| Buffalo | 17 | 14 | 12 | | | | 16 | 14 | 8 | 56 | 43 | 33 |
| New York | 16 | 24 | 25 | 2 | | | 15 | 23 | 24 | 139 | 145 | 144 |
| Associate | | | | | | | | | | 1 | 1 | 1 |
| **North Carolina** | | | | | | | | | | | | |
| Charlotte[1] | 42 | 40 | 50 | | | | 40 | 37 | 48 | 154 | 119 | 123 |
| Greensboro[1] | 8 | 9 | 12 | | | | 8 | 9 | 12 | 62 | 56 | 52 |
| Raleigh/Durham[1] | 26 | 37 | 32 | 4 | 2 | 1 | 24 | 30 | 31 | 220 | 203 | 172 |
| Associate | | | | | | | | | | | | |
| **North Dakota** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |

| State (By Regional Office) | Franchises Sold During Year | | | Franchises Closed During Year | | | Franchises Opened During Year[6] | | | Total Franchises Existing at Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Ohio** | | | | | | | | | | | | |
| Cincinnati[1] | 8 | 10 | 11 | | | | 7 | 10 | 9 | 69 | 65 | 63 |
| Cleveland[1] | 15 | 22 | 31 | | | | 15 | 22 | 30 | 178 | 167 | 160 |
| Columbus[1] | 26 | 28 | 28 | 3 | | 5 | 26 | 28 | 28 | 143 | 136 | 131 |
| Dayton[1] | 6 | 3 | 9 | | | | 6 | 3 | 6 | 37 | 37 | 35 |
| Detroit | | | | | | | | | | 2 | 3 | 4 |
| Associate | | | | | | | | | | | | |
| **Oklahoma** | | | | | | | | | | | | |
| Oklahoma City | 29 | 30 | 31 | | | | 29 | 30 | 29 | 135 | 136 | 136 |
| Tulsa[1] | 12 | 11 | 23 | | | | 11 | 9 | 22 | 72 | 71 | 82 |
| Associate | | | | | | | | | | | | |
| **Oregon** | | | | | | | | | | | | |
| Portland[1] | 15 | 33 | 41 | 12 | 9 | 6 | 15 | 33 | 39 | 123 | 123 | 103 |
| Associate | | | | | | | | | | | | |
| **Pennsylvania** | | | | | | | | | | | | |
| Philadelphia | 35 | 26 | 14 | | | | 26 | 23 | 9 | 133 | 113 | 100 |
| Pittsburgh[1] | 17 | 14 | 10 | | | | 17 | 14 | 10 | 43 | 30 | 26 |
| Associate | | | | | | | | | | | | |
| **Rhode Island** | | | | | | | | | | | | |
| Greater Rhode Island[1] | 19 | 14 | 19 | 1 | 1 | 1 | 19 | 13 | 17 | 67 | 50 | 37 |
| Associate | | | | | | | | | | | | |
| **South Carolina** | | | | | | | | | | | | |
| Charleston[1] | 14 | 18 | 8 | 3 | | 1 | 13 | 17 | 7 | 62 | 61 | 45 |
| Charlotte[1] | 2 | 2 | 6 | | | | 2 | 2 | 6 | 10 | 9 | 11 |
| Columbia[1] | 17 | 8 | 21 | | | | 16 | 6 | 17 | 81 | 69 | 65 |
| Greenville/Spartanburg[1] | 8 | 3 | 10 | | | | 8 | 3 | 9 | 47 | 39 | 36 |
| Associate | | | | | | | | | | | | |
| **South Dakota** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | 1 | 1 |
| **Tennessee** | | | | | | | | | | | | |
| Chattanooga[1,5] | 2 | | | | | | 2 | | | 2 | | |
| Knoxville[1] | 8 | 11 | 10 | | | | 7 | 11 | 9 | 78 | 71 | 70 |
| Memphis[1] | 9 | 14 | 17 | 2 | | | 9 | 13 | 17 | 63 | 71 | 74 |
| Nashville | 7 | 8 | 16 | | | 1 | 7 | 8 | 15 | 58 | 58 | 61 |
| Associate | | | | | | | | | | | | |
| **Texas** | | | | | | | | | | | | |
| Austin[1] | 11 | 30 | 32 | | | 2 | 8 | 29 | 28 | 212 | 205 | 180 |
| Dallas[1] | 23 | 25 | 43 | | | | 20 | 25 | 43 | 202 | 206 | 200 |
| Ft. Worth[1] | 15 | 7 | 3 | | | | 15 | 7 | 3 | 53 | 41 | 37 |
| Houston[1] | 96 | 122 | 110 | 71 | 65 | 46 | 93 | 117 | 106 | 394 | 388 | 355 |
| San Antonio[1] | 12 | 16 | 21 | | 1 | | 10 | 16 | 20 | 97 | 85 | 78 |
| Associate | | | | | | | | | | | | |
| **Utah** | | | | | | | | | | | | |
| Salt Lake City[1] | 8 | 6 | 4 | | | 1 | 8 | 5 | 4 | 63 | 60 | 59 |
| Associate | | | | | | | | | | | | |
| **Vermont** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| **Virginia** | | | | | | | | | | | | |
| Hampton Roads[1] | 61 | 55 | 64 | | | 1 | 59 | 54 | 62 | 229 | 216 | 176 |
| Richmond[1] | 18 | 20 | 12 | | | 1 | 17 | 20 | 11 | 77 | 70 | 78 |
| Washington D.C. | 20 | 13 | 16 | | | 1 | 19 | 13 | 15 | 87 | 75 | 65 |
| Associate | | | | | | | | | | | | |

