# JANI-KING OF BOSTON, INC.

## FRANCHISE AGREEMENT



AN AGREEMENT made and entered into in Addison, Dallas County, Texas by and between JANI-KING OF BOSTON, INC., a Texas Corporation, hereinafter referred as either "JANI-KING" or "Franchisor", and

Mariet*t*e L.S. Barros

hereinafter referred to, singularly or collectively, as "Franchisee", doing business as a

[  ] Corporation,          [  ] Partnership          [x] Sole Proprietorship
incorporated under the
laws of _____,

for the purposes of allowing Franchisee to operate a business as a Franchisee of JANI-KING.

## FRANCHISE SUMMARY

EFFECTIVE DATE: _August 27_, 2003      PLAN: _n/a_

INITIAL FRANCHISE FEE DOWN PAYMENT AND INITIAL FINDER'S FEE DOWN PAYMENT:
($  _n/a_  )
_See Transfer Agreement attached hereto_ _____ Dollars

PROJECTED INITIAL FRANCHISE FEE AND INITIAL FINDER'S FEE MONTHLY PAYMENT:

$ _n/a_ PER MONTH FOR _n/a_ MONTHS

INITIAL FINDER'S FEE BUSINESS:

($ _n/a_ ) See  transfer agreement attached hereto     (Thousand)

INITIAL OFFERING PERIOD: See transfer agreement attached hereto (  _n/a_ ) Days
hereto

TERRITORY: Counties: _____ n/a _____,
in the state of Connecticut.

Barnstable, Bristol, Essex, Middlesex, Norfolk, Suffolk, Plymouth,
and Worcester
in the State of Massachusetts.

Hillsborough and Rockingham
_____,
in the State of New Hampshire.

FRANCHISEE ADDRESS:

24 Alexander Avenue

CITY: _Medford,_        STATE: _MA_        ZIP CODE: _02155_

COUNTY: _Middlesex_     TELEPHONE NUMBER: ( _781_ ) _395-2843_

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT _AS_  INT _MLSB_
PAGE 1 OF 30

# RECITALS

## SECTION 1

1.1. Franchisor is in the business of operating and franchising professional cleaning and maintenance businesses which engage in the performance of comprehensive cleaning and maintenance services including, but not limited to, commercial, industrial, institutional and residential cleaning services, as well as the sales, leasing or distribution of related supplies and equipment under the name Jani-King and is authorized to grant a license to use the trademark and trade names connected therewith. Trademarks as used herein shall mean all trademarks, trade names, service marks, slogans and logos, including, but not limited to, the mark Jani-King or any other trademark or service mark which may be authorized in writing by an officer of Jani-King. Jani-King has developed and used and continues to use and control certain trademarks, service marks, and trade names that have become associated with its products and services so as to impart to the public superior standards of quality and service. Franchisee desires to utilize the reputation and techniques developed by Jani-King in its business as a Jani-King Franchisee.

## SECTION 2

2.1. The parties to this Agreement desire that the Franchisor grant to the Franchisee a license to use methods, procedures and products developed by Jani-King, in the business of operating a professional cleaning services company in the territory described in the Franchise Summary (also referred to herein as the "Territory") and agree that such business shall be governed by terms, covenants and conditions contained in this Agreement. The Franchise Summary is defined as all information contained on the first page of this Agreement appearing below the words "Franchise Summary."

## SECTION 3

### GRANT OF FRANCHISE

3.1. For and in consideration of the full and faithful performance of each and every one of the covenants, terms and conditions herein contained and agreed to by Franchisee, Franchisor grants to the Franchisee the right to establish and operate a Jani-King franchise within the Territory.

3.2. Franchisee shall operate the business at or from a location of its choosing within the Territory subject to the approval of Franchisor and Franchisee's continued compliance with the terms and conditions set forth herein.

## SECTION 4

### FRANCHISEE PLEDGES

4.1. To operate a Jani-King Franchise cleaning and maintenance services company in the Territory described herein, using the trade name "Jani-King" in conjunction with its business name, as "John Doe, d/b/a Jani-King", or "ABC Inc., d/b/a Jani-King". Franchisee agrees not to use as part of a corporate name or other legal name, (i) the name "Jani-King of (any city, state, or other region)", (ii) any other janitorial, maintenance or cleaning service name in conjunction with their formal name, i.e. such as "ABC Custodials", "ABC

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT___ INT___
PAGE 2 OF 30

Maintenance", "ABC Cleaning Services" etc., (iii) a name prefix of "Jani-", or any other similarly spelled or sounding prefix or (iv) any other trademarks, trade names or service marks or any name that has not been granted prior written approval by the Corporate Office; and that all such intellectual properties shall remain the sole property of Franchisor. All use of the Jani-King trademarks, trade names or service marks by Franchisee shall inure to the benefit of Franchisor and shall remain the sole property of Jani-King. All directory listings, advertising, letterhead, or any other visual or printed matter used by Franchisee to communicate to anyone shall conform to established Jani-King policies and shall be subject to review and approval by Jani-King prior to use by Franchisee; and Franchisee agrees to submit to Franchisor, prior to use by Franchisee, samples of any and all advertising and promotional plans and materials of any type which contain in any manner any of the trade names, service marks, trademarks, slogans and logos as are now or which in the future may be approved for use by Franchisee.

4.2.1. Franchisee agrees to devote sufficient time and effort to its business pursuant to this Agreement and that all work and services performed under this Agreement will be performed and/or supervised by Franchisee or authorized agents/employees of Franchisee that comply with all terms of this Agreement.

4.2.2. Franchisee, its agents, and employees will follow current established Jani-King policies, practices and procedures, and as they may be amended from time to time, and agrees not to deviate therefrom without prior written consent of Franchisor.

4.2.3. Franchisee and officers and directors (if Franchisee is a corporation) who will actively participate in the operations of the franchise business agree to successfully complete the initial training program within six (6) months of the signing of this Agreement.

4.3. In consideration of the franchise herein granted under the plan identified in the Franchise Summary (the "Plan"), and the initial services to be performed by Franchisor as pledged herein, Franchisee shall pay to the Franchisor, upon execution of this instrument, the INITIAL FRANCHISE FEE DOWN PAYMENT AND INITIAL FINDER'S FEE DOWN PAYMENT, as stated in the Franchise Summary herein ("the Initial Franchise Fee Down Payment and Initial Finder's Fee Down Payment" or the "Initial Franchise Fee and Initial Finder's Fee Down Payment"). Franchisee authorizes Franchisor's deduction of Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments, as stated in the Franchise Summary herein, (the "Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments" or the "Initial Franchise Fee and Initial Finder's Fee Monthly Payments) from the Gross Revenue, as defined herein, in the amount and number of payments stated in the Franchise Summary, provided Franchisee's franchise produces Gross Revenue in an amount equal to or greater than the Initial Franchise Fee Monthly Payments and Initial Finder's Fee Monthly Payments.

4.3.1. Payment of this sum shall entitle Franchisee to the right to operate a Jani-King franchised business in the Territory described herein. Franchisor will secure commercial cleaning and maintenance contracts and offer to Franchisee the opportunity to perform services in accordance with those commercial cleaning and maintenance contracts which contracts will have cumulative initial gross monthly billings in the amount equal to the amount stated as the "INITIAL FINDER'S FEE BUSINESS" in the Franchise Summary (the "Initial Finder's Fee Business"). The Initial Finder's Fee Business may also be referred to as the "Initial Business." All commercial cleaning and maintenance contracts will remain the sole property of Jani-King.

4.3.2. Except as otherwise noted herein, the Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment is non-refundable and is in addition to royalties and other payments set out herein.

4.3.3. In the event that Franchisor is unable to secure and offer to the Franchisee the right to provide services to commercial cleaning and maintenance contracts with a cumulative total of initial gross monthly billings equal to or greater than the Initial Finder's Fee Business within the time period stated as the Initial Offering Period in the Franchise Summary (the "Initial Offering Period"), a portion of the Initial Franchisee Fee Down Payment and the Initial Finder's Fee Down Payment may be refundable. If the Franchisor fails to offer the

JKB 000004

full amount of Initial Finder's Fee Business, an amount equal to the lesser of (i) three (3) times the amount of Initial Finder's Fee Business not offered to the Franchisee or (ii) the total Initial Franchise Fee Down Payment and the Initial Finder's Fee Down Payment paid by Franchisee to Franchisor may be refunded. Any refund will be first applied to any money owed to Franchisor, Jani-King Leasing Corporation, or an affiliate of Franchisor, any unpaid fees or charges that would result in a negative due Franchisee Report. Any remaining portion of the refund will be credited to the Franchisee, unless agreed to otherwise, in writing, by Franchisor and Franchisee. A refund, or other written agreement between the parties, under this provision will fulfill Franchisor's obligation to offer any remaining portion of the Initial Finder's Fee Business used to calculate the refund.

4.4. In addition to the Office Supply and Advertising Package provided to Franchisee by Franchisor as described in Schedule One of this Agreement, Franchisee is required to purchase the Professional Products and Equipment listed in Schedule One as the "Supply and Equipment Package", and also purchase, lease or provide proof of ownership to Franchisor of the following:

A commercial vacuum cleaner, a commercial floor polisher, a commercial wet/dry vacuum and a compact portable vacuum cleaner (canister type) w/shoulder strap and cloth bag, identified as "Additional Electric Equipment" in Schedule One. These items are not included in the Office Supply and Advertising Package furnished by Franchisor.

The Supply and Equipment Package and the Additional Electric Equipment must be obtained by the Franchisee before any Initial Finder's Fee Business will be offered.

4.5.1 Franchisee agrees to pay to Franchisor or its designee, by the fifth (5th) day of each month a royalty fee equal to ten percent (10%) of the monthly Gross Revenues. Gross Revenue is defined as all revenue invoiced by anyone for any contract services, one time cleans, extra work, sales of supplies, equipment or goods and any other revenue related to or derived from the provision of any cleaning and maintenance services including, but not limited to, commercial, industrial, institutional and residential, as well as the sale, leasing or distribution of related supplies and equipment in connection with the conduct and operation of Franchisee's business or otherwise directly or indirectly, in whole or in part, performed or sold by, or for the benefit of you, your principals, guarantors, spouse(s), officers, directors, shareholders, agents, or employees, regardless of the entity or business name used. The minimum royalty shall be Fifty Dollars ($50.00) monthly during the first twelve (12) months of operation and One Hundred Dollars ($100.00) per month thereafter. Such minimum royalty is subject to annual adjustment for increases in the Consumer Price Index.

