# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

VINCENT DE GIOVANNI,                        )
MARIETTE BARROS, DIAMANTINO      )
FERNANDES, MARIA PINTO, MANUEL   )
FERNANDES, MARIA MONTEIRO,          )
and all others similarly situated,               )
                                                               )
                                                               )
                        Plaintiffs,                      )
                                                               )
v.                                                             )          Docket No. 07-10066 MLW
                                                               )
JANI-KING INTERNATIONAL, INC.,       )
JANI-KING, INC. and                               )
JANI-KING OF BOSTON, INC.,                )
                                                               )
                        Defendants.                   )
_____)

## DEFENDANTS' RESPONSE
## TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, defendants Jani-King International, Inc. ("JKI"),

Jani-King, Inc. ("JK"), and Jani-King of Boston, Inc. ("Jani-King of Boston") (collectively,

"Jani-King") hereby respond to Plaintiffs' Statement of Undisputed Facts in support of Plaintiffs'

Motion for Summary Judgment.  Jani-King incorporates and refers herein to the declarations of

Dawn Dockery ( "Second Dockery Decl. [Dkt. 164]"), Michael Seid ("Second Seid Decl. [Dkt.

166]," and Don Burleson ("Second Burleson Decl." [Dkt. 165]).  Jani-King also incorporates and

refers herein to the declarations of Michael Seid ("Third Seid Decl.") and Eileen Hunter

("Hunter Decl."), which have been filed in support of Jani-King's combined Motion for

Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.

1

In setting forth these facts, Jani-King does not concede all such facts to be true for purposes of trial, but instead accept all such facts as true for purposes of their Motion for Summary Judgment.  Not every fact included in this statement is material to each alternative legal theory pursuant to which the court may enter summary judgment.  Jani-King provides additional facts to support its position that summary judgment is inappropriate at this stage in a separately-filed Statement of Undisputed Facts.

1.      Jani-King International is the "architect" of the Jani-King franchising system. (Burleson Decl., Exh. L, ¶ 11).

**Admitted.**

2.      Jani-King International wholly owns Jani-King, Inc., and Jani-King, Inc. wholly owns 18 regional offices. (Burleson Decl., Exh. L, ¶¶ 4-5).

**Admitted.**

3.      Jani-King of Boston, Inc. ("Jani-King Boston") is one of those regional offices. (Burleson Decl., Exh. L, ¶ 5).

**Admitted.**

4.      Jani-King Boston serves about 550-570 cleaning accounts. (Goffredo Depo., Exh. M, at 61).

**Admitted only to the extent that Mr. Goffredo's deposition cited testimony establishes that he did not have "an exact number" to which he could testify and that he was testifying to his best recollection on that day.**

5.      Jani-King Boston has about 120 "franchisees." (Goffredo Depo., Exh. M, at 63).

**Admitted only to the extent the Mr. Goffredo's cited deposition testimony establishes that he was estimating the number of franchise owners who are**

**currently servicing accounts and that he did not have an exact number to which he could testify.**

6.    Of these "franchisees," roughly 75 percent are unincorporated individuals who do the "franchisee" work themselves. (Goffredo Depo., Exh. M, at 64-65; Mota Depo., Exh. N, at 36-37).

**Denied.  Mr. Goffredo's cited testimony establishes that he did "not know offhand" how many current franchise owners are incorporated and that he was hazarding a guess when he testified that 25 to 30 percent of current franchise owners are incorporated.  The cited Goffredo deposition testimony does not address how many current franchise owners perform "franchisee work themselves."  The cited deposition testimony by Mr. Mota does not address how many current franchise owners are incorporated and Mr. Mota's testimony regarding how many franchise owners "do the work on their own" is an estimate.  The record establishes that Jani-King does not have any role in franchise owners' decisions regarding whether to hire employees and how to manage them.  (Hunter Decl. Exs. H at 8-10; Ex. I at 11; Ex. J at 13.)  Franchise owners do not consult Jani-King regarding their hiring decisions.  (Hunter Decl. Exs. H at 9; Ex. I at 9; Ex. J at 13.)**

7.    Jani-King Boston implements the franchising system developed by Jani-King International. (2d Dockery Decl., Exh. O, ¶ 10).

**Admitted.**

8.    When Jani-King Boston sells a franchise, it submits all completed paperwork to Jani-King International for review. (2d Dockery Decl., Exh. O, ¶ 13).