| State (By Regional Office) | Franchises Sold During Year | | | Franchises Closed During Year | | | Franchises Opened During Year[6] | | | Total Franchises Existing at Year End | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Washington** | | | | | | | | | | | | |
| Portland[1] | 3 | 6 | 4 | 2 | 2 | 1 | 2 | 6 | 4 | 19 | 20 | 16 |
| Seattle[1] | 15 | 20 | 12 | | | | 15 | 20 | 12 | 79 | 71 | 56 |
| Associate | | | | | | | | | | | | |
| **West Virginia** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| **Wisconsin** | | | | | | | | | | | | |
| Madison[1] | 1 | 4 | 11 | | | | 1 | 4 | 11 | 31 | 25 | 27 |
| Milwaukee[1] | 17 | 17 | 23 | 2 | | | 16 | 17 | 23 | 107 | 99 | 102 |
| Associate | | | | | | | | | | | | |
| **Wyoming** | | | | | | | | | | | | |
| Associate | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **INTERNATIONAL:** | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| Argentina[1] | | 3 | 5 | 4 | | | | 3 | 5 | 14 | 14 | 19 |
| Australia[1] | 80 | 79 | 68 | 9 | 7 | 16 | 76 | 71 | 64 | 719 | 655 | 603 |
| Belguim[1,5] | 4 | | | | | | 4 | | | 4 | | |
| Brazil[1] | 1 | | 12 | | | | 1 | | 12 | 119 | 129 | 131 |
| Canada[1] | 39 | 58 | 56 | 19 | 28 | 13 | 37 | 58 | 51 | 437 | 417 | 386 |
| France[1] | 15 | 12 | 15 | 23 | 1 | 3 | 15 | 5 | 9 | 65 | 63 | 57 |
| Great Britain[1] | 28 | 17 | 20 | 5 | | | 18 | 15 | 13 | 199 | 197 | 229 |
| Hong Kong[1] | 2 | 2 | 4 | | 1 | 1 | 1 | 1 | 4 | 12 | 12 | 9 |
| Malaysia[1] | | | | | | | | | | 10 | 10 | 10 |
| Mexico[1] | | | 6 | | | | | | 6 | 42 | 42 | 42 |
| New Zealand[1] | 27 | 18 | 22 | 1 | | | 20 | 12 | 12 | 106 | 80 | 63 |
| Russia[1,5] | | | | | | | | | | | | |
| Singapore[1] | | | | | | | | | | 11 | 11 | 11 |
| Spain[1] | | | | | | | | | | | | |
| South Korea[1] | | 1 | | | | | | 1 | | 49 | 49 | 48 |
| Taiwan[1] | | | 1 | | | | | | | 30 | 30 | 30 |
| Toronto | 15 | 15 | 17 | | | | 14 | 15 | 13 | 87 | 79 | 69 |
| Turkey[1] | 8 | 6 | 5 | 5 | 2 | | 8 | 6 | 5 | 13 | 11 | 7 |
| United Arab Emirates[1,5] | | | | | | | | | | | | |
| Windsor | 1 | 6 | 2 | | | 1 | 1 | 5 | 2 | 20 | 20 | 17 |
| Associate | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **SYSTEM TOTAL:** | 1675 | 1745 | 1929 | 241 | 241 | 123 | 1560 | 1632 | 1803 | 10,715 | 10,046 | 9,442 |