A fee of $25 per day (the "Non-Reported Business Fee") will be charged to Franchisee for each day Franchisee fails to report all Gross Revenue, in addition to any and all fees, payments, charges, chargebacks, or other amounts due and owing Franchisor under the terms of this agreement as a result of such Gross Revenues, whether or not collected by Franchisee. Such amounts shall be immediately due and payable. The payment of the Non-Reported Business Fee shall constitute liquidated damages and not a penalty, and shall be in addition to any other remedies available to Franchisor at law or in equity.

4.5.2. Franchisee agrees to pay Franchisor an advertising fee equal to one percent (1%) of Franchisee's Gross Revenue as defined above. Franchisee agrees to pay the advertising fee, in addition to the royalty payment, commencing on the fifth (5th) day of the month and continuing on the fifth (5th) day of every month thereafter for the remainder of the term. This Fee is a payment to the Franchisor for advertising and related costs and Franchisor does not have any duty to Franchisee related to the use of the Fee.

4.6. Franchisee further agrees to pay to Franchisor a Finder's Fee on any additional business in excess of the Initial Finder's Fee Business of which Franchisee accepts the designation, from Franchisor, as authorized franchisee to provide service to such business, whether or not that additional business or contract resulted from an increase in the contract price for an existing business being serviced by Franchisee, an expansion of service for existing business being serviced by Franchisee at the same or other locations, or completely new business.

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT _MM_    INT _MLSB_
PAGE 4 OF 30

Finder's Fees are in addition to royalties, Initial Franchise Fee and Initial Finder's Fee Monthly Payments, and other payments set out in this Agreement, and are calculated on the gross monthly billing for an account according to the formulas listed below. Franchisor has no obligation to offer Franchisee for the right to provide service to additional business or contracts beyond the Initial Finder's Fee Business. Should Franchisor, in its sole opinion, decide to offer Franchisee the right to service any additional business or contracts, Franchisee may either decline or accept the offer at the time it is made.

Following Franchisor's offer and Franchisee's acceptance of the right to provide service to any additional business or contract, the Franchisee agrees to pay an amount as a Finder's Fee according to the guidelines established by the Franchisor. Franchisor will, from time to time, establish such guidelines, policies and procedures as necessary to calculate the applicable Finder's Fee, taking into consideration industry standards and increases in costs and expenses of soliciting new accounts, and Franchisor reserves the right to increase or decrease the Finder's Fee in all categories. Currently, the following guidelines will apply, but any guideline or policy regarding the calculation of a Finder's Fee or the payment thereof, for any account, may be changed by the Franchisor at any time prior to the offering of the account:

(1)  Upon acceptance of the right to perform services on any additional business, the Franchisee will sign an Account Acceptance/Finder's Fee Agreement, that will include the Finder's Fee payment calculations, if any, according to the provisions set out in the Finder's Fee Schedules below.

(2)  For each of the Finder's Fee Schedules set out below, the following terms apply to calculate the Finder's Fee for the additional business:

"OVER" / "UP TO":  To determine the proper formula for a Finder's Fee payment structure within the appropriate Schedule, the Monthly Billing categories are listed by ranges, where the monthly billing will exceed the amount listed as "OVER", but less than the amount listed as "UP TO". If the monthly billing may fluctuate, the proper category of Monthly Billing will be determined by the maximum gross monthly billing allowed by the account contract.

DOWN PAYMENT:  The initial payment due at the time of acceptance of the right to provide services to the account, or as otherwise established under these guidelines, calculated by multiplying the percentage stated in the appropriate category of Monthly Billing under Down Payment, times the appropriate gross monthly billing. All Down Payments will be calculated using the gross billing for the First Full Month of Service. "First Full Month of Service", for purposes of calculating the Down Payment, is defined as the first month in which the service is performed on or before the 15th day of the month. If a partial month is the First Full Month of Service, the gross monthly billing, for purposes of calculating the Down Payment, is determined as though the account had been serviced for the entire month. If the account begins service after the 15th, the following month will be used for purposes of the Down Payment, and no payment is due for the initial period. The Down Payment is due along with the monthly franchisee report for the First Full Month of Service (and second month as required) and may be payable as a deduction from the account billing on the franchisee report.

MONTHLY PAYMENT:  The payment made each month for the designated number of months, calculated by multiplying the percentage stated in the appropriate schedule under Monthly Payment, times the gross monthly billing for the current accounting month. However, the total of the amounts paid as Monthly Payments (exclusive of the Down Payment) shall not exceed a sum greater than 300% of: (a) for Variable Rate Accounts, the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, exclusive of any down payment; or (b) for Public Event or Seasonal Accounts, the average gross monthly billing for the first twelve months service is performed under the account contract, exclusive of any down payment. Monthly Payments will begin the month following any scheduled Down Payment.

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT _A/_   INT _MLSh_
PAGE 5 OF 30

JKB 000006

MONTHS: The number of months a Monthly Payment must be made under the terms of the Account Acceptance/Finder's Fee Agreement, subject to the maximum sum described in the definition of Monthly Payment.

(3) Accounts will be identified according to the following definitions and the Finder's Fee will be calculated using the formula set out in the appropriate Finder's Fee Schedule for the type of account:

1. FIXED RATE ACCOUNT: An account that has a constant monthly billing established by the account contract, and has a term of one year or longer. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing allowed under the contract, or the fee and payment will be structured according to the Schedule.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 1,500 | 60% | 20% | 13 |
| 1,500 | 3,000 | 40% | 15% | 20 |
| 3,000 | 6,000 | 30% | 10% | 30 |
| 6,000 | 10,000 | 15% | 10% | 32 |
| 10,000 | unlimited | 5% | 5% | 65 |

2. VARIABLE RATE ACCOUNT: An account with a monthly billing that may fluctuate, depending on the occupancy of the property, where the billing is based on a set price per square foot of service area, and has a term of one year or longer. Any city, State or Federal account or Public School will be bid as a Multi-Tenant account. The Finder's Fee may be paid in full at the time of acceptance of the account, in which event, Franchisee will pay three (3) times the amount of the maximum gross monthly billing that would be generated in a month in which the building was at a one hundred percent (100%) occupancy factor, or the fee and payment will be structured according to the Schedule.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | | DOWN | MONTHLY | |
|---|---|---|---|---|
| OVER | UP TO | PAYMENT | PAYMENT | MONTHS |
| 50 | 3,000 | 30% | 5% | 72 |
| 3,000 | 6,000 | 15% | 5% | 72 |
| 6,000 | unlimited | 5% | 5% | 72 |

3. SEASONAL ACCOUNT: An account that will be serviced for a limited period of time but may recur on a seasonal basis. This account may have a constant or fluctuating monthly billing amount. A Down Payment is due only for the initial season. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract, which may occur over several seasons.

THIS SPACE INTENTIONALLY LEFT BLANK

JKB 000007

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

4. PUBLIC EVENT FACILITIES: An account involving a public facility that houses special events for a limited duration, but similar events recur on a regularly scheduled basis. The monthly billing will fluctuate, depending on the type of event or use of the facility, where the billing is based on the labor-hours required to service the property, and has a term of one year or longer. Monthly Payments are due each month until the total paid as Monthly Payments is equal to 300% of the average gross monthly billing for the first twelve months service is performed under the account contract.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | Varies* |

*Until Payments equal 300% of Average Gross Monthly Billing for first twelve months.

5. APARTMENT TURNAROUND: An account where one or more apartments or other facilities are serviced on a recurring basis as a make ready between occupancies or other uses. The monthly billing will fluctuate depending on the number of units serviced, but the account contract has a term of one year or more.

FINDER'S FEE SCHEDULE:

| MONTHLY BILLING: | DOWN PAYMENT | MONTHLY PAYMENT | MONTHS |
|---|---|---|---|
| Any Amount | 20% | 10% | All* |

*Each month service is performed.

6. OTHER NON-STANDARD ACCOUNTS: The Franchisor will establish the Finder's Fee on any other account that does not fall within one of the above definitions, prior to the account being offered to the Franchisee for designation of service. The Finder's Fee on nonrecurring contracts, initial cleaning or one time cleaning contracts will vary but do not currently exceed twenty-five percent (25%) of the total invoiced amount.

(4)   Policies and Procedures will be established by Franchisor from time to time which regulate the amount and calculation, terms of payment, credits on termination or transfers of accounts, and other issues concerning Finder's Fees.

4.7.  Franchisee agrees that Franchisor shall have the exclusive right to perform all billing and accounting functions for the services provided by Franchisee. Franchisee agrees to pay Franchisor three percent (3%) of Franchisee's Gross Revenues, monthly, as defined herein, as an Accounting Fee, to cover Franchisor's administrative costs and expenses for this service (see Section Five). Depending on Franchisee's monthly Gross

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT __ INT _JMSB_
PAGE 7 OF 30

JKB 000008

Revenue, Franchisee may be eligible for a rebate on the accounting fees paid by the Franchise. This rebate will be a percentage reduction of the accounting fee for the month(s) in which Franchisee is eligible and will be calculated each month using the following table. Franchisee's eligibility for the rebate shall be determined solely by Franchisor, and the calculation of the rebate shall be performed solely by Franchisor. Any rebate Franchisor determines Franchisee is eligible for will be issued to Franchisee twice per year at a time determined solely by Franchisor.

| Monthly Gross Revenue (Dollars) | Accounting Rebate (Percent) |
|---|---|
| 0-25,000 | 0 |
| 25,001-45,000 | 0.5 |
| 45,001-65,000 | 1.0 |
| 65,001-85,000 | 1.5 |
| 85,001-Over | 2.0 |

4.7.1. Franchisor each month will invoice clients serviced by Franchisee for the services rendered and supplies provided. All monies received from clients is the property of Franchisor. Each month, after deduction of all appropriate fees and charges including, but not limited to, the ten percent (10%) royalty fee, the one to three percent (1-3%) Accounting Fee, any note payments, the Initial Franchise Fee and Initial Finder's Fee Monthly Payments, Finder's Fees, advertising fees, transfer fees, chargebacks on past due invoices, any advances made to the franchisee by Franchisor, Non-Reported Business Fees, as defined hereinafter, or attorneys fees and court costs incurred by Franchisor in enforcing payment of accounts by clients, Franchisor will disburse money to Franchisee. On the fifth (5th) day of each month, Franchisor will disburse to Franchisee the amount of money appearing in the Due Franchisee Column of the Franchisee Report for the preceding month less any monies not collected from prior months ("Charge Back"). In the event the fifth (5th) day of the month falls on a Saturday, Sunday or recognized holiday, then all such amounts due to Franchisee will be disbursed before the end of the next business day.