**Admitted.**

9.      Jani-King International hires and oversees Jani-King Boston's "Regional

Director," and, more generally, oversees the management and operation of the entire Jani-King

Boston office. It provides policies, procedures, forms, training materials, marketing materials,

reporting requirements, and other guidelines for Jani-King Boston's operations. (Burleson Decl.,

Exh. L, ¶ 12-14, 21, 24-27; 2d Dockery Decl., Exh. O, ¶¶ 11, 17, 19, 24; Goffredo Depo., Exh.

M, at 12-14, 43, 67-68; Dockerty Depo., Exh. P, at 10-11, 19-21; Mota Depo., Exh. N, at 12-13).

**Admitted.**

10.     Jani-King International recently centralized some of the functions previously

performed by regional offices, including telemarketing and customer service.  (Goffredo Depo.,

Exh. M, at 14-15, 87-88; Dockerty Depo., Exh. P, at 18).

**Admitted to the extent this statement regards the centralization of telemarketing**

**and customer service functions and denied to the extent this statement regards any**

**other non-specified functions.**

11.     All of Jani-King International's departments are involved in preparing training

materials for cleaners, including training materials about cleaning techniques.  (Burleson Depo.,

Exh. Q, at 11-12).

**Admitted.**

12.     Jani-King International has an Operations Department. (Burleson Depo., Exh. Q,

at 13). Jani-King International is currently hiring a Director of Operations to head its Operations

Department. (Website Excerpts, Exh. R, at 1-4). As stated in the job opening, "Applicant must

have extensive commercial cleaning experience." (Id. at 2) (emphasis in original).

**Jani-King admits that JKI has an Operations Department, that it has a job posted**

**for a Director of Operations, and that the website cited states that "Applicant must**

**have extensive commercial cleaning experience." Jani-King further notes that the website cited expressly states that the duties of the Director of Operations will be: franchise relations and training; direct supervision of up to 10 reports, customer relations; inspecting accounts; maintain a an acceptable customer retention rate; starting and maintaining customer a counts; gathering and reporting production numbers; mentoring subordinates; and providing sales support. (*See* Churchill Decl. [Dkt. 186] Ex. R.)**

13.    Among other employees and departments, Jani-King International has two "speciality" departments – healthcare and hospitality – both of which develop training materials about proper cleaning procedures. (Burleson Depo., Exh. Q, at 8-9).

**Admitted.**

14.    Jani-King International sends employees with cleaning operations experience to regional offices to provide advice on new cleaning methods, among other subjects. (Burleson Depo., Exh. Q, at 23-25).

**Admitted to the extent that the phrase "cleaning operations experience" refers to experience in Jani-King's operations departments, which entail the duties set forth in the Second Dockery Declaration [Dkt. 165] at ¶¶ 24-28. When JKI sends individuals with operations expertise to corporate regional offices, the tasks performed include "help[ing] the regional operations staff and franchise owners with the startup process for large and/or specialized accounts" and "assist[ing] with specialty account marketing, hospitality accounts, health care accounts, employee training, and general marketing." (Second Burleson Decl. ¶ 28.) It does not involve**

**performing cleaning services.  (Churchill Decl. Ex. M at 83; Second Dockery Decl. [Dkt. 164] ¶ 27.)**

15.    Jani-King uses written franchise agreements. (Franchise Agreement, Exh. S).

**Admitted.**

16.    Jani-King International prepares all franchise agreement forms, so a regional office only completes cleaner information, such as the type of plan. (Goffredo Depo., Exh. M, at 93-94; Dockerty Depo., Exh. P, at 64-65).

**Jani-King admits that JKI prepares all franchise agreement forms used by the regional offices.  Jani-King denies that regional offices complete "cleaner" information.  None of the testimony cited by Plaintiffs uses the term "cleaner" and Jani-King does not refer to prospective franchise owners or franchise owners as "cleaners."  (*See generally* Second Burleson Decl. [Dkt. 165]; Second Dockery Decl. [Dkt. 164].)  Regional offices may assist prospective franchise owners in completing the paperwork necessary, including the franchise agreement.  (Second Dockery Decl. [Dkt. 164] ¶ 13.)**

17.    Cleaners cannot negotiate over the terms of a franchise agreement. (Goffredo Depo., Exh. M, at 92).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the deposition testimony cited does not refer to "cleaners."  Jani-King admits that it does not negotiate the terms of written franchise agreements with prospective franchise owners in Massachusetts.**