## PROJECTED OPENINGS AS OF DECEMBER 31, 2004

| State (By Regional Office) | Franchise Agreement Signed But Business Not Open | Projected Franchises to be Sold in 2005 | Projected Company Units to be Opened in 2005[c] |
|---|---|---|---|
| **DOMESTIC:** | | | |
| | | | |
| **Alabama** | | | |
| Birmingham[1] | | 24 | |
| Huntsville[1] | 1 | 16 | |
| Mobile[1] | | 9 | |
| Montgomery[1] | 1 | | |
| Associate | | | |
| **Alaska** | | | |
| Associate | | | |

| State (By Regional Office) | Franchise Agreement Signed But Business Not Open | Projected Franchises to be Sold in 2005 | Projected Company Units to be Opened in 2005[c] |
|---|---|---|---|
| **Arizona** | | | |
| Phoenix[1] | 3 | 35 | |
| Tucson[1] | | 18 | |
| Associate | | | |
| **Arkansas** | | | |
| Little Rock[1,5] | | 3 | |
| Memphis[1] | | 2 | |
| Associate | | | |
| **California** | | | |
| Los Angeles/Colton[2] | 1 | 72 | |
| Sacramento | 1 | 36 | |
| San Diego | 4 | 48 | |
| San Francisco/Oakland[3] | 4 | 48 | |
| Associate | | | |
| **Colorado** | | | |
| Denver | | 36 | |
| Associate | | | |
| **Connecticut** | | | |
| Hartford | 2 | 15 | |
| Associate | | | |
| **Delaware** | | | |
| Philadelphia | 1 | 5 | |
| Associate | | | |
| **District of Columbia** | | | |
| Washington D.C. | 1 | 8 | |
| Associate | | | |
| **Florida** | | | |
| Jacksonville[1] | 1 | 18 | |
| Miami | 1 | 60 | |
| Orlando[1] | 2 | 36 | |
| Pensacola[1] | | 9 | |
| Tampa Bay[1] | 1 | 48 | |
| Associate | | | |
| **Georgia** | | | |
| Atlanta[1] | 1 | 35 | |
| Associate | | | |
| **Hawaii** | | | |
| Honolulu[1] | | 15 | |
| Associate | | | |
| **Idaho** | | | |
| Associate | | | |
| **Illinois** | | | |
| Chicago[1] | 8 | 80 | |
| St. Louis | | 8 | |
| Associate | | | |
| **Indiana** | | | |
| Cincinnati[1] | | | |
| Indianapolis[1] | | 12 | |
| Louisville[1] | | 5 | |
| Associate | | | |
| **Iowa** | | | |
| Associate | | | |

| State (By Regional Office) | Franchise Agreement Signed But Business Not Open | Projected Franchises to be Sold in 2005 | Projected Company Units to be Opened in 2005[c] |
|---|---|---|---|
| **Kansas** | | | |
| Kansas City[1] | | 7 | |
| Associate | | | |
| **Kentucky** | | | |
| Cincinnati[1] | | 5 | |
| Louisville[1] | 2 | 10 | |
| Associate | | | |
| **Louisiana** | | | |
| Alexandria[1,5] | | | |
| Baton Rouge[1,4] | | 23 | |
| Lafayette/Lake Charles[1] | | 12 | |
| New Orleans[1] | 1 | 24 | |
| Associate | | | |
| **Maine** | | | |
| Associate | | | |
| **Maryland** | | | |
| Baltimore[1] | | 36 | |
| Washington D.C. | | 20 | |
| Associate | | | |
| **Massachusetts** | | | |
| Boston | 9 | 40 | |
| Greater Rhode Island[1] | 1 | 4 | |
| Hartford | 1 | 15 | |
| Associate | | | |
| **Michigan** | | | |
| Detroit | | 64 | |
| Associate | | | |
| **Minnesota** | | | |
| Minneapolis | 3 | 48 | |
| Associate | | | |
| **Mississippi** | | | |
| Jackson[1] | | 10 | |
| Memphis[1] | | 4 | |
| South East Mississippi[1] | | 6 | |
| Associate | | | |
| **Missouri** | | | |
| Kansas City[1] | | 8 | |
| St. Louis | | 40 | |
| Associate | | | |
| **Montana** | | | |
| Associate | | | |
| **Nebraska** | | | |
| Associate | | | |
| **Nevada** | | | |
| Las Vegas | 1 | 36 | |
| Reno[1,5] | 1 | 12 | |
| Associate | | | |
| **New Hampshire** | | | |
| Boston | | 8 | |
| Associate | | | |
| **New Jersey** | | | |
| New Jersey | | 36 | |
| Philadelphia | 1 | 15 | |
| Associate | | | |