4.8. Franchisee agrees to make all payments due Franchisor promptly in accordance with the terms of this Agreement, and recognizes that any failure on the part of the Franchisee to do so shall be deemed a substantial breach of this Agreement, and shall give Franchisor the right to terminate this Agreement immediately and retain all sums previously paid to Franchisor by Franchisee.

4.9.1. During the term of this Agreement, Franchisee shall maintain and preserve full, complete and accurate books, records and accounts regarding the Franchise business.

4.9.2. Upon request by Franchisor, Franchisee shall, at its sole cost and expense, prepare and submit to Franchisor within thirty (30) days after said request, a complete financial statement for the preceding twelve month period or any other calendar year, or a financial statement compiled and reviewed by a certified accountant or public accounting firm, together with such other information as Franchisor may reasonably require in order for Franchisor to determine that Franchisee is properly reporting and accounting for all Gross Income.

4.9.3. Franchisor reserves the right to inspect or examine the accounts, books, records and tax returns of Franchisee, at any reasonable time, so far as the same pertain to determination of Franchisee's Gross Revenue or the business of operating a Jani-King Franchise. Franchisor shall also have the right, at any time, to have an independent audit made of the books or financial records of Franchisee. Any such inspection, examination or independent audit shall be performed at the cost or expense of Franchisor unless the same is necessitated by the failure of Franchisee to provide the reports requested or to preserve records as provided herein, or unless the inspection, examination or independent audit discloses that any statement or report made by Franchisee is in error to an extent of five percent (5%) or more, in which case Franchisee shall immediately pay to Franchisor the

JKB 000009

amount in error and shall reimburse Franchisor for any and all costs and expenses connected with the inspection or audit (including, without limitation, reasonable accounting and attorneys' fees).

4.10. Franchisee agrees to be solely responsible for the services and results of services performed at locations where cleaning and maintenance services are performed by Franchisee, and to hold harmless and indemnify Franchisor from any and all claims arising from actions by Franchisee or its employees.

4.11. Franchisee agrees to maintain a clean and safe place of business in compliance with OSHA and other governmental and industry standards and to conduct its business in a manner that would bring goodwill and public approval to itself and Jani-King.

4.11.1. Franchisee is solely responsible for any leases of real or personal property in connection with the operation of its business, but agrees that Franchisor must approve office location, furniture and decor thereof to protect the image and reputation of Jani-King. Franchisee must at all times during the term of this Agreement maintain such office and all fixtures, furnishings, signs and equipment located thereon in good order and condition, and in a manner which will portray the goodwill and a positive image of the Jani-King name and reputation as such may be prescribed by Franchisor from time to time. Franchisee must, within a reasonable time specified by Franchisor, make all necessary additions, alterations, repairs and replacements to the office as required by Franchisor, but no others without Franchisor's prior written consent, including, but not limited to, periodic repainting or replacement of signs, furnishings, equipment or decor. No other business venture shall operate out of the premises utilized by Franchisee for its office without the prior written consent of Franchisor.

4.12.1 Franchisee agrees to be solely responsible for and indemnify and hold harmless Franchisor, Jani-King International, Inc., and their officers, directors, and employees for all loss or damage originating from, in connection with, or relating to the operation of Franchisee's business and for all claims or demands for damages to property or for injury or death of persons directly or indirectly resulting from or related to the operation of Franchisee's business. Franchisee also agrees that before Franchisee will be authorized to begin operating its franchise, Franchisee is required to obtain and carry the insurance listed below with the limits listed, naming Franchisor, Jani-King International, Inc., and their officers and directors as Additional Insureds from an insurer carrying an A.M. Bests' Rating of A or better. Franchisee shall provide Franchisor with proof of such required coverage.

| TYPE | LIMITS |
|---|---|
| Comprehensive General Liability | $ 2,000,000 (Aggregate) |
| Comprehensive General Liability | $1,000,000 (per Occurrence) |
| Hired and Non-Owned Automobile Insurance | $1,000,000 (per Occurrence) |
| Excess or Umbrella Insurance | $20,000,000 (Aggregate) |
| Workers' Compensation | Statutory Limits |

4.12.2. The various limits of the required insurance may be increased or have new types of coverage added as circumstances dictate. Franchisee shall provide Franchisor with proof of the required insurance coverage and is required to notify their insurance carrier that the insurance carrier will provide any cancellation notice directly to Franchisor no less than thirty (30) days prior to cancellation.

4.12.3. If Franchisee fails to secure the above listed insurance to the satisfaction of Franchisor, Franchisor may, in addition to other remedies, purchase such insurance for the benefit of Franchisee and seek prompt reimbursement from Franchisee for all premiums and other costs incurred. Franchisee shall be responsible for all premiums and other costs incurred by Franchisor up to and including the date Franchisor

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT *[initials]* INT *mLSβ*
PAGE 9 OF 30

JKB 000010

grants Franchisee written approval of Franchisee's insurance. Franchisee agrees to indemnify and hold Franchisor harmless from any claims, loss or damage.

4.12.4. As an alternative to the requirement of purchasing the above insurance, Franchisor may offer to Franchisee, and Franchisee may participate in Franchisor's Business Protection Plan ("BPP") to the extent offered. Participation in the BPP is voluntary, and Franchisee is not obligated or required to participate. If Franchisee does not participate in the BPP, Franchisee must provide Franchisor with a certificate of insurance showing that Franchisee has obtained the equivalent amount of insurance coverage with limits as shown above or as established in the Jani-King Policies and Procedures Manual.

4.12.5. Participation in the BPP includes an initial membership in the Guardian Risk Purchasing Group ("GRPG"), a Texas non-profit corporation organized for the purpose of purchasing liability insurance on a group basis for persons or entities engaged in the janitorial industry. Membership in the GRPG is restricted to individuals and entities who are engaged in the janitorial industry. Members in the GRPG participate in GRPG's group insurance policies. GRPG's group insurance policies are not individual insurance policies and the policy limits are shared between all GRPG members. If Franchisee does participate in the BPP, Franchisee is not required to purchase the required liability insurance listed above. Insurance provided by GRPG does not include coverage any personal or business use automobile(s) or Franchisee's equipment, supplies, or building if Franchisee's building is different from Franchisor's. Franchisee is required to purchase this insurance and supply proof of insurance to Franchisor before Franchisee will be authorized to begin operations of the franchise. You are also required to keep accurate payroll records. In the event Franchisee does not purchase this insurance, Franchisor reserves the right to purchase the insurance for Franchisee and charge Franchisee for the cost of the insurance.

The BPP also includes risk management, claims management assistance, periodic safety training, and regulatory compliance assistance. For these services, you will be required to pay an administration fee which may include a profit to us. We will be solely responsible for administering the BPP.

4.12.6. Franchisee's membership in GRPG can be terminated if Franchisee: (1) fails to pay any amount owed for Franchisee's participation in the BPP or (2) if Franchisee fails to report all revenue generated by Franchisee's participation in the janitorial industry or (3) if Franchisee files a fraudulent insurance claim under any of the insurance coverage obtained by Franchisee from GRPG, (4) if Franchisee has excessive losses or (5) if Franchisee does not participate in the janitorial industry for 12 consecutive months.

4.13. In connection with its agreement to indemnify and hold harmless Franchisor, Jani-King International, Inc., their officers, directors, and employees (the "Jani-King Parties") for all loss or damage as set forth in Section 4.12.1 of this Agreement, Franchisee agrees to defend the Jani-King Parties and any of their subsidiaries named in any lawsuit based on such loss or damage and to pay all costs and reasonable attorneys' fees associated with such defense. If any of the Jani-King parties wishes to retain their own counsel to defend any such action, Franchisee agrees to reimburse the Jani-King parties for all reasonable costs and legal fees incurred by the Jani-King parties for such defense. Said reimbursement shall be made to Franchisor in a timely manner as such fees are incurred by Franchisor and billed to Franchisee.

4.14.1 Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), agrees during the term of this Agreement not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning management services franchising or contracting cleaning management sales or any related business anywhere, except as otherwise approved in writing by Franchisor.

4.14.2 In the event this Agreement is sold, assigned, terminated or transferred, for any reason whatsoever, Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation),

JKB 000011

agrees not to engage in or have any financial interest in, either as an officer, agent, stockholder, employee, director, owner or partner, any other business which performs cleaning management services franchising or contract cleaning management sales or any related business: (a) within the Territory covered by this Agreement for a period of two (2) years from the effective date of such sale, assignment, termination, or transfer; and (b) in any other territory covered by a Jani-King Franchise Agreement for a period of one (1) year from the effective date of such sale, assignment, termination or transfer. Franchisee, including officers and directors of Franchisee (where Franchisee is a corporation), during the periods referred to in this subsection, further agrees not to divert or attempt to divert from Jani-King or its Franchisees, by soliciting clients previously serviced by Franchisee or other Jani-King franchisees to perform any business in which Jani-King or its franchisees were engaged in at any time during the twelve (12) months preceding such sale, assignment, termination or transfer.

4.15. Franchisee agrees to pay all personal property, sales, excise, use and other taxes, regardless of type or nature, which may be imposed, levied, assessed or charged, on, against or in connection with any services sold or furnished hereunder, whether from any state, municipality, county or parish, or other governmental unit or agency, which may have jurisdiction over such products, service and equipment.