18.    Cleaners are required to comply with Jani-King policies and procedures. (Goffredo Depo., Exh. M, at 96).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the deposition testimony cited does not refer to "cleaners."  Jani-King admits that franchise owners are required to comply with Jani-King policies and procedures.**

19.     Jani-King Boston monitors this compliance, and the cleaning performed by cleaners, in at least three ways: inspections, customer service calls, and contact evaluations. (Goffredo Depo., Exh. M, at 86-89, 97; Inspection Report, Exh. T).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the deposition testimony cited does not refer to "cleaners."  Jani-King does not actively monitor a franchise owner's compliance with the policies and procedures, but it does - in an effort to protect its tradename, its goodwill, and its system-wide standards, perform inspections, make customer service calls, and encourage the use of contact evaluation forms by franchise owners.  (*See* Second Burleson Decl. [Dkt. 165] ¶ 12.)**

20.     Jani-King has the right to remove a cleaner from an account. (2d Dockery Decl., Exh. O, ¶ 26).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King admits that it has the right to remove a franchise owner from an account if the franchise owner has failed to perform his or her obligations properly, pursuant to the terms of the Franchise Agreement or Policies and Procedures Manual.  (Second Dockery Decl. [Dkt. 164] ¶ 26.)**

<u>Facts Relevant to Usual Course of Business</u>

21.     Jani-King's franchise agreement states, "Franchisor is in the business of operating and franchising professional cleaning and maintenance businesses…." (Franchise Agreement, Exh. S, at ¶ 1.1). "Franchisor" is defined as "Jani-King of Boston, Inc." (Id. at 2).

**Admitted to the extent the language is written as stated, but denied to the extent that Plaintiffs interpret this to mean that Jani-King performs commercial cleaning services.**

22.     In its cleaning contracts with clients, Jani-King states, "Jani-King is in the business of providing commercial cleaning and maintenance services." (Jani-King Maintenance Agreement, Exh. U, at 1). "Jani-King" is defined as "Jani-King of Boston, Inc." (Id.).

**Admitted to the extent the language is written as stated, but denied to the extent that Plaintiffs interpret this to mean that Jani-King performs commercial cleaning services.**

23.     Jani-King International is involved in the franchising of only one type of business: commercial cleaning. (Burleson Decl., Exh. L, ¶ 4).

**Admitted.**

24.     Jani-King International regularly develops cleaning methods, procedures, marketing materials, and training materials that are summarized in various manuals, DVDs, and brochures. These are used by regional offices, such as Jani-King Boston, to provide initial and ongoing training to franchise owners, and they are used by franchise owners in the course of their work. (Burleson Decl., Exh. L, ¶ 14).

**Admitted.**

25.     Jani-King International's website heralds its role as a leader in the commercial cleaning industry. (Website Excerpts, Exh. R).

**Admitted to the extent the language is written as stated, but denied to the extent that Plaintiffs interpret this to mean that Jani-King performs commercial cleaning services.  The website cited also states that Jani-King is "[r]anked the world's No. 1 Commercial Cleaning Franchise Company year after year."**

26.     Jani-King International owns the intellectual property that is derived from its cleaning methods. (Burleson Decl., Exh. L, ¶ 15). This intellectual property creates goodwill on behalf of Jani-King International, its subsidiaries, and cleaners. (Burleson Decl., Exh. L, ¶ 16).

**Admitted to the extent that Jani-King owns the intellectual property derived from its development and refinement of confidential, proprietary cleaning methods, procedures, marketing materials, and training materials.  (Second Burleson Decl. [Dkt. 165] ¶¶ 14-15.)  Denied to the extent that Jani-King does not use the term "cleaners" to describe franchise owners.**

27.     Jani-King International publishes a monthly newsletter for use by regional offices and cleaners to promote the Jani-King brand and create goodwill for all parts of the Jani-King system. (Burleson Decl., Exh. L, ¶ 19).

**Admitted except to the extent that Jani-King does not use the term "cleaners" to describe franchise owners.**

28.     Jani-King Boston provides training on cleaning methods to franchise owners. (2d Dockery Decl., Exh. O, ¶ 15). For example, franchise owners are taught how to strip and wax floors, shampoo carpets, clean bathrooms, and clean offices. (Goffredo Depo., Exh. M, at 51, 75; Mota Depo., Exh. N, at 34). On occasion, Jani-King International employees provide training, as well. (Mota Depo., Exh. N, at 34-35).