| State (By Regional Office) | Franchise Agreement Signed But Business Not Open | Projected Franchises to be Sold in 2005 | Projected Company Units to be Opened in 2005[c] |
|---|---|---|---|
| **New Mexico** | | | |
| Albuquerque[1] | | 12 | |
| Associate | | | |
| **New York** | | | |
| Buffalo | 1 | 24 | |
| New York | 1 | 48 | |
| Associate | | | |
| **North Carolina** | | | |
| Charlotte[1] | 2 | 37 | |
| Greensboro[1] | | 30 | |
| Raleigh/Durham[1] | 2 | 24 | |
| Associate | | | |
| **North Dakota** | | | |
| Associate | | | |
| **Ohio** | | | |
| Cincinnati[1] | 1 | 15 | |
| Cleveland[1] | | 24 | |
| Columbus[1] | | 30 | |
| Dayton[1] | | 10 | |
| Detroit | | | |
| Associate | | | |
| **Oklahoma** | | | |
| Oklahoma City | | 30 | |
| Tulsa[1] | 1 | 24 | |
| Associate | | | |
| **Oregon** | | | |
| Portland[1] | | 15 | |
| Associate | | | |
| **Pennsylvania** | | | |
| Philadelphia | 9 | 40 | |
| Pittsburgh[1] | | 18 | |
| Associate | | | |
| **Rhode Island** | | | |
| Greater Rhode Island[1] | | 20 | |
| Associate | | | |
| **South Carolina** | | | |
| Charleston[1] | 1 | 20 | |
| Charlotte[1] | | 5 | |
| Columbia[1] | 1 | 18 | |
| Greenville/Spartanburg[1] | | 8 | |
| Associate | | | |
| **South Dakota** | | | |
| Associate | | | |
| **Tennessee** | | | |
| Chattanooga[1,5] | | 12 | |
| Knoxville[1] | 1 | 12 | |
| Memphis[1] | | 14 | |
| Nashville | | 36 | |
| Associate | | | |

| State (By Regional Office) | Franchise Agreement Signed But Business Not Open | Projected Franchises to be Sold in 2005 | Projected Company Units to be Opened in 2005[c] |
|---|---|---|---|
| **Texas** | | | |
| Austin[1] | 3 | 30 | |
| Dallas[1] | 3 | 40 | |
| Ft. Worth[1] | | 26 | |
| Houston[1] | 3 | 97 | |
| San Antonio[1] | 2 | 20 | |
| Associate | | | |
| **Utah** | | | |
| Salt Lake City[1] | | 12 | |
| Associate | | | |
| **Vermont** | | | |
| Associate | | | |
| **Virginia** | | | |
| Hampton Roads[1] | 2 | 55 | |
| Richmond[1] | 1 | 30 | |
| Washington D.C. | 1 | 20 | |
| Associate | | | |
| **Washington** | | | |
| Portland[1] | 1 | 5 | |
| Seattle[1] | | 24 | |
| Associate | | | |
| **West Virginia** | | | |
| Associate | | | |
| **Wisconsin** | | | |
| Madison[1] | | 12 | |
| Milwaukee[1] | 1 | 20 | |
| Associate | | | |
| **Wyoming** | | | |
| Associate | | | |
| | | | |
| **INTERNATIONAL:** | | | |
| | | | |
| Argentina[1] | | | |
| Australia[1] | 4 | 96 | |
| Belgium[1,5] | | 6 | |
| Brazil[1] | | 6 | |
| Canada[1] | 2 | 66 | |
| France[1] | | 16 | |
| Great Britain[1] | 10 | 24 | |
| Hong Kong[1] | 1 | 4 | |
| Malaysia[1] | | | |
| Mexico[1] | | 5 | |
| New Zealand[1] | 7 | 28 | |
| Russia[1,5] | | 15 | |
| Singapore[1] | | | |
| South Korea[1] | | 12 | |
| Taiwan[1] | | 5 | |
| Toronto | 1 | 20 | |
| Turkey[1] | | 25 | |
| United Arab Emirates[1,5] | | 20 | |
| Windsor | | 4 | |
| Associate | | | |
| | | | |
| **SYSTEM TOTAL:** | 115 | 2,453 | N/A |

A list of names, addresses, and business telephone numbers of all franchisees under franchise agreements with us which are located in the state where the proposed franchise is to be located is provided in Exhibit VII.

A list of names, last known addresses, and telephone numbers is located in Exhibit VII for every franchisee in this State who has had a franchise terminated, canceled, not renewed, or otherwise voluntarily or involuntarily ceased to do business under the Franchise Agreement in the most recently completed fiscal year, or who has not communicated with us within 10 weeks of April 29, 2005.

## ITEM 21

## FINANCIAL STATEMENTS

The financial statements listed below are attached to this Offering Circular as Exhibit VI:

1.  Audited financial statements of JK INT'L as of December 31, 2004, December 31, 2003, and December 31, 2002;

2.  Opinion of Accountant for the audited statements.

## ITEM 22

## CONTRACTS

We attached the following agreements as Exhibits to this offering circular:

Exhibit:

   I   Franchise Agreement

   II  Account Acceptance/Finder's Fee Agreement
      Guaranty

  III Equipment Lease Agreement

## ITEM 23

## RECEIPT

See Exhibit VIII