4.16. Franchisee agrees to timely pay all debts, obligations, and encumbrances that might arise as a result of its operation of a Jani-King Franchise. Franchisee understands that in the event it be adjudicated bankrupt, or becomes insolvent, or a receiver (whether permanent or temporary) of Franchisee's property, or any part thereof, shall be appointed by a Court of competent jurisdiction, or if Franchisee shall make a general assignment for the benefit of creditors, or if any judgment against Franchisee remains unsatisfied for thirty (30) days or longer, or if Franchisee defaults on any payments or obligations due Franchisor or its suppliers or others arising out of the purchase of supplies or the purchase or lease of equipment for use in the operation of a Jani-King Franchise, or if Franchisee infringes, abuses or misuses any of the Jani-King trademarks or trade names, or if the Franchisee fails to comply with any of the provisions of this Agreement except as to performance on customer accounts as set forth below, and has failed to take appropriate corrective action to the satisfaction of Franchisor within thirty (30) days after written notice by Franchisor of such failure or default, then Franchisor may terminate this Agreement and all rights of Franchisee hereunder shall cease at the end of said thirty (30) day period or such longer period as required by law.

4.17. Franchisee agrees to be solely responsible for the services, and results of such services, performed at locations where cleaning and/or maintenance services are performed by Franchisee and Franchisee's representatives and agrees to provide all labor, materials, tools and supplies necessary to service such premises. All of such services will be performed in a good and workmanlike manner, to the satisfaction of the customer for whom such services are performed and in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King. Franchisee understands and agrees that Franchisee is required to maintain a good relationship with each customer serviced by Franchisee, and that Franchisor may inspect any premises serviced by Franchisee at any time to ensure that the quality of service being rendered is in accordance with Jani-King standards.

The following procedures apply if any account we previously offered the right to you to provide services as part of the Initial Finder's Fee Business requests a transfer to another franchisee or cancels the cleaning contract:

(1) If an account cancels or is transferred to a new franchisee due to non-performance, theft, your failure to service the account properly, your failure to maintain good customer relations, or your failure to comply with the Policies and Procedures, we will not replace the account.

(2) If an account cancels at no fault of yours before you service the account for 12 full months, the full gross monthly billing value of that account will be replaced within a reasonable period of time by another account or a combination of accounts, at no additional cost to you. This provision applies until the cumulative time Franchisee

JKB 000012

has provided service to the original account and all replacement account(s) equals 12 months. If any replacement account or combination of accounts has a greater billing rate than the original account, the billing rate in excess of the original account will be applied to the obligation of other Initial Finder's Fee Business, or if the Initial Finder's Fee Business obligation has been fulfilled, Finder's Fees will be charged. Franchisor is not otherwise obligated to replace the accounts that are serviced by Franchisee if the account(s) cancel before the full term of the account.

EXAMPLE: An account with a monthly gross billing of $1,000 per month cancels after 7 months through no fault of yours. We will replace the account with one or more accounts having cumulative gross monthly billing of at least $1,000 per month. If any of the replacement accounts also happen to cancel at no fault of yours at any time during the next 5 months you service the account(s), we will replace the replacement account(s) with other account(s). If the cumulative gross monthly billings of the replacement accounts exceed $1,000, the monthly billing in excess of $1,000 would apply against other Initial Finder's Fee Business obligation, or Finder's Fees will be charged.

   4.17.1.  Franchisee and each of its employees must be in an approved, neat and clean uniform at any time they are performing services at a client's facility. A personal identifying name tag shall be considered a part of the uniform and is required for all personnel while on the premises of an account.

   4.17.2.  Failure of the Franchisee to comply with any provisions of this Agreement or established Jani-King Policies and Procedures within seventy-two (72) hours after Franchisor has given notice to the Franchisee of non-compliance will be sufficient cause for Franchisor to suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee has complied with the provisions, or, at the option of Franchisor, to transfer the right to provide service to the account to another Franchisee, without notice or delay.

   4.17.3.  A representative of Franchisor will inspect the accounts from time to time in order to insure that the service is performed in accordance with the cleaning schedule or instructions associated with the contract between Franchisor and the client and to the performance standards of Jani-King. If at any time, whether through complaint or inspection, a deficiency in performance is discovered, Franchisor can elect to dispatch its own staff to the account and correct all deficiencies in performance. Franchisor has sole discretion in determining urgency and the time frame when dispatching its staff to an account.

   4.17.4.  Franchisee must cooperate fully with Franchisor's staff, and pay a hourly rate ("Service Fee"), plus expenses and travel time, on each occasion Franchisor dispatches its staff to an account in order to correct a deficiency in performance. The Service Fee will be established exclusively by Franchisor from time to time, but will not exceed the rate of $50.00 per "labor hour". In order to promote full compliance with all Jani-King performance standards and policies, a Complaint Fee may also be charged to Franchisee as provided in Section 4.23.

   4.17.5.  If the deficiency in performance requires immediate action to meet the client's demand for a visit or performance of services at the client's premises in less than four (4) hours, and Franchisor is not able to reach the Franchisee, or the Franchisee is not available for an immediate visit or performance of services, the Franchisee will be assessed the Service Fee, plus expenses, for the operations representative's time and effort to satisfy the needs of the customer.

   4.17.6.  In the event Franchisee fails to perform the cleaning services as required by this Section, pursuant to the spirit and intent of this Agreement, and such deficiency shall continue for five (5) days cumulative within a ninety (90) day period, Franchisor may suspend the authority of Franchisee to perform services for any or all accounts serviced by Franchisee, until such time as Franchisor is satisfied that Franchisee will comply with all performance standards and policies, or, at the option of Franchisor, to transfer the account.

JANI-KING OF BOSTON, INC.                    INT /s/    INT _m2 SA,
FRANCHISE AGREEMENT: 4/03                    PAGE 12 OF 30

JKB 000013

4.17.7.  Franchisor may also exercise the option to transfer Franchisee's right to provide service to an account immediately upon receiving a request for transfer or cancellation from the customer or if Franchisee provides any services to any customer and does not report and include such services in their Gross Revenue..

4.17.8.  Franchisee shall waive any and all payments for services which may become due and payable after Franchisor has exercised the option to transfer an account under any of the Sections 4.17.1 through 4.17.7, and shall not be entitled to any refund, rebate or reduction of any fees previously paid or pledged in connection with that customer's contract.  If Franchisor does not exercise any option hereunder, either in part or in full, with regard to any deficiency or default, the election not to exercise any option shall not constitute a waiver of such rights with regard to any subsequent deficiency or default.

4.18.  At Franchisor's request, Franchisee will provide to Franchisor a list of all clients to which Franchisee is providing service and copies of the contracts under which service is being performed.  Franchisee is prohibited, without Franchisor's prior written approval, from disclosing to anyone other than Franchisee's employees the names of the clients or any list of clients to whom Franchisee is providing service.

4.18.1.  Neither Franchisee nor any officer, director or controlling principal of Franchisee shall communicate, divulge or use for the benefit of any other person, persons, partnership, association or corporation during the term of this Agreement and following the expiration or termination of this Agreement, any Confidential Information, as defined herein, knowledge or know-how concerning the methods of operation of the franchised business which may be communicated to them or of which they may be apprised in connection with the operation of the Franchise under the terms of this Agreement.  Franchisee and Controlling Principals shall divulge such confidential information only to such of Franchisee's employees as must have access to it in order to operate the Franchise.  Any and all information, knowledge, know-how, techniques and any materials used in or related to the  Jani-King system of doing business (hereinafter referred to as the "System") which Franchisor provides to Franchisee in connection with this Agreement, whether or not expressly marked or labeled confidential, shall be deemed confidential for purposes of this Agreement.  Neither Franchisee nor the Controlling Principals shall at any time, without Franchisor's prior written consent, copy, duplicate, record or otherwise make the same available to any unauthorized person.  The covenant in this Section shall survive the expiration, termination or transfer of this Agreement or any interest herein and shall be perpetually binding upon Franchisee and each of the Controlling Principals.

4.19.1.  In the event Franchisee voluntarily wishes to discontinue providing service to an account, Franchisee must notify Franchisor, in writing.  If the account's monthly billing amount is less than $10,000, the written request must be made at least ten (10) days prior to the desired date of transfer.  If the account's monthly billing is $10,000 or more, the written request must be made at least thirty (30) days prior to the desired date of transfer.  Upon Franchisor's receipt of Franchisee's request to discontinue providing service or in the event Franchisee fails to provide service to an account for a period of two (2) days, for any reason, Franchisor reserves the right to service the account or to offer the right to provide service to another franchisee.  In either event, Franchisee agrees that  any and all payments (regardless of when services were rendered) which paid after Franchisee no longer services the account will be waived by Franchisee, and Franchisee shall not be entitled to any refund or rebate of any fees paid or pledged previously to Franchisor for such business.

4.19.2.  All contracts under which terms services are provided by any Jani-King franchisee are the sole property of Jani-King.  The Franchisee may solicit potential clients to provide cleaning and maintenance services through their franchise.  However, all contracts for the provision of services by Franchisee must be drafted by Jani-King and must name Jani-King as the sole party to the contract (other than the client).

4.20.  Upon termination or non-renewal of this Agreement for any reason, Franchisee shall immediately and permanently cease all use of Jani-King trademarks, trade names, trade secrets, and all aspects of the System, and shall cease indicating verbally or in writing to clients and any other franchisee that it is still a Jani-King franchisee.  Franchisee shall immediately return to Jani-King all advertising matter, products or writings that

contain Jani-King's trade name, logo or copyright, as well as any information of a proprietary nature such as lists and files pertaining to customers, operational documents and similar information. All such lists, files and the information contained therein shall remain the exclusive property of Franchisor. Any keys to buildings, security passes, and codes shall be delivered by Franchisee to Franchisor at the time the Franchisee ceases providing service. In the event Franchisee fails to deliver all keys, security passes, and codes to Franchisor, Franchisee hereby agrees to pay all costs and expenses incurred by Franchisor resulting from Franchisees failure to return these items.

4.21.  If this Agreement is terminated or not renewed for any reason, such termination or non-renewal shall not be effective until Franchisee surrenders to Franchisor all property belonging to Franchisor including, but not limited to, keys to all clients' buildings and all contracts between Franchisor and Client. Franchisee agrees that the above-named items are the property of Franchisor. Franchisee must also pay, in full, all amounts owed to Franchisor at the date of termination or non-renewal and surrender any and all equipment belonging to Jani-King. Until Franchisee complies with each obligation hereunder, this Agreement shall be deemed effective and not terminated. Once Franchisee has, in Franchisor's sole opinion, complied with this paragraph, this Agreement shall be deemed terminated.