> **Denied except to the extent that Jani-King admits that it provides new and existing franchise owner with training regarding Jani-King's confidential, proprietary cleaning methods and procedures and that this training includes information regarding, among other things, best practices regarding general commercial cleaning techniques.**

29.     Jani-King Boston also provides training on sales. (Goffredo Depo., Exh. M, at 75).

> **Denied except to the extent that Jani-King admits that it provides new and existing franchise owners with training regarding how to solicit and bid commercial cleaning accounts.  (*See* Second Dockery Decl. [Dkt. 164] ¶¶ 15, 16.)**

30.     As part of the training, Jani-King Boston provides cleaners with written materials prepared by Jani-King International, including materials on cleaning methods and techniques. (2d Dockery Decl., Exh. O, ¶ 15).

> **Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King admits that it provides franchise owners with written materials prepared by Jani-King International, including manuals that include some information on cleaning methods and techniques.  (*See* Second Dockery Decl. [Dkt. 164] ¶¶ 15.)**

31.     Jani-King Boston provides advertising, accounting, and periodic operational support to cleaners. As a normal part of Jani-King Boston's day-to-day operations, its employees regularly interact with cleaners to assist with various issues. This assistance may include offering

suggestions regarding how to address a disagreement with a client, how to address unique cleaning issues, and how to solicit and bid accounts. (2d Dockery Decl., Exh. O, ¶ 16).

> **Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King admits that it provides advertising, accounting, and periodic operational support to franchise owners and that, as a normal part of Jani-King Boston's day-to-day operations, Jani-King of Boston employees regularly interact with franchise owners to assist them in the operation of their franchise business, which may include offering suggestions regarding how to address a disagreement with a client, how to address unique cleaning issues, or how to solicit and bid accounts.  (*See* Second Dockery Decl. [Dkt. 164] ¶ 16.)**

32.     Jani-King Boston works to obtain (and, if necessary, modify) cleaning contracts for clients whose offices are then cleaned by cleaners. (2d Dockery Decl., Exh. O, ¶ 22; Goffredo Depo., Exh. M, at 30; Dockerty Depo., Exh. P, at 70).

> **Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King admits that Account Executives in the Jani-King of Boston work with telemarketers "to obtain commercial cleaning contracts that are offered to Jani-King of Boston franchise owners to service."  (*See* Second Dockery Decl. [Dkt. 164] ¶¶ 22.)**

33.     To obtain cleaning contracts, Jani-King Boston salespeople gather information about a possible client account, "price out" the account, bid the account, deliver proposals, follow up on proposals, and attempt to "close" the account. (Goffredo Depo., Exh. M, at 9, 30,

99). They also do "cold calls," visiting buildings in an effort to develop new cleaning accounts. (Goffredo Depo., Exh. M, at 44-45).

**Admitted, but only to the extent that these accounts are obtained in order to be offered to and serviced by the franchise owners.**

34.     Jani-King Boston is a contracting party and "owns" these cleaning contracts; cleaners are not parties to the contracts. (Burleson Depo., Exh. Q, at 32; Franchise Agreement, Exh. S, ¶ 4.19.2; Jani-King Maintenance Agreement , Exh. U).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King otherwise admits that Jani-King of Boston is a contracting party to cleaning contracts.**

35.     It is Jani-King, not any of its cleaning franchisees, that is contractually obligated to provide cleaning services. (Jani-King Maintenance Agreement, Exh. U, at 1).

**Denied.  Under their franchise agreements, franchise owners are contractually obligated to provide cleaning services to accounts for which they have accepted the right to perform services.  (*See* Churchill Decl. Ex. S at § 4.10.)  Franchise owners sign an account acceptance form when they agree to accept Jani-King's offer to service an account.  (*See* Hunter Decl. Ex. N.)**

36.     Jani-King Boston provides cleaning services under these contracts by offering the cleaning assignment to a cleaner. (Goffredo Depo., Exh. M, at 80-83; Mota Depo., Exh. N, at 18, 21--22).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to**

**"cleaners."  Jani-King Boston offers franchise owners the opportunity to accept and service the customer accounts.  The franchise owner may accept or decline the offer. If they accept, their performance is governed by the terms of the Franchise Agreement, maintenance contract, and the Jani-King Policies and Procedures (*See* Churchill Decl. Ex. S at § 4.10.)**

37.     In offering assignments to cleaners, Jani-King Boston relies on various factors, including its legal obligations, its "moral" obligation, and a cleaner's performance record. (Goffredo Depo., Exh. M, at 104-107).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King admits that the deposition testimony cited establishes that Jani-King of Boston considers various factors when deciding which franchise owners it offers the right to service an account.**