4.22.  If Franchisee has proclaimed to have terminated or not renewed the Agreement and refused to surrender the items described herein, Franchisee agrees to pay Franchisor One Thousand dollars ($1,000.00) per day for each day that it has not complied with the foregoing paragraph. The parties acknowledge that damages for Franchisee's failure to adhere to the foregoing paragraph are difficult to ascertain and therefore agree that this amount shall be payable as liquidated damages and not as a penalty.

4.23.  In order to promote full compliance with all Jani-King performance standards and policies, a Fifty dollar ($50.00) complaint fee ("Complaint Fee") will be charged to any Franchisee who does not respond to or who has not serviced a customer complaint within the time frames allotted for initial response or corrective action and which require Franchisor's representatives to respond to the complaint. "Serviced" or "respond to" the complaint in this case means communicating with the client to determine the nature of the complaint and what needs to be done to resolve the situation, and to provide the customer relations necessary to try to protect the account from cancellation or damages to Jani-King's goodwill and does not mean providing cleaning or maintenance services to the customer to resolve a complaint. An additional Service Fee, as stated in Section 4.17.4 above, will be assessed, plus expenses (i.e., labor, materials, supplies, equipment, etc.), for all Franchisor's representatives' time required to resolve a complaint. A Complaint Fee will be charged under the following circumstances:

If at any time, whether through complaint or inspection, a deficiency in performance is discovered concerning the services provided by Franchisee, Franchisor will attempt to contact Franchisee during the four (4) hour period immediately following the discovery of the deficiency (attempting a contact a minimum of once each hour) and report the complaint to Franchisee.

The Complaint Fee, plus the Service Fee and expenses, will be charged under either of the following conditions:

(a)  Franchisor cannot locate the Franchisee during the above described four (4) hour period and Franchisor must respond to the complaint; or,

(b)  if the complaint was made known to Franchisee, and after two (2) hours following the opening of the client's business the following morning, the deficiency in performance has not been corrected to the satisfaction of the client and Franchisor resulting in Franchisor responding to the complaint.

THIS SPACE INTENTIONALLY LEFT BLANK

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT _____ INT _____
PAGE 14 OF 30

JKB 000015

4.23.1. The Fifty Dollar ($50.00) Complaint Fee, plus the Service Fee and expenses, will be charged to the Franchisee responsible for the complaint even if the account must be transferred to save it or if the account terminates for non-performance. The fees will be payable in the month they are incurred.

4.24. Franchisor reserves the right to establish company policies and/or procedures pertaining to the operation of Franchisee's franchised business or this Agreement. Franchisee agrees to be bound by the policies and/or procedures upon receipt of same by Franchisee. Franchisor shall keep a current, updated manual of all such policies and procedures at Franchisor's corporate office. In the event that policies and procedures kept by Franchisor differ from those kept by Franchisee, the policies and procedures maintained in Franchisor's corporate office manual shall be controlling.

4.25. The Franchisee acknowledges that the System must continue to evolve in order to reflect the changing market and to meet new and changing customer demands, and that accordingly, variations and additions to the System may be required from time to time in order to preserve and enhance the public image of the System and to ensure the continuing operational efficiency of franchisees operating within the System. Accordingly, Franchisee agrees that Franchisor may, from time to time, hereafter or otherwise change the System, including, without limitation, the adoption and use of new or modified trademarks, products, services, equipment and furnishings and new techniques and methodologies relating to the preparation, sale, promotion and marketing of service and supplies. Franchisee agrees to promptly accept, implement, use, and display in the operation of the franchise business all such additions, modifications and changes at its sole cost and expense.

4.26. Franchisee agrees that if it or any of its employees develop any new concept, process or improvement in the operation or promotion of the business franchised under this Agreement, it will promptly notify Franchisor and provide Franchisor with all necessary information concerning same, without compensation. Franchisee acknowledges that any such concept, process or improvement shall become the property of Franchisor, and Franchisor may utilize or disclose such information to other franchisees as it determines to be appropriate.

## SECTION 5

## NONCOMPETITION

5.1. Franchisor agrees to provide Franchisee with valuable initial and ongoing specialized training, trade secrets and proprietary and confidential information, including, pursuant to this Agreement and in connection with Franchisee's duties and obligations under this Agreement. The initial specialized training provides training in Jani-King methods and practices of professional cleaning services, management, sales and promotional techniques, and includes information about production procedures and rates, marketing, and management matters. The ongoing specialized training includes updated information of the type provided in the initial training, as well as additional training and information compiled and developed over time as the System evolves. The trade secret, proprietary, and confidential information (hereinafter collectively referred to as "Confidential Information") includes but is not limited to the System, as defined herein, which includes but is not limited to information regarding the operational, sales, promotional methods and techniques, and marketing methods and techniques of Franchisor and the Jani-King program. Such information includes but is not limited to (a) Jani-King's manuals and forms, the information contained and compiled therein, and the updates and memoranda thereto; (b) names of Jani-King's agents, suppliers, and customers, and their requirements, specifications, and preferences; (c) the contractual arrangements between Jani-King and its agents, suppliers, and customers; (d) the financial details (including but not limited to credit and discount terms) of Jani-King's relationship with its agents, suppliers, or customers; (e) the names of prospective Jani-King customers and their requirements, specifications, and preferences; (f) information concerning the remuneration paid by Jani-King to

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT *[initials]* INT *[initials]*
PAGE 15 OF 30

JKB 000016

its employees; (g) Jani-King's accounting software and forms; (h) information concerning and presented at Jani-King meetings; (i) security and access information; (j) information provided through initial and ongoing specialized training; and (k) Jani-King's business plans and strategies. Further, such information is over and above the ordinary skills and experience possessed by Franchisee, Franchisee's partners, and employees prior to execution of this Agreement. Franchisee acknowledges that, whether or not the initial and ongoing specialized training or Confidential Information is denoted, labeled or marked as confidential, Franchisor considers such training and Confidential Information to be, and treats it as, confidential.

5.2.    In consideration for the valuable initial and ongoing specialized training and Confidential Information described above, Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees as follows:

5.2.1. Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees that Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not at any time, both during and after,  the term of this Agreement, communicate or disclose to any person or entity (other than Franchisor or a person or entity expressly designated by Franchisor in writing), or use outside the scope of the business governed by this Agreement, any of the initial or ongoing specialized training or Confidential Information acquired by Franchisee (including the officers and directors of Franchisee, if Franchisee is a corporation) or Franchisee's employees during the term of this Agreement.

5.2.2  Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees to use all reasonable efforts to maintain as confidential the initial and ongoing specialized training and Confidential Information. Accordingly, Franchisee (including officers and director of Franchisee, if Franchisee is a corporation) agrees that Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not at any time duplicate, copy, record, or otherwise reproduce, in whole or in part, materials containing Confidential Information and/or information imparted through initial and/or ongoing specialized training, except as expressly authorized in writing by Franchisor.

5.2.3. Franchisee (including officers and directors of Franchisee, if Franchisee is a corporation) agrees that, during the term of this Agreement and for a continuous uninterrupted period of (2) years thereafter (unless otherwise specified in this Section 5) commencing upon expiration or termination of this Agreement, regardless of the cause for termination, except as otherwise approved in writing by Franchisor, Franchisee, the officers or directors of Franchisee (if any), and Franchisee's employees shall not, directly or indirectly, for itself/themselves or through, on behalf of, or in conjunction with any person, persons, partnership or corporation:

(a) Divert or attempt to divert to any competitor, by direct or indirect inducement or otherwise, any business or customer of the business franchised hereunder or any Jani-King franchisee anywhere;

(b) Do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's trademarks or trade names or the  Jani-King franchise program;

(c) Employ, seek to employ, or otherwise directly or indirectly induce to leave his/her employment any person who is employed by or has been employed within the previous twelve (12) months by Franchisor or by any of Franchisor's affiliated companies or by any other franchisee of Franchisor;

(d) Own, maintain, operate, engage in or have any interest in any business (hereinafter referred to as "Competing Business") which is the same as or similar to the business franchised under the terms of this Agreement, which Competing Business operates, solicits business, or is intended to operate or solicit business: (i) within the  Territory of this Agreement; and (ii) for a period of one (1) year commencing upon expiration or termination of this Agreement (regardless of the cause for termination), in any other territory in which a Jani-King franchise operates.

JKB 000017

5.3.  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this section is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which Franchisor is a party, Franchisee (including Franchisee's officers and directors, if Franchisee is a corporation) expressly agrees that Franchisee, Franchisee's officers and directors (if any), and Franchisee's employees will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section.

5.4  Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section, or any portion thereof, without its consent, effective immediately upon written notice to Franchisee; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which modified covenant shall be fully enforceable notwithstanding the provisions of any other Sections hereof.

5.5.  Franchisee acknowledges that any materials and information provided to Franchisee (including Franchisee's officers and directors, if Franchisee is a corporation) and/or to Franchisee's employees by Franchisor will at all times be and remain the property of Franchisor.  Franchisee also acknowledges that any materials, concept, process, or improvement developed in the operation or promotion of the business governed by this Agreement by Franchisee (including its officers and directors, if Franchisee is a corporation) and/or Franchisee's employees will at all times be and remain the property of Franchisor.  Franchisee agrees to give Franchisor notice of and all necessary information related to such development(s).  Upon sale, assignment, termination, expiration, or transfer of this Agreement, Franchisee shall deliver to Franchisor all property belonging to Franchisor (including but not limited to the materials described above) and/or relating to Franchisor's business.  In addition, upon sale, assignment, termination, expiration, or transfer to this Agreement, Franchisee agrees to provide Franchisor, upon Franchisor's request, with a list of all customers that Franchisee is servicing or has serviced on or at any time during the twelve (12) months preceding the date of such sale, assignment, termination, expiration, or transfer, and a copy of any contracts under which the service is or was provided.