38.     If a cleaner is not cleaning an account, Jani-King Boston would step in to find someone else to clean the account. (Goffredo Depo., Exh. M, at 82-83).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  The cited testimony establishes only that, in very rare circumstances, a Jani-King franchise owner's customer may call Jani-King of Boston to state that the customer's space has not been cleaned by the franchise owner and that Mr. Goffredo knew of no circumstances in which "anybody from Jani-King" has "gone and performed cleaning services . . . where a franchisee is unavailable."**

13

39.     Jani-King International provides training to Jani-King Boston salespeople. (Goffredo Depo., Exh. M, at 31).

**Admitted.**

40.     Jani-King International employs a "bidding expert" to provide assistance to regional offices with client account bids that exceed $10,000 per month. (Burleson Decl., Exh. L, ¶¶ 29-30).

**Admitted.**

41.     Jani-King International also provides bidding support in competitive bidding situations. (Goffredo Depo., Exh. M, at 98-99).

**Denied.  It is unclear what "competitive bidding situations" means.  The deposition testimony cited establishes that, on occasion, Jani-King submits commercial cleaning bids to prospective customers soliciting bids from multiple entities.**

42.     Jani-King Boston provides operational support to cleaners through an "operations manager" and "assistant operations managers." Among other duties, operations managers provide cleaners with "start-up help" and work with clients and cleaners on an ongoing basis to provide quality control and "to assure that the client is receiving the promised benefits of the Jani-King franchising system." (2d Dockery Decl., Exh. O, ¶ 24; Goffredo Depo., Exh. M, at 24-25, 80).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King otherwise admits that Jani-King Boston provides operational support to franchise owners through an "operations manager" and "assistant operations managers" and that, among other duties, operations managers provide**

**franchise owners with "start-up help" and work with clients and franchise owners**

**on an ongoing basis to provide quality control and "to assure that the client is**

**receiving the promised benefits of the Jani-King franchising system."**

43.     Operations managers are involved in the process of obtaining new accounts, to ensure the account can be serviced properly: "Before a salesman makes a final decision in signing up a contract, operations needs to have input to make sure the labor is there, the franchise owner will be able to provide good quality service to its customers." (Mota Depo., Exh. N, at17).

**Admitted to the extent that the deposition testimony cited establishes that**

**"obtaining new accounts" refers to the process of deciding whether a franchise**

**owner is available to accept and service the account according to the client's needs.**

44.     Operations managers may provide ongoing advice to cleaners about cleaning tasks. (Mota Depo., Exh. N, at 14, 32-33). Indeed, "[f]ranchise owners are constantly calling asking for advice." (Mota Depo., Exh. N, at 18).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective**

**franchise owners or franchise owners and the testimony cited does not refer to**

**"cleaners."  Jani-King admits that the deposition testimony cited establishes that**

**operations managers may provide ongoing advice to franchise owners about**

**cleaning tasks and that franchise owners call the Jani-King of Boston office for**

**advice and to receive offers of additional business.**

45.     Operations managers also work with clients and cleaners to resolve client complaints. (Goffredo Depo., Exh. M, at 62).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective**

**franchise owners or franchise owners and the testimony cited does not refer to**

**"cleaners."  Jani-King admits that the deposition testimony cited establishes that operations managers call franchise owners when a customer lodges a complaint with the Jani-King of Boston office and that the operations manager "set[s] up a meeting with the franchise owner, our operations manager, and the client," a process that is documented in Jani-King's records.**

46.     Operations managers oversee the transition of cleaning accounts when an account is transferred by Jani-King from one cleaner to another. (2d Dockery Decl., Exh. O, ¶ 26).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Admitted that operations managers are involved in offering an account to a different franchise owner when the current franchise owner ceases cleaning that account for one reason or another.**

47.     Operations managers spend most of their time "in the field," inspecting accounts or meeting with cleaners and clients. (Goffredo Depo., Exh. M, at 25-26; Mota Depo., Exh. N, at 16).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Mr. Goffredo's cited testimony establishes that operations managers spend two to three hours a day in the office and that operations managers spend their time in the field inspecting accounts, dealing with issues related to customer accounts, and meeting with customers and franchise owners.  Mr. Mota's cited testimony establishes that he spends forty percent of his time in the office.**

48.     On occasion, operations managers have arranged for a "subcontractor" to provide cleaning services to an account. This has happened where, for example, no franchise owner was willing to accommodate the client's schedule, the client mandated that its account not be transferred to a franchise owner after a subcontractor the client was satisfied with had started providing services, the account required specialized cleaning skills for a large-scale one-time clean, the account was located in an area where no franchise owner was willing to travel, or the account required more cleaning staff than any available franchise owner could provide. (2d Dockery Decl., Exh. O, ¶ 27).