5.6.  Franchisee expressly agrees that the existence of any claims that Franchisee, Franchisee's officers and directors (if any), or Franchisee's employees may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section. Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees and all costs of court) incurred by Franchisor in connection with the enforcement of this  Section of this Agreement.

5.7.  Franchisee acknowledges that a violation of any of the terms of this Section would result in irreparable injury to Franchisor for which no adequate remedy at law may be available.  Franchisee acknowledges that the initial and ongoing specialized training and Confidential Information described herein have been developed and compiled through Jani-King's time and effort in the industry and provide a blueprint for Jani-King's business.  Accordingly, Franchisee acknowledges that, in addition to Franchisor's remedies at law, Franchisor may seek and obtain preliminary and permanent injunctive relief restraining the breach or threatened breach by Franchisee; and Franchisee consents to the issuance of an injunction prohibiting any conduct by Franchisee in violation of this Section.

5.8.  Franchisee shall require and obtain execution of covenants similar to those set forth in this Section (including covenants applicable upon and after the termination of a person's relationship with Franchisee) from any or all officers, directors, managers and other  employees of Franchisee who have received or will receive initial and/or ongoing specialized training or Confidential Information directly or indirectly from Franchisor. Every covenant required by this Paragraph shall be in a form satisfactory to Franchisor, including, without limitation, specific and express identification of Franchisor as a third party beneficiary of such covenants with the

JKB 000018

independent right to enforce them. Failure by Franchisee to obtain execution of a covenant required herein shall constitute a material event of default under the terms of this Agreement.

## SECTION 6

## FRANCHISOR PLEDGES

6.1.1. To offer Franchisee the opportunity to provide service to Franchisor's contracts located within the Territory, as defined herein, which have minimum cumulative gross monthly billings in an amount at least equal to the amount defined as the "Initial Finder's Fee Business" in the Franchise Summary. The contracts under which Franchisee will provide service are and will remain the property of Franchisor. The right to provide service to the Initial Finder's Fee Business will be offered within the number of days identified in the Franchise Summary as the "Initial Offering Period." The Initial Offering Period will begin on the date after (i) all required equipment and supplies have been obtained by Franchisee, (ii) Franchisee has successfully completed training as indicated by Franchisee's signing and returning to Franchisor the Acknowledgment of Completion of Training and (iii) Franchisee's delivery to Franchisor of written proof that Franchisee has obtain the insurance required under this Agreement. Notwithstanding, the Initial Offering Period may begin at a later date if requested by Franchisee and agreed to by Franchisor, or as provided below.

6.1.2. The actual time to secure and offer, as described above, the Initial Finder's Fee Business to the Franchisee may, at Franchisor's sole discretion, be automatically extended under the following conditions: (1) if Franchisee requests a delay in the offering of the Initial Finder's Fee Business; (2) if Franchisee is in default under the terms and conditions of the Franchise Agreement or any other agreements between Franchisee and Franchisor; or (3) if any of the Initial Finder's Fee Business previously provided to Franchisee requests a transfer to another Franchisee or requests to be cancelled due to non-performance in which case Franchisee is required to repeat and complete to Franchisor's satisfaction all training classes required by Franchisor. In the event of the occurrence of any of the above conditions, Franchisor will have the remainder of the Initial Offering Period or a minimum of 120 days, which ever is longer, from the date: (1) Franchisee notifies Franchisor that they are ready to accept the right to service other business and has provided any documentation required under the Policies and Procedures; (2) Franchisee has cured any default; or (3) the acknowledgment of retraining is signed, to offer the balance of Initial Finder's Fee Business to Franchisee. Franchisor does not guaranty that the Initial Finder's Fee Business will reach or remain at the level stated on the Franchise Summary throughout the term of the Franchise Agreement.

6.2. To provide Franchisee with the Office Supply and Advertising Package outlined in Schedule One of this Agreement.

6.3. To make available to Franchisee applicable confidential manuals, training aids and other pertinent information concerning Jani-King methods and practices.

6.4. To provide an initial local training program to include Jani-King cleaning methods, systems and programs using established Jani-King procedures and forms. Franchisee agrees to successfully complete the training within six (6) months after the date of this Agreement.

6.5. To offer Franchisee the right to provide service to Jani-King clients until Franchisee has been offered the right to provide service to Jani-King clients with cumulative gross monthly billings in an amount equal to or greater than the Initial Finder's Fee Business and.

6.6. To provide additional training and support for Franchisee at reasonable rates as established by Jani-King policies and procedures, currently at a rate of Fifty Dollars ($50.00) per hour, plus expenses.

JKB 000019

6.7. To allow Franchisee the non-exclusive right to use the Jani-King marks, insignia, logo, design and color scheme in the Territory subject to limitations and restrictions herein, and to allow Franchisee to utilize the processes, methods, materials, equipment and promotional plans developed by Jani-King.

6.8. To permit Franchisee the right to profit from its efforts, commensurate with its status as owner of its business, and correspondingly, to bear the risk of loss or failure that is characteristic of this status.

6.9. To make available to Franchisee the System and to provide Franchisee with new developments in the cleaning services industry at the discretion of and as determined by Franchisor.

6.10. To make available for Franchisee, at Franchisor's discretion and at a reasonable cost, promotional materials, sales and service manuals, equipment and other materials relevant to the operation of a Jani-King franchise.

## SECTION 7

## ADDITIONAL SERVICES

7.1. There are no additional services provided by Franchisor to Franchisee except as explicitly set out in this Agreement.

## SECTION 8

## DEFAULT AND TERMINATION

8.1. Franchisee shall be deemed to be in default, and Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee, either by mailing or hand delivery, upon the occurrence of any of the following events:

(a) If Franchisee or any of its Principals is convicted of, pleads guilty or no contest to, or receives deferred adjudication for a felony, a crime involving theft, a crime involving moral turpitude, or any other crime or offense that is reasonably likely, in the sole opinion of Franchisor, to adversely affect the Jani-King franchise program, any Jani-King trademarks, trade names or the goodwill associated therewith or Franchisor's interest therein.

(b) If Franchisee or any of its Principals discloses or divulges the contents of any Confidential Information, or any other trade secrets or confidential information provided to Franchisee by Franchisor in violation of the terms and conditions of this Agreement.

(c) If Franchisee abandons the Jani-King Franchise business or otherwise forfeits the right to do or transact business in the Territory where the licensed business is located.

(d) If Franchisee or any of its Principals purport to transfer any rights or obligations under this Agreement to any third party without the Franchisor's prior written consent.

(e) If Franchisee makes any material misrepresentations or untrue or false statements on the franchise application or in other correspondence relating to the acquisition of the franchise business.

JANI-KING OF BOSTON, INC.                          INT _____  INT _____
FRANCHISE AGREEMENT: 4/03                         PAGE 19 OF 30

(f) If the Franchisee repeatedly fails to comply with one or more requirements of the Agreement, any operations procedure, or Jani-King Policies and Procedures, whether or not corrected after notice;

(g) If Franchisee fails to comply with any provision of this Agreement, any other agreement between Franchisor and Franchisee, and thereafter fails to cure such default to the satisfaction of the Franchisor within thirty (30) days after written notice has been given thereof. Defaults by the Franchisee shall include, without limitation, the occurrence of any of the following events:

(i) If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its subsidiaries or affiliates when due, or to submit the financial information required by Franchisor under this Agreement, or makes any false statements in connection therewith.

(ii) If Franchisee fails to maintain the standards that Franchisor requires in this Agreement or any other standards contained in Jani-King manuals, including the Jani-King Policies and Procedures manual.

(iii) If Franchisee engages in conduct which reflects unfavorably upon the operation or reputation of the Jani-King franchise business or System.

(iv) If Franchisee fails, refuses, or neglects to obtain the Franchisor's prior written approval or consent as required by this Agreement, other than as provided in Section 8.1(d).

(v) If Franchisee or any of its Principals misuses or makes any unauthorized use of the Jani-King proprietary trademarks, trade names, service marks or other materials, including any forms of advertising, or otherwise materially impairs the goodwill associated with the Jani-King name or Franchisor's rights.

(vi) If Franchisee is declared insolvent or bankrupt, or makes any assignment or trust mortgage for the benefit of creditors, or if a receiver, guardian, conservator, trustee in bankruptcy or similar officer shall be appointed to take charge of all or a part of Franchisee's property by a court of competent jurisdiction. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A., Sec. 101 et seq.)

8.2.  The termination of this Agreement shall be without prejudice to any remedy or cause of action which Jani-King may have against Franchisee for the recovery of any monies due Jani-King or any equipment or property of Jani-King, or to any other right of Jani-King to recover damages for any breach hereof.

8.3.  If the provisions of this Agreement provide for periods of notice less than those required by applicable state law, or provide for termination, cancellation, non-renewal or the like other than in accordance with applicable state law, Section 11.2.2. of this Franchise Agreement shall apply.

## SECTION 9

## TERM AND EXTENSION

9.1.  Subject to Section 9.2 herein, this Agreement and the franchise and license granted hereunder, unless sooner terminated, shall be and remain in full force and effect for a period of twenty (20) years from and after the Effective Date of this Agreement which is the date identified in the Franchise Summary. This Agreement shall expire 20 years after the Effective Date unless extended pursuant to the terms contained herein.

9.2.  Provided Franchisee is not in default of this Agreement and provided Franchisee has delivered to Franchisor the required notice, Franchisee shall have the option to renew this Agreement for an additional period

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT _____  INT _____
PAGE 20 OF 30

of twenty (20) years and for three (3) subsequent, additional twenty (20) year periods following the first extension (a total of one hundred (100) years when initial periods and renewal terms are combined). Prior to the expiration of each 20 year term, Franchisee must notify Franchisor, in writing, of its intention to renew the Agreement not less than seven (7) months nor more than twelve (12) months prior to the end of the then current term.

9.3. As a condition to and at the time of any renewal, Franchisee is required to execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its subsidiaries, and their respective officers, directors, agents and employees in their corporate and individual capacities, including without limitation, claims arising under this Agreement and any federal, state and local laws, rules and ordinances.