**Admitted.**

49.     Operations managers use a manual developed by Jani-King International and attend conferences for training and development run by Jani-King International, including training on cleaning techniques. (2d Dockery Decl., Exh. O, ¶ 28; Goffredo Depo., Exh. M, at 27; Mota Depo., Exh. N, at 12-15). They may also consult with advisors at Jani-King International. (Mota Depo., Exh. N, at 13-14).

**Admitted.**

50.     Prior to coming to work for Jani-King Boston, its operations manager, Joe Mota, had worked for over 18 years as a cleaning supervisor, and he had "a lot of knowledge" about the cleaning industry. (Goffredo Depo., Exh. M, at 28-29; Mota Depo., Exh. N, at 7).

**Admitted.**

51.     Mota hired an assistant with experience as a cleaning supervisor at a hospital; that background was important to Mota, "[b]ecause Jani-King does a lot of health care facilities, and he had the experience in order to properly train and advise the cleaner owners." (Mota Depo., Exh. N, at 11-23).

**Denied.  The quotation from the cited deposition testimony is incorrect.  Mr. Mota did not use the phrase "cleaner owners."  He used the phrase "franchisee owners." The cited deposition testimony includes twelve pages of questions and answers, but appears to only reference testimony on pages 11-13.  Jani-King admits that the cited testimony establishes that Mr. Mota hired an individual with eight years of experience as an environmental supervisor at Mount Auburn Hospital and six years of experience as a housekeeping supervisor.  The testimony also establishes that Mr. Mota found this individual's experience "important" when making the decision to hire him because "he had the experience in order to properly train and advise the franchise owners."**

52.     Clients may contact an operations manager or one of Jani-King's customer service representatives to discuss any issues that arise. (2d Dockery Decl., Exh. O, ¶ 25).

**Admitted.**

53.     Jani-King's customer service representatives work out of Jani-King International's offices in Texas. (Goffredo Depo., Exh. M, at 14-15, 87-88; Dockerty Depo., Exh. P, at 18). Those representatives contact clients for quality control assurance. (Burleson Depo., Exh. Q, at 30-31).

**Admitted to the extent this relates to Jani-King's current practices.**

54.     Jani-King Boston's administrative personnel maintain customer account information and are responsible for accounting functions, including billing and collecting money from clients. (Burleson Decl., Exh. L, ¶ 31; 2d Dockery Decl., Exh. O, ¶ 30; Goffredo Depo., Exh. M, at 31-32). The billing process involves both Jani-King Boston and Jani-King

International. (Burleson Depo., Exh. Q, at 27-29). Clients send payments directly to Jani-King

Boston. (Goffredo Depo., Exh. M, at 49).

**Admitted.**

55.    Jani-King International generates monthly "cleaner reports" for all of the cleaners

in regional offices. (Burleson Decl., Exh. L, ¶ 31).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective**

**franchise owners or franchise owners and the testimony cited does not refer to**

**"cleaners."  The testimony cited expressly states that JKI "generates monthly**

***'franchisee reports'* for franchise owners in corporate regional offices" (emphasis**

**added).**

56.    Overall, Jani-King Boston has 10 employees: three operations personnel (who, as

discussed above, spend most of their time in the field inspecting cleaning accounts or meeting

with cleaners and cleaning clients), three sales staff (who, as discussed above, seek to develop

new cleaning accounts), three administrative staff (who, as discussed above, field calls from

cleaning clients and handle client accounting and billing), and the regional director. (Goffredo

Depo., Exh. M, at 14, 16-17).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective**

**franchise owners or franchise owners and the testimony cited does not refer to**

**"cleaners."  Admitted to the extent that the deposition testimony cited refers to the**

**personnel in place at the time of Mr. Goffredo's deposition.**

57.    Nobody in the Jani-King Boston office is responsible for recruiting cleaners.

(Goffredo Depo., Exh. M, at 45).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  The cited testimony establishes that franchise owners are not "recruited" by Jani-King of Boston employees, and that new franchise owners are "obtained" through Jani-King's website or through referrals.**

58.     Jani-King Boston employees are entitled to incentive compensation that is tied to factors such as the number of cleaning contracts that cancel or the number of new cleaning contracts that are obtained. (Goffredo Depo., Exh. M, at 33-37).