9.4. As a further condition to and at the time of any renewal, Franchisee agrees to execute Franchisor's most recent standard franchise agreement being used by Franchisor which may differ substantially from the agreement under which the Franchisee has operated and any other ancillary agreements and documents as Franchisor may require. Franchisee understands that the most current, executed agreement between Franchisee and Franchisor will govern relations between Franchisor and Franchisee for the following Twenty (20) years. However, no additional Initial Franchise Fee or renewal fee shall be paid by Franchisee at the time of renewal, nor shall Franchisor be obligated to provide any additional Initial Finder's Fee Business or training.

## SECTION 10

## TRANSFER

10.1. This Agreement shall inure to the benefit of the successors and assigns of Franchisee. The interests of Franchisee in this Agreement are personal and may not be sold, assigned, transferred, shared or divided in any manner by Franchisee without the written consent of Franchisor, which consent shall not be unreasonably withheld. Franchisee shall provide to Franchisor prior to the sale or transfer, a copy of any written agreements relating to the proposed sale or transfer, or any additional information which Franchisor may require in order to determine if it will grant its consent to the proposed sale or transfer. For purposes of this Agreement, any change in stock ownership, voting or other control whatsoever of a corporation or partnership which acts as a Franchisee under this Agreement constitutes a transfer. Any transaction or series of transactions which would have such an effect must be approved by Franchisor on the same basis as any other sale or transfer as set forth herein. Franchisee hereby covenants and warrants (i) that its certificate or articles of incorporation, corporate charter, by-laws and/or partnership agreement limit transfers as described in this Section 11, and (ii) if Franchisee is a corporation, that each security shall bear a legend (in a form to which Franchisor consents) indicating that any transfer is subject to this Section 11, or if Franchisee is a partnership, that its partnership agreement shall provide (in a form to which Franchisor consents) that all transfers are subject to this Section 11.

10.2. Franchisee agrees to pay to Franchisor the greater of Two Thousand Dollars ($2,000.00) or ten percent (10%) of the sales price or exchanged value as a transfer fee (the "Transfer Fee"). This Transfer Fee must be paid before Franchisor will grant consent to the sale or transfer. If no monetary consideration or other exchange of value is made for the transfer of a franchise, no Transfer Fee will be charged for a transfer to: (1) any party currently holding an interest in the franchise at the time of the transfer; (2) a controlled corporation in which the current owners of the Franchise retain ninety (90%) percent or greater of the outstanding shares of stock; or (3) if the transfer is to an immediate family member of the current owner (for the purposes of this Section 10.2, family members include Franchisee's mother, father, brother, sister, and children only), whether a life time transfer or upon death. An administrative fee will be charged to cover necessary and reasonable costs and preparation of the documents associated with the transfer if no Transfer Fee is assessed. The current administrative fee is $250.00, but may be increased by Franchisor in the future.

10.3. Prior to the sale or transfer of the franchise, Franchisee will provide to Franchisor a copy of any written agreements relating to the proposed sale or transfer or any additional information which Franchisor may

JKB 000022

require in order to determine if it will grant consent to the proposed sale or transfer. It is agreed that consent for sale, transfer or assignment will be granted only when: (a) all obligations under the terms of this Agreement have been fulfilled, (b) all money owed by Franchisee to Franchisor and Franchisor's affiliates have been paid in full, (c) the purchaser of the franchise agrees to undergo the training required of a new Jani-King franchisee and (d) the purchaser of the franchise agrees to execute Franchisor's most current franchise agreement which may differ substantially from this Agreement.

10.4.  Franchisee also agrees to provide, as a condition of Franchisor's consent to the sale, transfer, or assignment, a personal covenant to the purchaser not to compete in the cleaning and/or maintenance services industry, nor to seek to divert business from Franchisor or its franchisees for a period of two (2) years after transfer or sale.  This covenant is in addition to the non-compete covenants contained in this Agreement.  The transferor must also execute a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor, Franchisor's parent corporation and affiliated corporations, and the officers, directors, shareholders and employees of Franchisor and each parent and affiliate corporation in their corporate and individual capacities including, without limitation, claims arising under this Agreement and federal, state and local laws, rules and ordinances.

10.5.  This Agreement is fully assignable by Franchisor and shall inure to the benefit of any assignee or other legal successor to the interest of Franchisor.

## SECTION 11

## RIGHT OF FIRST REFUSAL

11.1.  In the event Franchisee receives a bona fide arms-length offer to purchase Franchisee's interest in this Agreement (or in the business conducted hereunder) from any third party, or in the event Franchisee proposes to convert, assign, or otherwise transfer Franchisee's interest in this Agreement (or in the business conducted hereunder), in whole or in part, to any third party, Franchisee hereby agrees to offer to Franchisor a first right to purchase or otherwise receive Franchisee's interest under the same terms and conditions offered to or accepted from the third party (the "Right of First Refusal").  Franchisee's failure to offer to Franchisor the Right of First Refusal will be an act of default of the terms of this Agreement.  Notwithstanding anything contained herein to the contrary, Franchisee shall not be obligated to offer Franchisor the Right of First Refusal sale, assignment, or transfer is solely between Franchisee and either (a) a corporation whose original sole shareholders are individuals who comprise the original Franchisee and/or (b) the immediate family of Franchisee or the immediate family of the individuals described in (a) herein.  For the purpose of this section, immediate family shall mean the spouse, children, siblings, or parents of Franchisee only.

11.2.  Franchisee shall make available to Franchisor in a written statement verified by Franchisee the terms of the offer received or made by Franchisee, and Franchisor shall have thirty (30) days from the receipt of said statement to either accept or refuse such offer.  Written notice of Franchisor's decision to accept or refuse said offer shall be delivered to Franchisee.  Acceptance by Franchisor shall be at the same price and on the same terms set forth in the written statement submitted by Franchisee.

11.3.  In the event Franchisor fails to accept the offer within the thirty-day (30) period, Franchisee shall be free to effect the disposition described in the statement upon the exact terms set forth in the statement delivered to Franchisor, provided that nothing in this paragraph shall be interpreted as limiting the requirements of Section 10 hereof relating to transfer of the Agreement.

11.4.  Furthermore, in the event Franchisee is insolvent, or upon the filing of any petition by or against Franchisee under any provisions of any bankruptcy law, Franchisor shall have the first right to purchase the business conducted by Franchisee, for an amount and pursuant to terms established by an independent appraiser selected by Franchisor.

JKB 000023

# SECTION 12

## GENERAL

12.1.  Nothing in this Agreement shall be construed to prevent Franchisee from freely setting its own prices and discounts for services and products which it may render or sell provided such actions do not affect the business of Franchisor.

12.2.1.  Should any part of this Agreement for any reason be declared invalid or unenforceable, such decision shall not affect the validity of the remaining portion, which remaining portion shall remain in full force and effect as if this Agreement had been executed with the invalid or unenforceable portion eliminated, and the parties to this Agreement agree that they would have executed the remaining portion of this Agreement without including any such part, parts, or portion which may, for any reason, hereafter be declared invalid or unenforceable.

12.2.2.  If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination of or refusal to renew this Agreement than is required hereunder, or the taking of some other action not required hereunder, or if under any applicable and binding law or rule of any jurisdiction, any provision of the Agreement or any specification, standard or operating procedure prescribed by Franchisor is invalid or unenforceable, the prior notice and/or other action required by such law or rule shall be substituted for the comparable provisions hereof, and Franchisor shall have the right, in its sole discretion, to modify such invalid or unenforceable provision, specification, standard or operating procedure to the extent required to be valid and enforceable.  Franchisee agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is comprehended within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof, or any specification, standard or operating procedure prescribed by Franchisor, any portion or portions which a court may hold to be unenforceable in a final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.  Such modifications to this Agreement shall be effective only in such jurisdiction, unless Franchisor elects to give them greater applicability, and shall be enforced as originally made and entered into in all the jurisdictions.

12.3.  This Agreement, the Policies and Procedures manual, and the applicable information disclosed in the Uniform Franchise Offering Circular provided to Franchisee as part of this transaction constitutes the entire agreement between the parties and supersedes any and all agreements, verbal or written, including any other franchise agreement, previously made between the parties herein.  All transactions between Franchisee and Franchisor regarding any operation of a Jani-King franchise business granted under any franchise agreement dated prior to this Agreement shall be controlled by this Agreement and the most current publication of the Jani-King Policies and Procedures Manual.  Any amendment or modification to this Agreement is invalid unless made in writing and signed by all the parties.

12.4.  Franchisee acknowledges that neither Franchisor nor anyone on its behalf has made any representations, promises or agreements, orally or otherwise, respecting the subject matter of this Agreement which are not embodied herein.

12.4.1.  Franchisee acknowledges that it has carefully read this Agreement, that ample opportunity has been provided for Franchisee to obtain the services of an independent legal or financial advisor, and that Franchisee has had the opportunity to have this Agreement and all supporting disclosure documentation, as well as any other information gathered by the Franchisee, reviewed by an attorney or financial advisor of its own choice.

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT _____ INT _____
PAGE 23 OF 30

JKB 000024

12.4.2. Franchisee further acknowledges that Franchisor does not authorize any representative of Franchisor to make any oral, written, visual or other claim or representation that are not contained in the Uniform Franchise Offering Circular provided to Franchisee by Franchisor and does not permit any promises, agreements, contracts, commitments or representations to be made to Franchisee except those stated in this Agreement.

12.5. Franchisor may also conduct the type of business operated by the Franchisee.

12.6. This sub-section intentionally left blank.

12.7. It is agreed and understood that Franchisee will act at all times as an independent contractor and will not, at any time, directly or indirectly, hold itself out as an agent, servant or employee of Franchisor.

12.8. No waiver by Franchisor of any default in performance on the part of Franchisee, time being of the essence, or like waiver by Franchisor of any breach or series of breaches, of any of the terms, covenants and conditions of this Agreement shall constitute a waiver of any subsequent breach or waiver of said terms, conditions or covenants.

12.9. Any notice required or permitted under this Agreement must be in writing and delivered by personal delivery service or by deposit in the U.S. mail, certified, return receipt requested or by a recognized express delivery service providing written receipt of delivery at the address listed for the Franchisee in the Franchise Summary or to Franchisor at the following address:

Jani-King of Boston, Inc.
6 Lincoln Knoll Lane, Suite 104
Burlington, Massachusetts 01803

A party to this Agreement may change its notice information by providing written notice to the other parties pursuant to the notice requirements stated above, and such change shall be effective as to each other party on the tenth (10th) day after delivery to such other party.