**Denied.  The deposition testimony cited establishes that certain Jani-King of Boston employees are entitled to receive a commission if they keep the rate of cancellation for customer accounts below one percent, and that the commission is reduced if the cancellation rate is higher.  The cited deposition testimony further establishes that certain Jani-King of Boston employees are entitled to receive commissions for selling extra work and new accounts that will be offered to franchise owners.**

59.     Jani-King International has developed a system-wide database that is used to manage information about client accounts, including sales, inspections, complaints, accounting, billing, etc. (Goffredo Depo., Exh. M, at 40-42, 62; Dockery Depo., Exh. P, at 38; Mota Depo., Exh. N, at 26-27). Jani-King Boston relies on Jani-King International for advice and assistance with this database. (Dockerty Depo., Exh. P, at 40-41, 46-47).

**Admitted.**

60.     Jani-King Boston obtains revenue through contract billing (amounts paid by clients for regular cleaning performed by cleaners), extra work (amounts paid by clients for extra cleaning work), and leasing of cleaning equipment. (Goffredo Depo., Exh. M, at 48-50, 59). It

also obtains revenue by paying for cleaning supplies for cleaners, and then passing those costs on to the cleaner along with a 10 percent fee. (Dockerty Depo., Exh. P, at 53-55).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King of Boston does not obtain revenue through contract billings; it obtains revenues from fees paid by its franchise owners which are a contractually agreed-to percentage of the gross revenues realized by the franchise owners from servicing commercial cleaning accounts. The deposition testimony cited establishes that Jani-King of Boston receives the revenue due to franchise owners from the customer accounts that the franchise owners are servicing, and passes that revenue through to franchise owners after deducting the fees franchise owners owe to Jani-King.  The deposition testimony further establishes that Jani-King of Boston receives a certain percentage of revenue of equipment leases franchise owners enter into.  Jani-King admits that it receives a ten percent payment for handling supply invoices for franchise owners who choose to buy from a supplier who bills directly to Jani-King.  (*See* Churchill Decl. Ex. P at 54-55.)**

61.     New cleaners typically obtain required cleaning equipment by leasing it from Jani-King. (Dockerty Depo., Exh. P, at 67-68).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King otherwise admits that new franchise owners typically chose to obtain required cleaning equipment by leasing it from a Jani-King company.**

62.     The PowerPoint presentation given by Jani-King to potential cleaners states, "Franchising is where the parent company, the franchisor, allows other people, the franchise owners, to run clones of its business in return for initial and ongoing fees." (Goffredo Depo., Exh. M, at 69).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King otherwise admits that the PowerPoint presentation referenced contains this statement.  The slide referenced in the deposition testimony cited states further that "[t]he franchisor provides training, advice, and continuing support" and "[a] well run franchise combines all the advantages of big business—established trade name, reputation, reliability, resources and experience—with the drive and enthusiasm of the individual entrepreneur."  (Hunter Decl. Ex. O.)**

63.     If a cleaner sought to sign up a cleaning account without paying fees to Jani-King, that would be a violation of the franchise agreement. (Goffredo Depo., Exh. M, at 76-77). More generally, a cleaner cannot form another cleaning business at the same time he's performing cleaning services for Jani-King. (Goffredo Depo., Exh. M, at 104).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King admits that franchise owners must pay certain fees to Jani-King on all commercial cleaning business they service, "regardless of the entity or business name used."  (*See* Churchill Decl. Ex. S at §§ 4.5.1, 4.5.2.)**

64.     When Jani-King Boston learned that a cleaner was doing other cleaning work, the matter was referred to Jani-King International, and the cleaner did not continue perform services for Jani-King. (Goffredo Depo., Exh. M, at 109-110).

**Denied.  Jani-King does not use the term "cleaners" to describe its prospective franchise owners or franchise owners and the testimony cited does not refer to "cleaners."  Jani-King admits that the deposition testimony cited establishes that Jani-King of Boston referred a matter involving a franchise owner forming a competing commercial cleaning company to JKI and that that particular franchise owner stopped operating his Jani-King franchise.**

Other Facts

65.     While a handful of Jani-King franchisees might hire a few people to help them clean, that just makes a bad situation even worse, because the cleaning helpers may also be treated like contractors, without any benefits of employment. (Bastos Depo. , Exh. V, at 21).