12.10. THE PARTIES AGREE AND INTEND THIS INSTRUMENT TO BE EXECUTED, INTERPRETED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REFERENCE TO CONFLICT OF LAWS PRINCIPLES. TEXAS LAW SHALL APPLY TO ALL CLAIMS, DISPUTES, AND DISAGREEMENTS BETWEEN THE PARTIES, WHETHER ARISING FROM ALLEGED BREACHES OF THE CONTRACT OR AGREEMENT OR OTHER CLAIMS ARISING IN ANY WAY FROM THE PARTIES' DEALINGS. JURISDICTION AND VENUE IS DECLARED TO BE EXCLUSIVELY IN DALLAS COUNTY, IN THE STATE OF TEXAS.

12.11. The submission of this Agreement does not constitute an offer to license, and this Agreement shall become effective only upon execution thereof by Franchisor and Franchisee and the compliance with section 12.13.

12.12. THE PARTIES AGREE THAT ANY DAMAGES SOUGHT BY OR AWARDED TO FRANCHISEE SHALL BE LIMITED TO FRANCHISEE'S TOTAL INVESTMENT WITH FRANCHISOR, AND NO PUNITIVE OR EXEMPLARY DAMAGES WILL BE AWARDED TO FRANCHISEE.

12.13. This Agreement shall not be binding on Franchisor unless and until it has been accepted and signed by an officer or director of Franchisor at Franchisor's home office in Addison, Dallas County, Texas.

12.14. The numbers and headings of paragraphs used herein are for convenience only and do not affect the substance of the paragraphs themselves.

JANI-KING OF BOSTON, INC.                    INT _W_  INT _mgp_
FRANCHISE AGREEMENT: 4/03                     PAGE 24 OF 30

JKB 000025

12.15. Franchisee certifies and warrants that all owners and spouses of owners or partners, if the franchise is a sole proprietorship or partnership; and all persons who are a shareholder, officer or director of any corporation who holds the franchise: (1) are listed in the attached SCHEDULE OF PRINCIPALS; and (2) that all such parties will execute all Guarantees or other documents required by JANI-KING.

IN WITNESS WHEREOF, the parties hereto have set their hands this *27* day of *August*, 2*003*.

JANI-KING OF BOSTON, INC.

BY: _____

TITLE: _____Regional Director_____

FRANCHISEE

*Mariette L. S Barros*
(Signature of Owner, Partner or Authorized Officer)

Mariette L.S. Barros
(Print Name)
Social Security # *069 18 4324*

By: (Signature of Partner or Spouse)

_____
(Print Name)
Social Security #_____

By: (Signature of Partner or Spouse)

_____
(Print Name)
Social Security #_____

COMPLETE IF FOR CORPORATION:

_____
(Corporate Name)

_____
(Title of Authorized Officer)
Federal Tax ID#: _____

ACCEPTED by the Home Office of Franchisor on this *9* day of *September*, *2003*

BY: _____
Authorized Representative

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT___ INT___
PAGE 25 OF 30

JKB 000026

## SCHEDULE OF PRINCIPALS

ANY OTHER PERSON NOT LISTED IN THIS AGREEMENT WHO IS A SPOUSE, PARTNER, OR AN OFFICER, DIRECTOR OR SHAREHOLDER OF FRANCHISEE:

Name:
Relationship:
Taxpayer ID:
Address:

Telephone:


Name:
Relationship:
Taxpayer ID:
Address:

Telephone:


Name:
Relationship:
Taxpayer ID:
Address:

Telephone:


Name:
Relationship:
Taxpayer ID:
Address:

Telephone:


JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT____ INT____
PAGE 26 OF 30

JKB 000027

**SCHEDULE ONE**
**"OFFICE SUPPLY AND ADVERTISING PACKAGE"**

LIST OF MATERIALS PROVIDED TO FRANCHISEE
PURSUANT TO THE FRANCHISE AGREEMENT

| ITEM | AMOUNT |
|---|---|
| Business Cards (imprinted logo) | 1,000 |
| JANI-KING Logo/Border Paper (matching envelopes) | 100 |
| Color Tri-Fold | 50 |
| JANI-KING Tunics | 3 |
| JANI-KING Golf Shirt | 1 |
| JANI-KING Polo Shirts | 4 |
| Inspection Pads | 5 |
| Memo Pads | 5 |
| Past Performance Pads | 5 |
| Account Bid Sheet Pad | 1 pad |
| Contact Evaluation Pad (replace as needed) | 1 pad |
| JANI-KING Logo Binders | 2 |
| JANI-KING Executive Pad Holder | 1 |
| JANI-KING Tri-fold Pad Holder | 1 |
| JANI-KING Training Tapes | 1 set |
| JANI-KING Trust Your Keys Video | 1 |
| JANI-KING Customer Relations Handbook | 1 |
| Account Follow-up Sheets (replace as needed) | 5 |
| New Account Start-Up (replace as needed) | 5 |
| Initial Clean Sign-Off Sheets (replace as needed) | 5 |
| Franchisee Request Cards (replace as needed) | 5 |
| Authorization for Extra Work Forms (replace as needed) | 5 |
| JANI-KING Business Card Order Forms | As Needed |

JKB 000028

## "SUPPLY AND EQUIPMENT PACKAGE"

### THE FOLLOWING SUPPLIES AND EQUIPMENT MUST BE PURCHASED BY EACH FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR TO FRANCHISOR OFFERING ANY OF THE INITIAL FINDER'S FEE BUSINESS

The products listed may be purchased from Franchisor, subject to shipping restrictions, or any other source. Prices currently charged by Franchisor may be changed or modified in the future.

| ITEM | AMOUNT |
|---|---|
| All Purpose Cleaner (Biodegradable for use on walls, formica, etc. | 1 - one gallon container (or equivalent) |
| Glass Cleaner | 1 - one gallon container (or equivalent) |
| Restroom Disinfectant | 1 - one gallon container (or equivalent) |
| Cream Cleanser | 2 - one quart containers (or equivalent) |
| Neutral Floor Cleaner | 1 - one gallon container (or equivalent) |
| Carpet Cleaning Concentrate (Bonnet Method) | 1 gallon |
| Carpet Spot Remover | 1 can (or equivalent) |
| Floor Finish Stripper | 1 gallon |
| High Gloss Floor Finish | 1 gallon |
| Stainless Steel Cleaner | 1 can |
| Dust Mop Treatment | 1 can |
| Small Trash Liners (10-12 gallon capacity) | 1 case |
| Large Trash Liners (40-45 gallon capacity) | 1 case |

| ITEM | AMOUNT |
|---|---|
| Mop Bucket (26 quart minimum with wet floor caution inlayed) | 2 |
| Mop Wringer; Down Press | 2 |
| Wet Mop Handle | 2 |
| Wet Mop Head (24 oz.) | 4 |
| Dust Mop Head (24 inch) | 1 |
| Dust Mop Frame (24 inch) | 1 |
| Swivel Dust Mop Handle | 1 |
| Metal-Tipped Handle for Doodle Bug | 1 |
| Doodle Bug Holder and Pads (3) | 1 |
| Plastic Angler Broom | 1 |
| Corner Brush | 1 |
| Toy Broom | 1 |
| Janitor Dust Pan | 1 |

JANI-KING OF BOSTON, INC.
FRANCHISE AGREEMENT: 4/03

INT /*/    INT _hish_
PAGE 28 OF 30

JKB 000029

## "SUPPLY AND EQUIPMENT PACKAGE" – Continued

| ITEM | AMOUNT |
|---|---|
| 17" Black Stripping Pad | 5 |
| 17" Red Buffing Pad | 5 |
| 17" Bonnet Pad | 1 |
| Window Squeegee Handle | 1 |
| 14" Window Stripwasher with Sleeve | 1 |
| 12" Squeegee Channel | 1 |
| Commercial Sponge with Scrubber | 1 |
| Commercial Sponge | 1 |
| Roll-around Trash Container (32 gallon) | 1 |
| Brute Container Caddy | 1 |
| Lambswool Duster (Telescoping) | 1 |

| ITEM | AMOUNT |
|---|---|
| Disposal Wipes | 1 package |
| Disposal Gloves | 1 box |
| Putty Knife | 1 |
| Sanitary Bowl Swab | 2 |
| Rubber Door Stop | 1 |
| Wet Floor Caution Sign | 4 |
| One Quart Spray Bottle | 6 |
| Trigger Sprayer | 6 |
| 8 oz. Measuring Cup | 1 |
| Electronic Pager (not Available through Franchisor) | 1 |

Franchisor may adjust the items included in the Supply and Equipment Package as industry standards change.

## "ADDITIONAL ELECTRIC EQUIPMENT"

THE FOLLOWING EQUIPMENT MUST BE PURCHASED BY EACH
FRANCHISEE PURSUANT TO THE FRANCHISE AGREEMENT AND PRIOR
TO FRANCHISOR OFFERING ANY OF THE INITIAL BUSINESS

The products listed may be purchased from Franchisor or any other source.
Prices currently charged by Franchisor may be changed or modified in the future.

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 17" Floor Buffer with 1.5 HP electric motor, triple planetary gearing (includes pad driver) | $553.16 each |
| 1 | Wet/Dry vacuum with 15 gallon tank, including tool package | $380.40 each |

In addition to the above equipment, Franchisee must purchase one of the following equipment packages:

Equipment Package #1

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 12"Upright commercial 7 AMP vacuum * | $178.57 each |
| 1 | Compact Portable Vacuum Cleaner (Canister Type) w/ shoulder strap and cloth bag<br><br>Or | $126.00 each (CASH ONLY) |
| 1 | Backpack Vacuum Cleaner including tool package | $267.16 each |

or Equipment Package #2

| QUANTITY | DESCRIPTION | UNIT PRICE |
|---|---|---|
| 1 | 14"Upright commercial vacuum complete with the following:<br>• 750 watt vacuum motor<br>• 180 watt brush motor<br>• 40 foot cord<br>• paper filter collection system<br>• edging tool<br>• upholstery tool<br>• drapery brush<br>• attachment hose | $314.29 each |