**Denied.  The deposition testimony cited establishes that Jani-King of Boston franchise owner Joao Bastos pays his franchise's employees cash and that "at the end of the year," he sends his employees a Form 1099.**

66.     Michael Seid is not an expert in issues of misclassification. (Seid Depo., Exh. W, at 9, 79-82). As he testified, "I'm totally able to answer your questions on what I believe is an employer-employee on a business point of view, but not a legal point of view." (Id. at 82). Indeed, he did not even know what the third prong of section 148B was. (Id. at 82-84).

**Denied.  In the deposition testimony cited, Mr. Seid stated that he "certainly would" consider himself an expert on "the distinction between a franchisee and an employee."  (Churchill Decl. Ex. W at 80.)  When asked if he "held himself out as an**

**expert in the application of [the Massachusetts employee classification test]," Mr. Seid replied, " . . .I do, but not as a lawyer, not as a legal expert.  So if you asked the question leaving out the word 'lawyer,' I would say, yes, I'm toally able to answer your questions on what I believe is an employer-employee on a business pint of view, but not a legal point of view."  Mr. Seid has never identified himself as a legal expert.  (*See generally* First Seid Decl. [Dkt. 112]; Second Sied Decl. [Dkt. 166]; and Third Seid Decl. (filed herewith).)**

67.     He could not identify any other franchisor, outside of the cleaning industry, where all of the contracts were between the franchisor and the customer. (Seid Depo., Exh. W, at 31-34).

**Denied.  The deposition testimony cited establishes that Mr. Seid could not call to mind any examples in response to the question of whether he knew of franchising models where "every contract with the customer is between the franchisor and the customer."  (Churchill Decl. Ex. W at 31.)  Throughout his deposition, he provided examples of where a franchisor holds the contract with certain customers.  For instance, Mr. Seid provided an example of a home healthcare franchising system where "in order to get those licenses all of the customers have to be customers of the franchisor, and all the payroll in that situation has to be from the franchisor. . . ."  (Churchill Decl. Ex. W at 31-32.)**

68.     He's only fairly familiar with the cleaning industry. (Seid Depo., Exh. W, at 64).

**Denied.  See response to para. 67, *supra*.  In the deposition testimony cited, Mr. Seid stated that that his practice is "looking at the business as using franchising as a method of distribution" but that he does not look at "an industry" *per se*.**

69.    In a "vertically intergrated" commercial cleaning company, the chief executive officer would be in the same business as the cleaners. (Seid Depo., Exh. W, at 64-67).

**Denied.  In the deposition testimony cited, Mr. Seid stated that "in any company where there's a vertically-integrated company it's generally employees or independent contractors for the company doing the services."  Mr. Seid agreed that in a hypothetical "with a thousand variations" a simple model of a company employing people to do cleaning would "be a company" and that it was theoretically possible that all the employees of the company would be involved in delivering the product or service to the customer.**

70.    Franchising is "a method of distributing the product or service to the end user," where the franchisor's revenue is limited to fees but where the franchisor does not have the "burdens of an employer." (Seid Depo., Exh. W, at 68-69).

**Jani-King admits that the testimony cited reflects statements made in Mr. Seid's declaration.**

71.    He's unaware of any relevant distinctions between Jani-King and Coverall that would require a different result from the holding of Awuah v. Coverall North America, Inc., 707 F. Supp. 2d 80 (D. Mass. 2010). (Seid Depo., Exh. W, at 82-85).

**Jani-King admits that Mr. Seid had not studied the decision referenced at the time of his deposition.**

August 12, 2011

JANI-KING INTERNATIONAL, INC., JANI-KING, INC. and JANI-KING OF BOSTON, INC.,

By their attorneys,

s/ Kerry L. Bundy
Kerry L. Bundy (Pro hac vice)
Aaron D. Van Oort (Pro hac vice)
Eileen M. Hunter (Pro hac vice)
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000
(612) 766-1600 (facsimile)

and

Arthur L. Pressman (BBO #643094)
Gregg A. Rubenstein (BBO #639680)
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts  02110
(617) 345-1000
(617) 345-1300 (facsimile)

## Certificate of Service

I hereby certify that the foregoing filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be served by regular U.S. mail upon any nonregistered participants on this

12th day of August, 2011.

s/ *Eileen M. Hunter*
Eileen M. Hunter

fb.us.7155489.03